```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF TEXAS

 3                    FORT WORTH DIVISION

 4  UNITED STATES OF AMERICA,     ) CASE NO. 4:21-MJ-017-BJ
                                  )
 5            Government,         )
                                  ) FORT WORTH, TEXAS
 6  VERSUS                        )
                                  ) JANUARY 14, 2021
 7  LARRY RENDALL BROCK (01),     )
                                  )
 8            Defendant.          ) 1:29 P.M.

 9

10                        VOLUME 1 OF 1
           TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
11              BEFORE THE HONORABLE JEFFREY CURETON
                UNITED STATES MAGISTRATE COURT JUDGE
12

13  A P P E A R A N C E S:

14  FOR THE GOVERNMENT:     MR. JAY WEIMER
                            UNITED STATES DEPARTMENT OF JUSTICE
15                          NORTHERN DISTRICT OF TEXAS
                            801 Cherry Street, Suite 1700
16                          Fort Worth, Texas  76102-6882
                            Telephone:  817.252.5200
17
    FOR THE DEFENDANT:      MR. BROOK ANTONIO
18                          ASSISTANT FEDERAL PUBLIC DEFENDER
                            NORTHERN DISTRICT OF TEXAS
19                          819 Taylor Street, Room 9A10
                            Fort Worth, Texas  76102
20                          Telephone:  817.978.2753

21  COURT REPORTER:         MS. DEBRA G. SAENZ, CSR, RMR, CRR
                            501 W. 10th Street, Room 424
22                          Fort Worth, Texas  76102
                            Telephone:  817.850.6661
23                          E-Mail: debbie.saenz@yahoo.com

24  Proceedings reported by mechanical stenography, transcript

25  produced by computer.
```

1                          I N D E X

2    PROCEEDING                                    PAGE

3    Proceedings....................................  03
     TESTIMONY OF JOHN MOORE
4      Direct Examination by Mr. Weimer..............  05
       Cross-Examination by Mr. Antonio.............  39
5      Redirect Examination by Mr. Weimer...........  52
     Government Rests...............................  52-53
6    Defendant's Proffer of Evidence................  53
     Defendant Rests................................  54-55
7    Argument by Mr. Weimer.........................  55
     Argument by Mr. Antonio........................  60
8    Argument by Mr. Weimer.........................  62
     Court's Findings...............................  64
9    Reporter's Certificate.........................  76

10

11                 GOVERNMENT'S EXHIBIT INDEX

12   NO.   DESCRIPTION                           ADMITTED

13   1     Photo                                    11
     2     Photo                                    11
14   3     Photo                                    11
     4     Photo                                    11
15   5     Photo                                    11
     6     Facebook Screenshot                      29
16   7     Facebook Screenshot                      29
     8     Letter from CAE Simuflite                28
17   9     Photo                                    11
     10    Transcript of Facebook Posts             31

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

January 14, 2021 – 1:29 p.m.

*(Masks and videoconference utilized)*

*COURT SECURITY OFFICER:*  All rise.

Hear ye, hear ye, hear ye, the United States District Court in and for the Northern District of Texas, Fort Worth Division, is now in session, the Honorable Jeffrey L. Cureton presiding.

Let us pray.  God bless these United States and God bless this Honorable Court.  Amen.

*THE COURT:*  Thank you.  Please be seated.

All right.  The Court calls for preliminary and detention hearing Cause Number 4:21-MJ-17.  It is United States versus Larry Brock.

Mr. Jay Weimer is present for the government.

Is the government ready to proceed?

*MR. WEIMER:*  Yes, Your Honor, we are.

*THE COURT:*  And Mr. Brook Antonio, what says the defense?

*MR. ANTONIO:*  We're ready to proceed, Your Honor.

*THE COURT:*  Very well.

So, at this time I'm going to enter the Rule 5(f) oral order under the new rule that requires the government to comply with its discovery obligations and disclosure obligations under Brady versus Maryland and its progeny, and I

1    note the failure to do so could result in the imposition of

2    sanctions up to and including dismissal of charges.

3            We did not say that at the initial appearance, so I

4    do it at this hearing, for the record.  A written order will

5    also follow.

6            All right.  You may call your first witness,

7    Mr. Weimer.

8            MR. WEIMER:  Your Honor, the government calls FBI

9    Agent John Moore.

10           THE COURT:  Sir, if you would please come forward,

11   I'm going to ask you to raise your right hand and be sworn by

12   my clerk.

13           That's good right there.

14           (Witness John Moore sworn)

15           THE COURT:  All right.  You may take the witness

16   stand, please.

17           MR. WEIMER:  Judge, do you prefer that we conduct

18   the questioning from the table as we usually do, or because

19   we're in a new setting, use the podium?

20           THE COURT:  You may just do it from the table.  That

21   will be fine today.  Thank you.

22           MR. WEIMER:  Thank you.

23           THE COURT:  And you may be seated, sir.

24           You may proceed, counsel.

25           MR. WEIMER:  Thank you, Your Honor.

| | |
|---|---|
| 1 | **JOHN MOORE,** |
| 2 | having been first duly sworn, testified as follows: |
| 3 | **DIRECT EXAMINATION** |
| 4 | BY MR. WEIMER: |
| 5 | *Q.*     Sir, could you please state your name for the record. |
| 6 | *A.*     John Moore. |
| 7 | *Q.*     And where do you work? |
| 8 | *A.*     The Federal Bureau of Investigation. |
| 9 | *Q.*     How long have you worked there? |
| 10 | *A.*     Just over five years. |
| 11 | *Q.*     And you're a special agent? |
| 12 | *A.*     Yes, sir. |
| 13 | *Q.*     Are you assigned to a particular section or squad? |
| 14 | *A.*     Yes, sir, domestic terrorism in Dallas. |
| 15 | *Q.*     Okay.  And have you been involved in the |
| 16 | investigation of the defendant, Mr. Brock? |
| 17 | *A.*     Yes. |
| 18 | *Q.*     And to be clear, that investigation is being -- or |
| 19 | that prosecution is being handled by the Washington, D.C. |
| 20 | office; is that correct? |
| 21 | *A.*     Yes. |
| 22 | *Q.*     But because he lives here in Texas, you and others in |
| 23 | your agency have been called upon to assist? |
| 24 | *A.*     Yes. |
| 25 | *Q.*     Okay.  Let's -- let's jump right in and talk about |

1   the events of January 6th, 2021.

2           What was taking place that day of significance?

3   A.      The U.S. Senate was verifying the Electoral College.

4   Q.      Okay.  And that was taking place in Washington, D.C.

5   at the Capitol?

6   A.      Yes.

7   Q.      Were there any restrictions at that point in time

8   about who could enter the Capitol building or the areas around

9   the Capitol?

10  A.      Yes.  There were -- there were various barricades and

11  police checkpoints for security.

12  Q.      And on that day, people -- members of the public were

13  not allowed to enter the Capitol; is that correct?

14  A.      Yes.

15  Q.      And in fact, they weren't allowed to enter the areas

16  immediately surrounding the Capitol, which was blocked off by

17  barricades; is that right?

18  A.      Yes.

19  Q.      Okay.  But despite those restrictions, what happened?

20  A.      A group of individuals circumvented the barricades

21  and the police checkpoints and made forced entry into the

22  Capitol.

23  Q.      Okay.  Were any officers injured during that forced

24  entry?

25  A.      Yes.

```
1    Q.       What happened, to your knowledge?

2    A.       I understand that one officer was killed and several

3    others were injured.

4    Q.       After the rioters forced entry into the Capitol, are

5    you aware of what happened as far as the Senate and House

6    proceedings on counting the Electoral College votes?

7    A.       I'm -- I believe they were interrupted because the

8    Senate and the House had to take security measures and

9    evacuate the Senate and House floors, and the proceedings were

10   postponed by a number of hours.

11   Q.       Okay.  And in fact, on that day, at that time Vice

12   President Mike Pence was actually in the Capitol on the Senate

13   floor presiding over the Senate; is that right?

14   A.       That's right.

15   Q.       Okay.  Was he evacuated as well with the

16   other -- with the senators?

17   A.       Yes.

18   Q.       What happened after that evacuation as far as the

19   rioters were concerned?  Where were they going in the Capitol

20   building?

21   A.       From what I've seen, they went into the floor of the

22   Senate, I believe the floor of the House as well.  They went

23   into various offices in the Capitol building.  They went into

24   the Speaker of the House's office and other hallways and

25   offices unknown to me.
```

1  Q.       Okay.  Are you aware that during these riots, while

2  the protesters and rioters were inside the Capitol building,

3  people were chanting, hang Mike Pence?

4  A.       Yes, I am aware.

5           MR. ANTONIO:  Objection, leading.

6           MR. WEIMER:  Just drawing attention to certain

7  specific facts.

8           THE COURT:  That's all right.  Continue.

9  Q   (BY MR. WEIMER)  Now, are you also aware that, right

10 outside the Capitol during this same time, rioters set up a

11 gallows with a noose?

12 A.       Yes.

13 Q.       Now, you said that after a period of several hours,

14 the rioters were cleared.  At that point in time, did

15 investigators search through the Capitol and find anything of

16 significance, any weapons or anything like that?

17 A.       I believe they found pipe bombs or what appeared to

18 be pipe bombs.

19 Q.       And did they find, also, some Molotov cocktails?

20 A.       Yes.

21 Q.       Can you describe what a Molotov cocktail is?

22 A.       It's an incendiary device.  It's a bottle filled with

23 gasoline meant to start a fire.

24 Q.       Okay.  So, because of all of that, the congressional

25 hearings to certify the presidential election were delayed by

1    several hours and the congressmen and Vice President Mike

2    Pence weren't allowed to resume the proceedings for several

3    hours?

4    A.      That's correct.

5    Q.      And again, just -- I think you mentioned before, but

6    just to be clear, none of these people involved in the riot,

7    none of these members of the public, were allowed inside the

8    Capitol on that day; is that right?

9    A.      That's correct.

10   Q.      Legally allowed inside the Capitol on that day.

11           All right.  Now, we're here about one person involved

12   in that, Mr. Brock.  How did you first become aware that he

13   was a subject of interest?

14   A.      I was on duty this weekend for our office, and at, I

15   believe, 5:58 a.m., as I was getting to work, my superior sent

16   me an article from the New Yorker magazine that detailed

17   Mr. Brock's potential involvement in the riots, and I took

18   that article into what we call intake, but basically inputted

19   that information into our system, computer system.

20   Q.      Why was that relayed to you, in particular, because

21   of where he lives?

22   A.      Yes, because he lives in North Texas.

23   Q.      Okay.  And the city of Grapevine in particular; is

24   that correct?

25   A.      Yes, in Grapevine.

1   Q.      Now, you said there was an article.  Was he

2   identified by name in that article?

3   A.      Yes.

4   Q.      And was there a photograph of him on the Capitol

5   floor or on the Senate floor?

6   A.      Yes.

7   Q.      According to that article, did he actually give an

8   interview to a reporter about his presence at the Capitol that

9   day?

10  A.      Yes.

11  Q.      And what did he tell the reporter?

12  A.      He said he thought he was allowed in.  He had come to

13  Washington, D.C. for the 'Stop the Steal' rally and thought

14  that it was okay to enter the Congress or the Senate floor.

15  Q.      Just to back up a bit, you described earlier, but the

16  rioters would have had to break through a number of barriers

17  and force open locked doors, break through windows in order to

18  get in; is that correct?

19  A.      That's correct.

20  Q.      Okay.  Now, what did you do after reading this

21  article?  Did you do anything to confirm Mr. Brock's identity,

22  and that he was the same person by that name that lived in the

23  state of Texas?

24  A.      I did.  I pulled his driver's license photo from the

25  Texas driver's license system and compared it to several

1    images that were available online through open source

2    investigation and confirmed that he did bear resemblance to

3    those pictures.

4    Q.      Okay.  And he appeared to be the same person

5    photographed and interviewed in that article?

6    A.      Yes.

7    Q.      And then, in the course of your investigation, did

8    you, working with other agents and the Capitol police and

9    other investigators, obtain some pictures from the Capitol

10   that depict Mr. Brock at the Capitol that day, on the 6th?

11   A.      Yes, I did.

12   Q.      Okay.  And have you reviewed -- if I could direct

13   your attention to the evidence packet in front of you,

14   Government's Exhibits 1 through 5 and Government's Exhibit 9,

15   are those all photographs from the Capitol that you obtained

16   in the course of your investigation, 1 through 5 and 9?

17   A.      Yes.

18   Q.      Okay.

19          MR. WEIMER:  Your Honor, I would move to admit at

20   this point Government's Exhibits 1 through 5 and 9.

21          THE COURT:  All right.  Those are admitted.

22          MR. WEIMER:  And, Your Honor, did you receive a copy

23   of the evidence packet?

24          THE COURT:  I did.

25          MR. WEIMER:  Thank you.

1    *Q    (BY MR. WEIMER)*  All right.  If we can look at those

2    quickly, if you can direct your attention to Government's

3    Exhibit 1 and just describe for the record what this is a

4    photo of.

5    *A.*      This is a photo of a group of people that had made

6    entry into the U.S. Capitol.  In the lower right, I can see

7    Mr. Brock with his helmet.

8    *Q.*      And just since we're looking at the photos for the

9    first time, can you describe -- he's wearing a helmet.  What

10   color is the helmet?

11   *A.*      The helmet is green.

12   *Q.*      Okay.

13   *A.*      He's wearing a jacket that's largely black, but it's

14   got some black and gray and white camouflage pattern on it,

15   and he's got flex cuffs either hanging from the jacket or in

16   his right hand.

17   *Q.*      Okay.  And there is a large crowd of people in this,

18   pushing their way through a door; is that right?

19   *A.*      That's right.

20   *Q.*      And off to the left-hand side, upper kind of left

21   corner, do you see a uniformed police officer there?

22   *A.*      I do.

23   *Q.*      Now, let me ask you this.  Based on your review of

24   the New Yorker article with Mr. Brock, did he provide an

25   explanation for having the flex handcuffs while he was at the

1  Capitol to the reporter in the New Yorker article?

2  A.      Yes.  He said he found them on the floor and he

3  picked them up in order to secure them, so that he could give

4  them to a police officer when he found one.

5  Q.      Okay.  And in this photograph, on -- looks like on

6  the right side of his waist, you can see the flex cuffs; is

7  that right?

8  A.      That's right.

9  Q.      And there's a uniformed police officer just a few

10  feet away, correct?

11  A.      That's correct.

12  Q.      Okay.  Let's take a look at the next photograph.

13  This is Government's Exhibit 2.  And what does this depict?

14  A.      That is -- Mr. Brock appears to be exiting Speaker of

15  the House Nancy Pelosi's office.

16  Q.      Okay.  And how can you make out that it's her office?

17  A.      There is a sign, a placard over the door, that says

18  Speaker of the House Nancy Pelosi.

19  Q.      And he's pretty easy to identify in this photo

20  because there's a red circle, but he's, I take it, the

21  individual wearing, again, the green helmet and black

22  jacket --

23  A.      Yes, sir.

24  Q.      -- with the red circle around him.

25          Again, referring back to that New Yorker article, I

1   believe in that article, or perhaps in another interview that

2   was publicized, he was asked about whether or not he went into

3   Speaker Pelosi's office and denied doing so; is that right?

4   A.      That's right.

5   Q.      Okay.  And here in this picture, we can see him

6   coming out of that office?

7   A.      That's right.

8   Q.      Let's turn to Government's Exhibit 3, and can you

9   please tell the Court what this exhibit shows, what this

10  photograph shows?

11  A.      This is a picture of what appears to be an office

12  with a set of doors that are closed.  Mr. Brock's in the lower

13  left-hand corner.  He's wearing his helmet, body armor.  He

14  has the white flex cuffs in his left hand, and he has

15  something -- it appears as though he has something in his

16  right hand, and it appears as though he's looking down at his

17  right hand.

18  Q.      Okay.  If we flip ahead to the next photograph,

19  Government's Exhibit 4, is this the same location?  Is this a

20  picture of the same location but further on in time?

21  A.      Yes.  It's the same office.  It looks like he's

22  walked from where he was in the last picture to the set of

23  doors and he's trying to open them.

24  Q.      Okay.  And in fact, if you flip -- you can probably

25  see it better, but in Government's Exhibit 3, the previous

1   photograph, if we focus on those Senate doors, we can see they

2   say United States Senate on them, correct?

3   A.      That's correct.

4   Q.      And then there is a pair of push handles or push

5   plates on the door, and on the right-side door, below the push

6   plate, there appears to be a deadbolt lock, the exterior of a

7   deadbolt lock; is that right?

8   A.      That's right.

9   Q.      Okay.  So, now, if we flip ahead to Government's

10  Exhibit 4, because those things are a little obscured by

11  Mr. Brock's body, but what does he appear to be doing?

12  A.      It appears as though he's using keys and attempting

13  to function the lock of the right door.

14  Q.      Okay.  And again, he's wearing the same attire that

15  you've described previously?

16  A.      That's right.

17  Q.      Okay.  All right.  Now, let's move ahead to the next

18  photograph, Government's Exhibit 5.  And where is -- what is

19  this photograph showing?

20  A.      That's Mr. Brock on the Senate floor wearing the

21  green military-style helmet, the military-style body armor,

22  the black, gray, and white camouflage pattern jacket, and

23  holding the flex cuffs.

24  Q.      Okay.

25  A.      I would also point the patch -- there's three patches

1  on his body armor.  It looks like a -- well, actually, I won't

2  get into that in this picture.  It's three patches on his body

3  armor that bear a resemblance to other patches that we see

4  later on.

5  Q.      Great.  And this is on the Senate floor, this

6  photograph?

7  A.      Yes.

8  Q.      So some -- whether it was through the door that we

9  saw in the previous picture or some other way, he was actually

10  able to access the Senate floor?

11  A.      That's correct.

12  Q.      All right.  Now, let's skip ahead, if we would, to

13  Government's Exhibit 9.  And what is this showing?

14  A.      This shows Mr. Brock coming up a stairway somewhere

15  in the Capitol building.  Again, this was provided by the

16  Capitol police.

17         In this picture, Mr. Brock is wearing the green

18  military-style helmet, the green military-style body armor

19  with three patches on it, black, white, and gray camouflage

20  jacket, and holding white zip ties.  They appear to be held in

21  his left hand.

22  Q.      Okay.  All right.  And based on those photographs,

23  were you able to conclude that Mr. Brock was the same person

24  that resided here in Texas?

25  A.      Yes.

1   Q.      Okay.  Did you at some point, after concluding that

2   on January 9th, obtain a search warrant for his residence?

3   A.      Yes.

4   Q.      Now, when you identified where his residence was, did

5   you do anything to try to determine whether he was home or had

6   left?

7   A.      We did.  I sent some agents to the office, the

8   leasing office of that apartment duplex, and they verified

9   that he did indeed reside there.  They had pulled some hasty

10  initial surveillance, but then ultimately accessed the

11  security camera footage, which is backed up by a badging

12  system for people going in and out of the parking garage, and

13  they determined that he had left or someone with his vehicle

14  and his access code had left the parking garage at 1:21 p.m.

15  on Saturday, the 9th.

16  Q.      Okay.  And did you conduct surveillance and also

17  later go back to monitor the apartment complex's surveillance

18  footage to determine whether he ever came back to that

19  apartment?

20  A.      We conducted surveillance -- we had agents conducting

21  surveillance at that area for a good chunk of that afternoon,

22  and then when we realized that we could tell whether or not he

23  badged in, we didn't want to draw any more attention to the

24  situation than we already had.  So, we did not have physical

25  surveillance on that apartment the entire time, but we had the

1    ability to access the -- that code, and then I personally was

2    there on the morning of Sunday, January 10th, and did not find

3    any vehicles that I knew to be titled to Mr. Brock in the

4    parking garage or adjacent to the apartment complex.

5    Q.      So, based on your surveillance, the review of the

6    apartment complex's badge-in-badge-out records, and your

7    review of their video surveillance, after 1:21 on January 9th,

8    he didn't come back to that apartment complex?

9    A.      That's my understanding.

10   Q.      And he was arrested the next day, the 10th, correct?

11   A.      That's correct.

12   Q.      Okay.  And also on the 10th -- in fact, I believe

13   right around the same time as you conducted the arrest -- you

14   executed a search warrant at that apartment complex or at that

15   apartment?

16   A.      That's correct.

17   Q.      And what did you find when you entered Mr. Brock's

18   apartment?

19   A.      We found the -- a jacket that bore strong resemblance

20   to the one he wore on the Senate floor hung in the closet.  It

21   was a black, gray, and white camouflage jacket, and it

22   had -- there's actually some distinctive bright red markings

23   along the zipper that you can see in these photos, so we found

24   that jacket.  We found a Punisher patch with a -- a Punisher

25   patch set to the Texas flag in the trash in his kitchen/living

```
1    room area.  We found a neck gaiter/face mask that bore a
2    resemblance to the one that he was depicted wearing in the
3    Senate chamber in the trash as well.
4    Q.      Did you find the green combat helmet that he was
5    wearing in the photographs at the Capitol?
6    A.      No, sir.
7    Q.      Did you find the body armor that he was wearing from
8    the photographs at the Capitol?
9    A.      No.
10   Q.      Did you find in his apartment some gun safes?
11   A.      We did.
12   Q.      And was there anything of significance on or near the
13   gun safes?
14   A.      The code to the gun safes was left on -- was left
15   written on top of the gun safes.
16   Q.      And did you open them up?
17   A.      Yes.
18   Q.      Was there anything inside?
19   A.      No, there were no guns.
20   Q.      Okay.  Let me skip ahead a little bit, but after you
21   arrested Mr. Brock, did he make any statement to you
22   indicating that he left the codes to the gun safes in
23   anticipation of you coming and searching his apartment?
24   A.      He did.
25   Q.      What did he say?
```

1   A.       He said, did you -- something to the effect of, did

2   you find the gun safe codes.

3   Q.       Okay.  And that indicated to you that he was

4   anticipating you searching when he left?

5   A.       Yes.

6   Q.       All right.  Let's move back.  You said you found a

7   Punisher patch in the trash at his apartment.  What

8   significance did that have in your investigation?

9   A.       The -- some of the pictures of Mr. Brock on the

10  Senate floor, he had three kind of distinct patches Velcroed

11  to his body armor.  One was a white patch with like a -- with

12  a raven and a skull.  One was what appeared to be a

13  unit -- Air Force unit patch.  It had his name and rank on it,

14  and I believe it said Cajuns.  And then the third patch was a

15  Punisher skull with a Texas flag background.

16  Q.       Do you know what the significance of a Punisher patch

17  is, in general?  Does it have any meaning?

18  A.       Yes.  My understanding is the Punisher was a

19  character in a 1980s cartoon or movie that both stood for and

20  acted on vigilante justice, and that patch has been taken up

21  by numerous people to -- or that picture has been taken on by

22  numerous people to signify their support for vigilante

23  justice.

24  Q.       Okay.  Let's talk about the arrest now.

25           On January 9th, did you begin looking for Mr. Brock,

1    trying to figure out where he was?

2    A.      Yes.  The first steps would have been sending people

3    to the apartment complex.

4    Q.      What else did you do to try to find out -- figure out

5    his location, once you realized he was not at his apartment?

6    A.      An agent from my squad reached out to an

7    ex-girlfriend of his to see if they had spoken recently, and

8    they hadn't, but she gave us whatever -- what information she

9    did have on Mr. Brock and what her thoughts were.

10   Q.      And were you able to locate him with her information?

11   A.      No, we were not.  So, as of the evening of

12   January 9th, we were unable to locate him.

13   Q.      Okay.  And did you at some point get a search warrant

14   to try to track his phone?

15   A.      We did.

16   Q.      How did -- did that assist you, or how did that

17   assist you?

18   A.      It was only partially effective for reasons that I

19   cannot speak to totally intelligently.  A telephone location

20   search warrant can have various degrees of success in locating

21   people.  They have got a -- a margin of error that's measured

22   in meters, so when you get geographic, as we call them, pings,

23   or geographic location signals, they will say it is accurate

24   within X amount of meters, and our pings were generally

25   accurate within 5,000 meters, which is, you know, specific

1    enough to tie somebody to a certain part of a county, but not

2    to a specific residence.

3              So, when the pings started coming in on the evening

4    of the 9th, it showed Mr. Brock to be somewhere in the

5    vicinity of Eagle Mountain Lake in Northern Tarrant County, so

6    we assumed that either he or his phone were in Northern

7    Tarrant County and not in Grapevine.

8    Q.      And did -- you said those pings, at that point in

9    time, could kind of give you a general location, but not

10   specific enough to identify a specific house or residence

11   based on the kind of data you were getting on that date.

12             Did that change from Eagle Mountain Lake or did it

13   always remain in that area?

14   A.      It changed.  So, on the morning of the 10th, the

15   phone was still showing to be in the vicinity of Eagle

16   Mountain Lake, so we sent out a surveillance team to look

17   along the logical roads.  It's actually right on the

18   lakeshore, so it kind of narrowed it down a little bit, and we

19   had a surveillance team looking for his white Toyota Tundra.

20   That's what we knew him to have left his apartment complex in,

21   so that was the best we could so.

22             At the time, with the information we had, we never

23   found the Tundra, and the pings never improved.  And then at

24   around midday on the 10th, we noticed the pings starting to

25   move eastward.  So, he started to move eastward, and the pings

1    stopped in the vicinity of Keller, Texas.

2    Q.       Okay.  At some point on the 10th, did you attempt to

3    make contact directly with Mr. Brock by his -- by the cell

4    phone number you knew him to have?

5    A.       Yes.

6    Q.       What happened?

7    A.       When I first called him, he text me back, and said, I

8    got your message, I appreciate it -- something to the effect

9    of, I got your message, I appreciate it, I need to talk to my

10   attorney first.  And he then provided me with his attorney's

11   phone number, so I called his attorney and spoke to him and

12   told him that we needed to speak with Mr. Brock sooner than

13   later.

14   Q.       And just to be clear, not the same attorney he has

15   here today?

16   A.       That's correct.

17   Q.       Okay.  After a series of exchanges with Mr. Brock's

18   attorney, did he ultimately turn himself in?

19   A.       Yes, he did.

20   Q.       How long did that process take place, from the first

21   time you made contact with Mr. Brock until he finally agreed

22   to turn himself in?

23   A.       It took about three hours.

24   Q.       Okay.  And where did he meet you to turn himself in?

25   A.       The Grapevine, Texas, Police Department.

1    Q.       Okay.  And I believe you said, but he was not driving

2    that white Tundra when he arrived at the Grapevine Police

3    Department?

4    A.       No, he was not.

5    Q.       And you've not been able to locate that truck?

6    A.       No, we have not.

7    Q.       Okay.  All right.  During the course of your

8    investigation, including the period of time when you were

9    trying to locate Mr. Brock, did you speak to some classmates

10   of his?

11   A.       I did.

12   Q.       And these would have been classmates from the Air

13   Force Academy?

14   A.       That's right.  The Air Force Academy, Class of 1989.

15   Q.       Okay.  What did they tell -- kind of go one by one.

16   The first classmate you talked to, what did he or she tell

17   you?

18   A.       He said that there was a Facebook chat group that had

19   been established with some members of their class, the Air

20   Force Academy Class of 1989.  And around the time of the 2020

21   presidential election, so around early November of 2020, the

22   rhetoric in the Facebook group started to get pretty hostile,

23   and there were some pretty hostile divisions between the

24   political left and right within the group.

25   Q.       Okay.  What did this classmate tell you about what

1    Mr. Brock posted to that message site?

2    A.      He had said that Mr. Brock had made reference to a

3    civil war, and that this gentleman and other people didn't

4    want to know what kind of -- actually, they questioned him,

5    like, what do you mean?  Are you coming for me?  And he said,

6    you're not worth it.  You don't want to test me.  You don't

7    want to find out what kind of republican I am.  And to

8    that -- I think it was to that question, or to that statement,

9    that the friend said, well, do I need to be worried?  And he's

10   like, no, you're not worth it.

11   Q.      Okay.  And the classmates made reference to -- or

12   said that Mr. Brock talked about a civil war in his posts on

13   that Facebook chat group?

14   A.      That's correct.

15   Q.      Did the -- and you spoke to two other classmates of

16   his as well, in addition to the first one?

17   A.      Yes.

18   Q.      Did they generally corroborate what the first one

19   told you?

20   A.      Yes, they did.

21   Q.      Did you ask them whether they could provide you with

22   screen shots of the messages that they were telling you about?

23   A.      I did, and none of the three of them were able to do

24   that.  They didn't have -- they didn't take screenshots or

25   screen captures at the time, and now don't have access to the

1  Facebook group chat, and one of them had blocked Mr. Brock as

2  a friend based on the rhetoric in the conversation.

3  Q.      So, one of the three that you talked to blocked him

4  because of his violent rhetoric?

5  A.      Yes.

6  Q.      And then you said that the Facebook -- Mr. Brock's

7  Facebook account was no longer accessible?

8  A.      Yes.

9  Q.      Okay.  Do you know if he deleted it or if Facebook

10 shut it down?

11 A.      I don't know.

12 Q.      But it's not -- one way or the other, it's not

13 accessible now?

14 A.      That's right.

15 Q.      Okay.  All right.  And did one of the classmates tell

16 you something to the effect of, we have more guns and are

17 going to take over?

18 A.      Yes, that Mr. Brock referenced a "we," not

19 specifically -- not specific as to who the "we" was, but said,

20 we've got more guns.

21 Q.      Referring to himself and some other undefined group

22 of people?

23 A.      That's right.

24 Q.      Okay.  Also, did one of them talk about -- say that

25 he said something to the effect of, we would see what he,

1    Brock, was going to do in the coming weeks?

2    A.       Yes.

3    Q.       And just for the timeline, these conversations all

4    took place prior to January 6th of 2021, correct?

5    A.       That's correct.

6    Q.       All right.  You also, during this time, spoke to

7    someone who alerted you to an employment history of Mr. Brock;

8    is that right?

9    A.       That's correct.

10   Q.       And we're not talking about his most recent employer,

11   but an employer that he was employed by back in 2017, 2018?

12   A.       That's correct.

13   Q.       CAE Simuflite?

14   A.       Yes.

15            MR. ANTONIO:  And, Your Honor, I'm going to object

16   as to relevance on this issue.

17            MR. WEIMER:  Your Honor, the relevance will become

18   apparent when we enter the letter, but this clearly goes to

19   detention.

20            THE COURT:  Yeah, I saw the letter.  I'm going to

21   allow it.

22   Q   (BY MR. WEIMER)  Okay.  Can you take a look at

23   Government's Exhibit 8, please.  Do you recognize that?

24   A.       I do.

25   Q.       And is -- what is it?

A.       It is a termination letter to Mr. Brock from CAE
Simuflite.

Q.       And were you able to get in touch CAE Simuflite to
verify the authenticity of this letter?

A.       I did, and they verified that it was authentic.

         MR. WEIMER:  Okay.  Your Honor, the government moves
to admit Government's Exhibit 8.

         THE COURT:  Government's Exhibit 8 is admitted.

Q    (BY MR. WEIMER)  All right.  Can you just -- it's a short
letter.  Can you just go ahead and read it?

A.       Yes.  It says -- excuse me.  It says:

         Dear Larry, In addition to your pattern of
problematic behavior -- which has resulted in at least three
verbal warnings and one written warning -- it has recently
come to our attention that you're inappropriately -- that you
inappropriately communicated to employees that you had not
killed anyone for a while and regarding potentially shooting
members of a particular religion and/or race.  This type of
comment is not appropriate in our workplace, disregards our
values and code of business conduct, and can create a hostile
and/or dangerous work environment.

         As such, this letter is to notify you that,
effective immediately, May 18th, 2018, your employment with
CAE is terminated due to this threatening and discriminatory
speech, as well as your pattern of problematic behavior.

1          And then it's signed.

2    Q.      Okay.  Also during this time when you were doing your

3    investigation, did you get a phone call or get in touch with

4    an ex-wife of Mr. Brock?

5    A.      Yes.

6    Q.      And did she provide to you some screenshots of -- I

7    guess it's a Facebook profile that Mr. Brock had posted late

8    last year?

9    A.      Yes.

10   Q.      All right.  Let's take a look at Government's

11   Exhibits 6 and 7, if you would.  Are those the screenshots

12   that she provided to you?

13   A.      Yes.

14          MR. WEIMER:  And, Your Honor, I'd move to admit

15   Government's Exhibits 6 and 7.

16          THE COURT:  Government's 6 and 7 are admitted.

17   Q   (BY MR. WEIMER)  Okay.  And if we look specifically at

18   Government's Exhibit 6 -- I mean, sorry, Government's Exhibit

19   7, kind of at the bottom of the page, it looks like the

20   photograph is sort of repeated, but at the bottom of the page,

21   can you see where it says, Torch Flyer updated?

22   A.      Yes.

23   Q.      Can you read that sentence?

24   A.      It says, Torch Flyer updated his cover photo on

25   December 27th, 2020 at 1:46 p.m.

1   Q.      Okay.  And then can you sort of just describe what
2   the photo shows?
3   A.      The photo is of someone in camouflage -- camouflage
4   military tactical gear, face paint, holding an AK-47 style
5   rifle.
6   Q.      And it appears to be maybe from a movie or something
7   like that?
8   A.      Yeah.  It appears to be from a movie, and it's --
9   Q.      And then he has written in -- if you flip back to
10  Government's Exhibit 6, it's a little more clear there, but it
11  appears that he's written a caption underneath this photograph
12  of an individual with a rifle.
13          What does the caption say?
14  A.      6 Jan 2021.
15  Q.      And what's the significance of that date?
16  A.      That's January 6th, 2021, the day that the Electoral
17  College was to be certified, and the day that they held the
18  'Stop the Steal' rally and ultimately rioted at the Capitol.
19  Q.      Okay.  Now, ultimately, were you able to obtain a
20  search warrant for Mr. Brock's Facebook account?
21  A.      Yes.
22  Q.      And based on your conversations with his classmates
23  and also with his ex-wife, were you able to determine what his
24  user ID and user name were on the Facebook account?
25  A.      I was, both from the -- the photos we just discussed

1    from the ex-wife, as well as one of the Air Force Academy

2    classmates.  They both said his Facebook user ID was Torch

3    Flyer spelled T-O-R-C-H space F-L-Y-E-R.

4    Q.       Okay.  And have you reviewed what Facebook provided

5    you for his accounts, all the posts and photographs that they

6    provided you?

7    A.       I have not completed reviewing everything --

8    Q.       You've reviewed some of it?

9    A.       -- but I've reviewed some of it.

10   Q.       Okay.  If you would take a look at Government's

11   Exhibit 10, please.  It's a three-page document.

12   A.       Yes, sir.

13   Q.       Is that a true and accurate transcript of some of the

14   posts that Mr. Brock made and some of the photos that he

15   posted to his Facebook account based on the search warrant you

16   received?

17   A.       That's correct, yes.

18           MR. WEIMER:  Your Honor, government moves to admit

19   Government's Exhibit 10.

20           THE COURT:  10 is admitted.

21   Q    (BY MR. WEIMER)  Okay.  Let's go ahead.  And on

22   November 11th, 2020, he made some postings about a battle.

23   Can you go ahead and read those?

24   A.       Yes.  It says:  The battle isn't winnable

25   democratically if they complete the steal.  They went into

1    court yesterday.  Let's see what happens.  Fire and blood will

2    be needed soon.

3    Q.       Okay.  And November 11th would have been just a

4    few -- just a week after the presidential election?

5    A.       That's correct.

6    Q.       Then on December 24th, 2020, what did he post?

7    A.       I bought myself body armor and a helmet for the civil

8    war that is coming.

9    Q.       Then on December 25th, 2020, did he post a

10   photograph?

11   A.       He did.

12   Q.       And can you just describe the photograph that he

13   posted?

14   A.       The photograph is Mr. Brock in the green

15   military-style body armor, bearing a resemblance to what he

16   was wearing at the Capitol.  There are three patches, Velcro

17   patches on the chest, two of which he appeared to have been

18   wearing at the Capitol.  The one that would be on his right,

19   it's a red patch that appears to be a military unit patch.

20   The one in the middle is a white and black patch with a raven

21   and a skull.  Both of those patches, he appeared to be wearing

22   on the Senate floor on January 6th.

23   Q.       Okay.  And then the third one is different than the

24   one that he was wearing on the Senate floor?

25   A.       Yes, sir.  The third one is a black and white patch.

1    It appears to be an Arabic character.  I'm not sure what it is
2    and I -- and he did not appear to be wearing that on
3    January 6th on the Senate floor.
4    Q.        Instead, on the 6th, he had the Punisher logo in
5    there?
6    A.        That's correct.
7    Q.        Okay.  All right.  Next, on December 31st, 2020, what
8    of significance did he post on that day?
9    A.        He posted:  We are now under occupation by a hostile
10   governing force.  That may seem ludicrous to some, but I see
11   no distinction between a group of Americans seizing power and
12   governing with complete disregard of the Constitution and an
13   invading force of Chinese communists accomplishing the same
14   objective.  Against all enemies foreign and domestic.
15   #OathKeeper #2A #III%.
16             Defin- --
17   Q.        Go ahead.
18   A.        And then it goes on to say:  Definitely not skipping
19   these today.  Luck may be needed in the second civil war.
20   Q.        Okay.  Let's talk about those hashtags.  #OathKeeper,
21   are you familiar with a group by that name?
22   A.        Yes.
23   Q.        Can you briefly explain who the Oath Keepers are and
24   what they are about?
25   A.        The Oath Keepers are -- the term "Oath Keeper" refers

1    to people that have taken an oath to defend the Constitution

2    against all enemies, foreign and domestic.  This includes

3    military and former military personnel, law enforcement and

4    former law enforcement personnel, and they are a somewhat

5    loosely organized group of people that are -- have dedicated

6    themselves to potentially carrying out militia activities in

7    support of the Constitution against enemies, foreign and

8    domestic, with an emphasis on the domestic.

9    Q.      Okay.  Enemies that they perceive?

10   A.      Enemies that they perceive to be, yes.

11   Q.      And what about III% -- I assume 2A just refers to the

12   Second Amendment, which is referring to the right to keep and

13   bear arms?

14   A.      That's my understanding.

15   Q.      And III%, does that mean anything?  It's three Roman

16   numerals and a percent.  Does this mean anything to you?

17   A.      Yes.  That's also kind of a loosely defined militia

18   movement, referring to the concept that it was only III% of

19   the colonists that fought in the Revolutionary War and

20   overthrew the world's largest superpower at that time, and it

21   will only take III% of U.S. citizens, or citizens, I guess of

22   anyplace, to overthrow what they perceive to be a tyrannical

23   government.

24   Q.      Got you.  Okay.  Just moving ahead, January 1st,

25   2021, what did he post of significance on that day?

1    A.      He wrote:  I suspect that is what will happen on the

2    6th.  The castle will be stormed.  The question is what then?

3    Q.      Okay.  And referring to the castle will be stormed on

4    the 6th, does that have any significance in your

5    investigation?

6    A.      I infer that they are referring to the U.S.

7    Capitol --

8              MR. ANTONIO:  Objection.

9              THE COURT:  Hold on.  What was the objection?

10             MR. ANTONIO:  Your Honor, he can't speculate on --

11             THE COURT:  Go ahead and stand, please.

12             MR. ANTONIO:  He can't speculate or infer anything.

13   He has to speak from his own knowledge.

14             THE COURT:  I'll let him draw a reasonable

15   conclusion from the evidence.

16             You may answer the question.

17             THE WITNESS:  Okay.

18   Q  (BY MR. WEIMER)  You can answer.

19   A.      My conclusion is that they are referring to the U.S.

20   Capitol since the 'Stop the Steal' rally is being planned for

21   the 6th of January.

22   Q.      Okay.  Next up, on January 5th, did he post anything

23   of significance?

24   A.      Yes.  These posts include:

25             This is not a President that sounds like he's giving

1  up the White House.

2          I truly believe that if we let them complete the

3  steal, we will never have a free election again.

4          I really believe we are going to take back what they

5  did on November 3rd.

6          Plane is packed with people going to stop the steal.

7          Not interested in missing tomorrow.

8          The watch phrase here seems to be Restore Our

9  Republic.

10 Q.     And those were all posted the day before the rioters

11 stormed the Capitol?

12 A.     That's right.

13 Q.     Okay.  All right.  Let's flip to the next page.  This

14 is January 6th, 2021, the day that the rioters stormed the

15 Capitol.  What did he post of significance on that day?

16 A.     He posted:  Patriots on the Capitol.

17          Patriots storming.

18          Men with guns need to shoot their way in.

19          Facebook deleted a post.

20 Q.     Let me stop you there.  Patriots on the Capitol.

21 Patriots storming.  Men with guns need to shoot their way in.

22 What did you understand that to mean?

23 A.     I understand that to mean the rioters that were in

24 the act of storming the Capitol need to shoot their -- use

25 guns to shoot their way in and get in using violent measures.

1    Q.       Okay.  Let's -- okay.  Still on January 6th, 2021,

2    what else did he post of significance, or what's the next

3    thing that he posted of significance?

4    A.       Facebook deleted a post.  Trying to find the name of

5    a woman that was gunned down by Capitol police today.  She was

6    unarmed and is the first Patriot Martyr in the Second American

7    Revolution.

8    Q.       Let me stop you there.  He's talking about a woman

9    that was gunned down today.  Do you know what that would refer

10   to --

11   A.       Yes.  There was --

12   Q.       -- posted on January 6th, 2021?

13   A.       Yes, sir.  There was one woman that was shot and

14   killed by law enforcement that was illegally entering the

15   United States Capitol that day.

16   Q.       And he refers to her as a "Patriot Martyr in the

17   Second American Revolution?"

18   A.       That's correct.

19   Q.       All right.  What's the next thing he says or posts on

20   the 6th?

21   A.       Funny BLM is a movement, but patriots are a mob.  The

22   real issue is the ruling class got a quick reminder that they

23   are not untouchable.

24   Q.       What does BLM refer to?

25   A.       Black Lives Matter.

1   Q.      And then finally, on the next day, January 7th, what,

2   if anything, did he post on that day of significance?

3   A.      The charade of an election is over.  Our vote was

4   stolen.  Time to secede.

5   Q.      Okay.  And we know that by the time you began your

6   investigation, Facebook or he had shut down the

7   account -- whether it was Facebook or him, somebody had shut

8   down the account that we have just been looking at; is that

9   right?

10  A.      That's correct.

11  Q.      All right.  Let me kind of jump ahead a little bit,

12  looking into the future.

13          Are you aware of any threats or concerns that law

14  enforcement has about activities similar to what happened on

15  January 6th happening again between now and the inauguration

16  on the 20th?

17  A.      Yes.  I know that there are planned armed

18  demonstrations at every state Capitol.  There are planned

19  demonstrations at the U.S. -- or in Washington, D.C. at

20  probably various places in Washington, D.C.  There are threats

21  of violence towards FBI field offices.

22  Q.      Okay.  And during the course of your investigation,

23  you already told us that you found empty gun safes at

24  Mr. Brock's apartment, also failed to locate his combat helmet

25  or body armor.  Have you found any of those things since you

1  searched his apartment?

2  A.      No, I have not.

3            MR. WEIMER:  I'll pass the witness, Your Honor.

4            THE COURT:  All right.  Cross-examination?

5            And you may use the podium, if you wish.

6            MR. ANTONIO:  I'm going to use the podium, Your

7  Honor.

8            THE COURT:  Yes, sir.

9            MR. ANTONIO:  Thank you.

10                         **CROSS-EXAMINATION**

11  **BY MR. ANTONIO:**

12  Q.      Agent Moore, correct?

13  A.      Yes, sir.

14  Q.      Good afternoon.  How you doing?

15  A.      I'm well.

16  Q.      So, let me start out by asking, have you prepared any

17  e-mails regarding this case?

18  A.      Yes.

19  Q.      Have you done any video interviews with regards to

20  this case?

21  A.      Yes.

22            MR. ANTONIO:  Your Honor, I was --

23            THE WITNESS:  Just for clarification, the only video

24  interview was of the subject, Mr. Brock, who elected to use

25  his Miranda rights, so there was no -- there was no interview,

1    but that interaction when I read him his Miranda rights was

2    recorded.

3    Q.      Okay.

4           MR. ANTONIO:  Your Honor, at this time in regards to

5    Jencks, I would ask that all e-mails be turned over.  The

6    government has turned over some Jencks, but I don't believe I

7    have the e-mails.

8           THE COURT:  All right.  Did you review any of those

9    in preparation for your testimony today?

10          THE WITNESS:  The Facebook -- some of the Facebook

11   screenshots --

12          THE COURT:  No, e-mails that you created or -- and

13   relating to this matter, did you go back and review any of

14   those?

15          THE WITNESS:  No, sir.

16          THE COURT:  All right.  I'll grant you a continuance

17   if you want to take the time for him to go back and search his

18   e-mails and give them to you, but that's the only relief I'm

19   going to give you today.

20          MR. ANTONIO:  No need for a continuance, Your Honor.

21   We would just ask if anything comes up in those that we be

22   able to reopen the hearing.

23          THE COURT:  All right.  So, those will be preserved

24   by the government, and to the extent that they bear upon the

25   issue of detention or probable cause, you may file a

```
 1   motion -- well, as to detention, you may.
 2              MR. ANTONIO:  Thank you.
 3              THE COURT:  All right.
 4   Q   (BY MR. ANTONIO)  I want to take you to January 6th.
 5   That day, there were thousands of people in the Capitol,
 6   correct?
 7   A.      Yes, sir.
 8   Q.      And there were a lot of people who attended a rally
 9   hosted by the President?
10   A.      Yes, sir.
11   Q.      And that was the 'Stop the Steal' rally?
12   A.      Yes, sir.
13   Q.      And after that rally, thousands of those individuals
14   marched the streets to the Capitol?
15   A.      That's correct.
16   Q.      And so it wasn't a situation where it was a small
17   group that arrived at the Capitol, there were thousands of
18   people who arrived at the Capitol?
19   A.      That's correct.
20   Q.      And all thousands of those individuals arrived at
21   different times in the Capitol?
22   A.      Yes, sir.
23   Q.      And some of those individuals, a group of them, went
24   through a barrier that was at the front of the Capitol?
25   A.      I presume so.  I -- it's my understanding there were
```

1    several different barriers, several different breach points.

2    I'm not sure what -- you know, in what -- what relation those

3    breach points were to the Capitol.

4    Q.      And at some point, when the -- the group of

5    individuals who started going through the barrier, officers

6    kind of just, after they got through, let them in?

7    A.      I have heard that.

8    Q.      And so, Mr. Brock is not identified as any individual

9    who tried to push through the barrier or assault cops to get

10   through the barrier?

11   A.      No, sir.

12   Q.      Let's talk about when those individuals got into the

13   Capitol.  The Government's Exhibit 1, that's -- you said

14   that's a photo of individuals going into the actual Capitol

15   building?

16   A.      I'm not -- I'm not sure where that door leads to.  I

17   know that was turned over by Capitol police, as are most of

18   these.  I think Exhibits 1 through 5 or most of these pictures

19   are.  I believe that is into the Capitol itself, into the

20   Senate floor.  I'm not sure, 100 percent sure, which venue

21   that door leads to.

22   Q.      Okay.  So -- but there are doors to the Capitol

23   building, correct?

24   A.      That's right.

25   Q.      Some people were seen breaking windows to get into

1    the Capitol building, right?

2    *A.*      That's correct.

3    *Q.*      Some people were seen breaking in doors to get into

4    the Capitol building, right?

5    *A.*      Yes.

6    *Q.*      Mr. Brock was not identified as any of those

7    individuals who broke a window to get into the Capitol?

8    *A.*      No, he wasn't identified, but nor have we got an

9    exhaustive list as to who was actually responsible for the

10   breaking and entering of the building.

11   *Q.*      So, the answer is, no, he was not identified as being

12   one of those individuals who broke a window to get into the

13   Capitol?

14   *A.*      That's -- that's correct.

15   *Q.*      And the picture that you see in Government's Exhibit

16   1, the doors have opened in this photo, correct?

17   *A.*      Yes.

18   *Q.*      And Mr. Brock, you've identified him as the

19   individual in the -- at the bottom right of the photo and kind

20   of in the back of the crowd?

21   *A.*      That's correct.

22   *Q.*      And there's an officer to the left of the crowd and

23   to the right of the door, so he's on the middle, top left of

24   the photo?

25   *A.*      Yes, sir.

1  Q.      And so, Mr. Brock was not an individual who initially

2  pushed through that door?

3  A.      No.

4  Q.      And there are no officers in this photo trying to

5  stop Mr. Brock or arrest Mr. Brock?

6  A.      No.

7  Q.      In fact, that officer on the left is just standing

8  there watching the individuals enter into the building?

9  A.      That's right.

10  Q.      The officer has his hands in his pocket, looks like?

11  A.      He looks like that.  I can't say that that means that

12  it's okay for everyone to walk through that door.  Also, we

13  brought up the significance of that officer because the --

14          THE COURT:  Just answer the question that was asked,

15  please.

16          THE WITNESS:  Okay.

17  Q   (BY MR. ANTONIO)  And to the right of Mr. Brock in the

18  photo, it looks like the zip ties are actually on the floor?

19  A.      I -- I can't tell based on -- I don't have a good

20  depth perception in the picture.

21  Q.      Uh-huh.

22  A.      I see what you are saying, but they appear to be

23  either in his right hand or on his right side.  I can't tell

24  if they are on the floor, and since they are in his hand in

25  other pictures --

1  Q.       The zip ties that Mr. Brock is alleged to have had,

2  are they the same zip ties that the Capitol police have?

3  A.       I don't know.

4  Q.       Were they the same type of zip ties that could have

5  been left in the hallways by the Capitol police?

6  A.       They could have been.

7  Q.       So, when Mr. Brock told the New Yorker that he found

8  them on the floor, that actually could have been true?

9  A.       Yes.

10  Q.       And between Mr. Brock and that police officer, there

11  were probably 20 or 30 people?

12  A.       Yes, sir, that's correct.

13  Q.       And some of those individuals have flags in their

14  hands?

15  A.       Yes, that's correct.

16  Q.       So, Mr. Brock could have not even seen the officer

17  standing there?

18  A.       That's possible that he may not have seen him.

19  Q.       I'm going to take you to Government's Exhibit 2.  You

20  said that's a photo of Mr. Brock outside of Nancy Pelosi's

21  office?

22  A.       That's correct.

23  Q.       And are there cameras inside of Nancy Pelosi's

24  office?

25  A.       I believe so.  There are -- there are video -- there

1   are other videos or -- correction, I don't know.

2   Q.      And so this photo actually has him standing outside

3   of Nancy Pelosi's office?

4   A.      That's correct.

5   Q.      I'm going to take you to Government's Exhibits 3 and

6   4, and, actually, I'm going to take you straight to Exhibit 4.

7   That photo, it looks like Mr. Brock is messing with the lock,

8   as you testified earlier, correct?

9   A.      Yes, sir.

10  Q.      But Mr. Brock did not break any windows in that

11  photo?

12  A.      No, sir.

13  Q.      Does not kick any doors down in that photo?

14  A.      No, sir.

15  Q.      Now, Government's Exhibit 5, that's the exhibit you

16  said you saw Mr. Brock on the Senate floor, correct?

17  A.      Yes, sir.

18  Q.      Can you see his hands clearly?

19  A.      Yes, sir.

20  Q.      Mr. Brock doesn't have any weapons?

21  A.      No, sir.

22  Q.      He doesn't have any weapons on his tactical jacket at

23  all?

24  A.      Not that I can see.

25  Q.      And you said people were in the crowd saying, hang

| | |
|---|---|
| 1 | Mike Pence.  Has anyone that's been interviewed or talked to |
| 2 | said they saw Mr. Brock saying, hang Mike Pence? |
| 3 | A.      No, sir. |
| 4 | Q.      So, after this happened, you said the entire building |
| 5 | was searched, correct? |
| 6 | A.      Yes.  The entire building was cleared, was tactically |
| 7 | cleared for devices and people. |
| 8 | Q.      And you said some of those devices include pipe bombs |
| 9 | and Molotov cocktails? |
| 10 | A.      Yes. |
| 11 | Q.      Is -- Mr. Brock is not alleged to have put those |
| 12 | Molotov cocktails or pipe bombs there? |
| 13 | A.      No, sir. |
| 14 | MR. ANTONIO:  Court's brief indulgence? |
| 15 | THE COURT:  You have it. |
| 16 | Q   (BY MR. ANTONIO)  So let's talk about when you got to |
| 17 | this case and you were looking for Mr. Brock. |
| 18 | Did you already have his -- when did you find out his |
| 19 | number? |
| 20 | A.      I found out his number on Saturday morning. |
| 21 | Q.      And that was January 9th? |
| 22 | A.      Yes, sir. |
| 23 | Q.      Okay.  And did you attempt to call Mr. Brock on |
| 24 | January 9th? |
| 25 | A.      No, sir. |

1  Q.      But you found out where Mr. Brock lived on
2  January 9th?
3  A.      Yes, sir.
4  Q.      And so that's when you went to Mr. Brock's house?
5  A.      Yes, sir.
6  Q.      There was no warrant out for Mr. Brock at that time?
7  A.      That's correct.
8  Q.      Mr. Brock wasn't informed that he was actually -- you
9  guys were looking for him at that time?
10 A.      No, sir.
11 Q.      You were looking to arrest him without having to tell
12 him?
13 A.      No.  When we went to his apartment the first time, we
14 were --
15 Q.      Yes.
16 A.      -- we were looking to confirm that he lived there
17 because a lot of people move around and a lot of times the
18 best -- a driver's license may say that a person lives at a
19 house or an apartment, and they, in fact, have moved and
20 haven't updated their driver's license, so we were -- the
21 first step to confirming where he lived was to go to the
22 leasing office and see if he was, in fact, a resident.
23 Q.      Okay.  And so, when you didn't find Mr. Brock, that's
24 when you went and got the warrant for the cell phone?
25 A.      When we -- pardon me?  When we didn't find him?

1   Q.      Yes.

2   A.      Yes, sir.  When he didn't -- when he didn't -- when

3   we did -- when he did not return, or when we did not have

4   evidence of his return to the Grapevine apartment, we got a

5   warrant for the cell phone.

6   Q.      And at some point you said you got his number on

7   Saturday at -- in the morning, on the 10th (sic)?

8   A.      Yes.

9   Q.      And when you got his number, you gave him a call?

10  A.      No, sir.

11  Q.      I'm sorry.  You had his number on Saturday, the 9th,

12  and you called him on Sunday, the 10th?

13  A.      Yes, sir.

14  Q.      And that's because you couldn't track him down to

15  kind of find out where he was to sneak up on him?

16  A.      That's right.

17  Q.      And so, when you called him, he actually reached back

18  out to you?

19  A.      That's correct.

20  Q.      Didn't try to avoid you?

21  A.      No, sir.

22  Q.      He actually referred you to his other attorney, which

23  was not me?

24  A.      That's correct.

25  Q.      And you guys set up a time for him to turn himself

1    in?

2    A.       That's correct.  We -- there's more to the

3    conversation, but yes.

4    Q.       And so Mr. Brock actually came into the police

5    department and turned himself in?

6    A.       That's correct.

7    Q.       Are you familiar with social media?

8    A.       Yes, sir.

9    Q.       Are you familiar with how hashtags work?

10   A.       Not completely familiar.

11   Q.       So, let me ask you this.  Are you familiar with

12   people posting popular hashtags of things they like?

13   A.       Yes.

14   Q.       And so, when people post those hashtags, those are

15   free for anybody to post those hashtags?

16   A.       That's correct.

17   Q.       And so even if a person is not a member of a group or

18   a class, they can still post a hashtag because they really

19   like it?

20   A.       That's correct.

21   Q.       And so, you don't have any ties or you don't know of

22   any ties between Mr. Brock and the actual group Oath Keeper?

23   A.       No, sir.

24   Q.       And you don't have any proof of any ties between

25   Mr. Brock and the III% movement or group?

1   A.      No, sir.

2   Q.      And you spoke about future events that the FBI's on

3   high alert for?

4   A.      Yes, sir.

5   Q.      And those events include demonstrations at every U.S.

6   Capitol in the country?

7   A.      Yes, sir.

8   Q.      Mr. Brock is not part of those group of people who

9   have planned any of those events?

10  A.      Sir, are you -- are you asking me?

11  Q.      Yes.  You don't have any proof that Mr. Brock is a

12  part of any of those groups or any of those events?

13  A.      No, I do not.

14  Q.      Were you able to verify Mr. Brock's military service?

15  A.      I did not pull a DOD record, however, I spoke to him

16  about it, and I understand that he was a military officer,

17  Lieutenant Colonel, retired.

18  Q.      And he's honorably discharged from the military?

19  A.      That's my understanding.

20  Q.      Mr. Brock also has no criminal history, correct?

21  A.      That's correct.

22          MR. ANTONIO:  No further questions, Your Honor.

23          THE COURT:  All right.  Any further questions for

24  this witness from the government?

25          MR. WEIMER:  Briefly, Your Honor.  Thank you.

**REDIRECT EXAMINATION**

**BY MR. WEIMER:**

Q.      Now, Mr. Brock's attorney has asked questions suggesting that he may not -- that Mr. Brock may not have known that he was not allowed at the Capitol.

        Can I refer you to page 3 of Government's Exhibit 10, please, and this is the Facebook posts that he made on January 6th, 2021, the day of the riots.  Can you read the first three posts?

A.      Patriots on the Capitol.  Patriots storming.  Men with guns need to shoot their way in.

Q.      Okay.  Thank you.  Also, let's look briefly at Government's Exhibit 4.  Again, it's a photograph, and just please describe again what Mr. Brock appears to be doing in this photograph.

A.      He appears to be trying to function the lock on a door that appears to be locked.

Q.      Okay.

        MR. WEIMER:  I believe that's all.  Pass the witness, Your Honor.

        THE COURT:  Thank you, sir.  You may step down.

        THE WITNESS:  Thank you, sir.

        THE COURT:  The government may call its next witness.

        MR. WEIMER:  No further witnesses from the

1    government, Your Honor.

2              THE COURT:  All right.  Does the defense wish to

3    offer any evidence on the issues of probable cause or

4    detention at this time?

5              MR. ANTONIO:  Yes, Your Honor, I do.

6              Two things -- well, a couple of things I want to

7    offer.

8              THE COURT:  All right.  You may.

9              MR. ANTONIO:  His family is here.  I want to proffer

10   what they wanted to testify to.  They were a little concerned

11   about testifying in this case.

12             THE COURT:  Very well.  I will accept the proffered

13   evidence.

14             MR. ANTONIO:  As far as his father, Larry Brock,

15   Sr., he is also a retired Air Force man.  It's interesting.

16   He told me a story about how when Larry went back in, for a

17   while Larry was in, he actually got activated as a reservist,

18   so they served together at one time.

19             But he confirmed Larry's service.  He confirmed his

20   honorable discharge.  He confirmed the awards that he had, and

21   he confirmed that he's never had any problems with him growing

22   up, and he's honorably served his entire life, basically.

23             Now, his mother, I also talked to her.  She

24   confirmed his military service.  She told me something I

25   didn't know, and gave me the DD-214s that he actually got out

1   in 1998, and then after 9/11, he reactivated and got back in.

2   He's done, I think she told me, four tours in Afghanistan.

3           So, that's all for the proffer.

4           Your Honor, I do have these -- his two DD-214s.  I

5   just got them this morning when I got here, so I don't have

6   copies.  I let the government see it.  I can certainly give it

7   to Your Honor.

8           THE COURT:  All right.  Thank you.

9           MR. WEIMER:  We've seen it, Your Honor.  No

10  objections.

11          THE COURT:  Very good.  If you would approach and

12  just set it up here on the bench, I'll take a look at those.

13          MR. ANTONIO:  Thank you, Your Honor.

14          THE COURT:  Thank you, sir.

15          Give me just a moment to review these documents.

16          (Pause in proceedings)

17          THE COURT:  All right.  So, for the record, I have

18  been handed two Certificate of Release or Discharge from

19  Active Duty forms for the named defendant.

20          MR. ANTONIO:  And what's important on those

21  documents, Your Honor, I just want to point out, is that they

22  lay out his achievements and medals that he received while he

23  was in there.

24          THE COURT:  I will take notice of that.  Thank you.

25          MR. ANTONIO:  Thank you.  And that's all I have as

1  far as evidence goes, Your Honor.

2          THE COURT:  All right.  Any rebuttal evidence from

3  the government at this time?

4          MR. WEIMER:  No, Your Honor.

5          THE COURT:  All right.  Then I'll consider the

6  evidence closed.

7          For the record, I'm going to return these

8  certificates.  These appear to be --

9          MR. ANTONIO:  Original.

10          THE COURT:  One is original.  I'm not sure about the

11  second one, it's on different paper.

12          But I'm going to hand these to my clerk and they

13  will be returned to the defense for safekeeping.  I ask that

14  you preserve a copy in your records.

15          MR. ANTONIO:  Yes, Your Honor.

16          THE COURT:  All right.  Do you wish to be heard in

17  summation, Mr. Weimer?

18          MR. WEIMER:  Yes, Your Honor.  Thank you.

19          First of all, Your Honor, given what the defense has

20  just proffered, obviously the defendant's military service is

21  admirable.  However, in the context of everything that was

22  going on here, his prior experience and training make him all

23  the more dangerous and make his behavior all the more

24  concerning.

25          We know, based on the statements that he made in

1    numerous Facebook posts, that he genuinely believes that he is

2    participating in a civil war against the United States

3    Government or at least against some portion of the United

4    States Government.

5              He has spoken openly about his desire to do violence

6    in service of that civil war.  He has spoken about people that

7    rioted at the Capitol with him and were killed as martyrs in

8    the civil war.  So, he clearly believes that he is

9    participating in a righteous and just cause, and can justify

10   any act of violence or any act of law breaking in service of

11   what he believes to be this righteous goal.

12             The fact that he served in the military means that

13   he has the experience and training to participate in that

14   so-called civil war all the more effectively, and that makes

15   him a great danger to the community, Your Honor.

16             We've seen the photographs of what he did at the

17   Capitol.  We've heard what was going on in context.  Defense

18   counsel pointed out that Mr. Brock was not involved in every

19   aspect of what happened in the Capitol that day.

20             We did not offer all of the events that happened on

21   that day to suggest that he was directly participating in

22   placing bombs or erecting the gallows.  We don't know whether

23   or not he participated in the chants to hang Mike Pence and

24   kill other people that were members of the government.  We

25   don't know.  We may find out at some point, but the point of

1    that evidence, Your Honor, is to show the context of what was

2    going on when he did what he did.

3            Here, we have a situation where a very large group

4    of people believe that an election -- including Mr. Brock

5    because he said so -- believe that an election has been stolen

6    from them, believe that they are participating in a righteous

7    civil war.  They are chanting, hang Mike Pence, the Vice

8    President, who is in the Capitol building at the time this

9    riot is taking place.

10           They have erected a gallows with a noose to carry

11   out exactly the threat that they are making, and Mr. Brock

12   goes in, equipped in full combat gear, a combat helmet, a

13   bulletproof vest, combat gear, and carrying -- whether he

14   picked them up at the Capitol as a fortuitous find, or whether

15   he brought them with him to the Capitol, he's carrying flex

16   cuffs to restrain hostages, and he has those flex cuffs when

17   he makes his way to the Senate floor.

18           In that context, his goal can only be one thing.  He

19   means to take hostages.  He means to kidnap, restrain, perhaps

20   try, perhaps execute members of the United States Government.

21   There is no other reason for him to be doing what he's doing

22   in the context of everything he said and everything that's

23   going on that day.

24           He has repeatedly justified violence on his Facebook

25   posts, references to shootings, to guns, and participating in

1    a civil war, and, Your Honor, this is particularly of concern

2    given the situation that we are still in where there will be

3    additional protests, armed protests, riots, and other events

4    throughout the next two weeks until the inauguration and

5    perhaps after that.

6           It's a very volatile situation.  We know what he's

7    willing to do already, and we simply do not believe that

8    there's any way that we can safely release him into the public

9    in that situation.

10          Your Honor, we would also, of course, point out that

11   we know that Mr. Brock had guns.  We know that in

12   anticipation -- and he was not informed in any direct way that

13   he was going to be arrested, but surely he's following the

14   news.  He was interviewed.  He was the subject of a New Yorker

15   article.  He sees that other people are being arrested, and he

16   told the agent that he left the codes to his empty gun safes

17   so that they would be able to access, I guess, the safes

18   without breaking them.  When they arrived, the guns are gone.

19   His combat helmet is gone.  His body armor is gone.

20          *THE COURT:*  Is there evidence there was guns in

21   those containers, or are you surmising that there were guns

22   and they are gone now?

23          *MR. WEIMER:*  Yes, Your Honor, there is.  I can

24   recall the witness brief to testify, or if you would like me

25   to proffer --

1           THE COURT:  Just proffer it.

2           MR. WEIMER:  Yes.  His girlfriend told us that he

3    had guns and that he had moved them from the house.

4           THE COURT:  All right.  Thank you.

5           MR. WEIMER:  So, in light of that, he took his

6    combat armor, his bulletproof vest, his guns, moved them

7    somewhere, we do not know where.

8           In the context of everything else, we simply can't

9    allow him back out into the public at this point.  There's

10   just too much danger involved with somebody who has such a

11   firm and righteous belief that violence is justified at this

12   time.  And, for that reason, Your Honor, we ask that he be

13   detained.

14          THE COURT:  Is the main thrust of your argument that

15   the defendant presents a danger to the community, as opposed

16   to risk of flight or nonappearance?

17          MR. WEIMER:  Yes, Your Honor.  The main thrust is

18   that he presents a danger to the community, absolutely.  I

19   believe a risk of nonappearance is also an issue because he

20   does believe so righteously that what he was doing is correct,

21   and that if he needed to flee so that he could commit some

22   further act in furtherance of his goals, he would do so, but

23   that sort of ties in with the violence, so that really is the

24   main thrust of our argument is the danger of violence.

25          THE COURT:  Thank you.

1          Mr. Antonio?

2          *MR. ANTONIO:*  Thank you, Your Honor.

3          Mr. Brock is charged with misdemeanors in this case.

4     The Bail Reform Act presumes innocence -- not innocence,

5     release in these cases, or that there be no combination of

6     conditions to secure the safety of the public.  In this case,

7     the government has not proven their burden because it's their

8     burden to prove it.

9          I'll briefly touch on flight risk because I

10    understand the government's not really going forward with it,

11    but it sounded like they were kind of going forward on flight

12    risk.

13         Your Honor, he has ties here.  He's a 29-year vet in

14    the military.  Mom, dad, stepdad are all here in court today.

15         Your Honor, as I said before, he's facing

16    misdemeanors.  One is 12 months, the other is 6, so a total of

17    18 months.  He has no reason to run or do anything in this

18    case.

19         And I will also state that he's in the military.

20    He's a soldier.  He's used to following orders and directions,

21    and he knows how to do that.

22         Mr. Brock is also not a danger to the community.  I

23    understand that the government is trying to give a broader

24    picture of what happened, and this was going on around

25    Mr. Brock, and these things were found, and these persons

1   died, but we have to look at the individual and what that

2   person did that day, what they are alleged to have done.

3           And every question that I asked that tied to any

4   type of violence, any type of breaking anything, anything

5   assaultive, the answer was, no, we don't have anything to show

6   Mr. Brock was involved in that.

7           So what we have here is an allegation of a trespass

8   with craziness going on around.  That's it.  That's all we

9   have.  That doesn't rise to the level of detention for

10  Mr. Brock.  It doesn't make him a danger to the community.

11          And you couple that with his past, with his history

12  of being a military man, of serving honorably, of receiving

13  medals while in the military, of no criminal history, there's

14  nothing here to show that Mr. Brock is a danger to the

15  community.

16          To address the allegations that there's other things

17  that are going to happen, or that he talked with the

18  individuals and his servicemen and his friends and posted on

19  Facebook, he posted all that before January 6th, and what did

20  you actually see happen on January 6th with Mr. Brock?  He

21  came to DC unarmed.  He came to DC and didn't push anybody,

22  didn't hurt anybody, didn't shoot anybody, no violence.

23          That's what you actually saw, and that's what we

24  have to take into context.  We can't say, he said this, but

25  his actions were that.  Oh, yeah, by the way, his actions in

1    the future will be what he said he did before, when he hasn't

2    done that.

3           So, it's all talk.  It's all speculation and

4    conjecture, and that's all his Facebook posts have been, and

5    that's what the government is trying to do here, and hold him

6    and say he may participate in these things, but he's not a

7    part of the group of any of it.  He's not a part of the

8    planning of any of that.

9           So, to bring it back, Your Honor, if we simply look

10   at this case for what it is, it's a trespass.  It's a

11   misdemeanor.  He's not a danger.  He's not a flight risk.  So,

12   Your Honor, he should be released in this case.

13          *THE COURT:*  All right.  Thank you, Mr. Antonio.

14          Any final words from the government?

15          *MR. WEIMER:*  Briefly, Your Honor.  Thank you.

16          We should not give Mr. Brock credit for failing to

17   accomplish the goals that he had when he went to the Capitol

18   on January 6th.  By the grace of God, and some very heroic

19   Capitol police officers, these senators were able to be

20   evacuated, and Vice President Mike Pence was able to be

21   evacuated, before the rioters were able to make entry onto the

22   Senate floor, but it was a matter of minutes.

23          And had some of the senators not made it out of that

24   room when Mr. Brock and all of the other rioters entered, the

25   very worst could have happened.  We're lucky that it didn't,

1    but he shouldn't get credit for being a few minutes too late.

2            Now, as far as the charges that are against

3    Mr. Brock, this is a case out of Washington, D.C.  I think

4    Your Honor understands that this is a very volatile and

5    dangerous time.  The investigations are ongoing.

6            We fully expect that more serious charges will be

7    forthcoming, but the government has acted as expeditiously as

8    possible to put charges that are easily proveable based on the

9    available evidence.

10            So, this should not be taken as the final word on

11   what Mr. Brock or other individuals involved in these riots

12   will be charged with.  This is just what we can easily prove

13   at this moment in time.  With lots and lots of video, lots and

14   lots of photographs, we just got Facebook search warrants this

15   morning, there's a lot of investigation yet to be done.

16            But even so, that's not really the determining

17   factor in a detention decision, and that factor is that

18   Mr. Brock is clearly a danger to the community.  He has made

19   that quite clear in his Facebook posts, and all we have to do

20   to make that determination is not make any kind of

21   inferentially (sic).  We just have to take him at his word.

22   He says what he wants to do.  He says who he believes he is.

23   All we have to do is believe him.

24            We ask that he be detained for that reason.  Thank

25   you, Your Honor.

1          *THE COURT:* All right.  Well, based on the evidence
2     and the testimony before the Court, I will find that there is
3     probable cause for the charges in the criminal complaint out
4     of the District of Columbia.
5          As pointed out, the defendant is charged with
6     misdemeanor charges carrying the exposure as disclosed by the
7     defense.  I'm considering the factors under the statute,
8     Section 3142, and in weighing those in light of the evidence
9     and the information I have, I'm taking into account that the
10    defendant quickly self-surrendered, he did not possess
11    weapons, or, at this stage, have any evidence of violent
12    actions involved with his alleged activities on January 6th,
13    and his long and distinguished military career.
14         I believe that any of the concerns regarding risk of
15    flight or nonappearance or a danger to the community can be
16    addressed with an appropriate set of conditions and
17    combination of conditions that will assure that this defendant
18    will not be a risk of flight or a danger to the community.
19         They are going to be restrictive.  There is going to
20    be location monitoring and restricted travel of the defendant,
21    as well as other tightly-composed conditions.
22         So, we'll need to stand in recess for a few minutes
23    while an order setting conditions of release is prepared, and
24    I will go over those with you, Mr. Brock, and you'll go
25    through those with your attorney before I even do that.

1          Do you understand, sir?

2               THE DEFENDANT:  Yes, sir, I do.

3               THE COURT:  Okay.  Thank you.  You can remain

4     seated.

5               MR. WEIMER:  And, Your Honor, can we be heard

6     briefly on conditions that would be appropriate?

7               THE COURT:  I will hear what your requests would be.

8               MR. WEIMER:  Your Honor, we would first and foremost

9     ask that there be a condition that Mr. Brock absolutely

10    possess no firearms, that he surrender any firearms that he

11    owns, and that he not be in a household with firearms of any

12    kind.

13         We would also ask that he not be permitted to travel

14    to any location where there are protests going on.  That

15    would, of course, include the Capitol and any other location

16    where there are known protests occurring.  Obviously, we'll

17    have to make accommodations because he's being prosecuted out

18    of Washington, D.C., but we don't anticipate that any

19    appearances will be set prior to January 20th, so there should

20    be no need for him to go to that city.

21              THE COURT:  We reached out for a court date and did

22    not receive a specific answer, so I assume you're correct in

23    that.  So, he'll be ordered to report to DC, and have

24    permission to travel there only for the purpose of a court

25    appearance.

1          And if you want to -- the language about

2     restriction from any protest sites, I understand the request.

3     You want to draft up some language that you think would be

4     appropriate?

5          MR. WEIMER:  Well, I guess I should have asked, Your

6     Honor, you did mention a location monitoring.  We would move

7     that a home confinement, entire complete home confinement be

8     appropriate here.

9          Mr. Brock is not currently employed, so there is no

10    need for him to travel to or from a job.  We haven't heard any

11    evidence that he has any other obligations or responsibilities

12    that would require him to travel outside the home, so we

13    believe that, at a very minimum, home confinement at an

14    appropriate location would be required here.

15         THE COURT:  And I think that would alleviate the

16    concerns of attending any type of protest or rally that would

17    be of concern to the government.

18         MR. WEIMER:  That's correct.

19         THE COURT:  All right.  So, there will be an

20    appropriate restriction in that regard.  That usually goes

21    with location monitoring, and I will impose that as well in

22    this matter.

23         All right.  Then let's stand in recess for a few

24    minutes while the conditions of release are prepared.

25         *(Off-the-record discussion with probation)*

1        THE COURT:  You can be seated and go about your
2  business.  I apologize.
3        (Pause in proceedings)
4        THE COURT:  Let me have order in the courtroom.
5  We're going back on the record for a moment.
6        Mr. Weimer, you had something you wanted to bring to
7  my attention?
8        MR. WEIMER:  Yes.  As far as the conditions are
9  concerned, given the nature with which all of these protests
10  have been organized, and Mr. Brock's inflammatory postings as
11  well, can we ask for a no-internet condition?
12        THE COURT:  Yes.  I was trying to think if there was
13  less restrictive, but I don't think I could monitor social
14  media access without restricting internet access.  There's
15  just too many ways to monitor -- or to access the internet.
16        Let me hear from Mr. Antonio, after he confers with
17  his client.
18        MR. ANTONIO:  Court's brief indulgence?
19        THE COURT:  Uh-huh.
20        (Pause in Proceedings)
21        THE COURT:  Yes, sir.
22        MR. ANTONIO:  Your Honor, here's the issue.  He has
23  a class that he takes and it's all online.
24        THE COURT:  I read that on this report.
25        MR. ANTONIO:  And so my recommendation is to have an

order saying, no social media.  Social media is public.  If he's making any type of posts publicly, people are going to see it, people are going to report it.

In the alternative, if you think there's something more restrictive that he may need and you may be concerned about that, I would ask that we maybe put the same device we put on people's devices that monitor whether they go on sex sites and things like that, and restricting the social media to say he can't go on social media sites.  So, then that way, you could monitor it and see if that happens.

*THE COURT:*  All right.  I definitely agree that there should be no access to social media or other types of group chats or group talks.

I have read that you were seeking certification and taking some online course, so I'm going to work with pretrial services to see if that software, monitoring software, will work.

So, here's what I'm going to order.  There is to be no social media or other group chat access accessed by this defendant, and any internet activity to be monitored by the pretrial services office and reported to the Court on a regular basis.

And to the extent we're unable to adapt our software to that purpose, I may reenter a different condition that will comply with what we're able to do.

1          *MR. ANTONIO:*  Very well, Your Honor.

2          *THE COURT:*  So, at this point, that's about the best

3    I can do, but, Mr. Brock, I think you understand the concerns

4    here, and, you know, I need to give you a very short rope.

5    You can understand that we're in federal court.

6          These are strange times for our country, and the

7    concerns that are expressed by the government are not falling

8    on deaf ears.  I'm basing this on the factors I said earlier,

9    and the evidence I have before me about January 6th, and,

10   specifically, as to you.

11         Now, it's a fluid situation.  If that situation

12   changes and the government brings additional evidence, I may

13   have to revisit this detention issue on that level.

14         Same is for the defense.  If I find out you are

15   accessing social media or hanging out with friends groups that

16   have nefarious goals, I'm going to take that into

17   consideration and pull you back in.

18         My goal today is not to lock you up, but to allow

19   you to remain on these conditions of release while your case

20   is pending, to live with your family and take care of your

21   family, but you have to understand it's a very short rope.

22         I'm going to work with you, as long as I know you're

23   working with the Court, and my pretrial services officers are

24   going to stay in regular contact and know your whereabouts and

25   know your activities, and you need to walk the straight and

1    narrow while you're on these conditions.  Otherwise, you leave

2    me no choice but to lock you up at that time.

3           In all my time on the bench, I don't know that I've

4    ever detained for just simply a -- I say, simply, for

5    misdemeanor charges only, but as you heard, the investigation

6    is ongoing, and if that situation changes, I may have to

7    reconsider what I'm saying right now.  But I'm giving you this

8    opportunity on these conditions because I believe they will

9    alleviate the concerns this Court would have with danger to

10   the community or any risk of flight or nonappearance.

11          And so, with all that being said, I will word these

12   conditions as I indicated and have to reconsider only if I'm

13   unable to monitor the activity to the extent I need to.

14          All right.  Anything else before we go off the

15   record and prepare conditions?

16          *MR. WEIMER:*  Just a quick suggestion on the crafting

17   of the language.

18          Would it be easier -- and I don't know what the

19   technical capabilities of the software monitoring are either,

20   but would it be easier to just say, no internet except for

21   this online class?

22          *THE COURT:*  That probably would be the easiest, and

23   then --

24          *MR. WEIMER:*  And that would rule out any social

25   media and anything else that might lead to --

1             THE COURT:  Yes.  I'm going to draft something, and

2    each side will have an opportunity to look at it, and then if

3    there are further suggestions in crafting, I'll certainly be

4    open to hearing that.

5             All right.  We'll stand in recess once more.

6             (Recess)

7             THE COURT:  All right.  We need to go back on the

8    record for just a moment.

9             All right.  Court is called to order.

10            We're back on the record in United States versus

11   Larry Brock.  An order setting conditions of release was

12   prepared and circulated to counsel.

13            Does the government have any requests or suggestions

14   after reviewing what we've drafted?

15            MR. WEIMER:  No, Your Honor.  The document appears

16   acceptable to the government.  The only -- I spoke to Julie.

17   The only clarification, that I just wanted to put on the

18   record, is that the firearms restriction means no firearms in

19   the house at all, even if they belong to somebody else who

20   lives in the house.

21            THE COURT:  And that -- yes.  And I understand

22   Mr. Brock's going to live with his family.  So, there are to

23   be no firearms.  It will be considered in your possession, if

24   it's where you live, so, Mr. Brock, that applies to wherever

25   you are residing.

1          How about from the defense?  The language we tried

2     to craft was to -- regarding internet access is to try to

3     limit it, as I indicated, to the classes that are necessary,

4     but I'm trying to be flexible in the language to give my

5     pretrial services officers the ability to work with Mr. Brock.

6          MR. ANTONIO:  Uh-huh.

7          THE COURT:  So I've given -- if he gets permission,

8     and he needs to go to some other site for what he's going

9     to -- the certification he's going for, that's always possible

10    without having to come back in and redo it all.

11         MR. ANTONIO:  So, this is not just limited to just

12    the class?  If he needs to -- if he gets a certification and

13    needs to -- because he's going to be a --

14         THE DEFENDANT:  Home inspector.

15         MR. ANTONIO:  A home inspector.  If he needs to get

16    online dealing with being a home inspector, or get online to

17    pay his bills, this leaves him open for that?  That was my

18    only concern.

19         THE COURT:  Yeah.  I'm going to write in on the

20    original, and other access as permitted by pretrial services

21    officer.

22         MR. ANTONIO:  All right.

23         THE COURT:  So all he has to do is inform them, this

24    is why I need to go to this one, and, boom, it's done.

25         MR. ANTONIO:  That works.  Thank you.

1          *MR. WEIMER:*  No objection.

2          *THE COURT:*  All right.  Okay.  We'll write that in.

3          Go ahead and sign that, and know that I will write

4     that in on your original.

5          *(Bench conference with courtroom deputy)*

6          *(Brief recess)*

7          *THE COURT:*  All right.  We are once again on the

8     record, Cause Number 4:21-MJ-17, United States versus Larry

9     Brock.

10         Mr. Brock, during the recess, after concluding the

11    preliminary and detention hearing, an order setting conditions

12    of release has been prepared.

13         Have you had sufficient time to review that order?

14         *THE DEFENDANT:*  Yes, sir.

15         *THE COURT:*  Do you understand all of the conditions

16    that are set forth in the order?

17         *THE DEFENDANT:*  Yes, sir.

18         *THE COURT:*  Is it your signature that appears on

19    page 3 of the original that I have before me under

20    acknowledgment of the defendant?

21         *THE DEFENDANT:*  Yes, sir.

22         *THE COURT:*  Just above your signature, there's a set

23    of provisions which set forth the possible penalties and

24    sanctions should you fail to comply with these conditions.

25         Did you review those carefully?

1          *THE DEFENDANT:*  Yes, sir, I did.

2          *THE COURT:*  You understand it can be a separate

3    federal offense for you to fail to comply with these

4    conditions, sir?

5          *THE DEFENDANT:*  Yes, sir.

6          *THE COURT:*  All right.  The -- I know we have had

7    discussions to craft these conditions.

8          Are the conditions, as drafted, acceptable to the

9    government?

10          *MR. WEIMER:*  Yes, Your Honor.

11          *THE COURT:*  To the defense?

12          *MR. ANTONIO:*  Yes, Your Honor.

13          *THE COURT:*  All right.  There's an additional

14    consequence, Mr. Brock, I need to make you aware of, and that

15    is if you fail to abide by these conditions, it could

16    adversely affect the case you have in the district court,

17    which would be in DC, in that a district judge -- or in this

18    case, if it stays misdemeanor, it could be a magistrate

19    judge -- could find that you have failed to accept

20    responsibility for your actions, if you are unable to abide by

21    the court conditions.

22          Do you understand it can have an adverse effect on

23    the case pending against you in federal court at this time?

24          *THE DEFENDANT:*  Yes, sir.

25          *THE COURT:*  All right.  All right.  Then I'm

1    satisfied that Mr. Brock understands the conditions of

2    release, and I'm going to sign these conditions, and I'm going

3    to order that the marshals release you after any appropriate

4    processing, if any, on these conditions.

5            You will need to stay in close contact with my

6    pretrial services office.  They will talk to you today.  You

7    do need to follow these to the letter of the law.  It's --

8    it's an opportunity for you to remain out while this case is

9    pending, but as we talked about earlier, we do monitor these

10   closely, and if they are violated, you basically leave me no

11   alternative but to then go ahead and put you in the custody of

12   the United States Marshal.

13           So, I hope I don't see you in relation to these at

14   all, and I wish you good luck as you go forward.

15           Are there any other matters to consider in

16   connection with Mr. Brock from the government?

17           *MR. WEIMER:*  Nothing from the government.

18           *THE COURT:*  From the defense?

19           *MR. ANTONIO:*  No, Your Honor.

20           *THE COURT:*  All right.  The defendant is ordered

21   released by the marshals after any appropriate processing.

22           The attorneys are excused.  Thank you all.

23           *MR. WEIMER:*  Thank you, Your Honor.

24           *COURT SECURITY OFFICER:*  All rise.

25           *(End of Proceedings)*

Debbie Saenz, CSR, RMR, CRR, TCRR
United States District Court
(817) 850-6661

1              **REPORTER'S CERTIFICATE**

2        I, Debra G. Saenz, CSR, RMR, CRR, certify that the

3  foregoing is a true and correct transcript from the record

4  of proceedings in the foregoing entitled matter.

5        Further, due to the COVID-19 pandemic, participants wore

6  masks or were heard via videoconference, so proceedings were

7  transcribed to the best of my ability.

8        I further certify that the transcript fees format

9  comply with those prescribed by the Court and the Judicial

10  Conference of the United States.

11        Signed this 25th day of January, 2021.

12

13                          /s/ Debra G. Saenz

14                          DEBRA G. SAENZ, CSR, RMR, CRR
                            Texas CSR No. 3158
15                          Official Court Reporter
                            The Northern District of Texas
16                          Fort Worth Division

17

18  CSR Expires:       1/31/2022

19  Business Address:  501 W. 10th Street, Room 424
                       Fort Worth, Texas  76102
20

21  Telephone:         817.850.6661

22  E-Mail Address:    debbie.saenz@yahoo.com

23

24

25

Debbie Saenz, CSR, RMR, CRR, TCRR
United States District Court
(817) 850-6661