## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-CR-140-JDB** |
| **v.** | : | |
| | : | |
| **LARRY BROCK,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO TRANSFER VENUE AND TO ADOPT MOTION IN RELATED CASE

Defendant Larry Brock, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to another district and has moved to adopt the motion for change of venue in another case before the Court, *United States v. McHugh*, No. 1:21-cr-453. The defendant fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.[1]

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered

---

[1] Every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion. *See United States v. Bledsoe*, No. 21-cr-204 (July 15, 2022) (Minute Order) (BAH); *United States v. Williams*, No. 21-cr-377 (June 10, 2022) (Minute Entry) (BAH); *United States v. McHugh*, No. 21-cr-453 (May 4, 2022) (Minute Entry) (JDB); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

On January 6, 2021, the defendant entered the Capitol building through the Senate Wing doors, before making his way down to the Senate floor.  The defendant spent approximately 38 minutes inside the Capitol building on January 6th, during which time he went on the Senate floor for approximately 6 minutes, while carrying zip ties.  The defendant eventually exited the Capitol at approximately 3:02 p.m.

Based on his actions on January 6, 2021, the defendant was charged with violations of Title 18 U.S.C. §§ 1512(c)(2) and 2 (Obstruction of an Official Proceeding), Title 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), Title 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), Title 40 U.S.C. § 5104(e)(2)(A) (Entering and Remaining on the Floor of Congress), Title 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building), and Title 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).

The defendant now moves for a change of venue.  ECF No. 47.  He primarily seeks to adopt the motion for change of venue filed by the defendant in *United States v. McHugh*, ECF No. 55, No. 1:21-cr-453, a motion that this Court denied without prejudice at a hearing on May 4, 2022. The defendant also briefly argues that venue should be transferred for additional reasons relating to media coverage of the events of January 6, 2021, and the political makeup of the District of Columbia.  ECF No. 47 at 2-3.  To the extent the Court allows the defendant to adopt the motion for change of venue in *McHugh*, the government similarly requests leave to incorporate its

opposition to the motion in *McHugh*.  And the motion should be denied for the reasons stated below.

## ARGUMENT

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary."  *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

I.     **The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

The defendant contends that venue should be transferred based on media coverage of the events of January 6, including coverage of hearings conducted by the House Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee").  *See* ECF No. 47 at 1-2 (citing *McHugh*, ECF No. 55 at 10-16).  "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).   In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised

4

confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same). In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible

for jury service.  *Id.* at 382.  Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  *Id.* at 383.  "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias."  *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity.  *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011).  And contrary to the defendant's contention, those factors do not support a presumption of prejudice in this case.

### A.    Size and characteristics of the community

The defendant argues (ECF No. 47 at 1) that an impartial jury cannot be found in Washington, D.C., because of its "relatively small" jury pool.  Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*.  The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals."  *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an eligible jury pool of

nearly half a million, "12 impartial individuals could not be empaneled." *Id.*

>   **B.    Nature of the pretrial publicity**

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice. As in *Skilling* and *Haldeman*, the news coverage of Brock is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession."  *Id.* Indeed, although any media characterizations of Brock would be inadmissible, the photos and videos of Brock that have been disseminated would be both admissible and highly relevant at trial. *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial. Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

The defendant also contends that the nationally televised hearings of the Select support a change of venue.  ECF No 47 at 2.  But this exposure was not limited to D.C.  Instead, the hearings were carried on national networks across the country.  In similar circumstances, the D.C. Circuit affirmed the denial of a change of venue where the defendants—who were high-ranking members of the Nixon administration—complained that they were prejudiced by news coverage of the Watergate-related hearings.  *Haldeman*, 559 F.2d at 62-64 & nn.35, 43.  The court of appeals

observed that "a change of venue would have been of only doubtful value" where the "network news programs and legislative hearings" related to Watergate were "national in their reach." *Id.* at n.43.  The defendant has not pointed to any evidence that D.C. residents were more likely to have watched the Select Committee hearings than citizens in other parts of the country.

Additionally, a careful voir dire—rather than a change of venue—is the appropriate way to address potential prejudice from the Select Committee hearings.  "[V]*oir dire* has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner." *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981).  After a careful voir dire, this Court can select a jury from those residents who either did not watch the hearings or who, despite having watched the hearing, give adequate assurances of their impartiality.  *See Haldeman*, 559 F.3d at 62 n.35 (rejecting claim of prejudice even though "several jurors" had "seen portions of the televised Senate hearings" related to Watergate).

### C.        Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383.  In this case, 18 months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage of the recent stories have mentioned Brock himself, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

### D.        The jury verdict

Because Brock has not yet gone to trial, the final *Skilling* factor—whether the "jury's

verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does

not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance,"

*id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should

proceed to trial in the district where the crime was committed, and courts can examine after trial

whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling*

factors supports the defendant's contention that the Court should presume prejudice and order a

transfer of venue without even conducting voir dire.

**II.     The Characteristics of the District of Columbia's Jury Pool Do not Support a Change
         of Venue.**

The defendant also contends that a D.C. jury cannot be impartial because of various

characteristics of the District's jury pool: the District's "extensive connections to the federal

government and [C]ongress," the fact that "many District residents have direct personal

experiences of January 6th and its aftermath," and the District's "partisan makeup."  ECF No. 47

at 1-2.

**A.     The District's connection to the federal government does not support a change
         of venue.**

The defendant argues that the Court should transfer venue because the jury pool is

relatively small with extensive connections to the federal government and Congress.  ECF No. 47

at 1.  But the defendant does not explain how merely being employed by or otherwise connected

to the federal government would render a person incapable of serving as an impartial juror.

Although some federal employees, such as the U.S. Capitol Police, were affected by the events of

January 6, many others were neither directly nor indirectly affected.  Indeed, many federal

employees were nowhere near the Capitol on January 6 given the maximum telework posture at

the time.  And the storming of the Capitol on January 6 was not aimed at the federal government

in general, but specifically at Congress' certification of the electoral vote.  There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case.  *See United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government.  According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017.  OPM, Federal Civilian Employment, available   at   https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.      But   many   federal employees who work in the District live outside the District and would not be part of the jury pool. And the District has nearly 700,000 residents.  Thus, even if every federal employee were disqualified, the Court would be able to pick a jury in this District.

### B.      The impact of January 6 on Washington D.C. residents does not support a change of venue.

The defendant contends that a D.C. jury could not be impartial because D.C. residents have had "direct personal experiences of January 6 and its aftermath."  ECF No. 47 at 1.  But January 6 is now more than a year in the past.  Many D.C. residents do not live or work near the Capitol. There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were

victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing);

*Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003)

(1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir.

2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  In

*Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the

Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384 (quotation

omitted).  "Although the widespread community impact necessitated careful identification and

inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task."

*Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by

January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

> **C.     The District of Columbia's political makeup does not support a change of venue.**

The defendant also argues that a change of venue is necessary based on the "extraordinarily

partisan makeup of the District of Columbia."  ECF No. 47 at 2.  He points out that "over 92% of

the district residents voted for Joseph Biden[]" in the 2020 presidential election and that more than

123,000 District residents voted in the Democratic primary for mayor, compared to 2,368 District

residents who voted in the Republic mayoral primary.  *Id.* at 1-3.  The en banc D.C. Circuit rejected

a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was

required because "Washington, D.C. is unique in its overwhelming concentration of supporters of

the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when

Nixon ran for President in 1968 and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon,

J., concurring in part and dissenting in part).  The majority rejected the relevance of this fact,

observing that authority cited by the dissent gave no "intimation that a community's voting

patterns are at all pertinent to venue."  *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d

1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here.  To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims.  But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire.  This Court should not presume that every member of a particular political party is biased simply because this case has a political connection.  Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895).  The same is true here.  The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial."  *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases.  High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, and Roger Stone, have all been tried in the District.  *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States*

*v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-CR-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020).  Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone."  2020 WL 1892360, at *30-31.  Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

## III.   The Voir Dire Process in the First January 6 Jury Trials Has Demonstrated That Impartial Juries Can be Selected in This District.

At this point, multiple January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort.  *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire").  Instead, the judges presiding over each of those trials was able to select a jury in one or two days.  *See United States v. Reffitt*, 21-cr-32, Minute Entries (D.D.C. Feb. 28 and Mar. 1, 2022); *United States v. Robertson*, 21-cr-34-CRC, Minute Entry (D.D.C. Apr. 5, 2022); *United States v. Thompson*, 21-cr-161, Minute Entry (D.D.C. Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (D.D.C. Apr. 25, 2022); *United States v. Hale-Cusanelli*, 21-cr-37, Minute Entry (D.D.C. May 23, 2022); *United States v. Williams*, 21-cr-377, Minute Entry (June 27, 2022); *United States v. Bledsoe*, No. 21-cr-204, Minute Entry (July 18, 2022).  And the voir dire that took place in the first five jury trials

undermines the defendant's claim that prejudice should be presumed [2]

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined).  *See Reffitt* Trial Tr. 521.  The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror.  *Reffitt* Trial Tr. 23, 30.  The Court then followed up during individual voir dire.  Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[3]

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%).  *See Thompson* 4-11-22 Tr. 169, 171, 180, 189, 192.  The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire.  *Id.* at 3-4, 34.  Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[4]

---

[2] Because they remain restricted on PACER, the transcripts from the voir dire proceedings in these cases are being submitted under separate cover to the Court and counsel.

[3] For those struck based on a professed inability to be impartial, see *Reffitt* Trial Tr. 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046), 172-73 (Juror 443), 174-78 (Juror 45), 202-09 (Juror 1747), 223-35 (Juror 432), 263-74 (Juror 514), 358-69 (Juror 1484).  For those struck for other reasons, see *Reffitt* Trial Tr. 168-172 (Juror 313, worked at Library of Congress), 209-24, 281 (Juror 728, moved out of D.C.), 284 (Juror 1650, over 70 and declined to serve), 340-51 (Juror 548, unavailability), 382 (Juror 715, anxiety and views on guns), 398 (Juror 548, medical appointments), 441-43 (Juror 1240, health hardship), 453-65 (Juror 464, worked at Library of Congress), 465-81 (Juror 1054, prior knowledge of facts).

[4] For the three stricken for bias, see *Thompson* 4-11-22  Tr. 52 (Juror 1242), 85 (Juror 328), 158 (Juror 999).  For the six stricken for hardship or inability to focus, see *id.* at 43 (Juror 1513), 44 (Juror 1267), 49 (Juror 503), 40 (Juror 1290), 92 (Juror 229), 109 (Juror 1266).

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson* Trial Tr. 302. The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Id.* at 14. It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial." *Id.* at 13, 15. As in *Reffitt*, the Court followed up on affirmative answers to those questions during individual voir dire. Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[5]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%). *Webster* 4-26-22 AM Tr. 6, though it later excused one of those 35 based on hardship, *Webster* 4-25-22 PM Tr. 217-18. The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster* 4-25-22 AM Tr. 19. During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66. Only 10 out of 53 prospective jurors (or about 19%) were stricken based

---

[5] For those struck based on a professed inability to be impartial, see *Robertson* Trial Tr. 26-34 (Juror 1431), 97-100 (Juror 1567), 121-30 (Juror 936), 136-42 (Juror 799), 160-71 (Juror 696), 189-93 (Juror 429), 256-65 (Juror 1010), 265-68 (Juror 585), 287-92 (Juror 1160). For those struck for other reasons, see *Robertson* Trial Tr. 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.), 156-60 (Juror 1122, language concerns), 193-96 (Juror 505, work hardship), 245-50 (Juror 474, work trip); 279-82 (Juror 846, preplanned trip).

on a professed or imputed inability to be impartial, as opposed to some other reason.[6]  The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case.  *Webster,* 4-26-22 AM Tr. 7.

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%).  *Hale-Cusanelli* Trial Tr. 226, 231.  The Court asked prospective jurors questions similar to those asked in the other trials.  *See id.* at 72-74 (Questions 16, 20).  Of the 15 prospective jurors struck for cause, 11 (or 23% of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[7]

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice."  *Irvin*, 366 U.S. at 728.  In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner."  *Id.* at 727.  The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors

---

[6] Nine of the 19 stricken jurors were excused based on hardship or a religious belief.  *See Webster* 4-25-22 AM Tr. 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster* 4-25-22 PM Tr. 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262).  Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office.  *See Webster* 4-25-22 AM Tr. at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster* 4-25-22 PM Tr. at 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

[7] *See Hale-Cusanelli* Trial Tr. 62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 92-93 (Juror 653), 124-25 (Juror 1129), 152 (Juror 182), 156 (Juror 176), 182 (Juror 890), 197-98 (Juror 870), 217 (Juror 1111), 224 (Juror 1412).  For the four jurors excused for hardship, *see id.* at 77-79 (Juror 1524), 99 (Juror 1094), 132 (Juror 1014), 151 (Juror 899).

(25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803. *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first few January 6-related jury trials have confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case. The Court should deny the defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

### CONCLUSION

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ April H. Ayers-Perez*
April H. Ayers-Perez
Assistant United States Attorney
Detailee
TX  Bar No.: 24090975
11204 McPherson Road, Suite 100A
Laredo, Texas 78045
(956) 754-0946
April.Ayers-Perez@usdoj.gov