**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Criminal Action No. 21-140 (JDB)** |
| **LARRY BROCK,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION**</u>

Defendant Larry Brock is charged via indictment with six offenses related to the breach of the United States Capitol on January 6, 2021.  <u>See generally</u> Superseding Indictment [ECF No. 24] ("Indictment").  Brock has filed four motions seeking, among other things, dismissal of one count, a transfer of venue, and further discovery.  The Court will deny each motion for the reasons explained below.

<u>**Background**</u>

On January 6, 2021, the U.S. Congress convened in the Capitol for a joint session to certify the vote count from the November 2020 presidential election.  Aff. in Supp. of Criminal Compl. [ECF No. 1-1] ¶ 6.  The Capitol was closed to the public, but a large crowd was gathered outside. <u>Id.</u> ¶ 7.  Around 2:00 p.m., members of the crowd violently forced their way into the Capitol, past officers of the U.S. Capitol Police and over barricades.  <u>Id.</u> ¶ 8.  Shortly after, members of the House of Representatives and Senate, as well as then-Vice President Michael Pence, were forced to evacuate and effectively suspend the joint session.  <u>Id.</u> ¶ 9; <u>see also</u> <u>United States v. McHugh</u>, Crim. A. No. 21-453 (JDB), 2022 WL 296304, at *1–2 (D.D.C. Feb. 1, 2022) (<u>McHugh I</u>) (further describing the violence and destruction on January 6).

The government alleges that Brock participated in this riot.  <u>See</u> Aff. in Supp. of Criminal Compl. ¶¶ 11–16.  According to the government, Brock entered the Capitol through the Senate

1

Wing Doors at approximately 2:24 p.m. on January 6th and was inside the Capitol for approximately 38 minutes.  Mem. in Opp'n to Mot. to Compel Disc. [ECF No. 53] ("Opp'n to Disc. Mot.") at 2.  The government alleges that during that time, Brock was outside the office of Speaker of the House Nancy Pelosi and on the Senate floor, and that he carried zip ties throughout. Id.; Gov't's Opp'n to Def.'s Mot. to Transfer Venue [ECF No. 50] ("Opp'n to Venue Mot.") at 2.

A grand jury charged Brock with six offenses via indictment: obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); entering and remaining in a restricted building and grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Three); entering and remaining on the floor of Congress in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four); disorderly conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and parading, demonstrating, or picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six).  Indictment at 1–3.  On July 1, 2022, Brock filed the four motions now before the Court: (1) a motion to dismiss Count One—the charge under 18 U.S.C. § 1512—or, in the alternative, for an order requiring the government to provide a bill of particulars, see generally Mot. to Dismiss Count I or in the Alternative for a Bill of Particulars [ECF No. 46] ("Mot. to Dismiss"); (2) a motion to transfer venue, see generally Mot. to Adopt Mot. of Other January 6th Defendant and for Change of Venue [ECF No. 47] ("Venue Mot."); (3) a motion to compel additional discovery from the government, see generally Mot. to Compel Disc. [ECF No. 48] ("Disc. Mot."); and (4) a motion to compel discovery on selective prosecution, see generally Mot. to Compel Disc. on Selective Prosecution [ECF No. 49] ("Selective Prosecution Mot.").  The government timely opposed each motion on July 22, 2022. See generally Opp'n to Def.'s Mot. to Dismiss [ECF No. 54] ("Opp'n to Mot. to Dismiss"); Opp'n to Venue Mot.; Opp'n to Disc. Mot.; Mem. in Opp'n to Selective Prosecution Mot. [ECF No. 55]

("Opp'n to Selective Prosecution Mot."). Brock has not filed any replies. The motions are now ripe for decision.

## Analysis

### I.    Motion to Dismiss

Brock's first motion is styled "Motion to Dismiss Count I or in the Alternative for a Bill of Particulars." Mot. to Dismiss at 1. The motion identifies two reasons why the indictment should be dismissed for failure to state an offense. First, relying on United States v. Miller, Crim. A. No. 1:21-CR-00119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022), appeal docketed, No. 22-3041 (D.C. Cir. June 28, 2022), Brock argues that 18 U.S.C. § 1512(c)(2) applies only to obstruction that involves documents or records. Mot. to Dismiss at 2. Second, he argues that the facts he expects the government to present would not "constitute an attempt to obstruct" the certification of the Electoral College vote. Id. at 2–3.

"[A]n indictment's main purpose is 'to inform the defendant of the nature of the accusation against him.'" United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (quoting Russell v. United States, 369 U.S. 749, 767 (1962)). Under the Federal Rules of Criminal Procedure, the indictment need contain only "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1); accord United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015).

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant may move to dismiss the indictment against him for "failure to state an offense." Relevant here, if the statutory provision at issue does not cover the charged offense, the indictment "fail[s] to state an offense." McHugh I, 2022 WL 296304, at *3 (citing United States v. Montgomery, 578 F. Supp. 3d 54, 59 (D.D.C. 2021)). In assessing whether to grant a motion to dismiss under Rule 12(b)(3)(B)(v), a court considers whether the allegations in the indictment, assumed to be true, "would be sufficient

3

to permit a jury to find that the crimes charged were committed." United States v. Bozell, No. 21-CR-216 (JDB), 2022 WL 474144, at *2 (D.D.C. Feb. 16, 2022) (citation omitted).  Courts dismiss indictments "only in unusual circumstances."  Ballestas, 795 F.3d at 148.

The statute under which Brock is charged in Count One reads:

(c) Whoever corruptly--

   (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

   (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).

Brock first asks that this Court dismiss Count One, charging a violation of 18 U.S.C. § 1512(c)(2), "for the reasons offered in" Miller.  Mot. to Dismiss at 1.  In Miller, Judge Nichols construed § 1512(c)(2) to cover only actions taken "with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding."  2022 WL 823070, at *15.  This Court, however, has already considered and declined to adopt the reasoning and holding of Miller.  See United States v. McHugh, Crim. A. No. 21-453 (JDB), 2022 WL 1302880, at *2–12 (D.D.C. May 2, 2022) (McHugh II).  McHugh II is in line with previous decisions from this Court, see, e.g., Bozell, 2022 WL 474144, at *5, as well as every other district court to consider the issue addressed in Miller.  See, e.g., United States v. Grider, Crim. A. No. 21-022 (CKK), 2022 WL 3016775, at *3 n.3 (D.D.C. July 29, 2022) (collecting cases).

The Court's view has not changed.  As explained in McHugh II, § 1512(c)(2) "applies to the 'myriad means that human ingenuity might devise to permit a person to' obstruct an official proceeding," not only to those involving documents or records.  2022 WL 1302880, at *7 (quoting Collazos v. United States, 368 F.3d 190, 200 (2d Cir. 2004)).  This reading is compelled by the

statute's text, id. at *4–7, structure, id. at *7–10, statutory history, id. at *10, and legislative history, id. at *11–12, as well as principles of statutory construction, id. at *8–9, 11.  Particularly given that Brock raises "no substantive argument for reconsideration" of the Court's previous decisions on the issue, Grider, 2022 WL 3016775, at *3, the Court has no trouble rejecting this argument.

Brock also argues that § 1512(c)(2) "does not apply to" his alleged conduct.  Mot. to Dismiss at 2.  By his telling, the government is not "going to allege that [he] entered the United States Capitol until after [the official] proceeding had adjourned," and therefore the government does not assert "that any of his actions were the cause of the proceeding's adjournment."  Id.  In essence, he asks this Court to (a) construe § 1512(c)(2) to cover only actions that happened before a proceeding was first obstructed, influenced, or impeded and (b) in the context of January 6, find that only actions taken within the Capitol Building were a "cause" of the obstruction or impediment of the joint session of Congress.  Brock argues that the government has not alleged these elements and therefore has not alleged conduct that violates the statute.  Id. at 2–3.  This argument fails on all fronts.

First, § 1512(c)(2) is not so temporally limited.  The statute covers anyone who "corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so."  18 U.S.C. § 1512(c)(2).  The government may argue that a wide range of actions—including actions that happened after the joint session had been suspended in light of the rioting mob that had entered the Capitol—"obstructed, influenced, or impeded" the joint session.  The joint session continued to be obstructed, influenced, and impeded even after Vice President Pence and Members of Congress had fled, as it continued to remain in limbo as the January 6 mob flooded the Capitol throughout the day.  See Bozell, 2022 WL 474144, at *4 (concluding that the relevant question is whether acts obstructed, influenced, or impeded "the January 6 Certification as a whole" (citing 167 Cong. Rec. H85–H87 (daily ed. Jan. 6, 2021)).

Even if the Court construed the statute to require allegations of an action that happened before the initial obstruction—which it does not—Brock's challenge would still fail.   In his motion, Brock focuses on the moment he "entered the United States Capitol."  Mot. to Dismiss at 2.  But again, § 1512(c) is not so geographically limited: the obstruction, influence, or impediment of the joint session, or the attempt to do so, surely could have happened before Brock set foot in the Capitol Building.  See, e.g., United States v. Reffitt, No. 21-CR-32 (DLF), 2022 WL 1404247, at *3 (D.D.C. May 4, 2022) (upholding jury's conviction of January 6 defendant under § 1512(c)(2) despite the fact that the defendant "never entered the Capitol building").

Given the wide scope of § 1512, Brock's argument that the indictment fails to allege action covered by the statute fails.  There is no requirement that the government allege actions taken before the joint session was suspended; nor a requirement that it allege Brock entered the Capitol at any time, let alone before the joint session was suspended.  The indictment alleges that on January 6, 2021, Brock "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding . . . specifically, Congress's certification of the Electoral College vote."  Indictment at 1–2.  There are no additional temporal or geographic details required by § 1512(c)(2) that the government needed to allege.  The indictment sufficiently alleges conduct that, if proven,[1] would violate the statute.

## II.      Bill of Particulars

---

[1] The government spends much of its opposition arguing that the Court cannot review the sufficiency of the evidence against Brock at this stage in the proceedings.  See Opp'n to Mot. to Dismiss at 8–9.  Brock does not appear to dispute this proposition, Mot. to Dismiss at 2–3, but instead argues that the indictment does not allege a violation of § 1512(c).  The Court agrees that a challenge to the sufficiency of the evidence would be premature at this stage.

In the alternative, Brock requests that if the Court does not dismiss the charge under § 1512(c), the Court instead should order the government to provide a bill of particulars, as the "indictment makes no allegations as to which of his actions could have been obstructive of a proceeding that had already adjourned."  Mot. to Dismiss at 3.

Under the Federal Rules of Criminal Procedure, upon request, a "court may direct the government to file a bill of particulars."  United States v. Sutton, Crim. No. 21-0598 (PLF), 2022 WL 1183797, at *2 (D.D.C. Apr. 21, 2022) (quoting Fed. R. Crim. P. 7(f)).  "A bill of particulars is a formal written statement by the government that provides details of the charges in the indictment."  Id.  A defendant may request a bill of particulars "to ensure that the charges brought against [him] are stated with enough precision to allow [him] to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges."  United States v. Mostofsky, No. CR 21-138 (JEB), 2021 WL 3168501, at *1 (D.D.C. July 27, 2021) (alterations in original) (quoting United States v. Butler, 822 F.2d 1191, 1193 (D.C. Cir. 1987)).  The decision to grant that request and direct the government to provide a bill of particulars falls "within the sound discretion of the trial court."  Butler, 822 F.2d at 1194; see also Fed. R. Crim. P. 7(f).  Courts rarely direct the government to file a bill of particulars, doing so only when "necessary to allow the defendant[] to adequately prepare for and avoid surprise at trial."  Sutton, 2022 WL 1183797, at *2 (citation omitted).  A bill of particulars "may not be used by a defendant as a discovery tool or a device to preview the government's evidence or theory of the case."  Id.  Courts consider "the complexity of the crime charged, the clarity of the indictment, and the degree of discovery and other sources of information otherwise available to the defendants."  Id. (quoting 1 Charles Alan Wright & Andrew D. Leipold, Federal Practice and Procedure § 130 (4th ed. 2021)).

Brock argues that because the evidence the government has provided only shows Brock entering the Capitol after members of the U.S. Senate and U.S. House of Representatives had left,

the government has not provided any evidence of Brock's alleged obstruction of an official proceeding.  Mot. to Dismiss at 3.  Therefore, he claims, a bill of particulars is necessary to give notice of which actions the government will allege obstructed an official proceeding.  Id.

This argument is, at its core, a repackaging of his argument that the indictment does not identify an action that, if proven, would be sufficient to state an offense under § 1512(c)(2).  As discussed above, that argument fails as a matter of statutory interpretation, and it fares no better styled as a request for a bill of particulars.  The government has provided Brock with notice of which proceeding he is alleged to have obstructed, photos and videos of himself performing the acts that the government alleges form the basis of the charge, and witness statements describing his conduct.  Opp'n to Mot. to Dismiss at 10; see also Opp'n to Disc. Mot. at 2–4 (describing breadth of evidence provided to Brock, as well as specific videos of his entry into and exit from the Capitol).  The fact that Brock does not believe that this evidence amounts to a violation of § 1512(c)(2) is "more an issue of statutory interpretation than one of insufficient factual support," Mostofsky, 2021 WL 3168501, at *4, and settling that issue is "not the role of a bill of particulars," id. at *3.  In its opposition, the government does not suggest that there is other, unidentified evidence of Brock's presence at the Capitol earlier than approximately 2:24 p.m., see Opp'n to Disc. Mot. at 2, and any such evidence would be contradicted by the evidence the government has described to this Court and provided to Brock.  Regardless, Brock does not seem to suggest factual ambiguity, only that the government explain how the clearly described conduct falls under the statute.  But that is an argument for reconsideration of this Court's interpretation of the statute, not an argument for a bill of particulars.  See Mostofsky, 2021 WL 3168501, at *3.

## III.    Motion for Change of Venue

The Constitution establishes that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, and the Federal Rules

of Criminal Procedure narrow the default venue to "a district where the offense was committed,"
Fed. R. Crim. P. 18.  But if a defendant requests a transfer and demonstrates that "so great a
prejudice against the defendant exists in the [original] district that the defendant cannot obtain a
fair and impartial trial there," a court must transfer the defendant's trial to a different venue.  Fed.
R. Crim. P. 21(a); see also Skilling v. United States, 561 U.S. 358, 378 (2010) ("The Constitution's
place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district
at the defendant's request if extraordinary local prejudice will prevent a fair trial . . . .").

To show prejudice, a defendant must show more than juror familiarity with the case, or
even a preliminary opinion of its merits.  See Skilling, 561 U.S. at 380 ("[J]uror exposure to . . .
news accounts of the crime" does not "alone presumptively deprive[] the defendant of due
process." (citation omitted) (first alteration in original)); Irvin v. Dowd, 366 U.S. 717, 723 (1961)
("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an
accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality
would be to establish an impossible standard.").  A defendant must show that the local population
is "so aroused against [the defendant] and so unlikely to be able objectively to judge [the
defendant's] guilt or innocence on the basis of the evidence presented at trial that [the defendant's]
due process rights [will be] violated" if the case were not transferred.  United States v. Haldeman,
559 F.2d 31, 62 (D.C. Cir. 1976) (en banc) (per curiam).  This prejudice exists only in "extreme
circumstances."  Id. at 60 (citation omitted).  In almost all circumstances, the proper time to make
this determination is after jurors have been given a chance to show whether they can, in fact, be
impartial—that is, after voir dire.  Id. at 63–64.

Brock, like many other individuals charged with conduct stemming from the January 6
attack on the Capitol, requests a change of venue.  He does so by moving to "adopt" the motion of

another January 6th defendant made before this Court, [2] Venue Mot. at 1; <u>see also</u> Mot. to Change Venue, <u>United States v. McHugh</u>, 1:21-cr-453 (JBD) (D.D.C. March 15, 2022), ECF No. 55 ("McHugh Venue Mot."), which the Court denied without prejudice, <u>McHugh</u>, 1:21-cr-453 (JBD) (D.D.C. May 4, 2022), Min. Entry, May 4, 2022 ("May 4 Min. Entry").  The adopted motion argues that January 6th defendants' rights to a fair and impartial jury would be compromised by a trial in Washington, D.C.—that the "hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice," such that the change of venue motion should be granted before a jury is empaneled.  McHugh Venue Mot. at 2, 18.  The Court denied McHugh's motion without prejudice on May 4, 2022.  May 4 Min. Entry.  Other courts in this district have similarly denied motions to transfer venue filed by January 6th defendants, noting that the events of January 6th and the ensuing media coverage do not constitute the "extreme circumstances" necessary to presume prejudice prior to voir dire.  <u>See, e.g.</u>, <u>United States v. Garcia</u>, Crim. A. No. 21-0129 (ABJ), 2022 WL 2904352, at *15 (D.D.C. July 22, 2022); <u>United States v. Rhodes</u>, No. 22-cr-15 (APM), 2022 WL 2315554, at *21–23 (D.D.C. June 28, 2022); <u>United States v. Bochene</u>, Crim. A. No. 21-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022).

Given the in-depth treatment afforded to this issue already, the Court will only briefly summarize its reasons for denying Brock's motion, which are in line with those of other courts in similar cases.  As described above, Brock's motion adopts in their entirely the arguments put forth

---

[2] The Court notes that Brock's motion to adopt a motion filed by a defendant in a different case is unusual. <u>Cf.</u> Fed. R. App. P. 28(i) (permitting <u>co-appellants</u> to "adopt by reference a part of another's brief").  The government does not oppose the motion to adopt, but asks the Court for leave to incorporate its opposition to the motion in <u>McHugh</u>.  <u>See</u> Opp'n to Venue Mot. at 2–3.  In light of the government's response and the applicability of the arguments made in the adopted motion to Brock's case, the Court will grant Brock's motion to adopt the filing in <u>McHugh</u>, and will take into consideration the government's arguments made in both the opposition filed here and those made in its opposition in <u>McHugh</u>.  <u>See generally</u> Opp'n to Mot. to Change Venue, <u>McHugh</u>, 1:21-cr-453 (JDB), ECF No. 58 (D.D.C. April 7, 2022).

(and rejected) in the venue motion made in <u>McHugh</u>.[3]  Brock also adds two new facts to bolster those arguments.  <u>See</u> Venue Mot. at 2–3.  But the additional facts do not change the Court's conclusion that, at this stage, there is no reason to believe that voir dire will be ineffective in removing any potential bias or prejudice against Brock.

As relevant here, courts look to three factors in determining whether there is a presumption of prejudice in a given jury pool: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage.  <u>Skilling</u>, 561 U.S. at 382–84.  Notably, only <u>once</u> has the Supreme Court found a presumption of prejudice; in <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963), a case where the defendant's taped confession was broadcast to as much as a third of the venire, making his trial a "kangaroo court"—the interrogation and taped confession "in a very real sense was Rideau's trial—at which he pleaded guilty."  373 U.S. at 726; <u>see also</u> <u>id.</u> at 725 (describing the video as showing "Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff").  As several courts have recognized, the facts of <u>Rideau</u> bear little resemblance to the facts of Brock's, McHugh's, and other January 6th defendants' cases.  <u>See, e.g.</u>, <u>Garcia</u>, 2022 WL 2904352, at *8 n.16.

First, Washington, D.C.'s "size and characteristics" weigh against transfer. The Supreme Court has recognized a "reduced likelihood of prejudice where [the] venire was drawn from a pool of over 600,000 individuals."  <u>Skilling</u>, 561 U.S. at 382 (citing <u>Gentile v. State Bar of Nev.</u>, 501 U.S. 1030, 1044 (1991) (plurality opinion)); <u>see also</u> <u>United States v. Taylor</u>, 942 F.3d 205, 223 (4th Cir. 2019) (noting the same with respect to Baltimore's population of 621,000).  Washington,

---

[3] For simplicity, the court will cite the venue motion made in <u>McHugh</u> when discussing arguments first raised there and will cite Brock's motion only when discussing any new arguments Brock raises.

D.C. has over 600,000 residents.  See America Counts Staff, <u>The District of Columbia Gained More Than 87,000 People in 10 Years</u>, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/district-of-columbia-population-change-between-census-decade.html (estimating D.C.'s population as 689,545).  Perhaps recognizing that, McHugh's motion focuses primarily on the "characteristics" of D.C., noting the high proportion of federal workers; the stories of D.C. residents who were "deeply traumatized" by their proximity to the events of January 6th; and the "electoral makeup" of the District.  McHugh Venue Mot. at 4–8.

None of these characteristics suggest a community-wide bias that voir dire is ill-designed to remove.  Employment by the federal government is precisely the type of information that the defendant may elicit from potential jurors during voir dire.  See <u>Bochene</u>, 2022 WL 123893, at *2 (concluding that federal government employment was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").  The motion refers to anecdotes of trauma felt by D.C. residents; however, the Court has no basis to conclude such trauma is felt by a substantial portion of the venire, nor does the motion offer a reason to believe those who were traumatized to the point of bias would fail to report that during voir dire questioning.  Finally, the fact that a majority of Washington, D.C. residents have historically voted for Democrats is not "at all pertinent to venue."  <u>Haldeman</u>, 559 F.2d at 64 n.43 (denying motion to change venue in Watergate-related trial and rejecting evidence of D.C.'s political leanings); <u>see also</u> Order, Apr. 18, 2022, at 6–7, <u>United States v. Alford</u>, No. 21-cr-263 (TSC) (D.D.C. April 18, 2022), ECF No. 46 (concluding that "assumptions concerning party affiliation in the District are not an appropriate

basis for changing venue" and any "impressions or opinions . . . based on [defendant's] presumed political views" could "be assessed during voir dire").[4]

The <u>McHugh</u> motion also attaches the results of a telephone poll conducted by a private polling firm of 400 D.C. residents and 400 Atlanta residents. Ex. 1 to Mot. to Change Venue at 1, <u>McHugh</u>, 1:21-cr-453 (JBD) (D.D.C. Mar. 15, 2022), ECF No. 55-1 ("Select Litigation Survey"). The poll included questions about respondents' familiarity with and attitudes towards January 6th defendants. <u>Id.</u> at 4–5.

As an initial matter, public opinion polling commissioned by one party is often less probative than a "recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." <u>Haldeman</u>, 559 F.2d at 64 n.43; <u>see also</u> <u>United States v. Campa</u>, 459 F.3d 1121, 1129, 1147 (11th Cir. 2006) (en banc) (concluding that voir dire procedures "more thoroughly evaluated the sentiment of the Miami-Dade community" than a survey commissioned showing 69% of respondents were prejudiced against the defendants). Among other issues, surveys suffer from design flaws that can bias the results. The survey included here is illustrative. Many of the questions were drafted using impossibly broad language—"Are you more likely to vote that [a January 6th defendant] is guilty or not guilty of [the] charges?" Select Litigation Survey at 14. To make matters worse, respondents were not given an option to share that they had not yet formed an opinion as to the guilt of <u>every January 6th defendant</u>—the choices offered were "guilty" or "not guilty." <u>Id.</u> Despite that, almost 50% of respondents in Washington, D.C. volunteered that they did not have a fixed opinion, answering

---

[4] Brock adds one new fact in support of his argument that the characteristics of Washington, D.C. support a change in venue: in the recent mayoral primaries, over 120,000 D.C. residents voted in the Democratic primary, and fewer than 2,500 residents voted in the Republican primary. Venue Mot. at 2–3. Not only do these numbers represent a small percentage of D.C.'s population overall, but even assuming they suggest D.C. is overwhelmingly Democratic, they are cumulative of evidence presented in McHugh's motion, and do not sway this Court's opinion.

either "[d]epends" or "[d]on't know/[r]efused" (suggesting that at least half of the venire has no preconception of guilt, let alone an unshakable one). Id.

To the extent they are credited, the survey's results are mixed. The results do suggest that Washington, D.C. residents have an unfavorable opinion of those arrested for January 6th-related activities. Select Litigation Survey at 14 (reporting 84% of D.C. residents have unfavorable opinion of people arrested for participating in January 6th events, as opposed to 54% of Atlanta residents). But importantly for the question of impartiality, the results also suggest that an overwhelming majority—80%—of D.C. respondents believe that January 6th defendants will receive a fair trial in D.C. See id. And as described above, almost half of the respondents refused to say that they were more likely to find a January 6th defendant guilty. In short, the survey questions are neither reliable enough to act as a substitute for voir dire, nor convincing enough to merit a change in venue at this stage. See, e.g., Garcia, 2022 WL 2904352, at *11–13 (rejecting the same survey and denying motion to change venue in January 6th case).

Turning to the second factor, the type of information included in the media coverage was not the "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." Skilling, 561 U.S. at 382. Brock, through adoption, is correct that the events of January 6th received substantial news coverage. See Select Litigation Survey at 8–10. But "[t]he mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." United States v. Childress, 58 F.3d 693, 706 (D.C. Cir. 1995). If that were the case, then, by defendant's own telling, even Atlanta would be unavailable as a forum, as the Atlanta coverage could similarly be characterized as "intense pretrial publicity." See, e.g., Select Litigation Survey at 9–10 (citing data showing that the Atlanta Journal-Constitution ran almost 100 articles, and that local broadcasts in Atlanta ran over 4,000 stories, about January 6th in the year following the events); see also United States v.

14

Chapin, 515 F.2d 1274, 1288 (D.C. Cir. 1975) ("[P]recedent demands that the court take into account whether the publicity is sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, enabling the change to serve its purpose.").  Rather, only pretrial publicity analogous to the "inherently prejudicial" and "unforgettable . . . spectacle of Rideau's dramatically staged and broadcast confession" is inflammatory enough to presume prejudice.  Haldeman, 559 F.2d at 61.  McHugh, and hence Brock, identify public statements and reports that offer more editorializing than others, see, e.g., McHugh Venue Mot. at 13, but the fact that some coverage may be "hostile in tone and accusatory in content" is not enough to show prejudice when "[t]he overwhelming bulk of the material submitted . . . consists of straightforward, unemotional factual accounts of events," Haldeman, 559 F.2d at 61 (footnote omitted).  Indeed, courts have repeatedly denied venue transfers in cases with similar news coverage—in both scope and tone—to this case.  See, e.g., Skilling, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part) ("[L]ocal media coverage of the story saturated the community."); Haldeman, 559 F.2d at 61 n.34 ("[T]he pretrial publicity in this case was extraordinarily extensive . . . ."); In re Tsarnaev, 780 F.3d 14, 21–22 (1st Cir. 2015) (per curiam) (noting "there has been extensive publicity in this case," but not "of the grossly prejudicial character that attended Rideau").

In contrast to those cases, Brock identifies no pretrial publicity that mentions him.  "[W]hen publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact."  Skilling, 561 U.S. at 384 n.17 (alteration in original) (citation omitted); see also Garcia, 2022 WL 2904352, at *9 (noting that "this particular [January 6th prosecution] has not been subject of attention").  Even in the most high-profile cases, courts reject challenges where the defendant cannot show that members of the venire have knowledge of or an opinion about the defendant himself, even when he was a part of a highly publicized event.  See, e.g., United States v. Yousef, 327 F.3d 56, 155 (2d Cir. 2003) (rejecting World Trade Center bombing suspect's bias

claim because "the jurors that were picked had either never heard of Yousef or could not remember any of the details of his alleged involvement").  Absent any publicity about Brock himself, it is difficult to conclude that his case will feature a venire that prejudges his guilt or innocence in particular.

Finally, as the D.C. Circuit has noted, courts should avoid relying too heavily on pre-trial publicity to establish prejudice, as such an inquiry is only an "attempt to determine from [the court's] own reactions how the community would respond to that publicity."  Haldeman, 559 F.2d at 62 n.37.  "After the voir dire a judge can determine which description of the publicity's impact is accurate; before the voir dire a judge" can only guess.  Id.  For Brock, any impact pretrial publicity may have on potential jurors can, and should, be probed and rooted out through voir dire.  But the Court could only guess at this stage as to what, if any, impact generalized and primarily factual reporting of the events of January 6th will have on a relatively unknown defendant such as Brock; and such publicity does not compel a finding of bias in the venire as a whole.

The final factor is the time period between the arrest and trial.  By the time of Brock's trial in November 2022, almost two years will have passed since January 2021.  Two years is enough time, in general, for the "decibel level of publicity about the crimes themselves to drop and community passions to diminish."  Tsarnaev, 780 F.3d at 22.  Brock adds one additional fact in support of his motion: the House Select Committee to Investigate the January 6th Attack on the United States Capitol has continued to hold hearings over the past three months, "reignit[ing] coverage" of January 6th.  Venue Mot. at 2.  The Court agrees that these hearings make the passage of time somewhat less significant.  It does not, however, change the conclusion here—the content and nature of the January 6th coverage, including the Select Committee hearings, are not so inflammatory as to bias the entire Washington, D.C. community.  See Rhodes, 2022 WL 2315554, at *22 ("[M]edia coverage has been heavy due to the ongoing public hearings of the Select

Committee . . . .  But even if news coverage does not ebb, 'pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial.'" (citation omitted)).  Even if the content were inflammatory, the Select Committee hearings were broadcast nationally, and Brock has offered no evidence demonstrating that Washington, D.C. residents were a disproportionate percentage of the viewership.  See Tsarnaev, 780 F.3d at 22.  Again, a vigorous voir dire should suffice to root out any bias in individual jurors.

## IV.    Motions to Compel Discovery

Brock has filed two motions to compel discovery.  He asks for four categories of discovery: (a) specific information and evidence demonstrating his peaceful behavior, Disc. Mot. at 2; (b) evidence of his entry to the U.S. Capitol and/or restricted areas, id. at 3; (c) evidence of law enforcement's involvement in the attack on the Capitol, id. at 3–4; and (d) evidence of selective prosecution, Selective Prosecution Mot. at 6.

Upon a defendant's request, the government must "permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control" and, relevant here, "the item is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).  The government also has an affirmative duty under Brady v. Maryland, 373 U.S. 83, 87 (1963), to disclose "evidence in its possession that is favorable to the accused and material either to a defendant's guilt or punishment," United States v. Trie, 21 F. Supp. 2d 7, 23 (D.D.C. 1998).  Evidence is material if there is a "reasonable probability" that it would impact the outcome of the proceeding.  United States v. Bagley, 473 U.S. 667, 682 (1985). Rule 16 applies only to evidence that may influence or impact the outcome of a defendant's trial or sentencing; evidence related to "an independent constitutional bar to the prosecution," not

"refutation of the government's case in chief," falls outside of the rule's scope. United States v. Rashed, 234 F.3d 1280, 1285 (D.C. Cir. 2000).

Relevant here, there are two claims criminal defendants may bring under the Due Process Clause of the Fifth Amendment. First, the Supreme Court has suggested that it may "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," United States v. Russell, 411 U.S. 423, 431–32 (1973), though the Court "has never actually accepted this defense as grounds for dismissing an indictment," al-Baluchi v. Esper, 392 F. Supp. 3d 46, 65 (D.D.C. 2019). Defendants making such a claim face an onerous standard: the "requisite level of outrageousness . . . is not established merely upon a showing of obnoxious behavior or even flagrant misconduct on the part of the police." United States v. Kelly, 707 F.2d 1460, 1476 (D.C. Cir. 1983) (per curiam). Instead, the defendant much show "coercion, violence, or brutality to the person." Id. (quoting Irvine v. California, 347 U.S. 128, 133 (1954)). "Whether particular government conduct was sufficiently outrageous to meet this standard is a question of law," United States v. Boone, 437 F.3d 829, 841 (8th Cir. 2006), and if the standard were met, the proper remedy would be dismissal of the indictment, al-Baluchi, 392 F. Supp. 3d at 65.

Second, a defendant may bring a selective prosecution claim under the equal protection component of the Fifth Amendment. Despite its broad grant of prosecutorial discretion, the government may not base the decision to prosecute on "an unjustifiable standard such as race, religion, or other arbitrary classification." United States v. Armstrong, 517 U.S. 456, 464 (1996) (citation omitted). There is a "presumption that a prosecutor has not violated equal protection," id. at 465, and a defendant must present "clear evidence to the contrary" to succeed on such a claim, id. (citation omitted). To make out a selective prosecution claim, a defendant must show

that the challenged prosecution policy "ha[s] a discriminatory effect and that it was motivated by a discriminatory purpose." Id. at 457.

To show a discriminatory effect in prosecution policies, "a defendant must show that the Government afforded 'different treatment' to persons 'similarly situated' to him." United States v. Judd, Case No. 1:21-cr-00040 (TNM), 2021 WL 6134590, at *2 (D.D.C. Dec. 28, 2021) (quoting Armstrong, 517 U.S. at 470). "When a person's circumstances 'present no distinguishable legitimate prosecutorial factors that might justify' different prosecutorial decisions between him and the defendant, that person is similarly situated to the defendant." Id. at *2 (quoting Branch Ministries v. Rossotti, 211 F.3d 137, 145 (D.C. Cir. 2000)). Courts "'narrowly' interpret the phrase 'similarly situated.'" Id. (quoting United States v. Stone, 394 F. Supp. 3d 1, 31 (D.D.C. 2019)).

Courts impose a correspondingly "rigorous standard" for discovery in support of a claim of selective prosecution, Armstrong, 517 U.S. at 468; a defendant must present "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent," id. (citation omitted).

Brock first describes video footage of himself "attempt[ing] to break up" a confrontation between "an African American man wearing a blazer" and "a protestor." Disc. Mot. at 2. He requests information related to the video, including "additional video evidence" of the events, and "the name and contact information" for the "African American man." Id. In response, the government notes it has provided Brock with the "location, time, and numbers of cameras" that may have captured the altercation, and instructions on how to locate that footage in its discovery productions. Opp'n to Disc. Mot. at 2. As to the name and contact information for the man, Brock describes him only as an "African American man." Disc. Mot. at 2. The government's response suggests that he may be a member of the United States Capitol Police. See Opp'n to Disc. Mot. at

2.  Neither side, then, suggests that this man's identity is either known to the Department of Justice or within its possession, and the government is therefore under no obligation to provide it.  See United States v. Nordean, Crim. A. No. 21-175 (TJK), 2022 WL 2292062, at *2 n.4 (D.D.C. June 24, 2022) ("[T]he Government need not—indeed, it cannot—produce information or materials 'in the possession of Congress' but not in the possession of the Department of Justice or another executive agency." (citation omitted)); see also Cong. Rsch. Serv., The U.S. Capitol Police: Brief Background at 1 (July 29, 2021) (noting the "U.S. Capitol Police is a department within the legislative branch").  It appears, then, that there is no outstanding information Brock requests from this video that the prosecution has an obligation to provide under Brady or Rule 16.

Brock next describes his exit from the Capitol, and notes there may be an officer who "would have observed Mr. Brock persuade another individual who was behaving in a disorderly manner to exit the building with him peacefully."  Disc. Mot. at 2.  He asks for that officer's name, the status of his body camera, and/or any notes taken.  Id. at 3.  The government represents that it has identified "the Agency the officer works for" and provided "CCV footage of the altercation" and the status of body camera footage.  Opp'n to Disc. Mot. at 3.  Brock has not responded to these assertions.

On the record before it, the Court cannot determine whether the exact identity of the officer is within the government's possession such that it could be discoverable under Brady.  Regardless, Brock has not shown how the exact identity of the officer is material to his guilt or punishment.  Evidence is material under Brady "if there is a 'reasonable probability' that its disclosure could affect the outcome of the case."  United States v. Harris, No. CRIM. 06-00124 (ESH), 2006 WL 2882711, at *2 (D.D.C. Oct. 5, 2006) (quoting Bagley, 473 U.S. at 682).  Evidence that is "cumulative of information to which [the defendant] already has access" does not meet this standard.  Id.  Brock requested the identification of the officer because the officer "would have

observed" Brock's alleged peaceful behavior, and presumably been able to testify to it.  Disc. Mot. at 2–3.  Even assuming evidence of Brock's peaceful behavior in that moment would have a "reasonable probability" of affecting the outcome of the case, the CCV footage from the government would show Brock's behavior, making a description of the incident from the officer cumulative.

Brock notes that he has been "unable to locate a video alleged to show his entrance to the [C]apitol building and/or any restricted area."  Disc. Mot. at 3.  In its opposition, the government reports it has, as of July 22, 2022 (three weeks after Brock filed his motion), re-uploaded the "case-specific videos" showing Brock's movements.  Opp'n to Discovery Mot. at 3.  Absent a reply from Brock disputing the government's claims, the Court finds the government has satisfied its obligations to provide such video.

Brock's third category of discovery requests seeks "evidence of informants, undercover agents, cooperating sources and other similar persons present at the Capitol on January 6."  Disc. Mot. at 3 (cleaned up).  This evidence, he argues, would be used to show that law enforcement's behavior on January 6th was "so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction."  Id. (quoting Russell, 411 U.S. at 431–32).  As an initial matter, to the Court's knowledge, no court has identified the standard the defendant must meet to obtain discovery for this purpose.  The D.C. Circuit has indicated that material sought to establish "an independent constitutional bar to prosecution" is not discoverable under Federal Rule of Criminal Procedure 16, as it is not used to "refut[e] . . . the government's case in chief."  Rashed, 234 F.3d at 1285; see also Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring disclosure of information "material to preparing the defense"); Armstrong, 517 U.S. at 462 (stating that Rule 16 applicable only to "'shield' claims, which refute the Government's arguments that the defendant committed the crime charged").

In his motion, Brock requests this information "as Brady information." Disc. Mot. at 4. However, he fails to explain how the requested discovery would qualify as information material to his "guilt or to punishment," as required under Brady. See 373 U.S. at 87. The fact that a court may exercise its supervisory power to dismiss an indictment on the basis of the government's conduct has no bearing on the defendant's actual guilt or innocence. Moreover, Brock does not allege that his actions that day were caused by an informant, undercover agent, or cooperating source, or that he was somehow entrapped by the government's actions. See Disc. Mot. at 3–4. Brock has not shown how the requested material would have any relevance to his guilt or punishment, let alone rise to the level of materiality, and the Court declines to order such wide-sweeping discovery that is, in essence, simply a fishing expedition.[5]

Brock's final motion requests discovery on selective prosecution. He describes protests in Portland, Oregon during the summer of 2020 where protesters damaged federal buildings, in some instances using violent means like Molotov cocktails or arson. Selective Prosecution Mot. at 4–5 (citing Aff. in Supp. of Criminal Compl. ¶¶ 6–8, United States v. Bouchard, No. 20-mj-165 (D. Ore. July 24, 2020), ECF No. 1-1 (describing the Portland protests)). Brock then argues that the difference in charging decisions for the Portland protestors and the January 6th rioters can "only be explained by a bias in DOJ leadership in favor of liberal causes such as police reform and against conservative causes such as election integrity or support for Donald Trump." Selective Prosecution Mot. at 5. Brock's motion, however, does not even attempt to make the "rigorous" showing required to obtain discovery on a selective prosecution motion. See Armstrong, 517 U.S.

---

[5] Discovery requests based on independent constitutional claims, such as selective prosecution, are often evaluated under the framework set forth in Armstrong—the defendant must offer "some evidence tending to show the existence" of the constitutional violation. See, e.g., United States v. Oseguera Gonzalez, 507 F. Supp. 3d 137, 175 (D.D.C. 2020) (citation omitted) (extending this framework to vindictive prosecution claims). The Court does not decide here whether such a framework would be appropriate for "outrageous" government conduct claims under the Due Process clause, but notes that Brock has not provided any evidence to suggest the government had informants or undercover agents on January 6th, let alone that their presence constituted outrageous government conduct.

at 468.  He must provide "some evidence tending to show the existence" of both elements of a selective prosecution claim: that the prosecutorial policy had a "discriminatory effect" and a "discriminatory intent."[6]  Id. (citation omitted).  Brock's motion provides evidence of neither.

Brock focuses primarily on the Portland protesters, arguing that they are "similarly situated" to January 6th defendants such as himself.  Selective Prosecution Mot. at 3–5.  They are not.  As other courts have found, the mob on January 6th—of which the government alleges Brock was a part—"endangered hundreds of federal officials in the Capitol complex," including Members of Congress and their staffs, Vice President Pence, and the United States Capitol Police.  E.g., Judd, 2021 WL 6134590, at *5.  In contrast, the Portland protests happened at night, when no federal employees were in the buildings to be endangered.  See Aff. in Supp. of Criminal Compl. ¶¶ 5–6, United States v. Bouchard, No. 3:20-mj-165 (D. Ore. July 24, 2020), ECF No. 1-1 (describing "nightly criminal activity" and an altercation that began at "approximately 01:35 a.m.").  The decision to file and pursue more serious charges based on the threat to government officials and employees is certainly a legitimate prosecutorial consideration.  Other factors, such as the alleged purpose of the January 6th defendants' actions—obstructing the certification of the Electoral College vote—would also justify differences in prosecutorial behavior.  See United States v. Rhodes, Crim. No. 22-cr-15 (APM), 2022 WL 3042200, at *5 (D.D.C. Aug. 2, 2022) (concluding that Portland protestors were not alleged to have "engaged in comparable conduct" since defendant did not identify an "official proceeding" they obstructed).

_____

[6] Brock asks the Court to order discovery under Brady v. Maryland.  Selective Prosecution Mot. at 2–3.  The Court disagrees that selective prosecution evidence is discoverable under Brady, as it is irrelevant to Brock's guilt or punishment.  See United States v. Blackley, 986 F. Supp. 600, 602 (D.D.C. 1997) ("Brady/Giglio production is only required when the materials are being sought to prove defendant free from blame, and not when the defense seeks to obtain a collateral dismissal," such as a selective prosecution claim.).  Allowing selective prosecution evidence is contrary to the plain meaning of Brady, which is limited to evidence "material either to guilt or to punishment."  373 U.S. at 87. It would also undermine the rigorous standard for discovery set by Armstrong, which was animated by concerns that an easily surmountable discovery standard would "divert prosecutors' resources" and "disclose the Government's prosecutorial strategy."  517 U.S. at 468.

Brock argues that <u>his</u> case is comparable to Portland protestors as he is "not alleged to have engaged in violence or property destruction." Selective Prosecution Mot. at 5. That argument assumes that the level of <u>actual</u> violence and property destruction is the only difference between the Portland protestors and January 6th defendants, which is not the case. As part of the mob that stormed the Capitol, Brock is alleged to have taken part in the events of January 6th that caused "[m]embers of Congress [to] cower[] under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." <u>Judd</u>, 2021 WL 6134590, at *5. The government alleges Brock was "on the Senate floor"—the very floor from which Members of Congress had fled— "holding flex cuffs in his right hand." Opp'n to Selective Prosecution Mot. at 2. Those allegations alone would be a legitimate factor on which to base more serious charging decisions.

The comparisons to protests connected to Justice Kavanaugh's Supreme Court confirmation, see Selective Prosecution Mot. at 5–6, and the 2019 sit-in at Immigration and Customs Enforcement headquarters, <u>id.</u>, fail for the same reasons—Brock does not describe any similarly situated defendants given the difference in violence, threat to citizen safety, and scope.

Brock's arguments as to discriminatory intent fare no better. He concludes—with no proof or argument—that the motive behind the claimed discrepancies in charging is a "bias in DOJ leadership in favor of liberal causes." Selective Prosecution Mot. at 5. A conclusory statement like this is not "evidence" of anything; at best, it is a "personal conclusion[] based on anecdotal evidence," which is insufficient to form a colorable claim of discriminatory purpose. <u>Armstrong</u>, 517 U.S. at 468, 470. Further, Brock's assertion runs counter to the facts. Initial prosecution decisions in both the Portland cases and the January 6th cases, including charging January 6th protestors and dismissing cases against Portland protestors, were made under Republican

leadership.  See Judd, 2021 WL 6134590, at *6 n.9.[7]  Brock has not offered any evidence suggesting the January 6th prosecution decisions were made with discriminatory effect or discriminatory intent, and his motion for discovery into selective prosecution will be denied.

## **Conclusion**

For the foregoing reasons, the Court will deny each of Brock's motions.  A separate Order consistent with this opinion will issue.

/s/
JOHN D. BATES
United States District Judge

Dated: August 31, 2022

---

[7] For Brock specifically, the case against him was commenced in early January 2021, when Acting Attorney General Jeffrey Rosen, appointed by President Donald Trump, was still the leader of the Department of Justice.  See Compl. [ECF No. 1] at 8 (filed January 9, 2021).