VOLUME I
UNITED STATES  DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                         21-CR-140

LARRY RENDALL BROCK,

                    Defendant.

-------------------------------------------x

     Transcript of a Bench Trial held on

November 14, 2022, at the E. Barrett Prettyman U.S.

Courthouse, 333 Constitution Avenue, N.W.,

Washington, D.C., the HONORABLE JOHN D. BATES,

Senior Judge, Presiding.

                 A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    SOUTHERN DISTRICT OF TEXAS
                    11204 McPherson Road
                    Suite 100a
                    Laredo, Texas  78045
                      BY:  APRIL AYERS-PEREZ, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    1331 F Street, N.W.
                    Washington, D.C.  20005
                      BY:  BARRY KENT DISNEY, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    Narcotic & Dangerous Drug Section
                    145 North Street, N.E., Suite 2300
                    Washington, D.C.  20530
                      BY:  DOUGLAS MEISEL, ESQ.

For Defendant:      BURNHAM & GOROKHOV, PLLC
                    Attorneys at Law
                    1424 K St., N.W.
                    Suite 500
                    Washington, D.C.  20005
                      BY:  CHARLES BURNHAM, ESQ.

1

2                 I N D E X   O F   T E S T I M O N Y

3

4    Witnesses              Direct    Cross    Redirect    Recross

5    Elizabeth Glavey         28        47        --          --

6    Sean Patton              53       124        --          --

7    Nairobi Timberlake      147       169        --          --

8    Maggie-May Humphrey     173       185       186          --

9    John Moore              187        --        --          --

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   (Open Court, 9:35 a.m.)

2           THE CLERK:  Your Honor, we have Criminal Action

3   21-140, United States of America versus Larry Brock.  We have

4   Ms. April Ayers-Perez and Mr. Douglas Meisel representing the

5   Government and Mr. Charles Burnham representing Mr. Brock and

6   all parties are appearing in person.

7           THE COURT:  All right, good morning to everyone.

8   We're ready to go with trial in this matter.  I appreciate

9   the trial brief from the Government, the exhibit lists from

10  both sides, and the witness list from the Government.  And I

11  see I have an exhibit book here from each side and I

12  appreciate those as well.  And my first question is whether

13  there are any questions before we commence.  Anything that we

14  need to discuss before we get going, Mr. Burnham?

15          MR. BURNHAM:  I have a few preliminary issues.

16          THE COURT:  Okay.  For the court reporter, it's

17  usually easier if you use the lectern microphone.

18          MR. DISNEY:  Your Honor, before we get started, my

19  name is Barry Disney and I also appear for the Government.

20          THE COURT:  Good morning.

21          MR. BURNHAM:  Your Honor, the first preliminary

22  issue is very brief.  The Court had requested a written

23  waiver of trial by jury, I've prepared one that has

24  everybody's signatures except for your Honor's so if I can

25  approach, I'll hand it up to Mr. Bradley.

4

1          THE COURT:  Please hand it up to Mr. Bradley.

2          THE CLERK:  Thank you.  All right.  And this is a

3  written waiver of trial by jury, it's with the consent of the

4  United States, and by this document, the defendant is waiving

5  his right to a jury trial as is required under the Federal

6  Rules and I will approve and sign that.  Thank you,

7  Mr. Burnham.

8          MR. BURNHAM:  Thank you, your Honor.

9          THE COURT:  Go right ahead.

10          MR. BURNHAM:  The second issue is, there's an

11  evidentiary issue involving some Facebook records that, based

12  on trial preparation, is likely to come up repeatedly, but I

13  think it's, it admits of consideration in a summary fashion,

14  so I thought it was appropriate to raise it now.  I've

15  discussed this with the Government, they know what it is.

16  I'll summarize it as follows.

17          THE COURT:  Okay.

18          MR. BURNHAM:  The Government intends to introduce

19  in their case in chief a considerable number of Facebook

20  messages that were seized from Mr. Brock's personal cell

21  phone.  Some of those messages, we have no objection to, and

22  I've advised the Government as to which particular ones those

23  are, but to summarize, our position is that if a Facebook

24  message is either on January 6th itself or close to it, or

25  even if it was a few weeks ahead of time, if it specifically

1    refers to January 6th or to the Electoral College, it's
2    admissible and that's -- there's a number that fall in that
3    category, we won't be objecting to.  However, there's a
4    considerable number that are both weeks ahead of January 6th
5    and don't specifically refer to the Electoral College itself
6    or to the associated demonstration but rather to just general
7    political discussion about the election.  And there's, you
8    know, there's some heated rhetoric about, oh, the country is
9    being taken over, they're coming for our guns, isn't this
10   terrible.  And our objection to those is really on relevance
11   and 403 grounds, that they don't really speak to any question
12   presented to your Honor.  And I realize this is a bench
13   trial, but even so, it's highly prejudicial to Mr. Brock, and
14   it -- I think it gives the appearance that he's on trial for
15   having wrong political opinions if evidence comes in that is
16   just about the election, or about Joe Biden, or about, you
17   know, it's going to be 1776 all over again, it's -- and
18   there's really not much of a tie-in to much of that material
19   to any of the actual evidence.  So that would be our -- that
20   would be our objection.  We can get into individual ones now
21   or I could just sort of front the issue so --
22           THE COURT:  Well, I think it's good that you've
23   identified the issue, and it is a 403 issue as you explain
24   it, 403 issue really is going to depend on the specifics of
25   the Facebook entry, because I can't assess the prejudice

1    really without looking at the particular exhibit.  So

2    probably, given that it's a bench trial, I can wait until the

3    time of introduction of the particular exhibit and hear, if

4    necessary, from each side, at least the first time, to get

5    your full positions in line, and then make that assessment

6    under 403 whenever that objection is made.

7         So I would say that the best way to do it is, the

8    first time you have an objection, make the objection, I'll

9    hear from both sides, we don't have a jury that we have to

10   remove, it's not going to waste much time, and make the

11   ruling on that one.  And then for successive ones that you

12   have objections to, I can assess the prejudice based on the

13   particular exhibit.

14        MR. BURNHAM:  I appreciate that, your Honor, I'll

15   proceed that way.  The only remaining issue is, and I haven't

16   discussed this particular piece of it with the Government so

17   I don't know, is I don't know how particularly prominent

18   those messages were going to be in opening statements.  I

19   know this is a bench trial but if they were the centerpiece,

20   you know, we would invite direction from the Court that

21   perhaps that material ought not to be proffered to the judge

22   before you've had a chance to rule on it.  But that's the

23   only question.

24        THE COURT:  I guess I have to ask the Government

25   with respect -- I would assume it's not going to be central

1   to your opening?

2           MR. BURNHAM:  No, your Honor.

3           THE COURT:  I have to ask the Government whether it

4   intends to rely on those specific Facebook entry exhibits in

5   its opening.  And if so, then maybe I will have to deal with

6   that at least in part now, although, again, we don't have a

7   jury.  So if an opening refers to something that doesn't line

8   up in evidence, I could sort that out.

9           MR. BURNHAM:  And we are absolutely confident your

10  Honor can.

11          THE COURT:  Let me hear from --

12          MR. BURNHAM:  Thank you.

13          THE COURT:  -- from the Government just to have at

14  least clearly in mind what, if any, issue there may be with

15  respect to the openings, Ms. Ayers-Perez.

16          MS. AYERS-PEREZ:  Yes, your Honor.  There's only

17  one message that is planned to be used during the opening, it

18  is one that Mr. Burnham plans to object to or he's

19  represented he plans to object to.  I don't know if you want

20  to go over the specifics of the message now.

21          THE COURT:  Well, maybe we can do that message now

22  as sort of setting the table for all of the messages.

23          MS. AYERS-PEREZ:  Okay.

24          THE COURT:  All right.  Are you going to display

25  the message or how do you want to do it?

1          MS. AYERS-PEREZ:  We can display the message if --

2     9N.

3          THE CLERK:  Are you using your laptop?

4          THE COURT:  It's coming up.  Give me a second and

5     I'll read it.  Is it just the one page?

6          MS. AYERS-PEREZ:  It's two pages, the second page

7     will pop up if you let me know when you're done, we'll --

8          THE COURT:  I'll let you know when the second page

9     should pop up.  Do you have any problem with me reading it,

10    Mr. Burnham?

11         MR. BURNHAM:  No, your Honor, the Court has to read

12    it.

13              (The Court reviews the document.)

14         THE COURT:  Okay, second page.

15              (The Court reviews the document.)

16         THE COURT:  All right.  You can go back to the

17    first page while you make your argument.

18         MS. AYERS-PEREZ:  Yes, your Honor.

19         THE COURT:  Well, I guess I'll hear, hear the

20    objection first.  So Mr. Burnham, if you have more to say

21    with respect to supporting your objection.

22         MR. BURNHAM:  Well, I'll address that, your Honor,

23    I think this is a perfect example of the kind of thing we're

24    objecting to.  First of all, it's from Christmas Eve so well

25    in advance of January 6th.

1            THE COURT:  Two weeks.

2            MR. BURNHAM:  That's right, and secondly, by its

3    own terms, it doesn't refer to January 6 itself, it starts,

4    "If Congress fails to act on January 6th," then all these

5    crazy things are going to happen.  And I'll proffer to the

6    Government that there's not going to be -- proffer to the

7    Court there's not going to be any evidence to lay a

8    foundation that there was seizing of Democratic politicians

9    or, you know, seizing media assets, that's not going to be

10   supported by the evidence at all.  So really the two problems

11   are, by its own terms this does not refer to January 6, it

12   refers to some other time; and secondly, it doesn't tie in to

13   any particular evidence that the Government can proffer, I'm

14   confident, that the Court is going to hear.  And the

15   prejudice, I mean people talking on Facebook, they're

16   friends, military buddies, and it's the prejudice even in a

17   bench trial is, outweighs whatever relevance this

18   communication has.  So this is a good example of the type of

19   objections I'll be raising to your Honor.  There's going to

20   be communications that refer to January 6th I'm not going to

21   object to at all, not trying to keep out relevant evidence.

22   Thank you.

23            THE COURT:  Thank you, Mr. Burnham.

24   Ms. Ayers-Perez.

25            MS. AYERS-PEREZ:  Yes, your Honor.  This post

1    actually specifically refers to January 6th in the beginning.

2              THE COURT:  Well, it doesn't refer to the events of

3    January 6th, it refers to Congress failing to act on

4    January 6th, but you're right, there is a reference to that

5    date.

6              MS. AYERS-PEREZ:  Right, and this goes to the

7    defendant's intent, especially for Count One, the 1512, the

8    obstruction of the official proceeding, the intent aspect of

9    that is that he was intending to obstruct the official

10   proceeding which is counting the Electoral College votes,

11   which is a direct result of the 2020 election on

12   November 3rd.  And this is his plan, his action if that

13   doesn't happen, if Congress doesn't act on January 6th.  It

14   goes to his intent, his knowledge as to what's actually

15   happening on January 6th, about Congress' role in

16   January 6th, and his thought process as to where -- I mean

17   this is only two weeks before January 6th, and his thought

18   process of what will happen if Congress doesn't act on

19   January 6th.  And then of course we have the evidence that I

20   believe will come in, your Honor, of him actually being at

21   Congress on the Senate floor on January 6th.  I think it's

22   directly relevant, I don't think it's more prejudicial than

23   probative.  I think it's more probative because it goes into

24   his state of mind, into his intent which is really one of the

25   main reasons that we're here, that we're fighting about the

1    intent for Count One, that objection of the official

2    proceeding, your Honor, and that official proceeding is

3    what's happening in Congress on January 6th that he's

4    referencing, and is the catalyst for this entire message and

5    these tasks and these rules of engagement.

6            THE COURT:  All right.  I have three observations.

7    First observation is that it's a little hard to make a

8    definitive assessment of the, of how relevant this document

9    is, and how important, because I don't know what the other

10   evidence is, and I don't know whether this, in terms of its

11   relevance, is just cumulative of other evidence that will be

12   presented, which it may be, but I would say that the

13   relevance on a 402 assessment is maybe not all that strong,

14   but it seems to me that it is at least marginally relevant,

15   and so we do get to a 403 assessment because otherwise I

16   would believe it's admissible.  If we had a jury here, I

17   might reach a different conclusion with respect to the

18   prejudice, but I think with a bench trial, the prejudice can

19   be taken care of by my assessing it and giving it the weight

20   that it warrants, and understanding that sometimes things are

21   said not at the time of the January 6th events, but earlier

22   on that may be a little extreme.  I would say that some of

23   the things in this Facebook communication are pretty extreme,

24   but I think I can sort through that prejudice assessment

25   under 403.

1          So my -- I don't want to make a definitive ruling,

2    because maybe something will change between now and the

3    actual introduction of this document, but if nothing does

4    change, I would be inclined to overrule the objection and

5    allow this document to be admitted, understanding with a 403

6    prejudice assessment I will be looking closely at just how

7    relevant it is and limiting my consideration of it to its

8    relevance, not to other things.

9          MS. AYERS-PEREZ:  Yes, your Honor.

10          THE COURT:  All right.  So you can refer to it in

11    your opening if you so desire.  With that, other things, did

12    you have anything else, Mr. Burnham?

13          MR. BURNHAM:  No, your Honor, thank you.

14          THE COURT:  And for the Government, anything?

15          MS. AYERS-PEREZ:  Yes, your Honor, we have a number

16    of stipulations that we have agreed to, and I have copies for

17    you.  I know typically in a jury trial, I or the witness

18    would read it into the record, I'm not sure how you want us

19    to handle that here in the bench trial.

20          THE COURT:  Does it make sense to do it at the

21    outset or does it make sense to do some of them at different

22    places in the trial if you're trying to keep me just on track

23    in terms of following what's going on?

24          MS. AYERS-PEREZ:  Yes, your Honor, I think we could

25    do some of them at the outset and then others can be done at

1    various points during the trial.

2            THE COURT:  And none of them are very long?

3            MS. AYERS-PEREZ:  A couple of them are, one of them

4    is pretty lengthy.  The rest of them --

5            THE COURT:  What's pretty lengthy mean?

6            MS. AYERS-PEREZ:  Four pages.

7            THE COURT:  Maybe you ought to give me that one so

8    I can read it, so you don't have to read it into the record,

9    but if there's a desire by either side to read anything so

10   it's in the record and in my mind from your reading it, I

11   will allow you to do that.  But for the lengthier ones, I

12   don't think that's necessary, just make sure that you refer

13   to it at the appropriate time and I'll tell you that I have

14   read it or take the time then to read it.

15           MS. AYERS-PEREZ:  Yes, your Honor, thank you.

16           THE COURT:  So are you going to give that whole set

17   or are you going to do it step by step as we come to them?

18           MS. AYERS-PEREZ:  I can give you the whole set,

19   these are the ones that are the originals signed by myself

20   and Mr. Burnham and then we have of course copies that we can

21   read from.

22           THE COURT:  Why don't you give me the whole set and

23   that way I can read in advance what's necessary to read in

24   advance, and have at the moment what I need when you refer to

25   them.  Thank you.

1          MS. AYERS-PEREZ:  Thank you, your Honor.

2          THE COURT:  Now, these are, Mr. Bradley, all marked

3     as exhibits, so they will all be exhibits that will be

4     introduced as we get to them during the course of the trial.

5     All right.  Anything else, Ms. Ayers-Perez?

6          MS. AYERS-PEREZ:  No other preliminary matters,

7     your Honor, thank you.

8          THE COURT:  All right.  So with that, then we're

9     ready to proceed with opening statements by each side, and

10    then the evidence in the case.  How long does the Government

11    think its opening will be?

12         MR. MEISEL:  Fifteen to twenty minutes, your Honor.

13         THE COURT:  And the defense?

14         MR. BURNHAM:  I think I can do mine in 10, your

15    Honor.

16         THE COURT:  All right.  Well, let's start with the

17    Government.  Please go ahead, Mr. Meisel.

18         MR. MEISEL:  May it please the Court, good morning,

19    your Honor.  Judge, what you're about to see is a short

20    visual presentation of what you'll see in this case.  At the

21    close of the government's case, the only thing the Court will

22    need to decide is whether the defendant Larry Brock had

23    corrupt intent to obstruct an official proceeding to satisfy

24    Title 18 U.S. Code 1512.  It's the government's position the

25    evidence is sufficient that he was a "but for" cause for why

1    the Senate was obstructed from performing its constitutional

2    duty under the 12th Amendment on January 6, 2021.  This is a

3    snapshot or a roadmap that you need to decide this case.

4           Larry Brock is a veteran of the Air Force, which he

5    proudly displayed with his unit patch.  He celebrated

6    Christmas of 2020 by buying, by purchasing body armor and a

7    helmet or personal protective equipment in preparation for

8    what he considered an oncoming civil war.  He took an oath to

9    support and defend the Constitution from enemies foreign and

10   domestic, and on January 6, 2021, Larry Brock betrayed that

11   oath.  He betrayed his country and participated in mob

12   violence whose objective it was to disrupt the certification

13   proceedings for the 2020 Presidential election and prevent

14   the peaceful transition of power.  Brock was among a small

15   group that penetrated deep into the heart of the U.S.

16   Capitol, entering one of the most sensitive areas where the

17   Senate was convened to certify the election, the Senate

18   Chamber.

19          As early as November 2020 he contemplated an

20   assault on the U.S. Capitol.  He was preparing for that

21   assault as if it was a military operation, and viewing it

22   through the lens of a highly-trained tactically proficient

23   military officer.

24          I'm not going to -- the Court has already had an

25   opportunity to review this Facebook post, but this is one of

1    the most significant posts, within two weeks of the

2    January 6, 2021 event.  It reads like a military operations

3    order listing out assumptions that the U.S. military is not

4    going to be involved, seizing all Democratic politicians,

5    interrogating them using similar techniques that were used on

6    Al Qaeda, seizing national media assets.  Letting Democratic

7    cities burn, establishing provisional governments in

8    rebellious states, ceasing foreign aid except for key allies

9    as determined by President Trump.  And then rules of

10   engagement, do not kill law enforcement officers unless

11   necessary.  Gas would assist in this if we can get it.

12           Now in the video you're about to see you'll see the

13   defendant on the floor of the Senate.  You'll hear him tell a

14   fellow rioter to get out of the Vice President's chair.  And

15   if nothing else, it demonstrates that Brock, Larry Brock,

16   better than anyone else, understood the significance and the

17   value of the ground that they had just seized and its

18   importance to the disrupted certification proceedings.

19                    (Video played.)

20           MR. MEISEL:  Now the key issue in this case is

21   corrupt intent.  The evidence will show that Mr. Brock was

22   prepared for civil war.  He purchased body armor and a helmet

23   just before January 6, he anticipated violence and he came

24   prepared for violence.  He traveled from his home in Texas to

25   D.C. and he wore that equipment on January 6.  He witnessed

1    violence and destruction and kept moving, maneuvering freely

2    and extensively throughout the Capitol Building.  He picked

3    up and retained flex cuffs.  Twenty minutes after the

4    evacuation of the Vice President, Mr. Brock was at the same

5    door with a set of keys trying to access the Senate Chamber.

6    He entered one of the most sensitive spaces, the Senate

7    Chamber, where minutes earlier the Senate was convened with

8    the Vice President presiding to take up objections to the

9    Electoral College vote.  He remained on the Senate floor for

10   approximately seven minutes.  His escalating rhetoric on

11   social media demonstrates that he firmly and erroneously

12   believed that Trump was the rightful winner of the 2020

13   election and that offensive action was required to unwind the

14   election results and that he was doing his patriotic duty to

15   prevent the certification and the transition of power.

16          The evidence will provide a nearly uninterrupted

17   timeline of the defendant's movements starting at the Stop

18   the Steal Rally.  To his walk east down Constitution Avenue

19   toward the U.S. Capitol, and as the mob's protesters with

20   numerical overmatch tossed aside barricades and overwhelmed

21   Capitol Police defensive lines, Brock moved with the mob

22   formed on the West Front.  He ascended the West Plaza stairs

23   to the Upper West Terrace.  He moved with the crowd through

24   the breach at the Senate Wing Doors at 2:24 p.m., and then

25   moved south with the crowd through the memorial doors at

1    2:32 p.m. and ascending the memorial stairs to the second

2    floor.

3              So here's the Senate Wing Doors, and how it

4    appeared as Brock would have seen it at approximately

5    2:24 p.m.  Here is Mr. Brock entering the Senate Wing Doors

6    at 2:24 p.m.

7              After crossing through the memorial doors, he

8    ascends the second floor, he ends up in a location between

9    the Statuary Hall and the Rotunda, goes into the Rotunda

10   briefly, and then into the Rotunda door interior.  He's in

11   this area roughly from 2:35 to 2:39 p.m. before ascending the

12   Gallery stairs to the third floor.  Now it's during this

13   eight-minute window from entry to the memorial doors to the

14   Rotunda that Vice President Pence and his family are removed

15   from the Senate Chamber, the East Front is breached, staffers

16   throughout the building are barricaded and sheltering in

17   place, Capitol Police have established barricades in the

18   House Chamber with lawmakers sheltered in place.  And at

19   2:30 p.m., the Senate evacuation is well underway.

20             So on the third floor, these are additional images

21   of Brock as he -- of Mr. Brock as he moved from the Rotunda

22   to the Rotunda door interior, and this is an image of him

23   ascending the Gallery stairs toward the third floor.  So at

24   the third floor, he arrives at approximately 2:40 p.m. in the

25   east corridor, proceeds north to the Senate Gallery, and

1    enters the Senate Chamber balcony at approximately 2:42 p.m.

2            These photos depict Mr. Brock's movements through

3    the east corridor, through the Senate Gallery, the balcony of

4    the Senate Chamber.  And then at 2:47 p.m., Mr. Brock is seen

5    outside the Senate Chamber attempting to access the same door

6    that the Vice President had been removed by Secret Service no

7    less than 20 minutes earlier.

8            THE COURT:  Looked like exactly 21 minutes earlier.

9            MR. MEISEL:  Yes, your Honor.  This is video of the

10   Vice President being removed from the chamber through the

11   very same door that Mr. Brock was attempting to gain access.

12   So at this point, Mr. Brock and a group of rioters maneuvered

13   down to the second floor.  Ultimately, Mr. Brock is able to

14   access the Senate Chamber from approximately 2:48 p.m. to

15   2:55 p.m.  And after leaving the Senate Chamber, he maneuvers

16   down the west stairs and exits the Parliamentarian doors at

17   3:01 p.m.

18           And Judge, at the conclusion of the government's

19   case, after reviewing the government's evidence and the

20   escalating and violent rhetoric on social media and receiving

21   other evidence, physical evidence, my colleagues and I will

22   ask that you find that we've met our burden and we'll ask you

23   to find the defendant guilty of obstructing the official

24   proceeding and each of the lesser charges.  Thank you.

25           THE COURT:  All right, thank you, Mr. Meisel.

1    Mr. Burnham.

2         MR. BURNHAM:  Thank you, your Honor.  Morning

3    again, your Honor.  Your Honor, I'll start by observing that

4    I agree with the Government to the extent that intent is

5    going to be a central issue in this case.  There's going to

6    be other issues as well, other things we're contesting that

7    we'll get into probably more so at closing, but we maintain

8    absolutely when the evidence is viewed as a whole, there's no

9    evidence of criminal intent here.  In fact, quite the

10   opposite.

11        So what's the Court going to learn?  I'll start

12   with Mr. Brock himself.  As the Government alluded to, the

13   Court will hear that he is a veteran, long-time veteran of

14   the Air Force with combat experience flying the A10 and other

15   military aircraft.  There's not going to be any evidence that

16   he has a history of political activity at all, let alone any

17   kind of rabble rousing.  There's not going to be evidence

18   that he had even tangential connections to any organized

19   group, whether it be a suspect group or indeed any group.

20   The evidence is simply going to be that Mr. Brock was a

21   supporter of the former President, and an assiduous follower

22   of the news who, based on the things that he had read and

23   heard, developed concerns with the 2020 election, fraud,

24   illegality and so forth, and decided for that reason to

25   travel to D.C. on January 6 to support, along with thousands

1    of other people, to participate in that First Amendment

2    demonstration in support of the former President.  Mr. Brock

3    traveled to Washington, D.C. by himself, no one was with him,

4    there's not going to be any evidence that he was coordinating

5    with anyone he was going to meet there, I mean he was by

6    himself, there to support the President and support

7    Democracy.

8          He was present there at the speech at the Ellipse

9    where the President spoke.  There's already been alluded to

10   his attire.  I think the government's witnesses will probably

11   admit that throughout 2020 and particularly at two pro-Trump

12   protests in December, there had been counter-protesters that

13   engaged with the Trump supporters and there was instances

14   that reported in the news of throwing batteries, throwing

15   frozen water bottles, bricks, and that some of the Trump

16   supporters sustained injury and so the evidence is going to

17   be that not just Mr. Brock by a long shot but many, many

18   people, you've seen some of them already in the videos, wore

19   personal protective equipment of many kinds, vests, helmets,

20   bike helmets, motorcycle helmets, and Mr. Brock had that as

21   well, his helmet and he had on his vest.  So that was his

22   attire.  So he was there for the speech at the Ellipse and he

23   would have heard the President say, let's go to the Capitol.

24   And then, along with hundreds of thousands of other people,

25   there was the walk there down from the Ellipse down

1    Constitution Avenue to the Capitol itself.

2              And so then the important evidence that the Court

3    is going to hear at that point is Mr. Brock was not anywhere

4    towards the front of that group.  He wasn't the first wave as

5    it's sometimes been referred to.  On the contrary.  And those

6    were the people that there might be some evidence that were

7    fighting with police, you know, having standoffs, breaking

8    windows.  It's going to be none of that with respect to him.

9    The evidence, we're confident, is going to be that by the

10   time Mr. Brock approached the west facade of the Capitol, any

11   semblance of a barricade, this gets to the restricted area

12   issue, was removed outside of his presence.  The bike racks

13   were gone, the standoff with police were done, and at that

14   point any police in the area were literally standing aside,

15   the evidence is going to show that.  It's not just that they

16   weren't physically engaging the protesters, they were off to

17   the side making no effort whatsoever to interfere with the

18   movement of the crowd.  And that's not even a verbal effort,

19   there's not going to be evidence that there was say police on

20   loudspeakers saying, disperse, this is an unlawful entry,

21   assembly, disperse, there's not going to be any of that.

22             And then your Honor already saw that at the point

23   where Mr. Brock is on film entering the door to the building

24   itself, there's no police there, it's almost an orderly

25   procession into the Capitol.  There's nobody there putting

1    him on notice that entry there was prohibited.  And this is,

2    the backdrop to this is the evidence will show this is the

3    U.S. Capitol in the 9/11 era so to speak and the evidence, we

4    submit, is such that a reasonable person could conclude that

5    the persons lawfully in charge of the Capitol made a decision

6    that entry was going to be allowed.  All the evidence

7    tends -- I don't want to get into arguments in opening

8    statement but that's what I think the evidence will show.

9            The evidence will also show one of the cruel twists

10   of fate in this case, a tragic aspect of it is that right,

11   you know, if Mr. Brock had approached just a few minutes

12   before he did, there would have been protesters there

13   breaking windows and kicking the door and I think the

14   evidence is going to be clear that had Mr. Brock approached

15   at that point, he wouldn't have engaged in any of that.  I'll

16   get to why I say that in just a moment.

17           The other cruel fact about this case is the

18   evidence is going to show if he had approached that door just

19   a few minutes later, there would have been a police standoff

20   where police had secured the door and they had shields trying

21   to keep people out.  The evidence is going to be very clear

22   that had Mr. Brock approached just a few minutes later and

23   been presented with that scene, he would have turned around

24   and left.  I think the Court's going to have no trouble

25   concluding that.  The fact that he approached just, just when

1    he did, in the middle of the group is the tragic circumstance

2    that led to this unfortunate case.

3            And I think those observations are only going to be

4    reinforced by Mr. Brock's actions in the Capitol, some of

5    which we've seen already.  Your Honor heard Mr. Brock

6    admonishing the other demonstrator to get out of the Vice

7    President's chair and telling him and the others, we have to

8    be respectful, that's not our chair.  And that's not the only

9    example of that that the Court's going to hear today is of

10   Mr. Brock behaving in that way.  Your Honor probably, could

11   have already observed from the courtroom and from the videos

12   that Mr. Brock is a man of considerable physical stature.  He

13   was in his 50s, is in his 50s, was in his 50s in 2021 which

14   puts him older than probably most of the people that were

15   there that day, certainly not all.  And his long career in

16   the military, you'll see this, has given him a certain

17   ability to issue commands in an authoritative way, he has

18   that training.  And the evidence is all going to show that he

19   used those personal characteristics to exert a moderating

20   influence on anybody that was in his sphere.  If anyone was

21   getting out of hand, behaving disrespectfully, he admonished

22   those people not to do that, which is the very opposite of

23   the intent to obstruct government business, to obstruct

24   Congress, to break the law, to behave wrongfully.  It's

25   completely inconsistent with that.  I'm straying into

1    argument, I'll save further elaboration on that to closing.

2         Finally, though, there's going to be evidence that

3    Mr. Brock left the Capitol voluntarily under the supervision

4    of law enforcement well before the actual clearing out of

5    everybody began, and before the President's, you know, famous

6    tweet about, we love you, you're very special but you have to

7    leave, that all came later.  He voluntarily, after he had

8    walked around, been here and there, as your Honor saw, he

9    left voluntarily.  And even on his way out the door, when

10   another individual was -- there's a video of this, too,

11   getting a little out of hand and being a little

12   confrontational with officers, on his way out the door you

13   can see Mr. Brock patting this gentleman on the shoulder,

14   telling him calm down, escorting him out (indicating).  For

15   the record I'm making the motions that go along with that

16   description, that's, even on his way out the door, he was

17   behaving in that way.

18        And so the government's case, and we've heard this

19   already, is focusing on small parts of the record, I would

20   submit, look at this terrible Facebook message, look at this

21   30-second snippet of video, why is he opening that door,

22   isn't that nefarious?  But we submit when the evidence is

23   considered as a whole, it's a clear-cut case for complete

24   lack of criminal intent.  The Facebook messages, to the

25   extent they're admitted, are absurdly overheated and absurdly

1    inconsistent with the actual evidence of how Mr. Brock

2    behaved that day, who he was and what his actions were

3    intended to accomplish.

4         We submit at the conclusion of the evidence, the

5    Court will have no trouble concluding that Mr. Brock did not

6    have criminal intent and was instead, disagree with him

7    though the Court and other reasonable people might, was doing

8    his best to act in accordance with the best traditions of

9    citizenship, patriotism, and love of country to which he's

10   lived his whole life up to this point.  Thank you.

11        THE COURT:  Thank you, Mr. Burnham.  All right.  I

12   appreciate the opening statements of counsel, and now let's

13   hear and see the evidence in the case.  Government may begin

14   to present witnesses and exhibits.

15        MR. DISNEY:  Thank you, your Honor.  Your Honor,

16   you do have a stipulation, it's Exhibit 702 and it's

17   regarding the stipulation of the Electoral College.

18        THE COURT:  And that's a lengthy stipulation?

19        MR. DISNEY:  It is a lengthy stipulation and we

20   don't have to go through it at this point, but basically, it

21   lays out that the Electoral College was going on, the

22   counting, certification of Electoral College was going on,

23   that it was interrupted and it lays out the times that it was

24   interrupted.

25        THE COURT:  You can give me just a second.  I mean,

1    I'm familiar with this information generally, just a second.

2    Sometimes these exhibits are not all clipped together.  I

3    seem to have --

4              MR. DISNEY:  It was in the 702, the stipulations

5    that were just handed to you.

6              THE COURT:  Just a second.  I need to just make

7    sure I have everything straight here.  Does it have 18

8    paragraphs in total?  Fourth page would be the 18th

9    paragraph?

10             MR. DISNEY:  Yes, your Honor.

11             THE COURT:  All right, I've got it.

12                  (The Court reviews Exhibit No. 702.)

13             THE COURT:  All right, I've reviewed it.

14             MR. DISNEY:  We just wanted to have that background

15   for the Court before we call our first witness which will be

16   Elizabeth Glavey.

17             THE COURT:  All right.

18             THE CLERK:  Good morning, ma'am.

19             THE WITNESS:  Good morning, sir.

20             THE CLERK:  Please raise your right hand.

21

22             E L I Z A B E T H   G L A V E Y , called

23   as a witness and being duly sworn, testifies as

24   follows:

25             THE COURT:  Good morning, Ms. Glavey.

Elizabeth Glavey - Direct                    28

1              THE WITNESS:  Good morning, sir.

2              MR. DISNEY:  Your Honor, with permission of defense

3      counsel, I would move to admit State's Exhibits -- I'm sorry,

4      Government Exhibits 205, 206, 207, 208, and 209.  That's 205

5      through 209.

6              THE COURT:  Without objection?

7              MR. BURNHAM:  Yes, your Honor.

8              THE COURT:  All right.  So Government's 205, 206,

9      207, 208, and 209 are admitted, and by the way, Government's

10     70 -- well, I'm sorry, Exhibit 702, a stipulation, is

11     admitted as well.

12             MR. DISNEY:  And then two more exhibits are

13     Government's Exhibits 402 and 403.

14             THE COURT:  Without objection, Mr. Burnham?

15             MR. BURNHAM:  Yes, your Honor.

16             THE COURT:  402 and 403 are admitted.

17             MR. BURNHAM:  Yes, your Honor, no objection.

18     DIRECT EXAMINATION BY MR. DISNEY:

19     Q     Ma'am, would you tell us your name?

20     A     Elizabeth Glavey.

21     Q     And where are you employed?

22     A     The Secret Service.

23     Q     How long have you been with the Secret Service?

24     A     Thirteen years.

25     Q     And what is the mission of the United States Secret

1    Service?

2    A    It's a dual mission with protection and investigations.

3    Q    Thank you.  And what is the current position you hold

4    with the Secret Service today?

5    A    I'm an instructor at the Secret Service training

6    academy.

7    Q    And back on January 6 of 2021, what position did you

8    hold?

9    A    I was an agent on the Vice President's detail.

10   Q    And who was the Vice President at that time?

11   A    Michael Pence.

12   Q    And how long had you been on that detail?

13   A    At that time, three years.

14   Q    And what was your responsibilities on the Vice

15   President's detail?

16   A    To protect the Vice President and his family and to do

17   security advances.

18   Q    When you say to do security advances, what are you

19   talking about?

20   A    When the Vice President would travel, we would send out

21   a team to that location and we would conduct a security plan

22   for the venues that the Vice President would visit.

23   Q    In protecting the Vice President, is it important to

24   have a perimeter established?

25   A    A security perimeter, yes.

Elizabeth Glavey - Direct                          30

1    Q     And what purpose does that serve?

2    A     It provides a barrier for where the general public can

3    come in, get screened and enter our facility.

4    Q     And when you say get screened, what do you mean by

5    that?

6    A     To check the individuals for any kind of weapons that

7    could harm the Vice President or his family.

8    Q     And do you feel like that that is an important, the

9    screening is important in protecting the Vice President?

10   A     Yes.

11   Q     Thank you.  Now going back to January 6th, 2021, we

12   have this stipulation of the Electoral College, but it's my

13   understanding that Vice President Pence was slated to go to

14   Congress on that day?

15   A     That's correct.

16   Q     And what was your assignment on that particular day?

17   A     I was the site agent that day.

18   Q     And what does that mean?

19   A     I was responsible for taking the Vice President

20   anywhere he needed to go throughout the Capitol that day, I

21   was the point of contact.

22   Q     Prior to January 6th, 2021, did you and your colleagues

23   work out a plan about the Vice President's visit?

24   A     Yes.

25   Q     And is there a name for the, basically the sheet that

Elizabeth Glavey - Direct                     31

1   you used to develop this plan?

2   A     Yes, with my liaison counterpart, we completed the head

3   of state notification for the Capitol.

4   Q     Okay.  And what is, if you can just tell me what is a

5   head of state notification worksheet?

6   A     It notifies the Capitol who would be visiting, in this

7   sense Vice President Pence and Mrs. Pence and the daughter

8   would be attending the Capitol that day and who the point of

9   contacts were for the Vice President's detail, as well as his

10  itinerary for the day.

11  Q     And if we could pull up Government's 206, please.  And

12  do you see the document that's on the screen?

13  A     I do.

14  Q     Is that the head of state worksheet that you talked

15  about?

16  A     Yes, that's correct.

17  Q     This is -- is this basically the plan for the Vice

18  President's visit?

19  A     Yes.

20  Q     Who all is involved in getting this head of state

21  worksheet?

22  A     Our liaison division coordinates it.

23  Q     Okay, thank you.  And the Vice President, if we can go

24  ahead and keep that up, the Vice President, does it say on

25  the sheet what the function of his visit was?  Under the

1    fifth --

2    A      Yes, in the itinerary, the Electoral College

3    certification is listed in the function column.

4    Q      And who all was this distributed to?

5    A      It was distributed to the detail and the Capitol Police

6    and our liaison division.

7    Q      In general, can you tell us what the plan was for the

8    Vice President, you know, what time he was going to arrive

9    and tell me just what was anticipated.

10   A      We expected him to arrive around 12:30 and it was to

11   certify the vote, and we would stay at the Capitol until the

12   conclusion of the certification.

13   Q      What type of movement throughout the Capitol did you

14   anticipate the Vice President would have to make?

15   A      We expected to potentially have to make several

16   movements between the House and Senate side whenever there

17   would be an objection to the vote.

18   Q      Had you basically studied up on what was involved in

19   Electoral College to know what, kind of what was going to go

20   on?

21   A      Yes, I was briefed by our liaison division on the

22   formalities of the process.

23   Q      When the Vice President arrived at the Capitol, where

24   was the first place that he was going to be taken?

25   A      To his office.

Elizabeth Glavey - Direct                          33

1    Q    And what side of the Senate, what side --

2    A    The Senate side.

3    Q    I'm sorry, got ahead of myself.  And then where did you

4    anticipate him having to go?

5    A    To the House Chamber.

6    Q    Okay.  And then if there was an objection, where would

7    the Vice President -- objection during the certification,

8    where would the Vice President have to go?

9    A    We would return to the Senate Chamber.

10   Q    So your anticipation was there was going to be quite a

11   bit, even in the best circumstance, quite a bit of movement

12   from the Senate to the House side by the Vice President,

13   correct?

14   A    That's correct.

15   Q    Does that -- what issues does that bring up for someone

16   providing protection for the Vice President, this type of

17   movement?

18   A    The issues we did not know how long we would be there,

19   we obviously had to stay until the certification was

20   complete, so we just knew logistically we would be on both

21   sides of the Capitol repeatedly and we could go very late

22   into the evening.

23   Q    Is there someone in the Capitol with the Secret Service

24   that you worked with to maybe get down into the details of

25   the Vice President's movements?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Elizabeth Glavey - Direct                34

1    A      We work with our liaison division which -- is Secret

2    Service agents.

3    Q      Okay.  I was looking for a name of someone that you

4    worked with on that particular day.

5    A      Yep, Lanelle Hawa.

6    Q      And tell me, about what time did you get to the

7    Capitol?

8    A      I'd say I arrived around 10 a.m.

9    Q      And what did you do when you arrived?

10   A      I walked through the proceedings with Lanelle Hawa, she

11   again advised me on the formalities that would take place.

12          MR. BURNHAM:  Objection, hearsay.

13          THE COURT:  It is hearsay.  Sustained.  Although

14   the general subject, rather than the specific information,

15   really is not objectionable, that she gave general advice.

16   Q      And would it be fair to say that you and Agent Hawa

17   walked through a game plan of what would occur when the Vice

18   President came that day?

19   A      Yes.

20   Q      Can you explain to us, you said you were on the Vice

21   President's detail but you didn't arrive with the Vice

22   President; how does that work?

23   A      So as the site agent it's my responsibility to be there

24   early in advance of the Vice President and to prepare and

25   make sure everything is ready at the site for the Vice

Elizabeth Glavey - Direct                    35

1   President to arrive.

2   Q    And I'll show you Exhibit 205 if we could pull that up.

3   Can you tell us what we're looking at with State's --

4   Government Exhibit 205?

5   A    It's the e-mail with the head of state notification.

6   Q    That's the e-mail that attached that head of state

7   notification?

8   A    Correct.

9   Q    And you said that that was -- we can see some of the

10  people that that was sent to but your name's on there and

11  then that's from, that's the Agent Hawa that you spoke of,

12  correct?

13  A    Yes.

14  Q    Did you -- the Government's Exhibit 206 kind of set out

15  the best case scenario, if everything went according to plan,

16  correct?

17  A    That's correct.

18  Q    Did you also go over an emergency action plan?

19  A    I did, with Lanelle Hawa.

20  Q    And what is an emergency action plan?

21  A    It's a plan that we would put in place in the event of

22  an emergency with our protectee.

23  Q    Okay, thank you.  And did Vice President Pence arrive

24  to the Capitol on January 6th, 2021?

25  A    He did.

1  Q     And what time did he arrive?

2  A     Between 12, 12:30.

3  Q     And when did he next leave the Capitol grounds?

4  A     The next day around 3, 4 in the morning.

5  Q     Okay.  So I just want to be clear that when he arrived

6  at 12, 12:20 in the afternoon, he never left the Capitol

7  grounds until 3, 3, 4:00 the next morning?

8         MR. BURNHAM:  Objection, your Honor, leading.

9         THE COURT:  I'm sorry?

10         MR. BURNHAM:  Objection to leading.

11         THE COURT:  No, he's repeating what she already

12  testified to so the objection's overruled.  Did you get an

13  answer to that question?

14  Q     Is that correct, he never left?

15  A     That's correct, he never left.

16  Q     Thank you.  What did you do when the Vice President

17  arrived at the Capitol?

18  A     When the Vice President first arrived, I distributed

19  the visitor passes to the members of the detail that would be

20  entering the Capitol, and then we proceeded to the second

21  floor where the Vice President's office was.

22  Q     And when he arrived, where did his motorcade drop him

23  off at?

24  A     They dropped him off at the Senate Carriage entrance

25  and then they would have relocated at some point.

Elizabeth Glavey - Direct                              37

1    Q      Okay, thank you.  And are you then, after Vice

2    President Pence arrived at the Capitol, are you pretty near

3    him if not in the same room, you are at least in his

4    proximity throughout the whole time he's at the Capitol?

5    A      Yes.

6    Q      Thank you.  Where is the Vice President's office in the

7    Senate?

8    A      It's on the second floor.

9    Q      And what -- we have a stipulation but what time,

10   approximately what time did the certification of the

11   Electoral College start?

12   A      I don't recall, I would say maybe 1:00.

13   Q      Okay, it's in the stipulation, so ... if the

14   stipulation says that at approximately 12:56 the members of

15   the Senate proceeded from the Senate Chamber to the House

16   Chamber, would you have any disagreement with that?

17   A      I would not.

18   Q      And Vice President Pence would have then went with the

19   Senate over to the House Chamber?

20   A      Yes.

21   Q      And did you follow along?

22   A      I did.

23   Q      And did the certification of the vote then begin?

24   A      It did.

25   Q      And up to this point, is everything going to plan?

1    A     Yes.

2    Q     And did there come a time then when Vice President

3    Pence needed to go back to the Senate side?

4    A     Yes, there was an objection in the vote so we returned

5    to the Senate side.

6    Q     And again, that's all according to plan, correct?

7    A     Correct.

8    Q     At this point in time when you went from the Senate to

9    the -- I'm sorry, when you went from the House side to the

10   Senate side, were you aware of anything that gave you concern

11   going on on the Capitol grounds?

12   A     Yes.  While I was waiting outside the Chamber, I could

13   hear the crowds coming towards the Capitol and I walked over

14   to the windows and I could see the people coming.

15   Q     And at this time, were you aware of any unauthorized

16   person inside the building?

17   A     I was not aware of anyone at that time.

18   Q     Only on the grounds?

19   A     Only on the grounds.

20   Q     And what impact did the individuals coming onto the

21   grounds have in, on your job of protecting the Vice

22   President?

23   A     At that point, we started to enact our emergency action

24   plan.

25   Q     Okay.  Was there a decision made regarding the

Elizabeth Glavey - Direct                                    39

1    President -- Vice President's motorcade?

2    A      Yes, the decision was made to relocate the motorcade.

3    Q      And can you explain that in a little bit more detail?

4    A      The Vice President's motorcade typically is positioned

5    on the plaza, that's at least what I refer it to is the

6    plaza, and there isn't much of a barrier at that location, so

7    the decision was made to relocate the vehicles so that the

8    vehicles would not be stuck on the plaza with all the people.

9    Q      And I'll show you, play for you what we have as

10   Government's Exhibit 402 which will show the movement of that

11   motorcade.

12                    (Video playing.)

13           MR. DISNEY:  I'm sorry, that's not the right one.

14           THE COURT:  That's pretty quick.

15           MR. DISNEY:  Could I have just one second?

16           THE COURT:  This is 403, you said 402.

17           MR. DISNEY:  Yes, your Honor, I stand mistaken,

18   this is 403.

19                    (Government's Exhibit 403 playing.)

20   Q      Can you tell us what we're looking at here, Agent?

21   A      This is a video of the Vice President's motorcade

22   relocating.

23   Q      This was, would you agree, maybe the start of the

24   emergency plan?

25   A      Correct, it was.

Elizabeth Glavey - Direct                    40

1  Q    And why did you feel necessary to have that motorcade
2  move?
3  A    Because as you can see in the video, there's the crowds
4  there that have formed in close proximity to the vehicles so
5  we could not have our motorcade compromised by the general
6  public.
7  Q    Thank you.  And we can stop.  Now Agent Glavey, was
8  there a decision made to relocate the Vice President?
9  A    Yes, there was.
10 Q    And why is that?
11 A    Because the Capitol had been breached by the general
12 public so it was no longer secure and we didn't know if there
13 were people in the building with any kind of weapons.
14 Q    Now before you told us that you were aware that the
15 Capitol grounds had been breached.  Are you saying now the
16 Capitol as in the Capitol building was breached?
17 A    Yes.
18 Q    How do you know that?
19 A    When the motorcade was relocated, I broke away from the
20 detail and walked the route that we would take to our
21 relocation area, and when I was returning from that area back
22 to where the detail was, I heard the glass smash and then
23 shortly after I saw the public entering the building.  They
24 were already inside the building, they were crossing the
25 doorway where I was standing in close proximity.

Elizabeth Glavey - Direct                41

1   Q      Did you have a radio with you at this time?

2   A      I did.

3   Q      And were you able to communicate what you saw to your

4   supervisors?

5   A      Yes, I used my radio and I also was speaking directly

6   to one of my supervisors.

7   Q      Thank you.  And if we could play Exhibit 207.

8               (Government's Exhibit 207 was played.)

9   Q      We'll play that again so you can hear it.

10              (Government's Exhibit 207 was replayed.)

11  Q      I didn't hear it.

12  A      I can hear it.  "They've entered the building, hold,"

13  is what was said.

14  Q      "They've entered the building, hold."  What did you

15  mean by that?

16  A      In that, I was letting the supervisor know that

17  they've -- the public has entered the building and to hold,

18  don't bring the Vice President down.

19  Q      Thank you.  And this was obviously not according to

20  plan, correct?

21  A      Correct.

22  Q      And then I have two more, hopefully we can get them

23  louder, if not just tell me what they say, but Government's

24  Exhibit 208.

25              (Government's Exhibit 208 was played.)

Elizabeth Glavey - Direct                42

1    Q      Can you tell me what that says?

2    A      That, "They're making access to the second floor."

3    Q      Who is the "they" that you're talking about?

4    A      The public.

5           THE COURT:  Could you get the timeline in line?  I

6    don't think I know or maybe I missed it, the time of the

7    first radio communication and the second radio communication.

8    Q      Do you have those times?  Can you give me an

9    approximation of the times?

10   A      I can't.

11   Q      Okay.  It was after the motorcade had been moved,

12   correct?

13   A      Correct.

14   Q      And it was before the Vice President had been taken

15   from his office?

16   A      Yes.

17   Q      And we know from the stipulation that he was taken --

18   well, we'll get into that in a minute, so, I'll get -- I'll

19   lay a little bit more foundation?

20          THE COURT:  All right, thank you.

21   Q      If we could play Government's Exhibit 209.

22              (Government's Exhibit 209 was played.)

23   Q      What was it you said there, Agent?

24   A      There were 6 to 10 officers between us and the public

25   that were 5 to 10 feet away from me.

Elizabeth Glavey - Direct                              43

1    Q      And at this point, the Vice President was where?

2    A      He was upstairs in his office.

3    Q      So the -- he had, he was still in the Senate side?

4    A      Correct.

5    Q      Because of the people who had entered the building, was

6    a decision made to relocate the Vice President?

7    A      Yes.

8    Q      And did you observe that happening?

9    A      Yes.

10   Q      And was that part of the emergency action plan?

11   A      Yes.

12   Q      Why did you feel it was necessary to move the Vice

13   President, why didn't you just let the certification keep

14   going and walk through the people and --

15   A      The building was no longer safe for the Vice President

16   or his family.

17   Q      Why?

18   A      Because we had people in there and we did not know if

19   they had weapons or what their intentions were towards the

20   Vice President.

21   Q      Thank you.  And I want to show you Government's

22   Exhibit 403.  Is this -- I'm sorry, your Honor, this is 404,

23   this is where I am confused.

24          THE COURT:  404 is not in evidence.

25          MR. DISNEY:  Your Honor, I -- we've renumbered one,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    and I said 403, it should have been 404 so I would withdraw

2    403 and ask that 404 be admitted.

3              THE COURT:  So 404, without objection, is in

4    evidence.

5              MR. BURNHAM:  No objection.

6              THE COURT:  And 403 has been removed at this time

7    from evidence.  Go ahead.

8    Q    So let's go ahead and pull that 404 up.  Do you

9    recognize this stairway?

10   A    Yes, I do.

11   Q    What is that stairway?

12   A    It's the stairwell that is right outside the Vice

13   President's office.

14   Q    Do you have a name for it?

15   A    I do not, it's just right there by the Senate Lobby.

16             THE COURT:  The stairway right outside the Vice

17   President's office.

18             MR. DISNEY:  Thank you.  And your Honor, we have a

19   stipulation that the time is accurate.  And what time is

20   that?

21             THE COURT:  Is this a different stipulation or is

22   this in 702?

23             MR. DISNEY:  No, it's a different stipulation that

24   we can get to now.

25             THE COURT:  Just for recordkeeping purposes, as

Elizabeth Glavey - Direct                    45

1   soon as we refer to a stipulation, I want it admitted into

2   evidence so we have the record complete.

3              MR. DISNEY:  Thank you.  Your Honor, we would move

4   to, if I didn't already move to admit it, I would move to

5   admit the stipulation regarding the certification of the

6   Electoral College.

7              THE COURT:  702 is in evidence.

8              MR. DISNEY:  And next I would refer the Court to

9   Exhibit 701.

10             THE COURT:  And that too will be admitted into

11  evidence without objection since it's a stipulation.

12             MR. DISNEY:  And essentially what it says for our

13  purposes, your Honor, is that these videos are true and

14  accurate and that the times reflected are true and accurate.

15             THE COURT:  All right.

16  Q    And Agent, what time does this video have on it?

17  A    2:25.

18  Q    And what are we gonna see here?

19  A    You're going to see the Vice President come out of the

20  lobby.

21  Q    Thank you.  If we could go ahead and play the exhibit.

22             (Government's Exhibit 404 playing.)

23  Q    I'm going to ask you to pause it in just a second.  I

24  mean, no, go ahead, I'll tell you when.  Right here.  Your

25  Honor, may I approach the witness?

Elizabeth Glavey - Direct                    46

1        THE COURT:  You may.

2   Q    Would you know, I have an Exhibit 403A, would you write

3   down the time that is shown on the video, does that -- does

4   the still that's on the video match the picture that's on the

5   403A?

6   A    Yes.

7   Q    And would you write down the time when, the time that

8   the Vice President first leaves the office.

9   A    (Witness complies.)

10  Q    And the witness wrote 2:26 in compliance.  And if we

11  could just go ahead and finish that video.

12              (Government Exhibit 404 played.)

13  Q    Agent, where are you at here?

14  A    I was at the bottom of that stairwell.

15  Q    And is the Vice President then taken to a secure

16  location in the Capitol?

17  A    Yes.

18  Q    Thank you.  And did you remain with the Vice President

19  in that location?

20  A    Yes.

21  Q    Because of moving the Vice President to that secure

22  location, did the certification of the Electoral College have

23  to be suspended?

24  A    Yes, it was delayed.

25              MR. DISNEY:  And, your Honor, that is all the

Elizabeth Glavey - Cross                                 47

1    questions I have at this time.

2            THE COURT:  All right.  Mr. Burnham.  And 403A is

3    not in evidence, by the way, at this time.

4            MR. DISNEY:  Right.  Yes, thank you for that.

5    CROSS-EXAMINATION BY MR. BURNHAM:

6    Q    Good morning.

7    A    Morning.

8    Q    I'm Charles Burnham, I have a few questions.  So you

9    testified on direct that you were, for what period of time

10   were you on the Vice President's staff, like from when to

11   when?

12   A    I was on the Vice President's detail a total of four

13   years, but at the time of January 6th, I was three years.

14   Q    And so would I be correct in assuming that as a part of

15   that, as a part of that job, putting January 6th itself aside

16   for a moment, part of your job would be to remain aware of

17   different emergency situations that could arise with respect

18   to the Vice President, right?

19   A    Yes.

20   Q    All right.  And so you would have at least in a general

21   sense been aware that there had been a significant amount of,

22   at times, violence or protest activity in the city during

23   2020, right?

24   A    Protest activity, yes.

25   Q    And I'm talking about the protests surrounding the

1   George Floyd issue, other protests in support of the former

2   President before January 6th, right?

3   A     Yes.

4   Q     And at those protests, did you come to learn that there

5   had been clashes between different sets of protesters of

6   opposing views, BLM versus Trump or Antifa versus Trump, that

7   sort of thing?

8   A     Yes, I haven't worked any events where I had clashes

9   with protesters at my particular sites, but I was --

10  Q     But you were aware that they had taken place?

11  A     Yes.

12  Q     And did you hear either reported at those protests

13  there was bricks thrown, rocks thrown, batteries, punches,

14  you know, that kind of activity in general?

15          MR. DISNEY:  Your Honor, relevancy, personal

16  knowledge.

17          MR. BURNHAM:  Your Honor --

18          THE COURT:  Well, I take personal knowledge to mean

19  a hearsay objection.

20          MR. DISNEY:  Yes.

21          THE COURT:  And I understand your relevance point.

22  Mr. Burnham, you may respond.

23          MR. BURNHAM:  You know, the witness has testified

24  not only about her specific activities on that day but also

25  her general role, her background, what she did for the Vice

1    President so I just ask for a little latitude to probe that

2    area.

3              THE COURT:  I'm going to give latitude to have her

4    make general observations but to testify to specific things

5    that happened at protests, I think you do run into a hearsay

6    objection.  If she wasn't there.

7              MR. BURNHAM:  What if I --

8              THE COURT:  Which is what she said, she wasn't

9    there, so --

10             MR. BURNHAM:  Can I inquire --

11             THE COURT:  -- it is hearsay.

12             MR. BURNHAM:  Can I inquire not for the truth but

13   just to whether she heard there had been violent clashes, is

14   that question permissible?

15             THE COURT:  Not for the truth.

16             MR. BURNHAM:  Not for the truth, whether she had

17   heard it reported or been informed that such a thing --

18             THE COURT:  But you want to use it for the truth

19   ultimately.

20             MR. BURNHAM:  Not necessarily, your Honor, if it

21   had been reported in the news, that's relevant to the

22   argument the Court is anticipating about -- I might make

23   later, if it had been reported that it had taken place,

24   that's all I need.

25             THE COURT:  Well, I can sort it out so I'll allow

1    you to go ahead and ask the question and the witness to

2    answer it.  I'm not going to allow you to drill very deeply

3    into it, though.

4    Q    I'll try to ask it as bare bones as possible, just as a

5    general matter, had you heard it reported say in the news

6    that there had been clashes between protesters in Washington,

7    D.C. of opposing political viewpoints?

8    A    Yes.

9    Q    Thank you.  Now you testified that in preparing to

10   protect Vice President Pence that day, you had to familiarize

11   yourself to a certain extent with how the Electoral College

12   functioned, is that right?

13   A    Yes, the procedure, as far as the formalities that

14   would take place for the procession of the Vice President

15   from the Senate side to the House side and vice versa.

16   Q    What would trigger that movement would be an objection

17   to say Alaska's votes from a Senator and a Congressman, would

18   that be correct?

19   A    Correct.

20   Q    And were you -- you would have been aware that quite a

21   good number of Senators and Congressmen had in fact announced

22   their intention ahead of time to object to various states, is

23   that right?

24   A    Correct.

25   Q    And that I assume is why you had done the planning you

1   did to be shuttling back and forth repeatedly and perhaps

2   staying there late into the night, right?

3   A     That's correct.

4   Q     And was it your understanding that if an objection to

5   say, again, we'll take Alaska's votes, was sustained, then

6   that could result in the Alaska votes not being certified, is

7   that right?

8   A     I just knew of the proceedings as far as the Vice

9   President's movements, as far as how the electoral vote took

10  place.  That information I'm not concrete on.

11  Q     Were you aware that there had been talk that one of the

12  options that the Vice President arguably had was to delay the

13  certification; is that something that was on your radar?

14  A     It's something I had heard on the news, not necessarily

15  from a procedural standpoint within the Capitol.

16  Q     Did you have any sort of planning for what you were

17  going to do if the certification was delayed beyond that

18  date?

19  A     For us, we just had to work our event until the

20  conclusion so my responsibility was to stay at the Capitol

21  until the Vice President left.

22  Q     Counsel for the Government showed you a video just a

23  moment ago about, you know, how the Vice President and his

24  staff leaving the doors there, you recall that, right?

25  A     Yes, I do.

Elizabeth Glavey - Cross                    52

1    Q    Those doors, wouldn't it be correct that they just say

2    something like U.S. Senate or I think they said U.S. Senate,

3    that right?

4    A    Correct, I -- honestly have not read it, but if you

5    pulled it up, I could read it.

6    Q    Well, they don't say anything like this is Vice

7    President Pence's office, there's nothing like that, correct?

8    A    No.

9    Q    They don't have a label on the doorframe saying Vice

10   President or anything like that, right?

11   A    Right.

12   Q    As to the radio runs, you recall the first radio run

13   where you said that they've entered the building or something

14   to that effect?

15   A    Yes, I think I said they entered the building, hold.

16   Q    Do you remember where you were located when you made

17   that call?

18   A    I was on the first floor.

19   Q    What part of the first floor?

20   A    I would have been near the stairwell that led up to

21   outside that office in the video.

22   Q    How about when you made the call where you said

23   protesters are in the building; where did you observe

24   protesters entering the building from?

25   A    I was all in that general area so there was another

```
 1   small stairwell, so I was in that area which was close to a
 2   doorway, and the doorway is where I could see the protesters
 3   passing by through the hallway.
 4             MR. BURNHAM:  Thank you, no further questions.
 5             MR. DISNEY:  No redirect, your Honor.
 6             THE COURT:  All right.  Thank you very much.
 7             THE WITNESS:  Thank you, sir.
 8             THE COURT:  You may step down.
 9             MR. DISNEY:  May this witness be excused?
10             THE COURT:  She may be.
11                 (The witness was excused.)
12             THE COURT:  Next witness.
13             MR. DISNEY:  Your Honor, we'd call Captain Sean
14   Patton.
15             THE CLERK:  Good morning, sir.  Please raise your
16   right hand.
17
18             S E A N   P A T T O N , called as a
19   witness and being duly sworn, testifies as follows:
20             THE COURT:  Good morning, Captain Patton.
21             THE WITNESS:  Good morning.
22   DIRECT EXAMINATION BY MR. DISNEY:
23   Q    Sir, would you tell us your name?
24   A    Good morning.  My name is Sean Patton.
25   Q    And who are you employed by?
```

Sean Patton - Direct                    54

1    A      I am a captain with the United States Capitol Police.

2    Q      How long have you worked for the Capitol Police?

3    A      I'm in my 24th year.

4    Q      And how many of -- what is your present position?

5    A      I am currently assigned to the assistant commander of

6    the Capitol division since October of 2020.

7    Q      Thank you.  And what is the mission of the United

8    States Capitol Police?

9    A      The mission of the United States Capitol Police is to

10   protect and defend the Congress so that they can complete

11   their legislative duties in a secure and open environment and

12   also protecting the facilities, their staff, visitors from

13   crime or disruption.

14   Q      What about the protection of the Capitol building and

15   grounds itself?

16   A      Correct, and that is also included in our mission to

17   protect the facilities in which the legislative process is

18   being conducted.

19   Q      I want to talk to you about the events of January 6,

20   2021.  What was your -- how would you describe your

21   responsibilities on that day?

22   A      On January 6th, 2021, I was assigned as the assistant

23   commander for routine operations inside the Capitol building

24   and that means I'm responsible for the men and women who work

25   at the Capitol itself, not the office buildings that are on

Sean Patton - Direct                                    55

1   either side of the building or CDU.

2   Q    Okay.  Would that include protection of the Capitol

3   grounds or just the building itself?

4   A    That would include the Capitol building and the

5   immediate grounds around the Capitol as far as the barricade

6   entrances and the outer areas of the building.  I supervise

7   officers who work outside the Capitol called first responder

8   unit.  Those men and women are outside 24/7, they never come

9   inside and they're there to protect the building exterior.

10  And then I'm also responsible for the men and women who work

11  inside the building as well as the men and women who were

12  working inside the House and Senate Chambers.

13  Q    And in your capacity as a assistant commander at the

14  Capitol, did you work inside the Capitol on a daily basis?

15  A    Yes, sir.

16  Q    And are you familiar with the U.S. Capitol and the

17  grounds?

18  A    Yes, I am.

19  Q    I want to show you -- I'm going to move for admission

20  of Government's Exhibit 101, the map of the Capitol grounds.

21            THE COURT:  All right, you spoke to them, I didn't

22  hear but I think you said 101.

23            MR. DISNEY:  101, I'm just seeing if they have an

24  objection.  Did you have an objection?

25            MR. BURNHAM:  No objection.

Sean Patton - Direct                                     56

1        MR. DISNEY:  I would move to admit 101.

2        THE COURT:  101 is admitted without objection.

3   Q    And if we could bring that up and maybe zoom in just a

4   little bit.  Can you just give us, first of all, where is the

5   United States Capitol located in general, is it in the

6   District of Columbia?

7   A    Yes, it is.

8   Q    I just want to get that jurisdictional issue out.  So

9   can you tell me the streets that surround it?

10  A    The address of the United States Capitol is Number 1

11  First Street, Northwest, and it's surrounded by First Street

12  to the -- surrounded by First Street to the east,

13  Constitution Avenue and Independence Avenue, and First Street

14  in the west.

15  Q    And this Exhibit 101 in the top right-hand corner has a

16  compass that's pointing to the north, is that correct?

17  A    Yes, sir, compass is up in the upper right-hand corner.

18  Q    That's accurate?

19  A    Yes, sir.

20  Q    Tell me, what is the East Plaza area?

21  A    So if you look at the center of this picture, you see a

22  diagram of the United States Capitol, directly to the top of

23  the picture is an area called the East Plaza, or the East

24  Front as we refer to.

25  Q    And what are those areas that say Northeast Lawn and

Sean Patton - Direct                    57

1    Southeast Lawn, what are those areas?

2    A      Those are grassy areas that are within the Capitol

3    perimeter, again that outline that I just told you,

4    surrounded by Constitution, first, Independence and

5    Constitution, we also commonly refer to the area as the

6    Senate egg which is labeled Northeast Lawn and also the House

7    egg which is referred to as the Southeast Lawn on your map.

8    Q      And then I want to talk about the west side of the

9    Capitol, can you take us through the Capitol grounds moving

10   from the reflecting pool up to the Capitol building itself?

11   A      Yes, sir.  So again with the Capitol in the center of

12   the picture, directly to the lower area, you see an area

13   called the West Lawn of the Capitol, and then joining on the

14   West Lawn is a walkway we refer to as the Pennsylvania Avenue

15   Walkway, and that is because it's an extension of

16   Pennsylvania Avenue, the street which is on the left-hand

17   side of the Capitol reflecting pool.  Pennsylvania Avenue has

18   a circle which we refer to as Peace Circle, and then the

19   Capitol ground goes up, walkway taking visitors to the

20   Capitol, on the adjoining side.  Next to the West Lawn, same

21   thing, that walkway is called Maryland Avenue Walkway, which

22   is an extension of Maryland Avenue, and then we have a

23   Garfield Circle is in the center right there, the grassy

24   areas on either side of the West Lawn are also areas that are

25   free speech areas, and then the lawn areas move up to the

Sean Patton - Direct                                    58

1    area which we call the Lower West Terrace.

2    Q    And I know that the Court probably knows this but just

3    briefly, if I was at the White House and wanted to walk to

4    the Capitol, what would be the most direct route?

5    A    If you were at the White House, which is located at

6    1600 Pennsylvania Avenue, you could walk straight down

7    Pennsylvania Avenue and it would end at the Capitol.

8    Q    And it would take me right to the Peace Circle?

9    A    Correct, sir.

10   Q    And take me to the northwest side of the Capitol?

11   A    That is correct.

12          MR. DISNEY:  Thank you.  Now I would like to admit

13   Government's Exhibit 201.

14          THE COURT:  Any objection?

15          MR. BURNHAM:  No, your Honor.

16          THE COURT:  All right.  201 is admitted.

17   Q    And I know that this is a stock photo, but can you

18   explain how the West Lawn of the Capitol is terraced?

19   A    Well, the Capitol was constructed on an area called

20   Jenkins Hill, and the terrace, the building itself, you see

21   here, has sloping terraces that make the building flow into

22   the landscape and the picture that you see here is a view of

23   the Senate side because it's showing the -- it's an angle

24   pointing to the Senate Chamber.  The Dome is right behind the

25   Senate Chamber and on the right-hand side is the area we

Sean Patton - Direct                    59

1    refer to as the Upper West Terrace, you can see through the

2    tree line that there is an embankment that's higher up.  In

3    order to get to that area, you would have to use the

4    staircase.

5              MR. DISNEY:  And I would move to admit Government's

6    202.

7              MR. BURNHAM:  No objection.

8              THE COURT:  Without objection, 202 is admitted.

9    Q    And I know again this is a stock photo but can you

10   explain the different levels of the Capitol and kind of

11   explain what we're looking at here?

12   A    Yes, we're looking at a view of the West Front of the

13   Capitol, again, with the Capitol Dome in the middle of the

14   picture.  On the left-hand side, you see the Senate Chamber,

15   which is the north side of the building.  On the right-hand

16   side of the picture, the end of the building is referred to

17   as the House Chamber.  If you see in the middle of the

18   picture, there is a door with a little opening, we refer to

19   that as the Lower West Terrace door, and there is a line on

20   that Lower West Terrace that goes straight across to both

21   stairways that are the landings for those appropriate

22   stairways, and then right above those stairways is an area

23   referred to as the Upper West Terrace, and that is the top

24   landing area that authorized personnel could walk along and

25   go around the building to the other side.

1    Q     So the grassy area, what's that commonly referred to?

2    A     The grassy area in the center of the picture is

3    referred to as the West Lawn, West Front, or even Area 1.

4    Q     And then if I come up off the grassy area onto the

5    first cement, what's that called?

6    A     Typically call that the Lower West Terrace walkway.

7    Again it allows people to walk from say the Pennsylvania

8    Walkway over to the Maryland Walkway so they can make that

9    loop.

10   Q     And then you referred to the Upper West Terrace, what

11   separates the Upper West Terrace from the Lower West, or

12   Upper Terrace from the Lower Terrace?

13   A     What separates the Upper West Terrace from the Lower

14   West Terrace is the two flights of stairs.  There are, again,

15   behind those doors that you see in the center of the picture,

16   that is an opening to access the Lower West Terrace door, and

17   there's offices on that level as well.

18   Q     Now on January 6th, was there something going on on the

19   West Lawn that changed how the structure of the Lower West

20   Terrace?

21   A     Yes, there was.

22   Q     What's that?

23   A     The Architect of the Capitol who's responsible for the

24   maintenance of the building was constructing the inaugural

25   platform for the Presidential inauguration.

Sean Patton - Direct                              61

1           MR. DISNEY:  I'll move to admit Government's 203.

2           THE COURT:  Without objection?  203.

3           MR. BURNHAM:  No objection.

4           THE COURT:  Thank you, Mr. Burnham.  203's

5    admitted.

6    Q    And what does this red box demonstrate?

7    A    The red box area represents the construction area that

8    is off limits for the construction of the inaugural stage.

9    Q    Okay.  How many stories total is the U.S. Capitol?

10   A    The Capitol has four stories.  As you can imagine as

11   the building comes into the center, those floors become

12   smaller, but there is a fourth floor of the Capitol.

13   Q    Okay.  And then you said the Senate is on the left side

14   and the House is on the right side, correct?

15   A    In this picture, correct.

16   Q    Yes.  And when there's a Joint Session of Congress,

17   where do the Senate and House meet?

18   A    When there's a Joint Session of Congress, they meet in

19   the House Chamber.

20   Q    And are you familiar with the certification of the

21   Electoral College?

22   A    Yes, I am.

23   Q    And is it a Joint Session of Congress?

24   A    Yes, it is.

25   Q    So it would be held on the House side?

Sean Patton - Direct                                      62

1    A      Yes, it is.

2    Q      And does that involve the Vice President as the

3    President of the Senate?

4    A      Yes, it does.

5    Q      And is there -- well, I'll strike that.  I want to talk

6    to you about security measures at the Capitol on January 6,

7    2021.  First of all, can we -- I want to focus on the Capitol

8    building itself, was the Capitol building open to visitors on

9    January 26, 2021?

10          THE COURT:  January 6th, you mean?

11   Q      I'm sorry, what did I say?  January 6, 2021.

12   A      No, the Capitol was not open to the public on

13   January 6, 2021 because of COVID.

14   Q      So who then was allowed into the Capitol?

15   A      Members and their staff and invited guests.

16   Q      Okay.  So someone, the Vice President or someone who

17   had official business could go?

18   A      Correct, sir.

19   Q      Is the Capitol building, I think you said this but is

20   it under patrol by the Capitol Police 24/7?

21   A      Yes, it is.

22   Q      And are all the doors of the Capitol manned?

23   A      All of the doors to the Capitol are not staffed and the

24   reason being is some of the doors are fire emergency exits,

25   those are means of egress in the event of an alarm or an

Sean Patton - Direct                     63

1   emergency.  The only doors that the Capitol Police will staff

2   are doors where members and official business visitors can

3   enter into the building.

4   Q     So if I'm an official visitor and I have business at

5   the Capitol on January 6th, what type of screening would I

6   have to go through?

7   A     You would have to go through a magnetometer, any

8   personal belongings that you may have in your person carrying

9   a bag would have to go through an x-ray machine, and as well

10  as we also have explosive detection swiping we call an

11  itemizer screening so, that also is swabbed, your personal

12  belongings or your keys, some item that belongs to you for

13  explosives.

14  Q     So would it be correct that no one got into the Capitol

15  unless they had their own security detail or unless they went

16  through that screening?

17  A     That is correct, with the exception of members of

18  Congress of course.

19  Q     Okay, thank you.

20          THE COURT:  The way you said that, no one got into

21  the -- you mean no one was supposed to get into the Capitol.

22          MR. DISNEY:  Yeah, no one was authorized to go in.

23  A     Correct, no one was authorized to bypass security

24  screening unless they are a member of Congress, a VIP on a

25  protection detail, or authorized staff.

Sean Patton - Direct                    64

1    Q      Thank you.  Now I want to -- we talked about security
2    at the Capitol building, I want to talk about security at the
3    Capitol grounds.  On a day-to-day basis, is the Capitol
4    grounds open to the public?
5    A      So that is a tricky question because we have to put our
6    minds around are we in COVID, are we not in COVID.
7    Q      Let's say no COVID.
8    A      If it was no COVID and it was just a regular day, the
9    public is welcome to be on the Capitol grounds.
10   Q      Then what about during this COVID plague, were the
11   Capitol grounds open to the general public?
12   A      So during the COVID pandemic, the areas of the Capitol
13   which we call the grassy areas or the public areas, they were
14   under restriction because we were following the D.C.
15   government rules for large gatherings because people were
16   still being restricted, I think groups, no more than groups
17   of 10 were being allowed to congregate in any given area.
18   Q      And then on the days leading up to the January
19   inauguration, was there anything else going on at the Capitol
20   that restricted the grounds further?
21   A      Yes, so on the day of January 6, 2021, in addition to
22   the Joint Session, we were aware of a large pro-Trump
23   demonstration that was going to be occurring at the Capitol.
24   Q      Okay.  And I probably messed that up, but you talked
25   about on this photograph here that they were building a

Sean Patton - Direct                              65

1    stage?

2    A     Yes, they were building a stage for several months for

3    the Presidential inauguration.

4    Q     And did the building of that stage add some other

5    restrictions to the grounds?

6    A     Yes.  The entire West Front -- well, excuse me, the

7    West Front area was closed for construction for several

8    months prior to January of 2021.  During the construction,

9    there are times where we open small portions of the West Lawn

10   to receive the Capitol Christmas tree and then the public

11   could come in, take photos with the tree, but on January 6th,

12   that entire area was closed.

13   Q     So suffice it to say, setting aside the certification

14   of the Electoral College, there were restrictions in place on

15   the grounds to begin with?

16   A     Oh, yes, sir.

17   Q     COVID, the building of the stage, correct?

18   A     Correct, as well as snow fencing and other bike rack

19   along the perimeter of the Capitol that had been there

20   several months because of the ongoing construction.

21   Q     Then specifically as it relates to January 6th, was

22   there a restricted area that was established, specifically

23   for January 6th, and the Vice President coming to the

24   Capitol?

25   A     The question is did we extend the security perimeter

Sean Patton - Direct                    66

1    because of the January 6 -- excuse me, because of the

2    electoral vote count and the demonstration?

3    Q     Yes.

4    A     The answer is yes.

5           MR. DISNEY:  I'll ask that Government's 103 be

6    admitted.

7           THE COURT:  Without objection?

8           MR. BURNHAM:  I'm sorry, what was the number?

9           MR. DISNEY:  103, it was the perimeter map.

10          MR. BURNHAM:  No objection.

11          THE COURT:  Thank you, Mr. Burnham, no objection

12   and 103 is admitted.

13   Q     And this is a photo of the Capitol grounds, correct?

14   A     Yes, it is, sir.

15   Q     What does the red line represent?

16   A     The red line represents the extended security perimeter

17   on January 6 for the electoral vote count and for the

18   demonstration activity that was scheduled to happen that day.

19   Q     And what was the construction of that perimeter, how

20   was it actually made?

21   A     The majority of that perimeter consisted of bicycle

22   rack, while it also encapsulated natural portions of the

23   Capitol grounds and infrastructure that we have such as

24   kiosks and barricades and retaining walls.

25   Q     And was it all connected in some fashion?

1    A    It was, everything was connected in some fashion, so

2    individuals would not be allowed to enter inside that red

3    area that you have outlined.

4    Q    Was there any signage that alerted people that they

5    were not allowed to go into that area?

6    A    Yes, on certain portions of the bike rack, as well as

7    the snow fencing, there were signs that said closed by order

8    of the Capitol Police Board, area closed.

9    Q    I want to talk to you about the events of January 6th,

10   2021, and would it assist you in explaining the events if we

11   could go back to Exhibit 103?

12   A    Yes, sir.

13   Q    If we could then go back to 103.

14        THE COURT:  And at some point this morning we'll

15   need to take a morning break.

16        MR. DISNEY:  This might be a good time.

17        THE COURT:  If this is a good time, why don't we do

18   it now.

19        MR. DISNEY:  Yes, sir.

20        THE COURT:  So by that clock, we'll resume at 11:30

21   which is in 12 minutes.  Thank you.

22        THE CLERK:  This Honorable Court stands in recess

23   until 11:30 a.m.

24             (Court in recess, 11:18 a.m. to 11:33 a.m.)

25             (Open Court.)

Sean Patton - Direct                          68

1              THE COURT:  All right, Captain Patton, you're still

2      under oath.  Mr. Disney.

3              MR. DISNEY:  Your Honor, I spoke with defense and

4      we can move to admit some exhibits and maybe save a little

5      bit of time.

6              THE COURT:  That's fine.

7              MR. DISNEY:  Move to admit 104, 210, 211, and 212.

8              MR. BURNHAM:  No objection.

9              THE COURT:  210, 211, and 212 are not on my list.

10             MR. DISNEY:  I'm sorry, your Honor, you're right.

11     So I move to admit 104, and then 400 through 419.

12             THE COURT:  Through 419?

13             MR. DISNEY:  Yes.

14             THE COURT:  No objection to those, Mr. Burnham?

15             MR. BURNHAM:  No, your Honor.

16             THE COURT:  So that includes 403 that was not

17     admitted before?

18             MR. DISNEY:  Yes, your Honor.

19             THE COURT:  All right.

20             MR. DISNEY:  And then 501 through 508.

21             MR. BURNHAM:  No objection.

22             THE COURT:  501 through 508 and it includes all the

23     As in that numbering sequence?

24             MR. DISNEY:  Yes, your Honor.

25             THE COURT:  All right.  Thank you.

Sean Patton - Direct                                    69

1    Q      So Officer Patton --

2           THE COURT:  He probably likes to be called Captain.

3    Q      Captain Patton, are you familiar with the -- how the

4    Capitol grounds and building were overrun on January 6th?

5    A      Yes, I was.

6    Q      And were you present there on that date?

7    A      Yes, I was, sir.

8    Q      And do you have firsthand knowledge on how this

9    occurred?

10   A      Yes, I do.

11   Q      What time did you get to work on January 6th?

12   A      I arrived to work around 6:00 in the morning.

13   Q      And what was the first thing you did when you got to

14   work?

15   A      When I arrived at work, one of the first things I did

16   was grab another sergeant of mine from the midnight tour and

17   he and I had personally walked that entire perimeter of the

18   Capitol grounds, that same red area that you had outlined, we

19   had walked that to make sure that all of the perimeter was

20   connected and joining and that there were no unauthorized

21   individuals within that area.

22   Q      And was it all joining?

23   A      Yes, sir.

24   Q      And were there any unauthorized individuals inside?

25   A      No -- no.

Sean Patton - Direct                                    70

1    Q    Thank you, thank you.

2              THE COURT:  But this was at 6:00 in the morning.

3              THE WITNESS:  6:00 in the morning.

4    Q    Right.

5    A    But it was completely sealed, there was no one inside

6    that perimeter, there may have been a jogger or two on the

7    sidewalk that we had to give some verbal direction to leave

8    and everyone left.

9    Q    And then, so in general for the rest of that morning,

10   what did you do?

11   A    After we checked the perimeter to make sure that it was

12   secure, I had gone back into the building and performed some

13   administrative tasks, assignments that I had, making sure

14   officers were getting the property to get helmets, making

15   sure post assignments were covered and then tracking, you

16   know, what the House and Senate were doing, getting ready to

17   come into session.

18   Q    So why don't we jump to about noon and using the

19   diagram that is 101, can you explain to me what happened

20   around noon?

21   A    So around 12:00, I had come out of the building to go

22   to the East Front to monitor the arrivals of the VIPs coming

23   into the Capitol for the day.  When I was on the East Front,

24   I observed hundreds and hundreds and hundreds of

25   demonstrators that were on the other side of the bicycle

1    rack, the area that was not closed on the East Front,

2    demonstrators were all along the bicycle rack.  They were

3    actively demonstrating which means they were screaming,

4    holding signs, waving flags, and they were, like I said, just

5    lined up, shoulder to shoulder, as far as the eye could see

6    across the East Front demonstrating.

7    Q    And, but staying on the correct side of the perimeter?

8    A    That is correct.

9    Q    Okay.  And then what was going on on the West Front?

10   A    So slightly before, slightly before 1:00 in the

11   afternoon, while I was outside on the East Front, we heard a

12   radio call by our officers that demonstrators had breached

13   the lower Pennsylvania Avenue Walkway and were making their

14   way up to the Capitol.  At that point --

15   Q    Can you show us on the diagram where that is, I don't

16   know if it has a touch on it.

17   A    Can I touch?

18   Q    Yeah.

19   A    So the second green dot is, the green dot areas down

20   here are where we had bicycle rack and we had officers

21   positioned behind the bicycle rack to tell folks that the

22   area is in fact closed.  It was at that point where somewhere

23   between 20 to 75 demonstrators had come to that fence line

24   and started to engage with those officers at that location.

25   At some point folks had grabbed onto the bicycle rack and

Sean Patton - Direct                          72

1   were able to topple it over and move their way up

2   Pennsylvania Avenue Walkway.

3            MR. BURNHAM:  Objection.  Object to foundation, I

4   didn't hear the witness testify he was personally present for

5   this.

6            THE COURT:  Mr. Disney, why don't you get a little

7   bit of foundation for whether he was personally present or

8   whether this was what was being reported to him.

9   Q    Can you give us some insight into that, how do you know

10  this?

11  A    That was -- that information was reported to me, again,

12  I was on the East Front when the call came out over the radio

13  that demonstrators had breached that perimeter point, started

14  making their way.  The very next point I responded around to

15  the West Front and saw hundreds of demonstrators making their

16  way up that area I call Pennsylvania Walkway.

17  Q    So you didn't see the actual breach of that barrier,

18  you came around after it occurred?

19  A    That is correct.

20  Q    Have you since watched Capitol Police video to see that

21  breach?

22  A    Yes, I have.

23            MR. DISNEY:  And your Honor, that's been stipulated

24  as being true and accurate.

25            Does that give you knowledge of how that

1   penetration occurred?

2   A     Yes, it does.

3   Q     So with that, I'd like to be able to have it --

4         THE COURT:  It wasn't an objection, he just asked

5   for a foundation, I think there's been a foundation.

6         MR. DISNEY:  I'm sorry.  I'm sorry.

7         So you heard it, came around, it had already

8   occurred, tell us kind of what happened next as far as what

9   was going on on the west side after people had penetrated

10  down by Peace Circle.

11  A     So as the radio call went out for the breach, I ran

12  down the north side of the walkway to get to the West Front

13  and I saw officers running away because they said there's too

14  many of them and I directed these officers to come back, come

15  with me, we're not, you know, you're not turning around, come

16  back and get to this area.  So I had responded down and I

17  walked around, got to the Lower West Terrace area --

18  Q     Go ahead and use your finger to touch.

19  A     Sorry.  So I had come down, got to this Lower West

20  Terrace area right here and then I encountered, like I said,

21  what felt like hundreds of demonstrators coming up to this

22  first landing over here, and at that point we also had other

23  officers that were there and were trying to contain these

24  individuals from approaching the inaugural platform as well

25  as the staircases and the west side of the Capitol.  At that

Sean Patton - Direct                              74

1    point I directed individuals to start forming a perimeter, a

2    new perimeter, a new line, putting out additional bike rack

3    that had been -- that was nearby because of the construction,

4    and start to formulate some kind of line and direction to

5    have -- tell these demonstrators they're in unauthorized area

6    and they need to move back.

7    Q     Would you agree that at some point in time, it was

8    pretty clear that you had lost control of the Capitol

9    grounds, that it had been breached?

10   A     Yes.  I can agree that several -- an hour and a half

11   approximately later, which felt like hours and hours to me

12   personally because I was there, it felt like forever, but I

13   believe, well, I know that at some point around, between 2

14   and 2:30, demonstrators were able to circumvent where we were

15   positioned and come up the west side of the Capitol and get

16   into the building.

17   Q     Let me stop you before you do that.  So if a person

18   comes up to the West Lawn of the Capitol and they're on the

19   West Lawn and the Lower West Terrace, can they get in, can

20   they get into the Capitol building itself?

21   A     No, sir.

22   Q     What's the only way then to get into the Capitol

23   Building itself?

24   A     The only way to get into the Capitol Building is to go

25   through a visitor entrance which is located on the East Front

Sean Patton - Direct                          75

1   of the building.

2   Q    I'm sorry, that was a bad question.  What's the only

3   way from the west, if you can't get into the building from

4   the West Lawn and from the Lower West Terrace, where would

5   you have to go to get entrance from the west side?

6   A    There are no doors that are open to the public or

7   official --

8   Q    I'm not talking about open to the public, I'm just

9   saying in general.

10  A    Well, there are, again, on the west side of the

11  Capitol, there are doors, fire emergency doors, Lower West

12  Terrace door that I described earlier.  These are, again, all

13  secured doors on the West Front and their primary usage is

14  for emergency egress only.

15  Q    So ultimately, when you, when the West Lawn was

16  breached, the police formed a line up on the Lower West

17  Terrace, correct?

18  A    Yes, sir.

19  Q    And then you said that the crowd was able to basically

20  flank that line?

21  A    That is correct.

22  Q    Where did they go?

23  A    So demonstrators, I observed demonstrators go to both

24  sides and start to make their way up the stairs, we call them

25  the House stairs on the west side and then the Senate

1    stairs -- excuse me, the House stairs on the south side and

2    the Senate stairs on the north side, and they had moved

3    around --

4    Q     Can you show us on the diagram?

5    A     Yes, sir.  So they started to come up the stairs which

6    are down here, and then come up here to get to the terrace

7    areas over here and over here, and there's, in between these

8    two green lines, this area right here, again, is the

9    construction of the inaugural platform.  Also saw individuals

10   who climbed into the scaffolding which is located right here,

11   and here, and they climbed their way inside there and make

12   their way up towards the Capitol (indicating).

13   Q     Ultimately, was the Capitol building itself breached?

14   A     Yes, it was, sir.

15   Q     What was the -- what door was the first door to be

16   breached?

17   A     The first door to be breached was the Senate connecting

18   corridor wing door.

19   Q     Thank you.  And is that -- will we discover that's the

20   door that the defendant came in?

21   A     From prior video that I've seen --

22         MR. BURNHAM:  Objection.

23         THE COURT:  I'll sustain that objection.  Let's let

24   the evidence --

25         MR. DISNEY:  Okay, all right.

1          THE COURT:  -- come rather than summarize what he

2     thinks the evidence will be.

3     Q     So the Senate Wing Door was the first door to fall, is

4     that correct?

5     A     Yes, sir.

6     Q     Once people got into the building, what problems did

7     that create for Capitol Police to maintain control or to keep

8     people out of the building?

9     A     If we have an unauthorized person breach our security,

10    the Congress is at significant danger and could no longer

11    legislate.

12    Q     Okay.  So I guess what I was getting at is you were

13    able to keep people outside the building, right?

14    A     Yes, sir.

15    Q     For some time?

16    A     Yes, sir.

17    Q     Once that Senate Wing Door was penetrated and people

18    were inside the building, did that make it more difficult to

19    secure the building?

20    A     Absolutely.

21    Q     How is that?

22    A     That is because the Capitol Police had a significant

23    number of employees, almost all of them were outside either

24    on East Front or the West Front, remember, on the East Front

25    we still had hundreds if not thousands of demonstrators that

Sean Patton - Direct                              78

1    were behind the bicycle rack and that had a significant

2    amount of Capitol Police tied up with that.  Then with the

3    pursuing breach on the West Front, we had additional officers

4    come outside the building, as well as our civil disturbance

5    unit officers, forming to deal with what appeared to be

6    hundreds and hundreds of demonstrators who were coming from

7    the West Front.  So now we had demonstrators on both sides of

8    the building.  We did have Capitol Police inside the

9    building, again, as I mentioned, there are Capitol Police

10   inside the House Chamber and Senate Chamber, any time the

11   Congress is in session, as well as officers who are staffing

12   doors that are used as normal entry into the building, and we

13   have building patrols and other officers with the title

14   emergency responders who are available to take calls for

15   police services inside the building.  So when the building is

16   breached, all of our resources have to go to locating that

17   individual or individuals, in order to make sure that they're

18   not a potential danger to the occupants inside the building.

19   At that point, the rest of the entire building would go into

20   a status we call lock down, where we're securing all of the

21   entrances, making sure that no one enters and leaves until we

22   find those individuals.

23   Q    You said that not all the doors inside the Capitol were

24   manned?

25   A    Again, that is correct, in a normal day, we do not

Sean Patton - Direct                              79

1    staff every entrance to the building.

2    Q    And so once the building was penetrated, did that allow

3    people to open up unmanned doors?

4               MR. BURNHAM:  Objection to leading.

5               THE COURT:  Just a second.  Just a second.  You

6    want to say something, Mr. Disney?

7               MR. DISNEY:  I want to say if he knows.

8               THE COURT:  I'll sustain the objection, just be

9    careful about leading questions.  I think there's a lot that

10   can happen with leading questions on preliminary matters and

11   so forth but where we get into actual, significant events,

12   let's not lead the witness, let's let the witness testify to

13   nonleading questions.  So that objection is sustained.

14   Q    You talked about a large crowd forming on the west

15   side, and at this time, I would like to play, your Honor,

16   State's 401.

17              THE COURT:  It's in evidence.

18                  (Government's Exhibit 402 playing.)

19              THE COURT:  This is 402.

20              MR. DISNEY:  This is 402, your Honor.  Can we stop

21   it for a second.  Your Honor, I'm sorry, this is 402.

22                  (Government's Exhibit 402 playing.)

23   Q    Officer -- I'm sorry, Captain Patton, can you tell us

24   basically what we're seeing here.

25   A    You're seeing hundreds and hundreds of demonstrators

Sean Patton - Direct                    80

1    breach the West Front Lawn area and make their way towards

2    the Capitol.  The area at the bottom of the screen is the top

3    area of the inaugural platform, the lower area is the area we

4    refer to as the Lower West Terrace Walkway, again, that goes

5    between the Pennsylvania Avenue Walkway and the Maryland

6    Walkway on the left-hand side.

7    Q    And is the time at the bottom correct?

8    A    Yes, sir.

9    Q    And this is a time-lapsed video, correct?

10   A    Yes, sir.

11   Q    And so if we could just go ahead and play it.

12             (Government's Exhibit 402 playing.)

13   Q    Thank you.  Now, Captain Patton, do you ... we have a

14   stipulation that the Capitol grounds has cameras, is that

15   correct, CCTV cameras?

16   A    Yes, they do.

17   Q    And they're true and accurate?

18   A    Yes, sir.

19   Q    And have you viewed State -- Government's Exhibit 400

20   which is a compilation of the breaches on the west side of

21   the Capitol?

22   A    I have, sir.

23   Q    And is it true and accurate?

24   A    Yes, it is, sir.

25             MR. DISNEY:  Your Honor, we'd ask that we play

Sean Patton - Direct                    81

1    Government's 401.

2              THE COURT:  401 or 400?  400 is the compilation I

3    think.

4              MR. DISNEY:  Yeah, say that again, your Honor?

5              THE COURT:  On my exhibit list from you folks, it

6    looks like 400 is the compilation, is that what you're going

7    to play?

8              MR. DISNEY:  Your Honor, we had a misnumbering,

9    it's -- I will, we will get that corrected.

10             THE COURT:  What did we just look at then?  What

11   was that time lapse, what number was that?

12             MS. AYERS-PEREZ:  The time lapse on our list is 402

13   but the first four videos in the 400 series were misnumbered,

14   they were one up so 400 was 401, 401 was 402 just for those

15   first four videos.

16             THE COURT:  So there is no 400?

17             MS. AYERS-PEREZ:  Correct, your Honor.

18             THE COURT:  So 400 is 401?

19             MS. AYERS-PEREZ:  Correct.

20             THE COURT:  401 is 402?

21             MS. AYERS-PEREZ:  Correct.

22             THE COURT:  402 is?

23             MS. AYERS-PEREZ:  403.

24             THE COURT:  403 is?

25             MS. AYERS-PEREZ:  404.  And then what we've done is

Sean Patton - Direct                    82

1      404 is part of our larger exhibit, we just renumbered that

2      421.

3                THE COURT:  So 404 is 421?

4                MS. AYERS-PEREZ:  Yes, everything else is correct.

5      I do apologize for that, your Honor.

6                THE COURT:  All right.  Mr. Burnham, do you

7      understand what the Government has done in terms of

8      renumbering, are you okay with it?

9                MR. BURNHAM:  Yes, I follow, your Honor.

10               THE COURT:  All right, thank you.

11               MS. AYERS-PEREZ:  Thank you.

12     Q    So the compilation that I was talking about on the west

13     side is 401 and have you seen that?

14     A    Yes, sir.

15     Q    And does it true and accurately depict the breaches on

16     the west side of the Capitol?

17     A    Yes, sir.

18     Q    Your Honor, so at this time I'd play 401, it's

19     approximately six minutes.

20               THE COURT:  It's already been admitted into

21     evidence, preadmitted, so you can play it.

22               MR. DISNEY:  Thank you.

23                    (Government Exhibit 401 playing.)

24     Q    At the top of the screen, the pinnacle, the white, what

25     is that?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Direct                           83

1   A      That's Peace Circle, sir.

2              THE COURT:  And there are officers there trying to

3   maintain the perimeter?

4              THE WITNESS:  Oh, yes, sir, right down there in

5   front of that walkover stage we have officers positioned

6   behind bicycle rack and you can see the demonstrators are

7   coming up from Pennsylvania Avenue to that point and you can

8   see officers running on the grass to go to that location.

9   Q      And in the forefront of the picture, is that

10  construction with equipment from the stage?

11  A      Correct, that's the construction for the stage, those

12  pieces of equipment, and we had seen some construction

13  workers earlier on in the video come through.  Now you're

14  starting to see people breach that point, and at that point a

15  radio call had gone over the radio, that demonstrators had

16  breached the Pennsylvania Avenue bike rack and made their way

17  up the Pennsylvania Avenue Walkway.

18  Q      Is this approximately the time that you came around to

19  the East Front?

20  A      Correct, I started to come down the walkway which would

21  be on the right-hand side to come across this walkway to meet

22  this, you can see officers are coming around to go back up to

23  the top.

24  A      And you can see there that there's people ripping the

25  snow fencing down on the left-hand side by the walkway, it's

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Direct                              84

1    little hard to see because the grass is green, the snow

2    fencing is green, you can see that walkway, that area.  And

3    then this is --

4    Q     What's the view we see here?

5    A     Pardon me, sir?

6    Q     What's this view?

7    A     This is the view from Pennsylvania as if I was standing

8    on the Peace Memorial and I was looking at the, looking at

9    the bike rack, around the -- so the first lower bike rack

10   seems to be around Peace Circle, then you have the street

11   where all these demonstrators are and then there is a line

12   where our officers are behind those bike rack preventing

13   people from going up this walkway that you see.

14          THE COURT:  This is the same breach, just from a

15   different angle?

16          THE WITNESS:  Yes, sir.

17   Q     Yes.  Down at the forefront we see that, is that the

18   bicycle rack that you're talking about?

19   A     That's an example of bicycle rack that was used and

20   then the white stairs that you see on the other side of those

21   white squares are language that says area closed by order of

22   the Capitol Police Board.

23          (Government's Exhibit 401 continues playing.)

24   A     And then from the video you can start to see the

25   officers are getting pushed back and demonstrators are

Sean Patton - Direct                    85

1    starting to make their way up the Pennsylvania Avenue Walkway

2    towards the West Front of the Capitol.

3    Q    We talked about there being a stairway leading up to

4    the terrace, is this what we're seeing, that stairway?

5    A    Yes, sir, you're seeing a camera from the Senate side

6    of the Capitol looking at the stairway and then that white

7    area with the two doors is an enclosure for a grandstand that

8    is connected to the inaugural platform.

9    Q    This is 2:09 p.m.?

10   A    Yes, sir.

11   Q    Looks like things are being thrown?

12   A    Yes, sir, I was personally there on the West Front and

13   that day I was -- people threw batteries, bike rack at me,

14   sprayed me with mace, pepper spray, bear spray.

15        MR. BURNHAM:  Objection, your Honor.  Objection as

16   to relevance, misbehavior by other persons.

17        THE COURT:  Overruled.

18   Q    The stairs have now been overrun in this picture?

19   A    Yes, they have.

20   Q    Now can we pause it just for a second.  You talked

21   about the Senate Wing Door, is that door shown here?

22   A    Yes, it is, it's in the center of the video.

23   Q    And at 2:11, it looks to be intact, is that correct?

24   A    Yes, sir.

25   Q    Okay, thank you, go ahead.

Sean Patton - Direct                              86

1              (Government's Exhibit 401 continues playing.)

2    Q    Can you tell us what we're seeing here now?

3    A    It looks like we're about to have somebody come through

4    a window, we have an officer that comes into the scene right

5    here, I believe he discharges his OC spray at the individual,

6    and then we have demonstrators make their way into this area

7    that we're calling the Senate connecting corridor through the

8    window.  At the same time we have individuals breaking the

9    other window trying to breach the building as well.  The

10   individual in the middle of the screen is trying to release

11   the door.  That door does have fire equipment on it so that

12   red sign says if the door is depressed for 45 seconds it will

13   eventually release but it will sound an alarm.  Those two

14   individuals just kicked open that door and now we have

15   individuals coming into the Capitol.

16   Q    This is the initial breach of the Senate Wing Door?

17   A    Yes, sir.  So again, at this point, you can no longer

18   have legislative business in the Capitol because the

19   Capitol's breached.

20   Q    Describe what's going on at the Senate Wing Door at

21   2:28.

22   A    At 2:28, myself is in the center of the picture, I had

23   come into the building through the south, through the Senate

24   Carriage entrance and I'm directing officers to make sure

25   that individuals are being pushed back out of the Senate

Sean Patton - Direct                                    87

1    Wing, and I have, I had just come from making sure that the

2    Vice President was evacuated.  So we do have a good showing

3    of Capitol Police, we do have demonstrators that are leaving,

4    again, we're pushing them back out the way that they came in,

5    and we're bringing more reinforcements of officers to get

6    people out of the area.  I'm wearing a black jacket and have

7    the discernible oval --

8    Q    What door is this that we're looking at?

9    A    This is another emergency exit on the Senate Wing

10   referred to as the Parliamentarian door because the

11   Parliamentarian's office is nearby.

12   Q    How close is it to the Senate Wing Door?

13   A    It is -- it's around the corner to that Senate wing.

14   Q    Okay.  Thank you.  Now we're going back to the Senate

15   Wing Door?

16   A    Yes, sir, and I had left the area, by the way, at this

17   time.

18   Q    Looks like at 2:46, would you agree that you at least

19   have some control over the door?

20   A    Yes, there does look like some semblance of order at

21   this point.  But again, the windows, you have demonstrators

22   in the windows, the door is still open at this point so you

23   have officers that are engaging people in three different

24   areas.

25   Q    And are there rioters still within the building?

Sean Patton - Direct                    88

1   A     I don't have knowledge of that, specifically, I could

2   not give you a count of how many rioters or demonstrators

3   were still in the building at that point.

4   A     I can tell you from experience that the demonstrators

5   are pleading with the police to let them in the building.

6   The police officers are all telling them that the building is

7   closed and that they cannot enter.

8             MR. BURNHAM:  Objection, no question pending.

9             THE COURT:  Overruled.

10  A     You're seeing demonstrators hit the police with poles

11  and they're pushing their way into the building.

12  Q     And it appears -- am I correct that on the left it

13  appears that there are people in the building?

14  A     Yes, from this viewpoint, I can see that there are

15  people down the hallway there, that goes towards the center

16  of the building which we call the Crypt on the first floor.

17  So here's the challenge.  We have demonstrators trying to get

18  out of the building and demonstrators trying to get into the

19  building.

20            (Government's Exhibit 401 completed.)

21            MR. DISNEY:  Thank you.  Your Honor, we're now

22  going to turn from the general breach of the Capitol to the

23  specific conduct of the defendant.  Would you like to do that

24  now or would you like to break for lunch?  I'm not sure if

25  your --

Sean Patton - Direct                    89

1          THE COURT:  No, keep going.  We've got another 20

2     minutes before we break.

3          MR. DISNEY:  Your Honor, we have an Exhibit 708

4     which is a stipulation of the parties regarding the

5     defendant's presence in and around the Capitol, and I would

6     ask that 708 be admitted.

7          MR. BURNHAM:  No objection.

8          THE COURT:  Thank you, Mr. Burnham, 708 is

9     admitted.

10          MR. DISNEY:  And your Honor, we have a -- your

11     Honor, what we have is the Exhibit 104 which is a model of

12     the Capitol, and inside that model are the various CCTV and

13     other videos.  All of them will show the defendant, and what

14     I would propose is I simply call out the exhibit number, have

15     it played, and then note the time that the defendant appears

16     on the video.

17          THE COURT:  Sounds acceptable to me, okay with you,

18     Mr. Burnham?

19          MR. BURNHAM:  Fine, your Honor.

20          THE COURT:  Proceed, Mr. Disney.

21          MR. DISNEY:  Thank you.  Is that going to get any

22     larger?  Your Honor, can we see that if you leave it how it

23     is now?

24          THE COURT:  I'm sorry?

25          MR. DISNEY:  Can you see the exhibit how it is now?

1          THE COURT:  I can see it.  It's pretty small, but I

2     can see it.

3          MR. DISNEY:  If we can just have the court's

4     patience for a second while we try to get this.

5          THE COURT:  It hasn't grown.

6          MR. DISNEY:  Seems to be getting smaller, your

7     Honor.

8          THE COURT:  It's disappeared.

9          MR. DISNEY:  Your Honor, I do know that this is

10    going to take longer than 20 minutes to go through.  Would

11    the Court entertain --

12         THE COURT:  Well, we can take an earlier break if

13    that's not going to affect the availability of witnesses and

14    you can get everything set up, ready to go when we resume at

15    1:00 p.m.

16         MR. DISNEY:  Thank you.

17         THE COURT:  All right.  So we'll see you at 1:00.

18              (Luncheon recess, 12:17 p.m. to 1:18 p.m.)

19              (Open Court.)

20         THE COURT:  All right.  Captain Patton, good

21    afternoon.  I remind you you're still under oath.

22    Mr. Disney.

23         MR. DISNEY:  Thank you, your Honor.  Your Honor, we

24    had a glitch, we were playing the programs through -- I'm

25    sorry, we were playing the videos through a certain program,

1    that program was malfunctioning, we are just going to play

2    the videos themselves, they've already been admitted so I'll

3    just call out the exhibit and then play it as we had

4    discussed.

5              THE COURT:  All right.

6    Q    Captain Patton, I want to go through some videos the

7    defendant has stipulated as to his identity, so we'll go

8    through these videos and stop and have, like we said, I'll

9    mark the time to show the defendant, but if we -- you had

10   talked about a rally at the Ellipse, is that correct?

11   A    You're asking if I know about the rally, the Stop the

12   Steal Rally at the Ellipse of the White House, I know about

13   it, yes, sir.

14   Q    Your Honor, I play 501.

15              (Government's Exhibit 501 played.)

16   Q    Where was that location?

17   A    That area was near the Washington Monument and the

18   African-American Museum across from the White House.

19   Q    And if we could go to 501A.  And your Honor, the

20   defendant, by stipulation, is in the lower left corner where

21   the arrow is showing wearing a stocking cap and a flak

22   jacket.

23              THE COURT:  I see him.

24              MR. DISNEY:  Okay, thank you.

25   Q    Then if we could go to 502.

1          (Government's Exhibit 502 played.)

2   Q     Do you recognize this location?

3   A     Yes, it looks like Constitution Avenue.

4          MR. DISNEY:  And your Honor, if we could just back

5   up for a second?

6          THE COURT:  I saw him pass by, before.

7          MR. DISNEY:  Okay, thank you, your Honor.

8   Q     If we could go to 502A.  We'll go quicker, I got to

9   just get the pace of what we're doing.  That's the defendant

10  in the bottom right?

11  A     It appears to be.

12  Q     Thank you.  And if we could go to Exhibit 503.

13         (Government Exhibit 503 played.)

14  Q     And do you recognize that area?

15  A     I do, sir.

16  Q     And where is that?

17  A     These are the Senate steps going from the Lower West

18  Terrace to the Upper West Terrace immediately to the left of

19  the inaugural riser, that's the scaffolding you see on your

20  right-hand side.

21         MR. DISNEY:  And for the record, your Honor, the

22  defendant is reaching for the scaffolding in 503.  At 38

23  seconds.  If we could go to 411.  I'm sorry?

24         MR. BURNHAM:  I'm sorry, I have an objection.  I

25  think counsel just stated the defendant is reaching for the

Sean Patton - Direct                                                93

1   scaffolding -- I'll start over.  My objection is counsel just

2   stated I guess as a part of a question that the defendant is

3   reaching for the scaffolding and that's not something we --

4   first of all, testimony of counsel --

5           THE COURT:  That's just what he says, that's not

6   testimony in the record.

7           MR. BURNHAM:  And that's not part of -- that was

8   not part of our stipulation, that he was reaching for the

9   scaffolding, we're not disputing that's his helmet there,

10  but --

11          THE COURT:  He's just trying to identify through

12  his words, I understand it's not evidence.

13          MR. BURNHAM:  Thank you.

14  Q     411.

15              (Government's Exhibit 411 playing.)

16  Q     And Officer, can you see the defendant in this photo --

17  or this video, I'm sorry?

18  A     I do, sir, he's in the center coming through the

19  doorway of the Senate Wing corridor.

20  Q     Thank you.

21          THE COURT:  And the time?

22  Q     The time is -- what time?

23  A     2:24:15 p.m.

24  Q     2:24:15?

25  A     2:24, the video depicts that it's 2:24:15 p.m. on

1    January the 6th.

2    Q     And that's the Senate Wing Door?

3    A     That's the Senate Wing connecting corridor door.

4    Q     We talked about there being two breaches of the Senate

5    Wing Door; is this the first breach or the second?

6    A     This appears to be the first breach of the door.

7    Q     Thank you.

8    A     The initial breach, excuse me.

9    Q     The initial breach?

10          THE COURT:  When you say breach, this is after the

11   first breach?

12          THE WITNESS:  This is the first breach at 2:24 of

13   those doors.

14          THE COURT:  2:24 was the time of the first breach?

15          MR. DISNEY:  I can clarify that, Judge.

16   Q     What time was the Senate Wing Door initially broken

17   open?

18   A     I think sometime between 2:12 and 2:24.

19          MR. DISNEY:  Your Honor, the video that we showed

20   before lunch showed it at 2:12.

21          THE COURT:  Any disagreement with that?

22          MR. BURNHAM:  No, your Honor, 2:12 is, we agree

23   that was when it was first breached.

24          THE COURT:  That was my recollection as well, thank

25   you.

Sean Patton - Direct                          95

1    Q     And the defendant's coming in then at 2:24?

2    A     Yes, according to the video.

3    Q     Thank you.  If we could go to 420.

4              (Government's Exhibit 420 playing.)

5              THE COURT:  I'm sorry, what exhibit is this?

6              MR. DISNEY:  420, your Honor.

7              THE COURT:  420 has not been identified as an

8    exhibit in evidence yet.

9              MR. DISNEY:  I'm sorry.

10             THE COURT:  You told me 400 through 419, I believe.

11   I don't think 420 is in evidence.  Do you have it,

12   Mr. Bradley?

13             THE CLERK:  No.

14             MR. DISNEY:  I'll clarify that.

15             THE COURT:  Now the numbers were, everything was

16   renumbered in the beginning of the 400 series, I don't know

17   what's happened there.

18   Q     Let me just, before you play that ... your Honor, we

19   would move to admit the exhibit that's showing which is 420.

20             THE COURT:  This is 420, all right.  Any objection?

21             MR. BURNHAM:  No objection to 420.

22             THE COURT:  420 is admitted, and may be shown.

23   Q     Thank you.  And Officer -- or I'm sorry, Captain

24   Patton, can you tell us what area we're looking at here?

25   A     We're looking at a camera from the Capitol Police

Sean Patton - Direct                            96

1    that's facing toward the memorial door of the first floor of

2    the Capitol.

3    Q    And go ahead.

4              (Government's Exhibit 420 playing.)

5              MR. DISNEY:  And your Honor, the defendant is shown

6    in the bottom left, it's a little dark.

7              THE COURT:  I see him.

8              MR. DISNEY:  Thank you.

9    Q    Next could we go to 504.

10             (Government's Exhibit 504 playing.)

11   Q    And stop it for a second.  Do you recognize this

12   location?

13   A    I do, sir.

14   Q    What is this location?

15   A    This is the stairway from that atrium that goes up from

16   the first floor to the second floor.  At the top of the

17   staircase is the entryway to the Rotunda, the Speaker of the

18   House's private offices, as well as Statuary Hall.

19   Q    Who was the Speaker of the House at the time?

20   A    Representative Nancy Pelosi.

21   Q    Thank you.  And if we could go ahead and play 504.

22             (Government's Exhibit 504 playing.)

23   Q    And it appears that the -- am I correct that it appears

24   the defendant's shown on screen now at 32 -- 33 seconds?

25   A    It appears to me that the defendant's listed on the

Sean Patton - Direct                                    97

1    right-hand side with the helmet on.

2    Q    And if we could go to 504A which I believe --

3         THE COURT:  Just a second.  Well, go ahead and show

4    me 504A.

5    Q    Do you see the defendant in 504A?

6    A    I do, sir.

7    Q    Where in the photo is he?

8    A    He appears to be in the upper right-hand corner of the

9    photo.

10        THE COURT:  Just for clarification for the record,

11   the exhibit that was 504 was described as the stairs to the

12   Speaker's office, but the depiction of the defendant is in a

13   hallway at the bottom leading to the stairs, not on the

14   stairs, correct?

15        THE WITNESS:  Correct, sir.

16        THE COURT:  Go ahead.

17   Q    We would agree with that, thank you, Judge.  And if we

18   could go to then 505.

19             (Government's Exhibit 505 playing.)

20   Q    And if we could pause this.

21        THE COURT:  Too late.

22   Q    Do you recognize this location?

23   A    Yes, that was the area outside Speaker Pelosi's private

24   offices.

25   Q    And so the stairs that we saw in 504, if you ascended

Sean Patton - Direct                              98

1    those, then you would be in this location?

2    A     Yes, that's like I said earlier, based on when you get

3    to the top of the stairs, that's an open area that addresses

4    that hallway.

5    Q     Thank you.  And then we'll just stop it when we see.

6    And it's stopped at three seconds into the video.  Do you see

7    the defendant?

8    A     I do.

9    Q     And wearing the helmet?

10   A     Wearing the helmet next to the yellow flag.

11   Q     Let's go ahead and play.

12              (Government's Exhibit 505 played.)

13              THE COURT:  Do we have a time on this, can you see

14   the time in the upper left?

15              MR. DISNEY:  No, your Honor, this is an open source

16   video and we don't know the time.

17              THE COURT:  There's no time.

18   Q     Thank you.  Then if we could play 506.

19              (Government's Exhibit 506 played.)

20   Q     At 22 seconds, do you see the defendant in this video?

21   A     I do, he appears to be behind the individual with an

22   orange hat.

23   Q     Thank you.  Next we'll go to 412.  And can you stop it.

24   First of all, do you recognize the location shown in 412?

25   A     Yes, this is the Rotunda of the United States Capitol.

1    Q    And what time is it now?

2    A    According to the time stamp, it is 2:35 and 09 seconds

3    p.m.

4    Q    The Senate Wing Door is on the first floor of the

5    Capitol?

6    A    That's correct.

7    Q    And then the stairs that we saw would take you to the

8    second floor, correct?

9    A    Correct.

10   Q    And the Rotunda, is it on the first or second floor?

11   A    The Rotunda's on the second floor.

12   Q    And the time is now 2:35, correct?

13   A    Correct.

14   Q    Okay.  Go ahead.  And we'll go ahead and play 412 and

15   just stop it when ...

16              (Government's Exhibit 412 playing.)

17   Q    Do you see the individual to the bottom left, do you

18   see the defendant in this photo?

19   A    Yeah, if you're referring to the bottom left-hand

20   corner where there's a gentleman touching his hat with a

21   white shirt, I see the defendant standing next to him with

22   the green helmet.

23   Q    Thank you.  We'll just go ahead and play this.

24              (Government's Exhibit 412 completed.)

25   Q    Thank you.  If we could go to now 413.

Sean Patton - Direct                    100

1              (Government's Exhibit 413 playing.)

2       Q       And if we could stop it.  Can you tell me the location?

3       A       So this is a camera view of the area looking at the

4       Rotunda doors to the Capitol, Rotunda doors, if you go out

5       those doors you'll be on the East Front of the Capitol, and

6       this is on the second floor level.

7       Q       And --

8       A       Right outside the Rotunda.

9       Q       And the view that we're seeing are people inside the

10      Capitol, correct?

11      A       That is correct.

12      Q       But there also appears to be people outside?

13      A       That's correct.

14      Q       And you said it was on the second floor, can you just

15      explain how those people are on the second floor and still on

16      the outside?

17      A       So, on the outside of the doors that you see at the top

18      of the screen are steps, we call those the Rotunda steps that

19      take you down to the plaza.  Those steps are also restricted

20      to members of Congress and only authorized individuals.

21      Q       Thank you.  We'll just go ahead and play this and stop

22      it.

23              (Government's Exhibit 413 playing.)

24      Q       Can we stop it.  Do you see the defendant enter the

25      picture from the bottom?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Direct                    101

1    A      If you look at the bottom of the picture, there's a

2    gentleman with a red hat and then in front of him there's a

3    camouflaged hat individual and then there's a gentleman to

4    the left-hand side with a green helmet, that looks like the

5    defendant.

6    Q      Thank you.

7                  (Government's Exhibit 413 completed.)

8    Q      And if we could go to 418.  And what's this view here?

9    A      So this view is the opposite of what you just saw,

10   right below, it's not in the screen, are the Rotunda doors

11   that just came open, so this door is looking back into the

12   Rotunda of the Capitol, and that is the area now at the top

13   of the screen, and on the left-hand side are stairs that will

14   take you up to the third floor of the Capitol which is a

15   connecting corridor between the two chambers, the House

16   Chamber and the Senate Chambers.

17   Q      And if we could, you see the defendant shown in this

18   picture?

19   A      On the right-hand side of the screen, there are two

20   people with red hats, right above the one gentleman with the

21   red hat is a gentleman with a green helmet and that appears

22   to be the defendant.

23   Q      Thank you.  Can we go to 510 now.

24                  (Government's Exhibit 510 playing.)

25   Q      And stop it for a second.  What's this location?

Sean Patton - Direct                    102

1          THE COURT:  What number is this?

2          MR. DISNEY:  510.

3          THE COURT:  510 is not in evidence.

4          MR. DISNEY:  I'm sorry, Judge.  We'll skip this

5     one, Judge.  If we could go to 416.

6          THE COURT:  415?

7          MR. DISNEY:  16.

8               (Government's Exhibit 416 playing.)

9     Q    If we could pause it for a second.  Can you tell me

10    what area of the Capitol this is?

11    A    Okay.  So again, this is not a Capitol Police video,

12    looks like an open source video viewing the Rotunda doors and

13    those doors are on the -- you could see them on the left-hand

14    side of the screen.

15         THE COURT:  Make sure we're on the right exhibit.

16    416 on the Government's exhibit list is described as gallery

17    stairs.  Would that be a correct description of this video?

18         THE WITNESS:  On the right-hand side, your Honor,

19    is stairs going up to the galleries on the third floor.

20         MR. DISNEY:  I'm sorry, your Honor, so this is 510.

21         THE COURT:  This is 5 what?

22         MR. DISNEY:  10.

23         THE COURT:  510.  510 which is not yet in evidence

24    is described as Rotunda door interior video.

25         MR. DISNEY:  We would move to admit 510.

Sean Patton - Direct                      103

1          MR. BURNHAM:  No objection to 510.

2          THE COURT:  510 is admitted without objection.

3              (Government's Exhibit 510 playing.)

4   Q    At 2:17, do you see the defendant in this video?

5   A    I do, I see the individual in the bottom of the screen

6   coming up the stairs with the green helmet.

7   Q    And what are those stairs called?

8   A    Those stairs are stairs that lead you to the third

9   floor gallery, they're Rotunda stairs, interior stairs near

10  the Rotunda that take you to the third floor gallery.

11  Q    When you say gallery, what are you talking about?

12  A    This is new area, this is new construction, this is

13  called -- this is part of the Capitol Visitors Center.  When

14  you go up to the landing now, when you get to the top of

15  these stairs, there will be a connecting corridor because we

16  are essentially in the center of the building, correct, so

17  you'll be in a corridor that will allow you to either go to

18  the House Gallery or the Senate Gallery.

19  Q    So the gallery meaning whichever way you go, you can

20  view the Senate or the House?

21  A    Correct, sir.

22              (Government's Exhibit 510 completed.)

23          MR. DISNEY:  Your Honor, the next exhibit we have

24  is 511 and it was not admitted and we would move to admit it.

25          THE COURT:  Any objection to 511, Mr. Burnham?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Direct                                   104

1          MR. BURNHAM:  No, your Honor.

2          THE COURT:  Thank you.  511 is admitted.

3              (Government's Exhibit 511 playing.)

4     Q    Can you tell us what we're looking at here?

5     A    Now, at this point, that video before it shut off was

6     showing the Rotunda doors had been opened on the right-hand

7     side, and then on the left-hand side would be a walkway to go

8     back to the Rotunda, that view appeared to be from someone

9     standing on the steps.

10    Q    Thank you.

11             (Government's Exhibit 511 completed.)

12    Q    If we could now go to 416, and if we could pause that.

13    Do you recognize this location?

14    A    Yes, I do.

15    Q    What is this?

16    A    This is a view from the third floor to the middle

17    landing of the previous video that showed the staircase going

18    up from the Rotunda, that Rotunda foyer area that takes you

19    to the third floor.

20    Q    And can you note the time for us?

21    A    It's 2:35:13 p.m.

22    Q    Okay, thank you.  Do you see the individual going to

23    the left?

24    A    I do.

25    Q    Is that the defendant?

Sean Patton - Direct                                      105

1    A      That appears to be the defendant with the green helmet

2    on.

3    Q      If we can now go to 415.

4                  (Government's Exhibit 415 playing.)

5    Q      And stop that.

6                  THE COURT:  What are we looking at now?

7                  MR. DISNEY:  415, your Honor.

8                  THE COURT:  415?

9    Q      I'm sorry.  So if we can play 415, do you recognize

10   this area?

11   A      I do, sir.

12   Q      And what is it?

13   A      This is another connecting corridor that takes you

14   from -- takes you to the Senate Galleries on the third floor,

15   on the right-hand side is the old Senate Chamber, you see the

16   shutters across the hallway.

17   Q      I'm sorry, you talked about those gallery steps,

18   there's a corridor that could go either way?

19   A      Correct.

20   Q      And this, it appears, is that the defendant shown in

21   the picture in 2:40:52?

22   A      That is correct, in front of the person with the USA

23   sweatshirt.

24   Q      And is your testimony is that he's going towards the

25   direction of the Senate Gallery?

Sean Patton - Direct                              106

1    A      That is correct.

2    Q      Thank you.

3           THE COURT:  On the exhibit list, this is described

4    as east corridor, would that be an accurate description?

5           THE WITNESS:  Yes, sir, that corridor is on the

6    East Front of the building.

7           THE COURT:  Thank you.

8           THE WITNESS:  Yes, sir.

9    Q      Then if we could go to 414.

10           (Government's Exhibit 414 playing.)

11    Q      And stop it.  What are we looking at here?

12    A      So this camera is over the -- what we call the press

13    gallery so that's behind us on the left-hand side is the

14    office of the Secretary of the Senate and then straight ahead

15    is an elevator, Senators only elevator and that there appears

16    to be a person who's getting ready to come in from the

17    previous hallway coming down this corridor so this is a third

18    floor corridor directly outside the Senate Gallery.

19    Q      So if I -- if that door that says gallery door

20    number 1, if you go into it, what would you see?

21    A      You would be inside the Senate Chamber.

22    Q      On the upper level?

23    A      On the upper level, so the Senate Chamber has two

24    levels, the main level where the Senators sit that is on the

25    second floor, the upper area is referred to as the Senate

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Direct                                    107

1    Galleries that's on the third floor, and again, the

2    galleries, that's where members and their invited guests, the

3    public would be allowed to come view a Senate session, but

4    again, at this time, the galleries are secured and closed.

5    Q     Thank you.  And the individual that just walked across,

6    was that the defendant?

7    A     I can't tell from this vantage point, sir.

8    Q     Okay.

9    A     That individual does appear to be the defendant because

10   I can tell that he has flex cuffs in his hand.

11   Q     Thank you.  Now if we could go to 421.  And please tell

12   us what area of the Capitol this is.

13   A     So again --

14           THE COURT:  What -- 421?

15           MR. DISNEY:  Yes, sir.

16           THE COURT:  Not only is it not in evidence, it's

17   not on my exhibit list.

18           THE CLERK:  Nor mine.

19           MR. DISNEY:  All right, we'll skip that one.  If we

20   could go to 419.

21               (Government's Exhibit 419 playing.)

22   Q     And pause.  So what area are we looking at here?

23   A     So we are looking at the area right outside the Senate

24   Galleries, right at the top right-hand of the screen is an

25   enhanced security portal, that's a body scanner that all

Sean Patton - Direct                              108

1    individuals would go into the galleries would go through

2    prior to going into the galleries.

3    Q    Even after going through the security at the --

4    A    At the main door, sir, yes, sir, that's secondary

5    screening.

6    Q    And the defendant is right in front of that scanner?

7    A    That is correct.

8    Q    If we could go ahead and play.

9                 (Government's Exhibit 419 playing.)

10   Q    If we could stop.  That door that the defendant is in

11   front of now, what does that lead to?

12   A    That also leads to the Senate Gallery on the third

13   floor.

14   Q    Thank you.

15                 (Government's Exhibit 419 completed.)

16   Q    And this is at approximately 2:43?

17   A    That is correct, sir.

18   Q    Does that appear to be the defendant who's now exited

19   the Senate Gallery?

20   A    Yes, right next to the individual with the American

21   flag, I can see that the individual with the green helmet and

22   the flex cuffs in his right hand appear to be the defendant.

23   Q    Thank you.  If you go to 507.  And can you tell us, we

24   saw video earlier of Secretary -- I'm sorry, Vice President

25   Pence leaving a door.  Can you tell us what we're seeing in

Sean Patton - Direct                    109

1   this picture?

2   A     So on the right-hand side, first of all we're back on

3   the second floor, and we're right outside the Senate Lobby,

4   those doors on your right-hand side are also referred to as

5   the Vice President doors because immediately on the inside of

6   that door to your right hand is the Vice President's

7   ceremonial office.

8   Q     Is that -- I'm sorry.

9   A     I'm sorry.

10  Q     Is that the door that Vice President Pence was escorted

11  out of earlier?

12  A     That is correct.

13        THE COURT:  And on the exhibit list, 507, which I

14  think is what you believe we're on?  Is listed as inside

15  Senate Gallery video.  Would that be accurate?

16        THE WITNESS:  No, not for this video, sir.

17        THE COURT:  So what exhibit is this?

18        MR. DISNEY:  I'll ... all right.  I'm sorry, it's

19  417.

20        THE COURT:  417, Senate Chamber?

21  A     If you're -- if I'm following your curser, 417 looks to

22  say Senate Lobby CCTV and that is directly outside the Senate

23  Lobby, there's no cameras inside the Senate Lobby so that

24  would be accurate, outside the Senate Lobby if that's --

25        THE COURT:  So this is 417?

Sean Patton - Direct                          110

1          MR. DISNEY:  Yes, your Honor.

2          THE COURT:  All right.

3                (Government's Exhibit 417 playing.)

4    Q    And if we could pause.  Excuse me.  Can you describe

5    the actions of what appears to be the defendant in 417?

6          THE COURT:  Well, first of all, is that the

7    defendant?

8          THE WITNESS:  So to me that appears to be the

9    defendant wearing the green helmet and wearing the flex cuffs

10   now in his appears left hand and he appears to have some set

11   of keys and is trying to unlock the secured lobby doors that

12   are, if you were to go through those doors, would give him

13   access to the Senate floor.

14   Q    And what time is this?

15   A    This is at 2:47:14 p.m.

16         MR. DISNEY:  Your Honor, may I approach the

17   witness?

18         THE COURT:  You may.  You said give him access to

19   the Senate floor, does it also give him access to what we've

20   called the Vice President's office?

21         MR. DISNEY:  Yes, so the Senate Lobby is connecting

22   behind the Senate Chamber, which we call that area the Senate

23   floor too, so once you go through those doors, the Vice

24   President's office is on the right-hand side and the entrance

25   to the floor is on the left-hand side, so, yes, sir, both

Sean Patton - Direct                                    111

 1   doors.

 2              THE COURT:  All right.  You may approach the

 3   witness.

 4   Q    I'm going to show you what's been marked as 403A and we

 5   had a witness write on it earlier, I'm just wonder -- I'd ask

 6   you just to denote the time the defendant is at the door as

 7   shown in the exhibit on the screen.

 8              THE COURT:  The exhibit on the screen?

 9              MR. DISNEY:  Yes, sir, and that's 417.

10              THE COURT:  Captain Patton, the exhibit on the

11   screen, what's the time shown?

12              THE WITNESS:  So the -- the time on the screen is

13   2:47:14 p.m.

14              THE COURT:  Thank you.

15              THE WITNESS:  And I've just written that underneath

16   the picture, on top of the picture that is -- appears to be a

17   screenshot of this video.

18              THE COURT:  Okay.  What number exhibit is this?

19              MR. DISNEY:  403A, I haven't admitted it yet.

20              THE COURT:  I didn't think 403A was the screenshot

21   that showed the defendant at the door.

22              MR. DISNEY:  Can I show it to counsel now?

23              THE COURT:  And you had a time marked on it

24   earlier.

25              MR. DISNEY:  I did, I do.

Sean Patton - Direct                                   112

1          THE COURT:  And now this is -- you have two times

2     marked on this?

3          MR. DISNEY:  Well, the first one shows, what I'm

4     trying to demonstrate is the time the Vice --

5          THE COURT:  Oh, there are two different -- see,

6     I've never seen the exhibit, you're using the exhibit and I

7     haven't seen it.

8          MR. DISNEY:  I haven't admitted it yet.

9          THE COURT:  Well, that's why, but I haven't seen it

10    so it's actually two different pictures and now you're

11    putting two different times on, one for one picture and one

12    for the other picture.

13         MR. DISNEY:  Yes.

14         THE COURT:  Now I understand, but that was never

15    explained.

16         MR. DISNEY:  Thank you.

17         THE COURT:  Thank you.

18         MR. DISNEY:  Your Honor, I move to admit 403A which

19    is both of them on the -- shows the Senate Lobby door, the

20    left-hand picture shows the Vice President leaving at 2:26 as

21    noted by the witness, the right-hand side shows the defendant

22    trying to enter the door at 2:47 p.m.

23         THE COURT:  Any objection, Mr. Burnham?

24         MR. BURNHAM:  No, your Honor.

25         THE COURT:  All right.  And the times given, the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Direct                          113

1    second time was supplied by Captain Patton, the first time

2    was supplied by Agent Glavey.

3                   MR. DISNEY:  Yes.  Thank you.

4                   THE COURT:  You should -- that's the original

5    exhibit, you should hold it.

6                   MR. DISNEY:  Your Honor, if we could next go to

7    507.

8                        (Government's Exhibit 507 playing.)

9    Q     What is the location in the Capitol that we're seeing

10   here?

11   A     That individual's inside the Senate Gallery on the

12   third floor.  I can tell this because in the backdrop I can

13   see the Senate floor, I can see the presiding officer's chair

14   on the left-hand side of that individual.

15   Q     Thank you.  And if we could continue on.

16                        (Government's Exhibit 507 playing.)

17   Q     Do you see the defendant in this exhibit?

18   A     I do see the defendant behind the American flag wearing

19   the green helmet right below the light.

20   Q     The smaller American flag?

21   A     The smaller American flag.

22   Q     Thank you.

23                        (Government's Exhibit 507 completed.)

24                   MR. DISNEY:  Your Honor, if we could next go to

25   611.

Sean Patton - Direct                                    114

1              THE COURT:  What number?

2              MR. DISNEY:  611.

3              THE COURT:  It's not yet in evidence.

4              MR. DISNEY:  I would ask that 611 be admitted in

5     evidence.  I'm sorry, Judge, we just have a little trouble

6     with the program, but --

7              THE COURT:  I'm observing that.

8              MR. DISNEY:  -- I would ask that 509 --

9              THE COURT:  511?

10             MR. DISNEY:  509.

11             THE COURT:  I'm sorry, what?

12             MR. DISNEY:  509.

13             THE COURT:  509.  That is not yet in evidence.

14             MR. DISNEY:  We would ask that 509 and 611 be

15    admitted in evidence.

16             MR. BURNHAM:  No objection, your Honor.

17             THE COURT:  509 and 611 are admitted.

18             THE COURT:  And this is 509?

19             MR. DISNEY:  Yes, your Honor.

20                  (Government's Exhibit 509 playing.)

21    Q    Can you stop it.  The person speaking, can you identify

22    him?

23    A    Yes, that appears to be the defendant again with the

24    green helmet and the flex cuffs in his left hand.

25                  (Government's Exhibit 509 completed.)

Sean Patton - Direct                    115

1   Q     And now 611, your Honor.

2                 (Government's Exhibit 611 playing.)

3   Q     And can you tell me the location we're looking at here?

4   A     So now somebody is looking with a camera facing the

5   Senate floor, demonstrators and the witness, excuse me, the

6   defendant is in the center of the screen with the flex cuffs

7   on the Senate floor.

8   Q     Thank you.

9                 (Government's Exhibit 611 completed.)

10  Q     Now if we could go to 611A.  And is the defendant

11  depicted in 611A?

12  A     Yes, I notice the defendant is standing on top of the

13  gentleman with the black book bag and black shirt and he has

14  the green helmet on.

15  Q     And then 611B?

16                THE COURT:  Before we do, we're going in reverse

17  order, this is not in evidence.  If you want 611A in evidence

18  in order for him to identify, you should get it in evidence

19  before he identifies it.

20                MR. DISNEY:  I understand, your Honor.  Your Honor,

21  I'd move to admit 611A, 611B, and 611C.

22                THE COURT:  A, B and C of 611.  Mr. Burnham?

23                MR. BURNHAM:  Court's indulgence.  No objection.

24                THE COURT:  Thank you, Mr. Burnham.  611A, 611B,

25  and 611C are admitted.

Sean Patton - Direct                        116

1   Q     If we could go to 611B.

2         THE COURT:  We already had testimony about 611A and

3   I'll allow that before it was admitted.  Now we're on 611C?

4         MR. DISNEY:  This is B, your Honor.

5         THE COURT:  B, I'm sorry.

6   Q     Is the defendant shown in this photo as well?

7   A     Yes, I notice the defendant is standing on top of the

8   individual with black book bag, black shirt and he's got a

9   green helmet on.

10  Q     And finally, 611C?

11  A     I could tell that the defendant is in the picture, he's

12  got the green helmet and he's got the flex cuffs in now his

13  right hand.

14        MR. DISNEY:  And your Honor, next I would move to

15  admit 612 and 613.

16        THE COURT:  612 and 613, any objection?

17        MR. BURNHAM:  No, your Honor.

18        THE COURT:  Thank you.  612 and 613 are admitted.

19  Q     And if we could go to 612.  And can you tell us what

20  we're looking at here.

21              (Government's Exhibit 612 playing.)

22  A     We're looking at video of demonstrators on the Senate

23  floor.

24  Q     And if we could stop it at 14 seconds.  First of all,

25  can you tell me what time this is now?

Sean Patton - Direct                                    117

1    A       The time at the bottom of the video is 14:52 and 28

2    seconds.

3    Q       And can you identify the defendant in this video?

4    A       The defendant is on the left-hand side wearing the

5    green helmet and carrying flex cuffs in his left hand.

6    Q       Thank you.

7                    (Government's Exhibit 612 playing.)

8    Q       Who had normally sat at these desks?

9    A       Senators.  This is a highly restricted area and the

10   audience for this room is Senators and officers of the Senate

11   and invited guests and staff.

12                   MR. DISNEY:  And your Honor, this is 613.

13                   (Government's Exhibit 613 playing.)

14   Q       If we could pause it.  Can you identify the defendant

15   for the record?

16   A       Yes, the defendant appears to be on the right-hand side

17   of the individual with the red hat, excuse me, in between the

18   two individuals with red hats wearing the green helmet.

19   Q       Thank you.

20                   MR. DISNEY:  And Judge, your Honor, we would like

21   to just move to the -- he's shown once more at the end of

22   this, we'd like to move forward.

23                   THE COURT:  Okay.

24                   (Government's Exhibit 613 playing.)

25   Q       If we could stop it.  At 14:55, do you see the

Sean Patton - Direct                              118

1    individual that looks like he's exiting the door?

2    A      Yes, I do.

3    Q      Does that appear to be the defendant?

4    A      That appears to be the defendant with the green helmet

5    on.

6    Q      And where would that take -- where would you be if you

7    went through that door?

8    A      If you go through that door you'll come out onto the

9    second floor and that is the main Senate, that is the main

10   door to the Senate Chamber.

11   Q      Okay.  The main, you're in a hallway?

12   A      Yes, sir, you'll be in the hallway on the second floor

13   right outside an area we call the Ohio Clock Corridor.

14   Q      Thank you.  Then if we could go to 405.

15               (Government's Exhibit 405 playing.)

16   Q      And Officer -- sorry, Captain Patton, can you tell me

17   what this area is?

18   A      So this is another view of the third floor outside the

19   Senate Gallery, you'll notice in the right-hand side is a --

20   another screening portal and as well on the cabinet on the

21   right-hand side is a list of prohibited items for that

22   entrance into the gallery.

23   Q      And what time is this?

24   A      This appears to be 2:56:46 p.m.

25   Q      And can you identify that person who's walking through

Sean Patton - Direct                                    119

1   the picture?

2   A      The individual in the center of the screen appears to

3   be the defendant with the green helmet on.

4   Q      Thank you.

5                  (Government's Exhibit 405 completed.)

6   Q      Next if we could go to 405.

7              THE COURT:  We were just on 405.

8              MR. DISNEY:  I'm sorry.  I'm sorry, it's 408 then,

9   your Honor.

10             THE COURT:  408, okay.

11                 (Government's Exhibit 408 playing.)

12  Q      And while it plays, can you tell us the location?

13  A      I'm sorry, the location right now?  This is outside

14  the -- again, third floor area, this is the, outside the

15  Senate gallery, there's a staircase on the left-hand side

16  with an individual that appears to be the defendant because

17  he's wearing a green helmet going down the -- what we call

18  the West Grand Staircase that leads you --

19  Q      At what time?

20  A      At 2:56:54 p.m.

21  Q      Thank you.  Then next if we could go to 401.

22                 Your Honor, this is still 408, I'm sorry.

23             THE COURT:  This is still 408.

24                 (Government's Exhibit 408 completed.)

25  Q      Now, if we could play 407.

Sean Patton - Direct                    120

1              Your Honor, I'll skip that -- I'm sorry, do

2       you have it?   407.

3                   (Government's Exhibit 407 playing.)

4       Q     Do you recognize this area, Officer -- or Captain?

5       A     Yes.  So this is a view of the second floor of the

6       Senate and appears to be two Metropolitan Police officers

7       running down a corridor to address an individual who just

8       came off the stairs, those stairs, again, go to the third

9       floor that we were just at.

10                  MR. DISNEY:  And then next, your Honor, I'd like to

11      move to admit Exhibit 800.

12                  THE COURT:  800.  This is being admitted through

13      this witness, and there's no objection to that?

14                  MR. BURNHAM:  No, your Honor.

15                  THE COURT:  All right.  800 will be admitted.  And

16      once admitted, it can be shown.

17                  (Government's Exhibit 800 playing.)

18      Q     Can you pause it.  So what area are we looking at now?

19      A     So again, different view, it looks like the

20      individuals, defendant with the green hat -- helmet is coming

21      down the West Grand Staircase and is about to head back

22      towards the Senate, towards the President's room, going to go

23      down that hallway which is outside the Senate Chamber on the

24      second floor.

25      Q     This is the second floor?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Direct                          121

1   A     Yes, sir.

2   Q     Okay.  If we can continue playing this.

3                (Government's Exhibit 800 completed.)

4   Q     And next, if we could show 409.  And I just have a

5   couple more.

6                (Government's Exhibit 409 playing.)

7   Q     And pause that.  Can you tell me what we're looking at

8   here?

9   A     So you're looking at the main hallway on the second

10  floor, that's the hallway that I referred to as the Ohio

11  Clock Corridor, that is that center area where it appears to

12  be the defendant just came out wearing a green helmet from

13  the Senate main doors to the Senate Chamber.

14  Q     And the time?

15  A     The time is 2:55:26 p.m.

16               THE COURT:  And this is Exhibit 409?

17               MR. DISNEY:  Yes, sir.

18               THE COURT:  Described as west stairs.

19               THE WITNESS:  There's no staircase in this photo.

20  This is --

21               MR. DISNEY:  That is the name of the camera, that's

22  what we named it.

23               THE COURT:  That's the designation on the camera?

24               MR. DISNEY:  Yes.

25               THE COURT:  All right.

Sean Patton - Direct                     122

1          (Government's Exhibit 409 completed.)

2     Q    And next if we could go to 410.

3          (Government's Exhibit 410 playing.)

4     Q    And if we could pause that.  What are we -- what's the

5     location here?

6     A    So this appears to be, we're back at the first floor, I

7     believe, and then these individuals are coming out the

8     Parliamentarian door that we looked at earlier, and so what I

9     see here is police officers at the top of the screen and it

10    looks like they're directing people out of the building

11    coming towards me.

12    Q    And you said that the Parliamentarian door was just

13    around the corner from the Senate Wing Door?

14    A    Correct, sir.

15    Q    And if we could go ahead and play 410.

16         (Government's Exhibit 410 playing.)

17    Q    So these individuals are being moved outside, is that

18    correct?

19    A    Correct.

20    Q    And do you see the defendant in this photo?

21    A    Yes, I see the defendant, he is touching a man with no

22    shirt and has a green helmet on in the center of the screen.

23    Q    So you see the guy down at the bottom with the red

24    stocking cap?

25    A    Yes, sir, the red stocking cap with the American stars,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Direct                    123

1    blue stars on the left-hand side of that.

2    Q    So once you get past that individual, would you be

3    outside?

4    A    Yes, you should be outside after that point.

5    Q    Thank you.

6                 (Government's Exhibit 410 playing.)

7    Q    So if we can stop, stop the video here.  Would you note

8    the time that the defendant then went outside?

9    A    It is approximately 3:02 p.m.

10   Q    Thank you.  And lastly, 508.

11                (Government's Exhibit 508 playing.)

12   Q    Where is this location?

13   A    This is directly outside on the Upper West Terrace area

14   outside the Senate connecting corridor and outside the

15   Parliamentarian door.

16   Q    This is basically the outside of the area we just saw

17   everybody being pushed out to?

18   A    Yes, sir.

19   Q    Okay.  Do you see the defendant in this video?

20   A    I do, I see the defendant in the middle of the screen

21   and he's wearing a green helmet.

22   Q    Thank you.

23                (Government's Exhibit 508 completed.)

24         MR. DISNEY:  Your Honor, I have no other questions

25   at this time.

Sean Patton - Cross                    124

1          THE COURT:  All right.  Mr. Burnham.

2          MR. BURNHAM:  Thank you, your Honor.

3     CROSS-EXAMINATION BY MR. BURNHAM:

4     Q     Good afternoon, Captain.

5     A     Good afternoon, sir.

6     Q     Charles Burnham, I have a few questions.

7     A     Yes, sir.

8     Q     So to start with, Captain, early on in your testimony,

9     when you were describing to counsel the various parts of the

10    landscape around the Capitol, you referred to free speech

11    areas, do you recall that?

12    A     Yes, sir.

13    Q     Why are they called that?

14    A     There are grassy areas located around the Capitol

15    complex that are demonstration permitted areas, so

16    individuals coming to Capitol Hill who wish to demonstrate

17    have to apply for a permit in order to ensure that space is

18    available and that we try to manage so we don't have opposing

19    groups in the same geographical area.

20          THE COURT:  These are areas that were within the

21    perimeter on that day, though?

22          THE WITNESS:  That grassy area, there are grassy

23    areas, all the grassy areas on the Capitol complex have

24    permit numbers so for example I referred to Area 1 which is

25    the West Front grassy area, however, they are closed,

Sean Patton - Cross

1    demonstration areas were closed because of COVID, gathering

2    restrictions and as well as, depending on where they were

3    within our perimeter, they were closed.

4    Q    So let's say if it was another day before COVID, there

5    was another type of demonstration, it's entirely possible

6    that the demonstrators could have been allowed to get closer

7    to the Capitol than they theoretically were allowed to get on

8    January 6th, is that right?

9    A    That is correct, we have -- if it was not COVID, and we

10   had not been closed for approximately nine months, that

11   individuals could have access to the West Lawn of the

12   Capitol, for example, Area 1, and demonstrate.  However, that

13   area had been closed I think since September, early October

14   for construction of the inaugural platform, I'm sorry.

15             THE COURT:  I'm confused so I need to ask a

16   question.  The perimeter that in one shot was shown as a red

17   perimeter.

18             THE WITNESS:  Yes, sir, the red line.

19             THE COURT:  Was that true because of COVID or was

20   that just the perimeter for January 6th or for the

21   inauguration?

22             THE WITNESS:  That was the perimeter for

23   January 6th and that red line perimeter was extended because

24   of the demonstration activity, as well as the construction of

25   the inaugural platform as well.

Sean Patton - Cross                                    126

1    Q     And there had been -- well, strike that.  That sort of

2    gets to what I assume would be another -- would it be correct

3    to say that it's a goal of the Capitol Police to facilitate

4    First Amendment activity, citizens, you know, petitioning

5    their elected representatives insofar as it's consistent with

6    your security imperatives; would that be fair as a general

7    matter?

8    A     Yes, part of our duties are to make sure that people

9    can exercise their First Amendment rights in a safe and open

10   environment.

11   Q     Thank you.  So speaking of that, in late of 2020, there

12   were I think at least two prior to January 6th demonstrations

13   in support of the former President, is that right, one in

14   November, one in December?

15   A     That is correct.

16   Q     And as a high ranking officer in the Capitol Police,

17   without getting into details, I assume you would have been

18   involved in preparing for those and making sure security was

19   as it should be during those demonstrations; would that be

20   right?

21   A     Yes, I was working at the Capitol at that time for both

22   those demonstrations and part of our responsibility is to

23   make sure that we have officers working to make sure, you

24   know, the event happens without any physical harm or injury

25   to the buildings or to the people.

Sean Patton - Cross                                    127

1    Q     And during those demonstrations, the two that I

2    referenced in November and December, I forget the exact days,

3    there were confrontations between people who were apparently

4    Trump supporters and other groups of opposite political

5    views, is that right?

6    A     There were a couple skirmishes between demonstrators

7    and counter-demonstrators, again, I don't know the specifics

8    of which groups were out there.

9    Q     As a general matter, there was pushing, shoving,

10   throwing hard objects, some injuries, would that be accurate?

11   A     For the demonstrations that happened in November and

12   December, they were of significant amount of demonstrators,

13   and I'm sure there were some injuries.

14   Q     You referred several times in your direct testimony to

15   the construction that was, scaffolding and whatnot that was

16   present on January 6th, you recall that, right?

17   A     Yes, sir.

18   Q     And I think you referred to there were bike racks that

19   were used to sort of demarcate that construction area from

20   the rest of the grounds, is that right?

21   A     Yes, sir, there's a couple things, that red line that I

22   had shown earlier, that was an extended perimeter for the

23   January 6th events.  The construction of the inaugural

24   platform had a perimeter around it as well, there was video

25   footage showing of another ornamental bike -- ornamental rack

Sean Patton - Cross                    128

1    that went across the front of the Lower West Terrace and then

2    there was an additional snow fencing that was in place around

3    the grassy areas with appropriate signage indicating that the

4    area had been closed by the order of the Capitol Police

5    Board.

6    Q     So the bike racks that were around the construction of

7    the inaugural platform, your testimony on direct was that

8    your officers, in an ad hoc manner I take it, commandeered

9    those bike racks to try and set up another fallback position

10   once the demonstrators began to approach closer than they

11   should have to the Capitol, is that right?

12   A     Yes.  So when demonstrators breached the security

13   perimeter that was established on the West Front, those

14   demonstrators started to move their way up Pennsylvania

15   Avenue Walkway, and as they were doing that, they were coming

16   into the construction area that had additional barricades.  I

17   was personally there, I had come down and I had directed

18   additional bike rack because demonstrators had breached that

19   area, and everyone in that area, everyone in that area was

20   not authorized to be there.  And typically if somebody goes

21   over that fence when that area's closed, it's an arrestable

22   offense, immediately.  I directed the bike rack to be set up,

23   as you saw in the video, additional layer of bike rack was

24   coming up to start to give ground for our officers to push

25   people back from the stage.

Sean Patton - Cross                                    129

1    Q      So my specific question is, just to make sure I focus
2    in on what I wanted to know is, it is true that your police
3    officers moved bike racks from the construction to set up a
4    counter-demonstrator position, correct?
5    A      Yes, sir.
6    Q      You mentioned the Capitol was off limits on that day,
7    you mentioned that, you mentioned invited guests were allowed
8    to come in if -- that would include journalists, wouldn't it?
9    A      So no, it doesn't, sir.  Only media that are allowed
10   inside the building are credentialed media and that has to be
11   credentialed through the House and Senate press galleries.
12   So journalists reporting for a local agency trying to get in
13   the building cannot get in the building.
14   Q      But as point of fact there were journalists inside the
15   Capitol on January 6, a good number, correct?
16   A      I'm sorry, you said, the question was?
17   Q      The question was, there were, as a matter of fact,
18   journalists inside the Capitol on January 6th covering the
19   Electoral College, correct?
20   A      Yes, sir.
21   Q      And they were allowed to be there?
22   A      Yes, if they were credentialed, they were allowed to be
23   there.
24   Q      So as to the perimeter you described the red line on
25   one of the Government's exhibits, you mentioned that was

Sean Patton - Cross

1    largely composed of bike racks but then there were also

2    natural features of the landscape and certain kind of

3    fencing, that's an accurate summary, correct?

4    A    Yes, sir.

5    Q    Would it be correct to say the greater part of that

6    perimeter was bike racks?

7    A    I would say so, that's a good -- the red perimeter,

8    yes, sir.

9    Q    All right.  And so isn't it a fact that at various

10   locations in the bike rack perimeter, the racks were moved by

11   law enforcement personnel, whether that was strategic

12   fallback or some other reason, the fact is there were several

13   occasions where law enforcement moved the bike racks from

14   where they were, is that right?

15   A    No, sir, there's no reason for the police to move the

16   bike racks that made that outer red perimeter.  What is

17   different than what I said earlier was there were extra bike

18   rack up at the construction area up at the Lower West Terrace

19   area, that was just stacked to the side and so that bike rack

20   had been moved, but the red perimeter, officers didn't have a

21   reason to take down that perimeter if that's what you're

22   asking.

23   Q    I'm not asking whether they had a reason to, I'm asking

24   did they.  It's true that some of those bike racks in the

25   outer perimeter got moved by law enforcement, right?

Sean Patton - Cross                                    131

1    A    I'm sure the officers would move the bike rack to allow

2    themselves to go from one side to the other and then move the

3    bike rack back.

4    Q    Isn't it true the inner bike racks within the outer

5    perimeter, some of those were moved by law enforcement as

6    well, isn't that right?

7    A    Yes, sir.

8    Q    Why doesn't Capitol CCTV have sound?

9    A    It's just not designed that way, sir.

10   Q    Okay.  Let's focus on the Peace Circle.  We saw a video

11   where there was a breach of the perimeter into the -- from

12   the Peace Circle into the green area and then beyond that;

13   you recall that video, correct?

14   A    Yes, sir.

15   Q    And it's my understanding that at that point, yourself

16   and your officers were improvising as best you could to

17   respond to that security situation, is that right?

18   A    When you said improvise?

19   Q    Yeah, improvising as best you could to respond to that

20   situation.

21   A    Yes, when the area was breached, officers and officials

22   responded to that area.

23   Q    And there were -- we saw video, a directive, officers

24   literally sprinting across that section of the Capitol to get

25   where they needed to be; you recall that, right?

Sean Patton - Cross                               132

1    A      Yes, sir.

2    Q      All right.  So I take it it wasn't a priority of law

3    enforcement to reassemble the outer perimeter to the extent

4    it was dislodged by protesters, is that right?

5    A      That's an accurate statement.

6    Q      All right.  Just an issue of manpower, it wasn't the

7    biggest problem you had?

8    A      Exactly.

9    Q      Okay.  Do you recall the time-lapsed video that the

10   Government showed you where it's sort of fast forward of the

11   crowd assembling and growing and growing and then ultimately

12   approaching the building; you recall that, right?

13   A      Yes, sir.

14   Q      Do you recall, I'm going to ask you some questions

15   starting I guess now and then there will be more where I ask

16   you about videos, and I won't replay all of them but if you

17   ever need your recollection refreshed in response to one of

18   my questions, I'm sure the Government will be good enough to

19   replay the video.  So having said that, going back to the

20   time-lapsed video, if you recall, the crowd there literally

21   went out of the frame of the video, you couldn't see the end

22   of the crowd, is that right?

23   A      Yeah, the crowd spilled to, if you're looking at the

24   video, to the left and to the right and as well as coming to

25   the center.

Sean Patton - Cross                                    133

1   Q     And so if you had to estimate the distance from, again,

2   I guess we'll start, focus on the Peace Circle let's say and

3   you had to estimate the distance from the front line meaning

4   where you have a policeman and a demonstrator eyeball to

5   eyeball, from that line to the back of the crowd, I mean we

6   might be talking several hundred yards, would that be fair?

7   A     Yeah, when you say -- so when you said the officer at

8   the eyeball to eyeball, that's the first officer at the

9   Pennsylvania Walkway and then a hundred yards back in the

10  Peace Circle, Pennsylvania Avenue roadway, is that what you

11  mean like hundreds of people?

12  Q     I'm just asking how far did the crowd go back?  Hundred

13  yards maybe, could be more?

14  A     The crowd went all the way back to the White House,

15  sir.

16  Q     Government's Exhibit 401, and again, I'm sure the

17  Government will play this if you need to, if you recall that

18  part of 401, was the different breaches that took place there

19  at the East Wing doors, breaking of the window and then --

20  you recall that?

21  A     Yes, breaking of the windows first and then kicking the

22  door out.

23  Q     Yes, sir.  So if you recall the initial breach which I

24  think we all agreed took place around 2:12 consisted of, just

25  to summarize, got two windows on either side of the door and

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Cross                    134

1   protesters that were there kind of cooperated to break out

2   those two windows; is that a summary of how they got in?

3   A      Sure, yes, sir.

4   Q      And do you recall that once the protesters started

5   going in through those windows there was -- on the inside of

6   the windows there was almost like historical markers right

7   there inside the window; do you recall that?

8   A      When you say historical markers, you mean the display

9   cases?

10   Q      That's what they looked like to me, little pieces of

11   furniture that I thought were historical markers, perhaps

12   they're something else; you recall what I'm talking about,

13   though?

14   A      Yeah, I think you're talking about those wooden display

15   cases that are right below the windows that got stepped on.

16   Q      Sort of knock -- get knocked over there, you recall

17   that?

18   A      Yes.

19   Q      So at a certain point your officers cleared those out

20   of the way, you recall that?  The next video and those

21   historical markers are gone, do you recall that?

22   A      Yes, they fell over, got moved out of the way.

23   Q      Do you recall where they -- were they put in a closet

24   or off down the hall, do you recall?

25   A      No, I don't know where they wound up.

Sean Patton - Cross                      135

1    Q     So at a certain point over the course of the events

2    there at that door, the glass from the windows on either side

3    of the door, it appeared to have been completely smashed out

4    at a certain point; by that I mean there weren't shards left

5    after awhile, would you agree with that?

6    A     Yes, sir.

7    Q     So as you're approaching the -- step back for a minute.

8    The Government showed a video that had sort of the approach

9    from ground level up the stairs to those doors, you recall

10   that?

11   A     Yeah, on the Upper West Terrace.

12   Q     And wouldn't you agree that from, we'll call the ground

13   level before ascending the stairs, if I was, you know, trying

14   to retrace the steps, you can't see those doors from when you

15   first start up the stairs, would that be right?

16   A     Correct, there was -- yes, you cannot see that top

17   landing from the bottom of the stairs.

18   Q     You mentioned a fire alarm.  Do you recall hearing that

19   fire alarm during the time period you were present there by

20   the door?

21   A     So the door, all of our doors have a fire package on

22   them so doors that are typically closed like the Senate

23   connecting corridor wing door, that door has a push bar on it

24   so in the event of a fire, emergency, and someone had to

25   leave the building, they could depress that push bar, wait 45

Sean Patton - Cross

1    seconds and the Mag lock will automatically release that

2    door.  If you come by and touch that door, push the push bar

3    in, it will beep at you.  If that bar is depressed for a

4    significant amount of time, then that -- that door will go

5    into alarm mode and then you'll hear that audible alarm and

6    those are specific to those different doors.

7    Q    But the alarm was not actually sounding at the time you

8    approached the door, isn't that right?

9    A    No, the door -- when the door gets kicked out, the

10   alarm just goes off indefinitely, it's not -- that's not the

11   fire alarm for the building, that's just an individual, what

12   we call a local alarm for that door.

13   Q    So is it your testimony that alarm was sounding at the

14   time you were present by that door?

15   A    Oh, I heard the alarm, the alarm was going off on all

16   the doors there were breached.  You heard the same thing at

17   the Rotunda door when the Rotunda door was breached, you

18   could hear the audible alarm in the video.  So it's a common

19   noise to go off.

20   Q    You recall the -- do you recall the video where

21   Mr. Brock can be seen entering the building, correct?

22   A    Yes, sir.

23   Q    Isn't it correct there's no police there at the time?

24   A    Yes, sir.

25   Q    Do you recall that there's a video where the

Sean Patton - Cross

137

1   demonstrators, where they're going up the stairs and there's

2   a chant that can be heard, saying Nancy, Nancy, Nancy, do you

3   recall that video?

4   A      Yes, sir.

5   Q      Do you recall identifying Mr. Brock in that video and

6   his lips don't appear to be moving during that video, if you

7   recall?

8   A      I don't recall if his lips were moving.

9   Q      Do you recall him like appearing to look down at his

10  phone during that section of it?

11  A      That seems very reasonable.

12  Q      Not only does it seem reasonable but do you recall what

13  I'm talking about where you can see him looking at his phone?

14  A      I'd have to look at the video, but again, that seems

15  like a very realistic thing that he could have been doing at

16  that time.

17  Q      Government's 505 was a video that had, depicted

18  Mr. Brock and then there was a sign above it that said

19  Speaker Pelosi's office or something like that; you recall

20  that, right?

21  A      Yes, sir.

22  Q      I think you made this clear in your direct testimony

23  but I just want to make it absolutely certain for the record,

24  that's not part of her office, that was the outer area

25  outside the office, correct?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Sean Patton - Cross                                    138

1    A      That is correct.

2    Q      All right.  And so based on all the video we've seen

3    today, Mr. Brock did not enter that office, correct?

4    A      I think there was a video of him coming out of that

5    corridor, and again, when you go down that corridor, you are

6    exposed to the Speaker's office suites.  Again, there's

7    adjoining offices off that hallway and I think one of the

8    exhibits had Mr. Brock coming out, meaning you saw him

9    walking from the corridor with the sign that says Speaker

10   Pelosi over it.

11   Q      I want to be very clear here, there is not a video that

12   shows Larry Brock in Nancy Pelosi's office, that's not a

13   thing --

14   A      You are correct.

15   Q      Thank you.

16   A      There is not a video of him in her office, correct.

17   Q      And isn't it correct that --

18   A      That I've seen today.

19   Q      -- other individuals gained access to that office

20   throughout the course of the day, at least one, right?

21   A      I remember seeing some videos of some folks sitting in

22   a chair with their legs up on a desk in the Speaker's suite.

23   There were several of those offices in the Speaker's suite

24   that were locked and there were individuals from her staff

25   barricaded in those offices and there's many offices in that

Sean Patton - Cross                                    139

1   hallway where the Speaker is.

2   Q    Government's 412 was the video of the Rotunda where

3   Mr. Brock was kind of the bottom left-hand corner, do you

4   recall that video?

5   A    Yes, sir.

6   Q    You'd agree that in that video he seems to be taking

7   pictures of the paintings, the statues, all the other,

8   whatever else is in that part of the Rotunda, that be an

9   accurate description?

10  A    Yes, sir.

11  Q    All right.  And that is a spectacular part of the

12  Capitol if you haven't seen it in a while, you would agree

13  with that?

14  A    The Rotunda is very spectacular and it's underneath the

15  Dome which is the single largest symbol of Democracy in the

16  free world.

17           MR. BURNHAM:  Can I just have a moment to --

18           THE COURT:  Say that again?

19           MR. BURNHAM:  Could I have a moment to consult with

20  counsel for the Government?

21           THE COURT:  Absolutely.

22           MR. BURNHAM:  Thank you.

23                (A discussion was held off the record between

24                 counsel.)

25  Q    I'm going to ask the Government to bring back up, as

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    you see there, this is Government's Exhibit 412 in evidence

2    if they'd be good enough to play that video, I'll have a

3    question when we get to a certain part of it.

4                    (Government's Exhibit 412 playing.)

5    Q    Sir, as it's playing now, Captain, in the sort of the

6    top right there, can you see what looks like a bag of flex

7    cuffs that looks like maybe it spilled and there's some flex

8    cuffs on the floor there; do you see what I'm talking about?

9    A    Yeah, the black bag right there, that individual just

10   walked up to?

11   A    Yes.

12   Q    Yeah, I can see that black back, I see it spilled.

13   But ...

14   Q    And in a minute, Mr. Brock, if you can look at him on

15   the left, he's going to walk over there.

16                    Can I consult with counsel for a moment?

17               THE COURT:  You may.

18                    (A discussion was held off the record between

19                     counsel.)

20               THE COURT:  Maybe I can cut through this, if I can

21   guess what you're trying to show.  There are videos up until

22   this video that show Mr. Brock and he's been identified in

23   where he did not have flex cuffs in his hand.  This video,

24   Captain Patton, has already identified some flex cuffs

25   sitting on the floor at the time of this video, and then

Sean Patton - Cross                                          141

1   there are later videos that show Mr. Brock with the flex

2   cuffs.

3             MR. BURNHAM:  I'll just proffer, this video --

4             THE COURT:  If the Government will stipulate that

5   that's accurate, you can make your argument from that.

6             MR. BURNHAM:  Well, can I just ask through the

7   Court, this video that we're looking at, if, there's a little

8   bit more to it and it shows Mr. Brock picking up those very

9   flex cuffs I just identified.

10             THE COURT:  I know, that you're having trouble

11   finding.

12             MR. BURNHAM:  Perhaps the Government would just

13   stipulate that that's what it would show.

14             THE COURT:  If they could stipulate to that.

15             MR. DISNEY:  We will stipulate.

16             THE COURT:  It's a stipulation that in the later

17   part of that video, which was 412 I think, that Mr. Brock

18   actually picks up the flex cuffs from the floor.

19             MR. BURNHAM:  Thank you.  Can we take a look at

20   Government's 419, please.

21             (Government's Exhibit 419 playing.)

22   Q   Can we stop it there, please, if you would.  Let's --

23   so here, you see in this video, you've seen this before, you

24   see Mr. Brock there and then you see a gentleman near him,

25   looks like he's wearing like a black hat of some kind or a

Sean Patton - Cross                    142

1   black helmet, do you see who I'm talking about?

2   A    Yes, sir, in front of the guy with the cane, green

3   shirt?

4   Q    That's correct.  Can we go ahead and play it, please.

5              (Government's Exhibit 419 playing.)

6   Q    We're going to have to come back to that one.  You

7   recall seeing a video where -- well, strike that.  Can we see

8   Government's 409, please.  I don't think that's 409.

9              (A discussion was held off the record with

10              counsel.)

11  Q    Yeah, that's it.  So take a look at this video as it

12  plays.

13             (Government's Exhibit 409 playing.)

14             THE COURT:  Is this 409?

15             MR. BURNHAM:  409.  Can you pause it there for a

16  second, please.

17             So here in this video, what we just saw was

18  Mr. Brock, he comes out of the door and passes at least a

19  half a dozen policemen and then continues walking, is that a

20  fair summary?

21  A    Yes, sir.

22  Q    And he's got the flex cuffs there in his hand, you see

23  that, right?

24  A    Yes, sir.

25  Q    And you didn't see him make any kind of gesture to

Sean Patton - Cross                                        143

 1     shove them in his jacket or hide them from police or anything

 2     like that, correct?

 3     A     Correct, sir.

 4     Q     All right.  Can we play it, please.

 5                    (Government's Exhibit 409 playing.)

 6     Q     Now at this part there's a policeman, looks like maybe

 7     an MPD officer that appears to be redirecting him from the

 8     direction he was going to go back the other direction, does

 9     that appear to be what it is?

10     A     Yes, sir.

11     Q     And he's complying there with whatever that officer's

12     saying seemingly, correct?

13     A     Yes, sir.

14     Q     And finally, I think this is the last video I need to

15     play is 410, please.

16                    (Government's Exhibit 410 playing.)

17     Q     You recall this video, right?

18     A     Yes, sir.

19     Q     And this, if you watch the man there in the shirt, he

20     appears to be, you can't tell but he appears to be kind of

21     maybe giving some lip to those officers there?

22     A     You said shirt, you mean the guy with no shirt?

23     Q     No shirt.  He looks like he might be giving a hard time

24     to the officers there if you had to interpret his body

25     language, would that be fair?

Sean Patton - Cross                              144

1   A     That's fair.

2   Q     And one might even think you would wonder if he's

3   intoxicated just from the look of him, would that be

4   unreasonable?

5   A     I think he's been sprayed with pepper spray, his face

6   is all red, but yeah, you could say something like that.

7   Q     And now does the defendant appear to be trying to calm

8   him down and encourage him to leave the premises?

9   A     Yes, that's what it appears to be.

10          MR. BURNHAM:  Can I have a moment, court's

11   indulgence.

12          THE COURT:  Certainly.

13             (Pause in proceedings.)

14          MR. BURNHAM:  Thank you, Captain, no further

15   questions.

16          MR. DISNEY:  No redirect, your Honor.

17          THE COURT:  Captain Patton.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  You may step down.

20          THE WITNESS:  Thank you, your Honor.

21          MR. DISNEY:  May the captain be excused?

22          THE COURT:  Yes, he may be.

23             (The witness was excused.)

24          THE COURT:  Maybe it makes the most sense for us to

25   take our afternoon break now before you begin your next

1    witness.  The next witness will be who?

2              MS. AYERS-PEREZ:  Sergeant Timberlake, your Honor.

3              THE COURT:  Let's start again -- oh, let's make it

4    exactly, let's do it at ten after by that clock, ten after 3.

5              (Court in recess, 3:00 p.m. to 3:12 p.m.)

6              THE COURT:  Before we put the next witness on the

7    stand, no one's raised this but let me make sure where we are

8    on it.  With respect to the excluding witnesses, under Rule

9    615, it requires a party's request for the Court to order

10   that witnesses not hear other witnesses' testimony but that's

11   how we're proceeding, we don't have witnesses.  Before you

12   bring that witness in, could you just keep the witness out

13   for a second.  We're proceeding by not having witnesses in

14   the courtroom, so is someone invoking Rule 615?

15             MR. BURNHAM:  I invoke the rule, your Honor, thank

16   you.

17             THE COURT:  All right.

18             MS. AYERS-PEREZ:  And the only thing I would point

19   out, though, is one of our agents is in here sitting at

20   counsel table who is --

21             THE COURT:  One of your agents, meaning an agent

22   who's going to be a witness?

23             MS. AYERS-PEREZ:  Yes, your Honor.

24             THE COURT:  You can designate one person to be a

25   representative, I don't allow more than one person.  The rule

1    doesn't really clarify whether it can be more than one and

2    some judges allow more than one for an organization to bounce

3    in and out, I don't allow that and indeed the rule won't

4    always say that, I can guarantee you.

5           But the next question is the rule is not clear on

6    what excluding witnesses means, whether it just means that

7    witnesses are not in the courtroom or whether it also means

8    that witnesses cannot read transcripts or talk to other

9    witnesses, so if you want the latter, you have to request

10   that.

11          MR. BURNHAM:  To be honest, your Honor, I've always

12   understood it to mean that the witnesses are not to be

13   informed of the substance of testimony.

14          THE COURT:  It varies from judge to judge.  And to

15   be safe, I always say request it if you want it.

16          MR. BURNHAM:  I request that, the most fulsome

17   imposition of a rule on witnesses.

18          THE COURT:  So the rule that will be invoked here

19   is that witnesses will be excluded; in other words a witness

20   can't be in the courtroom, a future witness, but also that

21   the witnesses cannot discuss the case among themselves and

22   learn of another witness' testimony or read transcripts of

23   the proceedings.  Okay?

24          MS. AYERS-PEREZ:  Yes, and your Honor, just for the

25   record, I had informed all the witnesses prior to today that

Nairobi Timberlake - Direct                                    147

1    they are not to be discussing the testimony or anything about

2    that, even if they're in the same witness room, they're not

3    to discuss the case.

4            THE COURT:  I had not anticipated that there was a

5    problem with it, but I'm just raising it because it was not

6    invoked by anyone but I assumed that someone probably wanted

7    that to be the case.

8            MS. AYERS-PEREZ:  Right, your Honor, and although

9    we do have two agents, only one is going to testify, and he

10   is the one we're designating, he is here at counsel table.

11           THE COURT:  All right.  Let's have Officer

12   Timberlake.

13           THE CLERK:  Good afternoon, sir, please raise your

14   right hand.

15

16           N A I R O B I   T I M B E R L A K E ,

17   called as a witness and being duly sworn, testifies

18   as follows:

19           THE COURT:  Good afternoon, Officer Timberlake.

20   Ms. Ayers-Perez, please.

21           MS. AYERS-PEREZ:  Thank you, your Honor.

22   DIRECT EXAMINATION BY MS. AYERS-PEREZ:

23   Q     Good afternoon.

24   A     Good afternoon.

25   Q     Can you please state and spell your name for the

1   record?

2   A     Sergeant Nairobi Timberlake, N-a-i-r-o-b-i, last name

3   Timberlake, T-i-m-b-e-r-l-a-k-e.

4   Q     Thank you.  Sergeant Timberlake, where do you work?

5   A     U.S. Capitol Police.

6   Q     And how long have you worked with the Capitol Police?

7   A     Twenty-six years.

8   Q     You said your rank is as a sergeant?

9   A     Yes.

10  Q     When did you first get hired by Capitol Police?

11  A     February 5th, 1997.

12  Q     And when did you get promoted to sergeant?

13  A     November 2003.

14  Q     When you were first hired by Capitol Police, what was

15  your rank at that point?

16  A     Private with training.

17        THE COURT:  All right, let's, Mr. Bradley, let's

18  make sure the microphone is in front of the witness so the

19  court reporter can hear clearly.  Thank you all.

20  Q     What were your day-to-day responsibilities when you

21  first began with Capitol Police?

22  A     After training I was assigned to the Capitol division

23  midnight shift, 11 to 7, 11 p.m. to 7 a.m., duties were

24  responsible for inside patrols and outside patrols.

25  Q     Okay.  And when you were promoted to sergeant, what

Nairobi Timberlake - Direct                          149

1    were your day-to-day job responsibilities at that point?

2    A     Once promoted, I was sent over to the Senate division

3    for approximately a year and a half, I worked midnight shift

4    and did 3-to-11 shift.

5    Q     What is the Senate division?

6    A     Senate division is responsible for all Senate office

7    buildings, Dirksen, Hart, and Russell.

8              MS. AYERS-PEREZ:  Your Honor, at this point I would

9    move to admit Government's 102, I do not show that it's in

10   evidence yet.

11             THE COURT:  102 is not in yet, any objection?

12             MR. BURNHAM:  Court's indulgence.

13             THE COURT:  Certainly.

14             MR. BURNHAM:  No objection.

15             THE COURT:  Without objection, 102 is admitted.

16   Q     And Sergeant Timberlake, can you see that on your

17   screen there?

18   A     Yes.

19   Q     Okay.  So after you worked at the Senate division,

20   where did you move on from there?

21   A     I was reassigned back to the Capitol division, day

22   work, power shift.

23   Q     What's the Capitol division?

24   A     Capitol division is responsible for the Capitol

25   building itself, the Capitol grounds, what we call the

Nairobi Timberlake - Direct                    150

1   square.

2   Q     Where were you, what division were you working on

3   January 6, 2021?

4   A     Senate Chambers.

5   Q     Okay.  And what is the Senate Chambers division?

6   A     Senate Chambers section is within the Capitol division

7   which is in uniform services, we're responsible for the

8   Senate Chamber second floor, third floor, second floor is

9   mainly the Senate Chamber and the Senate wing, third floor is

10  the galleries.

11  Q     How long had you been in the Senate Chamber division?

12  A     Senate Chambers, approximately eight years.

13  Q     Okay.  Are you still in that division now?

14  A     Yes.

15  Q     And were you working on January 6, 2021?

16  A     Yes.

17  Q     And throughout the rest of this time we're here today,

18  if I just say January 6th, will you understand that to mean

19  January 6th, 2021?

20  A     Yes.

21  Q     Okay.  Were you scheduled to work that day?

22  A     Yes, I was.

23  Q     What time were you supposed to arrive?

24  A     8:30.

25  Q     And did you arrive by that time?

1    A    Yes.

2    Q    Take me through briefly what your morning was like that

3    day.

4    A    So briefly, 8:30 is our roll call start time for the

5    officers and supervisors, there's a roll call supervisor that

6    comes in at 0700 hours, he preps for the day as far as

7    assignments, make sure the duty roster is correct from

8    checking the sick book, making sure that all officers are

9    accounted for so when we have roll call at 8:30 we do a roll,

10    generally goes by post assignments and officers are given

11    their assignment for the day.

12    Q    Great.  And so were you expecting anything out of the

13    ordinary that day?

14    A    No, ma'am.

15    Q    All right.  Where did you expect to spend most of your

16    day that day?

17    A    Approximately on the second floor, Senate floor

18    escorting members, Senators back and forth from the House

19    Chamber to the Senate Chamber.

20    Q    Was there anything going on that day that you thought

21    would necessitate escorting members back and forth?

22    A    Yes, ma'am, we were certifying the election.

23    Q    Had you been a part of that before while working in the

24    Senate Chamber?

25    A    Yes.

1    Q     Okay.  Were you aware of any protests or rallies that

2    were going to be happening that day?

3    A     Yes.

4    Q     Okay.  Did you think that would affect you?

5    A     No, ma'am.

6    Q     And why not?

7    A     From my understanding from our briefings that the

8    protesters were mainly going to be at the White House and

9    that at some point some of the protesters might come over to

10   Capitol grounds but that they would be outside the perimeter.

11   Q     Okay.  Did you have any security concerns that day with

12   the going back and forth between the different chambers?

13   A     No, ma'am.

14   Q     Can you show us on the map here, and you're able to

15   touch on your screen and I'll clear it when you're done, but

16   can you show us what you mean by going back and forth between

17   the chambers and what you were anticipating that day?

18   A     So from this, so from the Senate Chamber at the Ohio

19   Clock area, the main entrance right here, Senators would

20   gather from inside the chamber, would walk across the second

21   floor of the U.S. Capitol led by the President of the Senate

22   Mr. Pence, and they would come through here, we would have

23   uniform officers on either side of the entry points and then

24   they would enter through the House main door.

25   Q     And were you anticipating that to happen frequently?

1    A    We weren't aware how it was going to go down but it was

2    our understanding that there was a lot of objections per

3    state for the ratification so we were going back and forth

4    periodically that morning, and afternoon.

5    Q    Did that day end up going normally?

6    A    Yes, for the morn -- yes.

7    Q    That morning.  Is there any point on January 6th where

8    things started to get abnormal?

9    A    In the early part of the afternoon, approximately

10   2 p.m.

11   Q    Okay.  Tell us what happened at 2 p.m.

12   A    Just prior to that, we saw some demonstrators in the

13   Upper West Terrace of the Capitol in this area here

14   (indicating), if you're looking from the second floor by the

15   Senate door balcony, you can see there were individuals up in

16   the secured area of the Upper West Terrace.

17   Q    And did you personally see that?

18   A    Yes.

19   Q    Where were you located when you saw that?

20   A    Second floor main hallway off of the Ohio Clock, right

21   here (indicating).

22   Q    Okay.  And what did you do when you saw that?

23   A    At that point we were just doing normal operations.  I

24   then went around to the Republican door which is over here by

25   the bank of six so the six elevator banks there, that's

1   called the Republican door right off the Senate floor, at

2   that point we heard a bang, couple of loud noises on the

3   first floor.  I was then advised by one of the officers we

4   think we have a breach on the first floor.  That's when I --

5   I'm sorry.

6   Q    I'm sorry, I'm sorry, I did not mean to cut you off.

7   Going back to when you first observed people outside, were

8   you concerned for security at that point?

9   A    Yes, ma'am.  The Upper West Terrace was supposed to be

10  secured for the inauguration so that's a restricted area,

11  that's police officers and AOC staff only.

12  Q    When you say AOC staff, what does that stand for?

13  A    I'm sorry, Architect of the Capitol.

14  Q    Were you concerned inside the Senate at that point?

15  A    It raised our security level up as far as people being

16  that close to the skin of the building, but at that point we

17  didn't, we didn't have any breach or anybody that wasn't

18  supposed to be inside the building at that time, so we were I

19  guess concerned but it didn't reach the high level yet.

20  Q    So tell me about what happened next.

21  A    So I'm at the Republican door, we hear, like I said, a

22  big bang, we believe there's a breach, and that's when I gave

23  the order to secure the chamber.

24  Q    Can you give us approximately, if you remember, what

25  time that was?

1    A    I couldn't, ma'am, I just knew it was after 2:00, I'm

2    not sure of the specific time.

3    Q    So when you give an order to secure the chamber, what

4    does that mean?

5    A    So the order is to shelter in place so that means the

6    uniform officers, they're at each one of the entry points

7    around the second floor and third floor of the chamber and

8    the plain clothes officers are to come inside the chamber,

9    secure the doors, and then start accountability check.

10   Q    So we've talked about going back and forth between the

11   chambers; was anybody in the Senate Chamber at that point?

12   A    At that time, we had the President of the Senate and

13   approximately, I don't have the final count but it was

14   probably about 88 Senators in that chamber at the time.

15   Q    When you say the -- when you say the President of the

16   Senate, are you talking about Vice President Michael Pence?

17   A    Correct.

18   Q    So tell me about what the accountability checks looked

19   like.

20   A    So once the chamber is secured, the cloak room,

21   Republican cloak room, the Democrat cloak room and the door

22   keepers which are controlled by the Senate Sergeant of Arms

23   are supposed to do accountability list.  So the Republican

24   cloak room supposed to give me a list of all the Republican

25   Senators that they have present, so same with the Democratic

1    cloak room, they're supposed to give me all the list of

2    Senators that are present and then the Sergeant of Arms staff

3    supposed to give me a list of staff, their staff

4    accountability, and if there's anybody inside the gallery,

5    supposed to give me a list of how many people were in the

6    galleries.

7    Q    Okay.  And did that happen?

8    A    Yes.

9    Q    How long did that take to happen?

10   A    Approximately five minutes.

11   Q    And how were people inside the chamber, did they

12   understand what was happening at that point?

13            MR. BURNHAM:  Objection, foundation.  Sorry, object

14   to foundation.  His testimony about what other people

15   understood.

16            THE COURT:  Maybe you could ask a question or two

17   before you ask that question.

18   Q    So there were a number of people still in the Senate

19   Chamber at that point, right?

20   A    Yes, ma'am.

21   Q    How many Senators did you estimate earlier?

22   A    I believe the count was 88.

23   Q    And were there staffers as well?

24   A    Yes.

25   Q    Okay.  Could you see their expressions?

1    A      Yes.

2    Q      Did they -- what did they seem like at that point?

3    A      They didn't fully understand what was going on, when

4    you give an order like that, we secure the chamber, one of my

5    officers approaches the main chair and then has a

6    predetermined announcement to give so depending on the

7    situation, depends on the card that they read.

8    Q      Do you remember what the announcement was that day?

9    A      That Capitol Police had a situation, we have secured

10   the chamber, please stand by, Senators, please take your

11   seats, we will update you as soon as we get clarification.

12   Q      And prior to that announcement, what was happening

13   inside the Senate Chamber?

14   A      The Senators had just come back from the House side so

15   we had VP Pence there and also had majority of the leadership

16   inside the chamber at the time.

17   Q      Okay.  Were they actually doing legislative activities

18   at that point?

19   A      Yes, we were in session.

20   Q      Okay.  What happens after that announcement?

21   A      After that announcement we cut the feed, the TV feed to

22   the chamber, and then with the Sergeant of Arms we had to

23   make a determination of what we were going to do next.

24   Q      What about the legislative activities that had been

25   happening, are they still happening at that point?

1    A     No, ma'am, everything was shut off at that time.

2    Q     Is that part of the Electoral College count?

3    A     Yes.

4    Q     So what happened then?

5    A     Once we secured the chamber, we were accountability,

6    find out how many people we have with us in the chamber and

7    then we were just standing by to make a determination as far

8    as where we were going to go next or what we were going to do

9    next.

10   Q     Are you aware of what's happening outside the Senate

11   Chamber at that point?

12   A     At that point, no, ma'am, I had sent an officer on the

13   East Side Wing to give me a heads up to do some recon on the

14   second and first floor.

15   Q     When you say recon, what do you mean by that?

16   A     Determine exactly what kind of breach do we have, how

17   many people do we have inside the building, intruders.

18   Q     And at what point did you learn that there had been a

19   breach?

20   A     We kind of figured it was -- it was something major

21   going on after we had locked and secured the chamber, then

22   when the officer got back to me to let me know how bad it

23   was, we figured we had a short amount of time before we had

24   to leave.

25   Q     What was your understanding on how bad it was at that

1    point?

2    A    From what I understood he told me there was multiple

3    individuals on the first floor, protesters.

4              MR. BURNHAM:  I object to hearsay at least insofar

5    as it's coming in for the truth.

6              THE COURT:  Can you do this without hearsay,

7    please?

8    Q    Okay.  So Sergeant Timberlake, at that point, did you

9    become aware that -- or were you aware at that point that

10   there might have been a breach or there had been a breach?

11   A    Yes.

12   Q    What do you do at that point?

13   A    We doubled up on the exter -- sorry, we doubled up on

14   the wing doors, the other doors were secure, and then we

15   waited for the Senate Sergeant of Arms to get in

16   communication with the command center to make determination

17   what we were going to do next.

18   Q    And how long did that take?

19   A    That took about approximately another five to ten

20   minutes.

21   Q    What did you do next?

22   A    At that point, when the decision was made to move the

23   Senators to another location, the first thing we did was

24   leadership left first, we then got Mr., sorry, got Vice

25   President Pence together with his group, I believe his

1    brother was in the gallery on the third floor at that time,

2    we brought his brother and his sister -- sorry, brother and

3    wife down to the second floor, put them in a package and took

4    them over to another location.

5    Q     Okay.  And what about everybody else who was in the

6    Senate Chamber?

7    A     We kept them in the chamber momentarily.  Once I got

8    back from dropping off the VP, we got the senators ready and

9    escorted them out of the chamber to another location, secured

10   the second floor doors, then I proceeded up to, up the East

11   Grand Staircase to the third floor where I had an officer

12   already assigned, he was waiting for the keys from me to

13   open -- I'm sorry, to secure the third floor gallery doors.

14   Q     Okay.  And before you go up to the third floor, do you

15   have any sort of radio on you that day?

16   A     Yes, ma'am.

17   Q     Okay.  And does the radio, does it connect to other

18   officers who are there?

19   A     My radio, it was different channels on the radio.  My

20   radio is assigned to the Senate Chamber or chamber channel

21   which is a designated channel for both Senate and House

22   Chamber officers, but my radio at that time was on scan, so I

23   was able to not only monitor my channel, I was also able to

24   monitor the inside channel and the outside channel.

25   Q     Did you in fact monitor the inside and outside channel

Nairobi Timberlake - Direct                          161

1    that day?

2    A     Yes, ma'am.

3    Q     What did it sound like, without going into what anybody

4    said?

5    A     It was hectic, it was a lot of radio communication

6    going on, a lot of officers requiring or requesting

7    additional assistance.

8    Q     And you've been with Capitol Police quite a long time,

9    had you ever heard the radio like that?

10   A     No, not like that.

11   Q     I'm going to clear this out.

12         THE COURT:  I thought that was very meaningful.

13   Q     So you go up to the third floor and you mentioned the

14   gallery; what is it you're trying to do up there?

15   A     The officer doesn't have keys to secure the gallery

16   doors, so I am -- I'm the only one that has the master keys

17   at that time, so I get up to -- after I secured the second

18   floor, the Senators are on their way to the next location

19   with another supervisor and approximately five other

20   officers, so me and another officer responded to the third

21   floor.  There's an officer already assigned up there waiting

22   for the keys, I hand them the keys so he can start securing

23   the gallery doors.

24   Q     How many Senate Gallery doors are there?

25   A     There's approximately nine.

Nairobi Timberlake - Direct                                              162

1    Q     And had any of the doors been secured or were all nine

2    unsecured?

3    A     Approximately only four more doors had to be secured.

4    Q     Okay.  And when you say secured do you just mean

5    they're open?

6    A     They're unsecured -- so they need to be locked and

7    secured, it's two doors, there's an end door, inner door

8    which is wooden doors and then there's an outer door, so each

9    gallery has a set of two doors.

10   Q     Why do you need to lock those doors?

11   A     To secure the chamber so that make sure there's no

12   vandalism nobody's bringing in or doing anything.

13   Q     Okay.  And can you get into the Senate Chamber from

14   those doors up there?

15   A     Yes.

16   Q     So tell me what happens when you go upstairs?

17   A     I see a couple of protesters as I get up to the third

18   floor landing as I go around from the east side to the main

19   center hallway, I give officer the keys, the master keys, he

20   then proceeds to try to secure the remaining doors.

21   Q     And was he able to?

22   A     No.

23   Q     Why not?

24   A     At that point he was confronted with several

25   protesters.

Nairobi Timberlake - Direct

1    Q    Could you see this?

2    A    Yes.

3    Q    So tell me what you saw.

4    A    At that point we were I believe at gallery number

5    three, we get into a shoving match with a couple of the

6    protesters shoving back and forth, he's trying to lock the

7    door, I get hit in the back of my head by at least one or two

8    of the protesters and then it's -- at that point it's three

9    against maybe 20 people.

10   Q    Okay.  So what do you do at that point?

11   A    Um, I just made a determination to cut our losses

12   there.  We could have pushed the fact but I guess it was

13   just, to me after calculating, it was just better to get back

14   with the rest of the group, secure the Senators, and then

15   come back with more manpower.

16   Q    Okay.  Can you show us on the map where exactly you

17   were during this?

18   A    Okay.  So I ran into the large group here.  So

19   protesters were coming down this main hallway here

20   (indicating).

21   Q    Sergeant Timberlake, I apologize, can you move your

22   microphone a little bit closer to you?

23   A    Sure.  So I'm by the Senate Chamber by Gallery 3 and 4,

24   officers trying to secure the chamber and then more

25   individuals are coming down the east hallway on the third

1    floor from the center of the building.

2    Q    Okay.  And is that what you just showed us on the map

3    here?

4    A    Yes.

5    Q    All right.  I'm going to clear that out, if we can pull

6    up Government's 419.  And I show that this is in evidence,

7    your Honor?

8              THE COURT:  It is in evidence.  As long as it's

9    419.

10   Q    Can you expand that.  Okay.  And don't play yet.

11   Sergeant Timberlake, do you recognize this area we're looking

12   at?

13   A    Yes, ma'am.

14   Q    Is that the area you were just speaking about?

15   A    Yes.

16   Q    What are these doors that we're seeing here?

17   A    So the doors on your right would be the gallery doors

18   where the general public will come and visit the Senate

19   Chamber.

20   Q    So I'm going to draw a couple circles here.  And I've

21   drawn four circles and my circles show up in red.  Are those

22   the doors we're talking about?

23   A    Yes, ma'am.

24   Q    So when you say they're unsecured is that what we're

25   looking at here?

```
 1    A    The first door here was secured (indicating), the other
 2    two doors down the hallway are the ones that needed to be
 3    locked and secured.
 4    Q    Okay.  I'm going to clear this out.  All right.  If we
 5    could play Government's 419.
 6                    (Government's Exhibit 419 playing.)
 7    Q    We can pause right there.  I'm pausing at the 11-second
 8    mark.  I'm going to make a circle around one person.  This is
 9    an individual wearing a helmet, vest, jacket, do you remember
10    him?
11    A    Yes, ma'am.
12    Q    How do you remember him?
13    A    He was one of the most vocal -- well, he and the
14    gentleman in black were very vocal, the gentleman with the
15    green helmet was telling the other gentleman to calm down,
16    that's not what we're here for, and ... sorry.  That was
17    pretty much it.
18    Q    Okay.  Can you draw on the screen where the gentleman
19    in the black is that you're referring to.
20    A    (Witness complies.)
21    Q    So when the guy in the helmet, when he's saying this,
22    are people listening to him?
23    A    Yes.
24    Q    And what do you observe that makes you believe people
25    are listening to him?
```

1    A     He had a command presence about him, he was, like I

2    said, tell everybody, when he told everybody to calm down,

3    that's not what we're here for, that's not what we're about,

4    the gentleman in the black kind of took it down a notch, and

5    I believe the gentleman in the red hat was also one, right

6    here is the one who attacked me (indicating).

7    Q     So what happens after he does that?

8    A     That's when we fell back and tried to catch up with the

9    rest of our group.

10   Q     Okay.  And did this gentleman, did he help you shut the

11   gallery doors at any point?

12   A     I'm sorry?

13   Q     Did he help you shut the gallery doors?

14   A     No.

15   Q     Did you see any flex cuffs on him?

16   A     Not at that time, no.

17   Q     And when I say flex cuffs, do you know what I'm talking

18   about?

19   A     Yes, we have what we call arrest kit up there on the

20   third floor, and we use plastic cuffs to secure prisoners.

21   Q     Okay.  Were you pretty close to the guy in the helmet?

22   A     Yes.

23   Q     Did he try to hand you any flex cuffs at any point?

24   A     No.

25   Q     If he had, would you have taken them from him?

Nairobi Timberlake - Direct

167

1   A    Yes.

2   Q    Okay.  I'm going to clear out these circles.  If we

3   could finish playing Government's 419.

4            THE COURT:  Back on 419?

5            MS. AYERS-PEREZ:  Yes, your Honor, back on 419.

6            (Government's Exhibit 419 playing.)

7   Q    While this plays, Sergeant Timberlake, was there

8   anything about what people were wearing that day that

9   concerned you?

10  A    Well, besides it was cold, some of the protesters were

11  wearing what appeared to be military gear.

12  Q    As a Capitol Police officer did that concern you in any

13  way?

14  A    Yes.

15  Q    Why?

16  A    That's something we've never seen or I've never seen on

17  Capitol grounds, that kind of gear.  My understanding when we

18  had our intell was supposed to just be peaceful protesters,

19  there might have been ... that's it.

20  Q    What did you do after you left the third floor?

21  A    Retreated back down to catch up with the rest of the

22  group.

23  Q    Where did you go from there?

24  A    Over to the Hart Senate building.

25  Q    Did you stay there for the rest of the afternoon?

Nairobi Timberlake - Direct                          168

1    A      No, so at that point, Captain Patton took over incident

2    command for Senate Chambers, then put my officers in small

3    groups of two and three and then we retreated back over to

4    the Capitol building through police lines and started

5    retrieving staff that were sheltering in place.

6    Q      So there was still staff sheltering in place inside the

7    Capitol at that point?

8    A      Yes, we have -- I'm sorry, leadership staff still in

9    the building and we also had what we call some support staff.

10   So Secretary of the Senate, legislative staff on the first

11   floor, Senate wing, and then also had leadership in their

12   particular offices, we still had staff that didn't make it to

13   the Senate floor in time were in their offices.

14   Q      Okay.  And when you say Captain Patton, are you talking

15   about Sean Patton?

16   A      Yes, ma'am.

17   Q      What time were you supposed to leave that day?

18   A      We were hoping to wrap up by 7 p.m.

19   Q      What time did you actually leave that day?

20   A      More like midnight.

21   Q      And you mentioned you'd been a Capitol Police officer

22   for quite some time now, have you ever seen anything like

23   this?

24   A      No, ma'am.

25          MS. AYERS-PEREZ:  Your Honor, I pass the witness.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Nairobi Timberlake - Cross                                    169

1              THE COURT:  All right, Mr. Burnham.  You can

2     probably take the exhibit down unless Mr. Burnham wants it

3     up.

4              MR. BURNHAM:  I may ask a question or two about it

5     so if you don't mind leaving it up.

6              THE COURT:  If it's okay with you, we can leave it

7     up.

8              MR. BURNHAM:  Thank you.

9     CROSS-EXAMINATION BY MR. BURNHAM:

10    Q    Good afternoon, Officer.  Charles Burnham, I've got a

11    couple questions for you.

12    A    Okay.

13    Q    I notice that you and your colleagues there appear to

14    be wearing civilian clothes, is that right?

15    A    Correct.

16    Q    It looks like a blue blazer and slacks I guess you

17    would say?

18    A    Blue suit, yes.

19    Q    Do you have a tie?  I can't even tell, do you have ties

20    on?

21    A    Yes.

22    Q    You do.  Is that your normal attire for working, is

23    that normally what you wear to work, civilian?

24    A    Yes.

25    Q    Were you carrying a firearm?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Nairobi Timberlake - Cross                    170

1    A     Yes.

2    Q     At the, I think at -- during your direct testimony you

3    refer to the situation with yourself and your colleagues

4    being, you know, 20 against 2, is that how you described it?

5    Or 20 against 3 I guess it would be, is that correct?

6    A     The crowd kept increasing.

7    Q     So that's -- would I be correct in saying that's a

8    dangerous situation to be in with just that few officers

9    having to handle that many people you didn't know who they

10   were, would that be correct?

11   A     Yes.

12   Q     All right.  And the hostile actions from the men in

13   black and the others that make the situation that much more

14   concerning, would that be correct, that they were acting that

15   way?

16   A     Yes, that and the fact that we didn't know if they were

17   armed or not.

18   Q     Yeah.  So it's -- I take it it was a welcome thing that

19   the man in the helmet exerted the influence he did to try and

20   defuse the situation, is that fair?

21   A     No.

22   Q     Not a welcome thing?

23   A     I'm sorry.

24   Q     I'm asking whether it was a welcome thing from your

25   perspective that the man in the helmet tried to calm people

1   down; is that something you were glad he did that?

2   A     He wasn't trying to calm people down, he was trying to

3   calm down that guy in black telling him calm down, that's not

4   what we're here for, that's not what we're about.

5   Q     That helped to defuse the situation seemingly, is that

6   correct?

7   A     Yes.

8   Q     Thank you.  Could -- would the Government be kind

9   enough to move the video till it's about 23 seconds

10   remaining.  So 23 seconds, I think it was.  Thank you.  You

11   can just let it play, thank you.

12                   (Government's Exhibit 419 playing.)

13             THE COURT:  This is going to take a minute and a

14   half to get there at this rate.

15             MR. BURNHAM:  If you can just pause it there.

16             Right there, you see the woman there in the Trump

17   flag in the bottom right?

18   A     With the bicycle helmet, yes.

19   Q     That was my question, she appears to have I guess a

20   green bicycle helmet or turquoise bicycle helmet, would you

21   agree with that?

22   A     I'm sorry.

23   Q     Do you agree she appears to be wearing what appears to

24   be a turquoise bicycle helmet?

25   A     Yes.

1   Q    And the person standing immediately in front of her has

2   some kind of helmet as well, would you agree with that?

3   A    Yes.

4   Q    Looks like it might be, I don't know, a rock climbing

5   helmet or something, that's my best guess, would you agree

6   with that or disagree?

7   A    I agree with you.

8   Q    Can we just play maybe 10 more seconds.

9                 (Government's Exhibit 419 playing.)

10  Q    All right, you can stop there, thank you.  Can I have

11  the court's indulgence?

12            THE COURT:  Certainly.

13            MR. BURNHAM:  Thank you, Officer, that's all my

14  questions.  No further questions.

15            MS. AYERS-PEREZ:  No redirect, your Honor.

16            THE COURT:  All right.  Thank you very much for

17  coming, Sergeant.  And you may be excused.

18                 (The witness was excused.)

19            MS. AYERS-PEREZ:  We call Maggie-May Humphrey.

20                 (Pause in proceedings.)

21            THE CLERK:  Good afternoon, ma'am.

22            THE WITNESS:  Good afternoon.

23            THE CLERK:  Please raise your right hand.

24

25            M A G G I E - M A Y   H U M P H R E Y ,

1    called as a witness and being duly sworn, testifies

2    as follows:

3              THE COURT:  Good afternoon, Officer Humphrey.

4    Mr. Meisel.

5              MR. MEISEL:  Thank you, Judge.

6    DIRECT EXAMINATION BY MR. MEISEL:

7    Q     Officer Humphrey, could you please state your name and

8    spell it for the record?

9    A     Sure, first name is Maggie-May, M-a-g-g-i-e, hyphen,

10   M-a-y, H-u-m-p-h-r-e-y.

11   Q     By whom are you employed?

12   A     Metropolitan Police Department.

13   Q     What is your title or position within MPD?

14   A     I'm an officer.

15   Q     How long have you been employed by the Metro Police

16   Department?

17   A     Since August of 2019, so three years and a couple

18   months.

19   Q     Okay.  So as of January 6, 2021, would it be fair to

20   say you had been an officer for approximately two years?

21   A     Approximately, over a year at that point.

22   Q     Okay.  Prior to your employment with MPD, did you have

23   any sort of previous training, experience in either military

24   or law enforcement?

25   A     Yes, I was in the Army.

Maggie-May Humphrey - Direct                    174

1    Q    How long were you in the Army?

2    A    So I joined in July of 2015, I had medically separated

3    in 2016.

4    Q    I'm going to direct your attention to January 6, 2021.

5    Were you working in your capacity as an officer with the

6    Metro Police Department on that day?

7    A    Yes.

8    Q    Was this a regularly scheduled tour for you?

9    A    No.  So my regularly scheduled tour of duty is midnight

10   tour, just working patrol on this day, I was working on a

11   civil disturbance unit.

12   Q    Okay.  So this was a special assignment that you were

13   detailed to, for that date?

14   A    Different than my usual assignment, yes.

15   Q    Gotcha.  And so do you recall what tour of duty you

16   were working that day?

17   A    It would have been like similar to the evening tour,

18   early afternoon, until late at night.

19   Q    Gotcha.  When you reported for duty, did you go through

20   normal routines like roll call?

21   A    Yes.

22   Q    Was there anything unusual about roll call when you

23   reported for duty on January 6, 2021?

24   A    Just that we were expecting a lot of people, it was

25   supposed to be somewhat of a big event, but I don't think

1    anybody was expecting anything too out of hand.

2    Q     Okay.  And your unit, what is the -- what is the

3    strength or composition of the unit?

4    A     So I was working civil disturbance unit 51 or CDU

5    platoon 51.  A platoon is made up of four squads, each squad

6    has seven officers and one sergeant and then there is a

7    lieutenant so 28 officers, four sergeants, one lieutenant

8    makes 33 people make up the platoon.

9    Q     Okay.  And after roll call, where did your unit deploy

10   to?

11   A     So our entire platoon was supposed to be in the area of

12   Black Lives Matter Plaza, I believe it's 16th and I, so all

13   four squads went down, parked somewhat nearby, and then we

14   walked and lined up in the vicinity of BLM Plaza.

15   Q     How long would you say that you were posted at BLM

16   Plaza from the time that you arrived there to the time that

17   you left?

18   A     It was very brief.  Our time down there.  I think by

19   the time we had walked down, lined up, I took a phone call

20   for a couple minutes and then we were leaving.

21   Q     Okay.  And do you recall the approximate time that you

22   arrived at BLM Plaza?

23   A     I believe it was sometime -- I'd say between like noon

24   and 2:00.  I think around 1:00 but I'm not certain.

25   Q     Okay.  Were you aware of what it was that triggered a

Maggie-May Humphrey - Direct                    176

1   movement away from that assigned post?

2   A     So like I had said, I took a phone call, so I turned my

3   radio down to hear the phone conversation.  By the time I had

4   gotten off the phone, I didn't have my radio turned back up,

5   the volume, so when something came out over the radio, it was

6   very obvious that something came out and we needed to leave

7   quickly, but I didn't hear that transmission.

8   Q     What made it obvious to you?

9   A     Just kind of the look of, I don't know if I want to say

10  shock but there was definitely a look on the officers' faces

11  around me like they were not expecting to hear what they were

12  hearing.

13  Q     And after you saw those expressions, what did the

14  officers start doing?

15  A     So pretty much everybody turned to their right, facing

16  towards where our vans were parked and actually started

17  running.

18  Q     Okay.  What did you do?

19  A     Followed along, ran with them.

20  Q     All right.  And from there, I'm assuming everybody

21  loaded up in the vans?

22  A     Yes.

23  Q     Where did you proceed from there?

24  A     So we actually ended up parking within the vicinity of

25  the Capitol building.

Maggie-May Humphrey - Direct                    177

1   Q     Okay.  And can you describe your initial observations

2   when you arrived at the Capitol building?

3   A     Sure.  So when we parked, the building was kind of in

4   front of me and to the left.  There was a lot of people out,

5   a lot of people in the street, in the lawn, just a lot of

6   people around the Capitol building.

7   Q     And what happened when you guys got out of your vans?

8   A     So as we started exiting the vans, we were told to put

9   on our full CDU equipment including our helmet, our gas

10  masks, and grab the, you know, riot batons that we carry with

11  us.  So everyone immediately got out and started donning all

12  of this equipment.

13  Q     So until that point, no one was fully prepared or armed

14  with any of that equipment?

15  A     No.  So it's typical to leave your helmet and that kind

16  of stuff in the van.

17  Q     Is it typical to go out on patrol with that equipment?

18  A     No.

19  Q     So on this particular day, all the officers that were

20  part of the CDU left their precinct or their headquarters

21  with that equipment with them?

22  A     Everyone assigned to the civil disturbance unit, yes.

23  Q     Now had you had occasion to go into full gear set, I'll

24  call it, prior to that, at any point during your employment

25  as an officer?

Maggie-May Humphrey - Direct                178

1    A       Aside from training, no.

2    Q       Okay.  And so the full equipment that includes helmet,

3    gas mask, baton?

4    A       Mm-hmm.

5    Q       Any other equipment I'm leaving out?

6    A       Our gloves, we typically wear gloves that we're given

7    with our CDU equipment that you wouldn't typically wear on

8    patrol.

9    Q       Gotcha.  And other than your CDU equipment, gear set,

10   are you equipped with body worn camera on that day?

11   A       Yes.

12   Q       Okay.  Was it functioning properly?

13   A       Yes.

14   Q       And did you at some point activate your body cam?

15   A       Yes.

16   Q       Do you recall roughly when you activated your body cam

17   in relation to your arrival at the Capitol?

18   A       Sometime after we got there, I'm not sure if I did

19   before entering the building or once inside the building.

20   Q       Okay.  Now, when you arrived at the Capitol and gear

21   up, what happens then?

22   A       So after putting on all of our equipment, we were

23   pretty much told to line up single file and march towards the

24   building, so we proceeded kind of through the lawn, kind of

25   up to what I think was a side door.  We might have stood

Maggie-May Humphrey - Direct                    179

1    outside on the steps for a couple seconds, but then we were
2    led into the building.
3    Q    And when you were led into the building, where was the
4    sort of first area where you were posted?
5    A    So once inside the building, we kind of proceeded in
6    from that door and down a hallway to the left which I later
7    in that day learned that that was a hallway towards the
8    Rotunda room.
9    Q    And when you arrived there, I'm assuming the rest of
10   your civil disturbance unit is with you?
11   A    Yes.
12   Q    And what was, what was your assignment once you arrived
13   in that hallway connecting to the Rotunda?
14   A    So very quickly, once inside that hallway, we began to
15   like make our first push of the day where we were pushing
16   people through this hallway down the hallway.  Again, I
17   wasn't sure where we were pushing them at this time, but
18   everyone just started pushing, so we just pushed.
19   Q    Okay.  Could you describe just what was happening in
20   that hallway, who were they pushing?
21   A    So I'm pretty sure there was some taller people in
22   front of me, I couldn't exactly see the people that we were
23   pushing, but just kind of realizing what was going on around
24   me, the biggest thing that stands out was like all of the
25   flags that decorated the Capitol building were knocked over,

1    falling on the ground.  In between pushing, myself and other

2    officers were trying to stand these flags up, and to me, that

3    was pretty important, that we at least make that right.

4    There was OC spray being deployed in the hallway, and again,

5    just pushing.

6    Q    Okay.  And we're talking about a line of MPD officers

7    pushing against protesters, just to be clear?

8    A    Yes.

9    Q    And I assume that these, based on the fact that you

10   were pushing, that the protesters are not willingly moving in

11   the direction that you're trying to get them to go to?

12   A    No, we, I mean I know I was pushing with all of my

13   strength, so it was definitely not moving willing people

14   around that building.

15   Q    And as you're pushing with several other officers, are

16   you, are you moving freely or are you pretty much sort of

17   dead in your tracks?

18   A    There was a lot of resistance, I know we did make some

19   movement, but there was a lot of resistance.

20   Q    Okay.  At some point do you get reassigned from that

21   position?

22   A    Yes.

23   Q    How long would you say that you were pushing before you

24   were retasked?

25   A    Time moved weird that day.  I don't know that I was in

Maggie-May Humphrey - Direct                    181

1    that hallway for more than 15 minutes before being

2    reassigned.  In my head that's how long it felt.

3    Q    Okay.  And can you describe what happened that you were

4    retasked?

5    A    So there was another officer, there might have been

6    more than one, but somebody who wasn't dressed in an MPD

7    patrol uniform or CDU uniform had come up and was speaking

8    with our lieutenant, Lieutenant Sheldon, and he very quickly

9    just looking around picked out a couple of us and said, you

10   know, you're going with whoever that was, and he said

11   something to them along the lines of, you know, you're in

12   charge, tell them what you need them to do.

13   Q    And so this was a Capitol Police officer that you were

14   being transferred over to?

15   A    It could have been.  There was definitely Capitol

16   Police officers around at that time.

17   Q    Okay.  And from your platoon or your civil disturbance

18   unit, was it just you or were there other officers from your

19   unit that were being retasked?

20   A    I believe there was three other officers off the top of

21   my head, I know Officer Cynthia Rios was there, a male

22   officer, Officer Singh was there, and then another female

23   officer, Officer Daniels was there also.

24   Q    Okay.  Where were you led to at this point?

25   A    So outside of this hallway, it was pretty much a short

1    walk to another hallway in between a staircase, standing

2    there there was a staircase that went up and a staircase that

3    went down.  To the left of me there was a big window where I

4    could see all of these people gathering up on the lawn.  I

5    could hear the yelling from outside and to the right of me it

6    looked like, kind of like offices or rooms down the hallway.

7    Q    Okay.  And at some point were you sort of assigned to a

8    fixed location?

9    A    Yes.

10   Q    Okay.  And that location, do you recall what level of

11   the building you were on?

12   A    I'm not exactly sure of the layout of the building, but

13   I felt like either there was a basement below us, or another

14   floor down one level that led to outside, I could hear

15   protesters, people outside pounding on the door, and then

16   there was a floor above us so I would guess ground level or

17   the middle floor of the building.

18   Q    Okay.  Were you near a window?

19   A    Yes.

20   Q    And did you have an opportunity to look out that

21   window?

22   A    Yes.

23   Q    Okay.  And so, and when you looked out that window,

24   were you looking at the ground or were you above --

25   A    I was above the ground.

1    Q      And could you describe the area around you?

2    A      Yeah.  So the stairs that went up to some kind of

3    doorway, I wasn't sure what kind of room was up there, I

4    think I was under the impression that that's where, you know,

5    Senators or important people in my mind were up --

6                MR. BURNHAM:  Object to speculation.

7                THE COURT:  I'm sorry.

8                MR. BURNHAM:  I take the witness' answer to be

9    speculating, there might have been Senators.

10               THE COURT:  I'll allow her to speculate on what she

11   believed.

12               MR. BURNHAM:  Thank you.

13   A      Below, again, there was another door that, to me I

14   thought led outside, I heard protesters out there.  Again to

15   the left, the window, from the window, I could see the lawn

16   and to the right a lot of doors down the hallway.

17   Q      Okay.  So you mentioned there were a set of stairs?

18   A      Mm-hmm, yes.

19   Q      So, and coming down these stairs, did you see other

20   officers, protesters?

21   A      Yes.  There was officers kind of at different times

22   walking through different areas, Capitol police officers, and

23   then at some point, what looked like a protester person

24   dressed in plain clothing came down from the stairs.

25   Q      Okay.  Have you had an opportunity to review a clip of

Maggie-May Humphrey - Direct                    184

1   body cam that we showed you during preparation for this

2   trial?

3   A     Yes.

4   Q     Okay.  When you viewed it, did you recognize it as

5   being from your body cam video?

6   A     Yes.

7        MR. MEISEL:  Okay.  This is already received in

8   evidence, your Honor, as Exhibit 800, I'd like to publish it

9   to the witness.

10        THE COURT:  You may.

11        (Government's Exhibit 800 played.)

12   Q     Is that video that we just played, that was a clip from

13   your body cam?

14   A     Yes.

15   Q     It appeared to fairly and accurately show what you

16   observed while posted somewhere inside the U.S. Capitol on

17   January 6, 2021?

18   A     Yes.

19   Q     Give me one moment, Officer Humphrey.

20        Officer Humphrey, thank you for your time,

21   Mr. Burnham might have some questions for you.

22        THE WITNESS:  Sure.

23        THE COURT:  Mr. Burnham, if you have any questions.

24        MR. BURNHAM:  Yes, your Honor, thank you.

25   CROSS-EXAMINATION BY MR. BURNHAM:

1    Q      Good afternoon, Officer, I'm Charles Burnham.

2    A      Good afternoon.

3    Q      So this video we just saw, you could hear there some

4    noise in the background that didn't appear to be coming from

5    yourself or the officers?

6    A      Yes.

7    Q      You agree with that?  And depending on what part of the

8    Capitol you were in, it can produce a, sort of an echoing

9    effect, would that be right?

10   A      That could be right.

11   Q      And so the individual that walked down, I don't think

12   it's -- it's not you that goes down the hall, it's another

13   officer, is that right, and you're there as well?

14   A      You can see in my camera that's Officer Daniels, I know

15   I started running down the hallway.

16   Q      And so at a certain point yourself and Officer Daniels

17   just stop and don't go any farther, maybe when you're about

18   halfway down that hallway, is that right?

19   A      Yes.

20   Q      And then you go back to wherever your post was?

21   A      Yes.

22   Q      Okay.  And I take it that you didn't get on the radio,

23   I didn't see it, and say we've got someone going down this

24   hallway, send in people to chase him or anything like that,

25   correct?

1    A    No.

2    Q    And the individual walking down there, he didn't appear

3    to change his pace at all, he continued walking more or less

4    consistent speed, would that be right?

5    A    I don't recall if he sped up or how quickly he was

6    going, there was a lot of confusion, but he definitely

7    continued down the hallway throughout the building.

8    Q    Well, at any rate he didn't break into a run, you agree

9    with that I'm sure?

10   A    Sure.

11              MR. BURNHAM:  Thank you.

12              THE COURT:  Mr. Meisel?

13              MR. MEISEL:  Just have one question for redirect.

14   REDIRECT EXAMINATION BY MR. MEISEL:

15   Q    Officer, you have any reason to question the accuracy

16   of the date/time stamp on your video?  Can you see it?

17   A    January 6 at 14:57 -- no.

18              MR. MEISEL:  Thank you.

19              THE COURT:  Thank you for coming, Officer Humphrey,

20   you may step down.

21                  (The witness was excused.).

22              MS. AYERS-PEREZ:  We call John Moore.

23              THE COURT:  All right.

24              THE CLERK:  Good afternoon, sir, please raise your

25   right hand.

John Moore - Direct                                    187

1           J O H N   M O O R E , called as a witness

2    and being duly sworn, testifies as follows:

3               THE COURT:  Good afternoon, Special Agent Moore.

4               THE WITNESS:  Good afternoon, your Honor.

5               THE COURT:  Ms. Ayers-Perez.

6               MS. AYERS-PEREZ:  Thank you, your Honor.

7    DIRECT EXAMINATION BY MS. AYERS-PEREZ:

8    Q     Good afternoon.  Can you please state and spell your

9    name for the record?

10   A     My name's John Moore, spelled J-o-h-n, M-o-o-r-e.

11   Q     Where do you work?

12   A     For the Federal Bureau of Investigation.

13   Q     What do you do for the Federal Bureau of Investigation?

14   A     I'm a special agent.

15   Q     How long you been a special agent with the FBI?

16   A     For little over six years.

17   Q     What did you do before that?

18   A     I was an active duty Army officer for six years after

19   college, and then I had a brief private sector manufacturing

20   career about four years while I was processing in the Bureau.

21   Q     What was your rank when you were in the Army?

22   A     I'm currently serving the Army Reserve and I'm a

23   lieutenant colonel.

24   Q     Okay.  And before the Army, what, did you go to

25   college?

John Moore - Direct                    188

1    A     I did.

2    Q     Did you get a degree?

3    A     I did.  I completed my undergrad in 2004, it was ROTC

4    so that's what I was doing immediately before the Bureau and

5    since got a master's degree in political science.

6    Q     Okay.  Are there any particular type of cases you work

7    on with the FBI?

8    A     I started out working white collar investigations my

9    first couple years and I've been working domestic terrorism

10   for the last -- since 2020.

11   Q     Okay.  And were you working with the FBI on January 6,

12   2021?

13   A     I was.

14   Q     And if I just call it January 6th from here on out

15   you'll know what that means?

16   A     Yes, ma'am.

17   Q     Okay.  Which FBI office did you work at?

18   A     The Dallas field office.

19   Q     Have you worked there for the entirety of your time

20   with the FBI?

21   A     I have.

22   Q     Do you still work at the Dallas field office?

23   A     I do.

24   Q     And that's Dallas, Texas, right?

25   A     That's correct.

John Moore - Direct                                      189

1    Q     All right.  Were you aware of what happened in
2    Washington, D.C. on January 6?
3    A     I'm aware.
4    Q     Were you aware back on January 6th and the days
5    afterwards?
6    A     I was aware immediately that day.
7    Q     Did the FBI in Dallas investigate any cases arising out
8    of what happened on January 6th at the Capitol?
9    A     We did.
10   Q     Did you get assigned any cases?
11   A     I did.
12   Q     Did you get assigned any cases involving a Larry Brock?
13   A     I did.
14   Q     When was that?
15   A     On the morning of January 9th, 2021.
16   Q     And had you identified Mr. Brock at that point?
17   A     I had.
18   Q     How did you do that?
19   A     Multiple ways.  So that January 9th was a Saturday, was
20   a very interesting time for the FBI.  We had taken in
21   numerous complaints from the public identifying Mr. Brock as
22   being the person depicted on the Senate floor in the Capitol
23   on January 6, 2021.
24   Q     So would it be fair to say people were calling in tips
25   identifying Mr. Brock?

John Moore - Direct                    190

1   A     That's correct.

2   Q     There was more than one of those?

3   A     Yes, ma'am.

4   Q     If you had to guess, if you could estimate, a lot or a

5   little?

6   A     There were at least five.

7   Q     Okay.  So what do you do at this point?

8   A     So we have to open a case, so we, or I reviewed the

9   multiple complaints and open source information available and

10  then put that into an FBI case and opened a case on

11  Mr. Brock.

12  Q     As part of opening a case on Mr. Brock, did you become

13  aware of his background or education or occupation at this

14  time?

15  A     I did.

16  Q     What did you become aware of?

17  A     I became aware of the fact that he had attended the

18  United States Air Force Academy, I believe graduated in the

19  class of 1989 and that he held the rank of lieutenant colonel

20  in the Air Force.

21  Q     Okay.  Was he a current, was he currently in the Air

22  Force at that time or had he retired?

23  A     He had since retired.

24  Q     Do you know if he was employed at that time?

25  A     I did, I believed he was employed at Hillwood Airways

John Moore - Direct                                191

1  and I also believed that day I spoke with Hillwood Airways

2  and they informed me that he was no longer employed.

3  Q    What did you do at that point?  Actually strike that,

4  let me ask you this.  Was Mr. Brock charged at any point?

5  A    He was.  By the end of the day on January 9th we had a

6  complaint out of this district in Washington, D.C. with an

7  arrest warrant for Mr. Brock.

8  Q    Who was to execute that arrest warrant?

9  A    The Dallas FBI.

10  Q    And so did you execute that arrest warrant?

11  A    I did.

12  Q    When was this?

13  A    On Sunday, January 10th, 2021.

14  Q    Okay.  And tell me about that.

15  A    Because of the exigency of the circumstances having,

16  Mr. Brock having partaken in a riot at the U.S. Capitol, it

17  was our office's judgment that he needed to be arrested

18  quickly, so we had a -- referred to as a ping warrant on his

19  phone.  The ping warrant was only giving us marginally

20  accurate data in that it was, ping warrants come with

21  different degrees of certainty basically down to the meter as

22  to how close the ping is in time and space to where the phone

23  or the person actually is, so we didn't know exactly where

24  Mr. Brock was.  We knew he was pinging in Tarrant County and

25  we eventually called him to make the arrest.

John Moore - Direct                                    192

1   Q      And as a fellow Texan myself, just to clarify, Tarrant

2   County is not in Dallas, right?

3   A      That's correct, it's adjacent, it's the county -- well,

4   it's where Fort Worth is so it's just west of Dallas County.

5   Q      Got it.  Did you eventually make contact with Mr. Brock

6   that day?

7   A      I did.

8   Q      Tell us about that.

9   A      We didn't -- I called Mr. Brock on his cell phone.  I

10  initially got a call from his civil attorney, I spoke to that

11  attorney, as did a United States Attorney, or AUSA in Texas

12  in the Northern District of Texas, so we had three-way call.

13  I also spoke to a former girlfriend of Brock's.  I believe I

14  also spoke to Mr. Brock at some point that day so it was a

15  very fluid situation.  I explained what was going on to the

16  attorney, the AUSA explained what was going on to the

17  attorney, and we eventually compelled Mr. Brock to

18  self-surrender at the Grapevine, Texas Police Department.

19  Q      Okay.  Did you go to the Grapevine, Texas Police

20  Department?

21  A      I did.

22  Q      Tell me what happened there.

23  A      I was -- I believe I was speaking directly to Mr. Brock

24  on the phone, I said, hey, come in and park on, you know, one

25  side of the parking lot.  He did that.  He was approached by

John Moore - Direct                                    193

1    our SWAT team, he was compliant and was taken into custody.

2    Q     Did Mr. Brock have anything on him at that point?

3    A     He had his mobile telephone.

4    Q     And did that come into your custody?

5    A     It did.

6    Q     And how was that?

7    A     He handed it over to the arresting agents.

8    Q     Was that arrest warrant the only warrant you had that

9    day?

10   A     No.

11   Q     What else did you have?

12   A     We had a ping warrant for his phone that I previously

13   described and we had a search warrant for his residence.

14   Q     Okay.  Did you execute that search warrant?

15   A     I did.

16   Q     And did you find anything -- what were you looking for

17   there?

18   A     We were looking for, I mean first and foremost, weapons

19   of any kind that can be used to carry out additional attacks

20   against the Government or others, as well as evidence linking

21   him to the crime at hand.

22         MR. BURNHAM:  Your Honor, I object to that answer,

23   move to strike the answer of additional attacks against the

24   government with weapons --

25         THE COURT:  Well, that's what he was looking for,

John Moore - Direct                                         194

1   so overruled.

2   Q     What else were you looking for, Agent Moore?

3   A     Other electronic devices, computers, telephones, other

4   things that may have had communications on them and then the

5   items that he was depicted wearing at the Capitol on

6   January 6th.

7   Q     Did you seize any items related to January 6th at his

8   residence?

9   A     Yes, ma'am.

10  Q     Did you bring any items that you seized here to court

11  today?

12  A     I did.

13  Q     And what were those items?

14  A     Excuse me.  I believe it was two mobile telephones,

15  cell phones that we found, some notebooks, the jacket that

16  Mr. Brock wore at the Capitol that day, hiking boots that

17  Mr. Brock wore -- hiking boots that we recovered, I'm not

18  certain if they were worn at the Capitol or not.  One of the

19  patches from his body armor that he's depicted wearing at the

20  Capitol, and some airline tickets, as well as I believe a

21  luggage receipt from his trip to and from Washington, D.C.

22  Q     And what were those airline tickets for?

23  A     I believe they were tickets reflecting a flight out on

24  January 5th and then returning to DFW on January 7th, 2021.

25            MS. AYERS-PEREZ:  Your Honor, we have a

John Moore - Direct                                    195

1    stipulation, it's Government's Exhibit Number 707, this is in

2    regards to the physical items obtained in the search of

3    Mr. Brock's house, just stipulating that they've been in the

4    custody of the FBI from the time of their seizure and that we

5    stipulate to the chain of custody.

6              THE COURT:  All right.  Without objection, because

7    there's a stipulation, Government, the Joint Exhibit 707 will

8    be admitted.

9    Q    Agent Moore, you've been in the courtroom the whole day

10   today, right, you've seen all the videos and everything we've

11   introduced here?

12   A    That's correct.

13   Q    Okay.  Did you remember the video of Mr. Brock at the

14   door to the Senate Lobby with what appeared to be some keys

15   in his hand?

16   A    I do.

17   Q    And were you aware of that video pretty early on in

18   your investigation?

19   A    I was.

20   Q    Did y'all recover those keys at his residence?

21   A    No.

22   Q    What about the helmet he was wearing?

23   A    No, we did not.

24   Q    And what about the vest he was wearing?

25   A    We did not recover that either.

John Moore - Direct                          196

1   Q      There appeared to be three patches on his vest, what

2   about the other two patches?

3   A      We did not recover those patches.

4          MS. AYERS-PEREZ:  Okay.  Your Honor, may I approach

5   the witness?

6          THE COURT:  You may.

7   Q      And Agent Moore, did you bring the blue bin right over

8   there with you today?

9   A      Yes, ma'am.

10  Q      And does that bin contain the -- a few of the items we

11  just spoke about?

12  A      Yes, it does.

13         MS. AYERS-PEREZ:  Now may I approach the witness.

14  Thank you, your Honor.

15         All right, Agent Moore, if I could borrow your

16  microphone as well, make sure everybody can hear me.  I'm

17  going to show you what we marked as Government's

18  Exhibit Number 1, do you recognize this?

19  A      I do.

20  Q      What is this?

21  A      This is a black-and-white jacket that Mr. Brock was

22  depicted wearing at the Capitol on January 6th.

23  Q      Where did you recover this from?

24  A      In his apartment.

25  Q      Okay.  And when was that?

John Moore - Direct                                    197

1    A     On January 10th, 2021.

2    Q     Will you open this and show it to us.

3    A     (Witness complies.)

4          MS. AYERS-PEREZ:  Your Honor, I move to admit

5    Government's Exhibit 1 into evidence.

6          THE COURT:  Any objection?

7          MR. BURNHAM:  No, your Honor.

8          THE COURT:  Government 1 is admitted.  Without

9    objection.

10   Q     All right, Agent Moore, I'm going to show you this bag

11   has been marked as Government's 2 through 5, do you recognize

12   this bag?

13   A     I do.

14   Q     What's inside that bag?

15   A     It's labeled trash contents, boarding pass, camouflage

16   neck gaiter and bag tag and patch so it's all those items.

17   Q     Why is it labeled trash contents?

18   A     Because at least some of the contents were found in the

19   trash.

20   Q     Okay.  Can you go ahead and open that for us.

21   A     (Witness complies.)

22   Q     So here we're looking at -- what is this?

23   A     This is, excuse me, this is a Velcro patch that's a

24   Punisher logo set to the Texas flag.

25   Q     And then here?

John Moore - Direct                    198

1    A     This is a airline ticket from Washington Reagan Airport

2    to Dallas Forth Worth Airport on January 7th.

3    Q     Okay.  And what else?

4    A     This is a luggage tag from American Airlines from what

5    I believe to be the same flight on January 7th.

6    Q     And lastly?

7    A     A neck gaiter that was depicted on Mr. Brock at the

8    Capitol.

9          MS. AYERS-PEREZ:  Your Honor, at this time I move

10   to admit Government 2 through 5 in evidence.

11         THE COURT:  Without objection, Government 2 through

12   5 are admitted.

13   Q     Thank you, Agent Moore.  Moving back to the phone we

14   had talked about.  What happened to that phone after you

15   collected it from Mr. Brock on January 10th?

16   A     I took it to the North Texas Regional Computer

17   Forensics Laboratory which is where our phone examiners work

18   and they made an extraction of that phone to be used as, a

19   review by us.

20   Q     Okay.  When you say extraction of the phone, what does

21   that typically show us?

22   A     It can vary depending on how successful the extraction

23   is but if, you know, if it's a smart phone, in this case it

24   was, it can have text messages and e-mails and pictures and

25   videos and contents of any app that a person has in their

John Moore - Direct                                    199

1    phone.

2    Q     Were they able to successfully extract the phone that

3    Mr. Brock had with him?

4    A     They were.

5    Q     And did you go through the extraction of that phone?

6    A     I did.

7    Q     Do you have reason to believe the extraction, that

8    the -- that that phone belongs to Mr. Brock?

9    A     I believe it belongs to him.

10   Q     Was there anything on the phone that made you believe

11   that this phone belonged to Mr. Brock?

12   A     Yes.

13   Q     What was that?

14   A     E-mails, e-mails signed by him, pictures of him, and

15   communications that appeared to be sent from him.

16          MS. AYERS-PEREZ:  Okay.  Your Honor, at this time,

17   to make it easier, I would move to admit Government's 306

18   through 326.

19          THE COURT:  All right, so Government's 306 through

20   326.

21          MR. BURNHAM:  Could I have a moment, your Honor?

22          THE COURT:  Certainly.

23          MR. BURNHAM:  No objection to those.

24          THE COURT:  306 through 326 are admitted.

25   Q     All right, Agent Moore.  I'm going to show you what's

John Moore - Direct                                    200

1    marked as Government's 306.  Do you recognize this?

2    A    I do.

3    Q    What are we looking at here?

4    A    It's a picture of demonstrators on January 6th.

5    Q    Where was this recovered from?

6    A    I believe it was recovered from Mr. Brock's phone.

7    Q    Okay.  Were there other photos and/or videos recovered

8    from his phone?

9    A    Yes.

10   Q    All right.  I'm going to show you what's been marked as

11   Government's 307.  What are we looking at here?

12   A    That's a picture of a helmet, a military style helmet

13   and body armor in a suitcase.

14   Q    Does that look familiar to what Mr. Brock is wearing on

15   January 6th?

16   A    It does.

17   Q    Okay.  And where was this recovered from?

18   A    His phone.

19   Q    And that's Mr. Brock's phone?

20   A    That's correct.

21   Q    I'm going to show you what's been marked as

22   Government's 308.  Do you recognize this?

23   A    I do.

24   Q    And what is this?

25   A    That is a picture of him wearing the body armor with

John Moore - Direct                     201

1    the three patches we've described previously, taking a

2    picture with his own phone.

3    Q      Is that something we would commonly refer to as a

4    selfie?

5    A      Yes.

6    Q      And when you say him, you mean Mr. Brock?

7    A      That's correct.

8    Q      Where was this recovered from?

9    A      From his phone.

10   Q      Mr. Brock's phone?

11   A      Yes.

12   Q      Okay.  I'm going to show you Government's Exhibit 309.

13   What are we looking at here, Agent Moore?

14   A      It appears to be the January 6th rally in Washington,

15   D.C.

16   Q      And where was this recovered from?

17   A      From his phone, Mr. Brock's phone.

18   Q      Okay.  I'm going to show you what's been marked as

19   Government's Exhibit 310.  And here, Agent Moore?

20   A      That is a picture of people on the street in I believe

21   Washington, D.C.

22   Q      Where was this recovered from?

23   A      From Mr. Brock's phone.

24   Q      I'm going to show you what's been marked Government's

25   311.  What are we looking at here, Agent Moore?

John Moore - Direct                                    202

1    A      People outside the United States Capitol.

2    Q      And where was this recovered from?

3    A      Excuse me, Mr. Brock's phone.

4    Q      I'm going to show you what's been marked as

5    Government's 312.  What are we looking at here, Agent Moore?

6    A      It is a -- looks like a screenshot of a flight that was

7    booked on American Airlines to Dulles Airport on January 5th,

8    2021.

9    Q      Is Dulles Airport in the Washington, D.C. area?

10   A      It is.

11   Q      Okay.  And where was this recovered from?

12   A      Mr. Brock's phone.

13   Q      Okay.  And is that Mr. Brock's name there at the top?

14   A      Yes.

15   Q      I'm going to show you what's been marked as

16   Government's Exhibit 313.  What am I looking at here, Agent

17   Moore?

18   A      That's a selfie of Mr. Brock at the rally on

19   January 6th, 2021.

20   Q      Okay.  And is he wearing -- is that the vest I see?

21   A      Yes, it's the vest and the jacket that we have just

22   previously discussed.

23   Q      Okay.  And I'm going to mark here on the screen, my

24   circle will come up in red.  What is that that I circled

25   there on his vest?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

John Moore - Direct                                    203

1    A     That's the Punisher patch that we just introduced into

2    evidence.

3    Q     Okay.  So that's identical to what you found there in

4    his apartment?

5    A     That's correct.

6    Q     Where was this photo recovered from?

7    A     His phone.

8    Q     Mr. Brock's phone?

9    A     That's correct.

10   Q     I'm going to clear the screen and I'm going to pull up

11   what's marked as Government's Exhibit Number 314.  What are

12   we looking at here, Agent Moore?

13   A     It's a picture from the January 6th, 2021 rally in

14   Washington, D.C.

15   Q     And who's that on the screen that we see?

16   A     Former President Trump.

17   Q     And where was this recovered from?

18   A     Mr. Brock's phone.

19   Q     Okay.  I'm going to show you what's been marked as

20   Government's Exhibit 315.  What are we looking at here, Agent

21   Moore?

22   A     It's a picture of riot police outside the Capitol on

23   January 6th, 2021.

24   Q     And where was this, where was this picture recovered

25   from?

John Moore - Direct                                    204

1    A      Mr. Brock's phone.

2    Q      All right.  I'm going to show you what's been marked as

3    Government's Exhibit 316.  What are we looking at here, Agent

4    Moore?

5    A      Another picture of President Trump on a television

6    screen January 6th, Stop the Steal Rally, January 6th, 2021.

7    Q      Where was this recovered from?

8    A      Mr. Brock's phone.

9    Q      All right.  I'm going to show you what's been marked as

10   Government's Exhibit 317.  And what are we looking at here,

11   Agent Moore?

12   A      It's another picture of Mr. Trump -- or correction,

13   President Trump speaking at the January 6 rally from

14   Mr. Brock's phone.

15   Q      Okay.  I'm going to show you what's been marked as

16   Government's Exhibit 318.  And what is this?

17   A      That is a picture of Mr. Brock on the Senate floor.

18   Q      And where was this recovered from?

19   A      From -- I believe it was recovered from Mr. Brock's

20   phone.

21   Q      Okay.  I'm going to show you what's been marked as

22   Government 319.  And what is this?

23   A      That's a picture of the U.S. Capitol building.

24   Q      Okay.  And there are a number of protesters or rioters

25   there in that picture, is that right?

John Moore - Direct                                    205

1    A      That's correct, it's from the January 6th riot at the

2    Capitol, 2021.

3    Q      Does this appear to be taken from the inside or outside

4    of the Capitol building?

5    A      It appears to be taken from inside the Capitol

6    building.

7    Q      Can you see the window frame there on the right side of

8    the picture?

9    A      Yes.

10   Q      And where was this recovered from?

11   A      Mr. Brock's phone.

12   Q      I'm going to show you what's been marked as Government

13   320.  Can you tell us what we're looking at here, Agent

14   Moore?

15   A      It's another picture of demonstrators at the

16   January 6th, 2021 rally.

17   Q      And where was this picture recovered from?

18   A      Mr. Brock's phone.

19   Q      Okay.  I'm going to show you what's been marked as

20   Government's Exhibit 321.  And what are we looking at here,

21   Agent Moore?

22   A      A picture of demonstrators somewhere on a street in

23   Washington, D.C. on January 6, 2021.

24   Q      And where was this recovered from, Agent Moore?

25   A      Mr. Brock's phone.

John Moore - Direct                     206

1    Q    Okay.  I'm going to show you what's been marked as
2    Government Exhibit 322.
3              THE COURT:  Maybe.
4                   (Government's Exhibit 322 played.)
5    Q    What was that a video of, Agent Moore?
6    A    That was a video of President Trump speaking at the
7    January 6 Stop the Steal Rally, 2021.
8    Q    And where was that video recovered from?
9    A    From Mr. Brock's phone.
10   Q    I'm going to show you what's been marked as Government
11   Exhibit 323.
12                  (Government's Exhibit 323 played.)
13   Q    What was that a video of, Agent Moore?
14   A    That was a video of protesters on January 6th, 2021.
15   Q    Was that at that Stop the Steal Rally?
16   A    It appeared to be so.
17   Q    Where did you recover that video from?
18   A    Mr. Brock's phone.
19   Q    I'm going to show you Government's Exhibit 324.
20                  (Government's Exhibit 324 played.)
21   Q    What were we looking at there, Agent Moore?
22   A    Demonstrators at the January 6, 2021 Stop the Steal
23   Rally.
24   Q    Where was that recovered from?
25   A    Mr. Brock's phone.

John Moore - Direct                                    207

1    Q       Show you Government's 325.

2                    (Government's Exhibit 325 played.)

3    Q       Where was that recovered from, Agent Moore?

4    A       Mr. Brock's phone.

5    Q       And what was that a picture or or a video of?

6    A       It was a video of Mr. Brock wearing body armor.

7    Q       Short video, pausing it there at the one-second mark.

8    What is Mr. Brock wearing there in that video?

9    A       He's wearing headphones, sweatshirt, and body armor.

10   Q       Okay.  Does that look similar to the body armor he was

11   wearing on January 6th?

12   A       It looks similar but the color is off.  I don't know if

13   it's the lighting but this looks kind of coyote tan and his

14   other body armor was green.

15   Q       Then I'm going to show you what's been marked as

16   Government's Exhibit 326.

17                   (Government's Exhibit 326 played.)

18   Q       That was a quick one, Agent Moore.  Do you -- what are

19   we looking at here, Agent Moore?

20   A       It's a video of President Trump speaking at the

21   January 6th, 2021 Stop the Steal Rally.

22   Q       And where was this recovered from?

23   A       Mr. Brock's phone.

24   Q       And I'm not sure I asked that but for 325, was that

25   also recovered from Mr. Brock's phone?

John Moore - Direct                                          208

1    A    Which one was 325?

2    Q    The one with the sweatshirt and the body armor.

3    A    Yes.

4    Q    Okay.  At any point in your investigation of Mr. Brock

5    did you become aware of any social media usage by Mr. Brock?

6    A    Yes.

7    Q    What was that?

8    A    Became aware pretty quickly that he used Facebook.

9    Q    And how did you become aware of that?

10   A    Some of the people that made tips or complaints to the

11   FBI stated that they were Facebook friends of his and that he

12   used some pretty heated rhetoric on Facebook.

13   Q    Okay.  And did you receive any sort of information to

14   help you identify Mr. Brock's Facebook?

15   A    Yes.

16   Q    What did you receive?

17   A    Multiple people told us that his Facebook --

18        MR. BURNHAM:  Object to hearsay.

19        MS. AYERS-PEREZ:  Your Honor, it doesn't --

20        THE COURT:  It's overruled.

21   Q    Go ahead, Agent Moore.

22   A    Well, multiple people told me that his Facebook user

23   name was Torch Flyer.

24   Q    Okay.  And what did you do with that information?

25   A    We submitted a search warrant to Facebook for the

John Moore - Direct                                    209

1     contents of that account.

2     Q     And that's the account with the user name, was is Torch

3     Flyer or Torch Flyer 10 or --

4     A     It's just Torch Flyer but it's also associated with his

5     phone number.

6     Q     Okay.  And so what did you get back from Facebook?

7     A     We got back content of numerous posts, direct messages,

8     and the various chat functions that are present on the

9     Facebook application.

10    Q     Did you review that information you received from

11    Facebook?

12    A     I did.

13    Q     Was it a lot or a little bit that came back?

14    A     I mean, not as much as other people I've dealt with,

15    more than others.

16    Q     Okay.  Was there any information that you reviewed that

17    helped you determine that this account belonged to Mr. Brock?

18    A     There was.

19    Q     And what was that?

20    A     The phone number associated with it was the phone

21    number we knew to be Mr. Brock's.  The user name associated

22    with the account was a user name that multiple witnesses had

23    said was Mr. Brock's and then some of the witnesses who had

24    spoken about their conversations with him, we could find

25    those conversations to back them up.

John Moore - Direct                                    210

1    Q    Okay.  Were there any other phone numbers other than

2    that one associated with the account?

3    A    Not that I know of.

4         MS. AYERS-PEREZ:  Your Honor, we have a

5    stipulation, Government's Exhibit Number 706, it includes the

6    handle, e-mail address and phone number of Mr. Brock, and the

7    stipulation is that the Facebook returns includes direct

8    messages, content posts, pictures, and videos produced by

9    Facebook for the time period November 1st, 2020 through

10   January 13, 2021 are authentic, accurate, and exact copies

11   from his account.

12        THE COURT:  All right.  That is stipulation number

13   706 and as such, it is admitted into evidence.

14        MS. AYERS-PEREZ:  And your Honor, we're going to

15   get into 900 series at this point I know this is the series

16   that Mr. Burnham has some objections to all but four of them.

17        THE COURT:  I think you're going to have to do them

18   one by one rather than try to preadmit all of them unless

19   there are some that you know there is no objection to.

20        MS. AYERS-PEREZ:  There are four but they're at the

21   very end so I'll go one by one until we hit them.

22        THE COURT:  All right.

23   Q    So I'm going to start with Government's Exhibit 900.

24        THE COURT:  Mr. Burnham, I'm going to allow the

25   exhibit to be shown to me in order for me to make any ruling

John Moore - Direct                                    211

1   on any objection.  Normally the fact finder would not see the

2   exhibit but in this instance, I need to see it in order to

3   rule on the objection.

4          MR. BURNHAM:  I understand, your Honor.  We have an

5   objection to 900.

6          THE COURT:  Thank you.

7   Q    All right, Agent Moore.  Do you see what's been marked

8   as Government's Exhibit 900?

9   A    I do.

10  Q    Do you know that to be part of the Facebook search

11  warrant return you received from Mr. Brock's Facebook

12  account?

13  A    I do.

14         MS. AYERS-PEREZ:  Your Honor, I would --

15         MR. BURNHAM:  So I object to this again on 403

16  grounds.  It's, it appears to be in quotation marks, "A

17  revolution every now and then is a good thing," sort of

18  reminds me of a Thomas Jefferson quote we learned about in

19  elementary school and so I think it's just general political

20  back and forth on Facebook.  It doesn't refer to January 6th

21  and even taking the worst possible view of the evidence we've

22  seen so far, it wasn't revolutionary activity, so --

23         THE COURT:  All right, just a second.

24         All right.  Seems to me, consistent with something

25  that you just said, that the relevance of this particular

John Moore - Direct                          212

1    communication from the Facebook account is pretty low, pretty

2    minimal, but also, the prejudice is pretty low, and I think

3    when you weigh all of that, first of all, even minimal

4    relevance is sufficient to get into evidence, and when you

5    then assess the prejudice versus the relevance, the test is

6    really weighted in favor of admission and I think while both

7    the relevance and the prejudice are pretty low, I think

8    because of the way the 403 test is structured, the evidence

9    can be admitted and I overrule the objection.

10            MS. AYERS-PEREZ:  Your Honor, I move to admit

11   Government's 900.

12            THE COURT:  And I overruled the objection and

13   therefore it is admitted.

14            MS. AYERS-PEREZ:  Thank you, your Honor.

15   Q    Agent Moore, do you see what we see there on the

16   screen?

17   A    I do.

18   Q    All right.  What date is this?

19   A    November 7th, 2020.

20   Q    And is this a comment or a message or what is it that

21   we're looking at?

22   A    It is a comment that Mr. Brock made on that date.

23   Q    And how do you know it's Mr. Brock?

24   A    Because it says Torch Flyer commented on a post

25   November 7th, 2020.

1    Q      And do you know Torch Flyer to be Mr. Brock?

2    A      I do.

3    Q      Okay.  And what does it say after what you just read?

4    A      "A revolution every now and then is a good thing; it is

5    time."

6    Q      Okay.  Moving on to Government's Exhibit Number 901.

7           THE COURT:  Will there be an objection to 901?

8           MR. BURNHAM:  Yes, on generally the same basis as

9    900, it's similar material.

10          THE COURT:  All right.  Let me read it.

11               (The Court reviewing the exhibit.)

12          THE COURT:  The same assessment.  The relevance is

13   pretty low, it's a full two months before the January 6th

14   events, it doesn't refer to the January 6th, but it has

15   marginal relevance with respect to intent, and the prejudice

16   is not very high, and I can certainly take account of what is

17   said here and view it through a proper filter, and I think

18   for that reason, I don't think that the probative value is

19   substantially outweighed by prejudice under 403 and therefore

20   the objection is overruled, and 901 is admitted.

21   Q      What are we looking at here, Agent Moore?

22   A      We're looking at a series of posts made by Mr. Brock on

23   November 8th, 2020.

24   Q      Okay.  With the first post, can you read it to us?

25   A      Yes, it says, "Fakebook doesn't want you to see this as

John Moore - Direct                    214

1    they continue to aid the Demonrats in election theft."

2    Q     What do you know Fakebook to be?

3    A     I believe it's a derogatory term for Facebook.

4    Q     What about Demonrats?

5    A     I believe it's a derogatory term for Democrats.

6    Q     What about the next message?

7    A     Also sent on November 8th, 2020, "Why would the general

8    lie?  This election is being stolen."

9    Q     And the last message?

10   A     Also sent on November 8th, 2020, "Biden outperformed

11   Obama?  Right.  I have said it before and I will say it

12   again.  If the President calls, I will answer #oathkeeper."

13   Q     What is a hashtag?

14   A     Hashtag is kind of a way of showing support or linking

15   yourself to a thing or group or something.

16   Q     And what is Oath Keeper?

17   A     Oath Keepers is a militia group made up primarily of

18   law enforcement and military personnel, both currently

19   serving or who have served in the past, and the foundation of

20   the group is that this group of individuals at one time took

21   an oath to defend the Constitution against enemies foreign

22   and domestic and they have formed a little militia to

23   continue to stand ready to defend their beliefs against who

24   they perceive to be enemies of the Constitution, foreign and

25   domestic.

John Moore - Direct                    215

1   Q    Okay.  I'm going to pull up what's been marked as
2   Government's 902.
3              THE COURT:  That's 901 again.
4              MR. BURNHAM:  Same objection to 902, it's general
5   political speech, fairly remote in time.
6              THE COURT:  Thank you, Mr. Burnham.  Once it's
7   enlarged, I will read it so I can rule.  But it's
8   disappeared.
9              MS. AYERS-PEREZ:  Can you zoom in?  Can you just
10  zoom in from here because this is the right one.
11             THE COURT:  Let me read it, please.
12             (The Court reviewing the exhibit.)
13             THE COURT:  I have to say, as to this one, the
14  first message is not really tagged to anything specific to
15  January 6th or what the conspiracy being asserted is, and the
16  second message outside the context of events on January 6th,
17  this is again two months beforehand, just talks about fraud
18  and relates what's happening in vote counts so the relevance
19  here is really quite minimal.  I'll allow the Government to
20  tell me why they think this is particularly relevant.
21             MS. AYERS-PEREZ:  Well, your Honor, the reason, and
22  we would surmise the reason that Larry Brock was there on
23  January 6th and so many people were there is because they
24  believed the election was stolen.  January 6th is when
25  Congress is certifying the votes of the election, and I

John Moore - Direct                                          216

1    realize this is almost two months before January 6th, but

2    it's only six days after the election.  That's the basis of

3    January 6th and the basis of the counting of the Electoral

4    College votes and it's this election that's the reason why

5    Larry Brock is so upset and why Larry Brock is there at the

6    Capitol on January 6th.  And his thoughts about the election

7    as they progressed between November 3rd and January 6th are

8    showing an increasing amount of intent, and what you will see

9    through these messages is he has various thought processes as

10   to what's going to happen with this election between outright

11   believing it's not real to believing the Supreme Court is

12   going to overturn it, to landing it at, well, Congress has to

13   stop it on January 6th.

14          THE COURT:  All right.  Mr. Burnham, you want to

15   say anything in response to that?

16          MR. BURNHAM:  Yes, your Honor.  I think the

17   position we've always maintained is that just general talk

18   about the election, was it stolen, was it not, without some

19   link is not enough to even have the marginal relevance your

20   Honor has been looking for, so I think the court's

21   observations are right on about this one.

22          THE COURT:  I'm going to conditionally admit it.

23   I'll have to see what the track of these messages is, and if

24   it fits within a showing that is relevant to intent in this

25   case.

John Moore - Direct                         217

1          MS. AYERS-PEREZ:  Yes, your Honor.

2          THE COURT:  So conditionally admit it.

3          THE COURT:  Which means I'm permitting the witness

4     to testify with respect to it subject to further decision by

5     me.

6          MS. AYERS-PEREZ:  Yes, your Honor.

7     Q    Agent Moore, can you tell us what we're looking at

8     here?

9     A    We're looking at two posts made by Mr. Brock on

10    November 9th, 2020.

11    Q    Okay.  And can you read the first post to us.

12    A    "When we get to the bottom of this conspiracy, we need

13    to execute the traitors that are trying to steal the

14    election, and that includes the leaders of the media and

15    social media aiding and abetting the coup plotters."

16    Q    And the second message, Agent Moore?

17    A    "Every day the fraud grows.  Every day the Arizona lead

18    shrinks.  GOP and RINOs stand with the President now or be

19    lost forever.  We will win this."

20    Q    What is RINOs?

21    A    It's a acronym for Republicans in Name Only.

22    Q    All right.  I'm going to pull up --

23         THE COURT:  Do one more and then we'll probably

24    break for the day.

25         MS. AYERS-PEREZ:  Okay, your Honor.  I'm going to

John Moore - Direct                                    218

1     pull up what's been marked as Government's Exhibit 903.

2                 THE COURT:  This is 90 --

3                 MS. AYERS-PEREZ:  3.

4                 THE COURT:  Yes, 903, I'm sorry.  Same objection?

5                 MR. BURNHAM:  Yes, same objection, your Honor.

6                 THE COURT:  All right.  Didn't get blown up much

7     but I think I can read it as long as we move it over so it's

8     not blocked on the right-hand side by these icons.

9                 MS. AYERS-PEREZ:  Might be easier to do it in two

10    parts, the top half and the bottom half and they're two

11    different things as well.

12                THE COURT:  You can do whatever you want, I can

13    read it as is, but this is all right.

14                     (The Court reviewing the exhibit.)

15                THE COURT:  The references at the bottom are just

16    references to future events?

17                MS. AYERS-PEREZ:  They are, your Honor.

18                THE COURT:  They're not the date of any

19    communication?

20                MS. AYERS-PEREZ:  It's not the date of any

21    communication.  I would point out that there's an RSVP that

22    he put that he's attending the Stop the Steal Rally on

23    January 6th in Washington, D.C.

24                THE COURT:  Right, but it's just referencing that

25    future event.

John Moore - Direct                 219

1          MS. AYERS-PEREZ:  Correct, it's not a message from

2     him.

3          THE COURT:  The only message other than the

4     reference, if you will, to that future event is right at the

5     top in the post -- oh, I guess there's a message to Senator

6     Hawley as well.

7          MS. AYERS-PEREZ:  And right above that, it looks

8     like a post 6 January 2021, "Storm the Castle."

9          THE COURT:  All right.  I understand the same

10    objection, this one is more directly tied to the January 6th

11    by the reference to the future event and on two occasions,

12    the first of which is, includes the label "Storm the Castle,"

13    and indicates an apparent willingness to take action.  And I

14    will admit it on that basis, not conditionally, I will admit

15    this one.

16          And with that, we're past 5 p.m., so you're

17    barreling right along in your testimony, I am assuming that

18    you're going to finish the government's case tomorrow

19    morning.

20          MS. AYERS-PEREZ:  I -- that is correct, your Honor,

21    Agent Moore is our final witness.

22          THE COURT:  So we'll go ahead and break for the

23    day.  The defense should obviously be prepared with its case

24    tomorrow because we will reach your case tomorrow unless

25    there's a motion that I rule on that keeps us from reaching

1    the case, but let's be ready to go at 9:30, and we'll

2    continue with Special Agent Moore at that time.  Thank you,

3    sir.  Thank you all.  Anything further that we need to talk

4    about before we break?

5                MS. AYERS-PEREZ:  Nothing from the Government.

6                MR. BURNHAM:  No, your Honor.

7                THE COURT:  All right.  Thank you all, see you

8    then.

9                     (Court Adjourned, 5:02 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4          I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

5     Official Realtime Court Reporter, in and for the

6     United States District Court for the Northern

7     District of New York, DO HEREBY CERTIFY that

8     pursuant to Section 753, Title 28, United States

9     Code, that the foregoing is a true and correct

10    transcript of the stenographically reported

11    proceedings held in the above-entitled matter and

12    that the transcript page format is in conformance

13    with the regulations of the Judicial Conference of

14    the United States.

15

16                         Dated this 25th day of November, 2022

17

18

19                              /S/ JODI L. HIBBARD

20                              JODI L. HIBBARD, RPR, CRR, CSR
                                Official U.S. Court Reporter
21

22

23

24

25


                    JODI L. HIBBARD, RPR, CRR, CSR
                          (315) 234-8547