VOLUME II
UNITED STATES  DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                            21-CR-140

LARRY RENDALL BROCK,

                    Defendant.

-------------------------------------------x

      Transcript of a Bench Trial held on

November 15, 2022, at the E. Barrett Prettyman U.S.

Courthouse, 333 Constitution Avenue, N.W.,

Washington, D.C., the HONORABLE JOHN D. BATES,

Senior Judge, Presiding.

                A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    SOUTHERN DISTRICT OF TEXAS
                    11204 McPherson Road
                    Suite 100a
                    Laredo, Texas  78045
                      BY:  APRIL AYERS-PEREZ, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    1331 F Street, N.W.
                    Washington, D.C.  20005
                      BY:  BARRY KENT DISNEY, ESQ.

                    U.S. DEPARTMENT OF JUSTICE
                    Narcotic & Dangerous Drug Section
                    145 North Street, N.E., Suite 2300
                    Washington, D.C.  20530
                      BY:  DOUGLAS MEISEL, ESQ.

For Defendant:      BURNHAM & GOROKHOV, PLLC
                    Attorneys at Law
                    1424 K St., N.W.
                    Suite 500
                    Washington, D.C.  20005
                      BY:  CHARLES BURNHAM, ESQ.

1
2                    I N D E X   O F   T E S T I M O N Y
3
4    Witnesses          Direct    Cross    Redirect    Recross
5    John Moore, cont'd  224       265      293          --
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    (Open Court, 9:37 a.m.)

2          THE CLERK:  Your Honor, we have criminal action

3     21-140, United States of America versus Larry Brock and all

4     counsel are present.

5          THE COURT:  All right, good morning to all counsel

6     and everyone else.  And let me ask an initial question.

7     Since things are moving a little faster than perhaps I had

8     anticipated, I will ask you, Mr. Burnham, whether you have

9     informed the Government of your potential witnesses if the

10    defense puts on a case.

11         MR. BURNHAM:  Your Honor, the only -- the only

12    witness we might call would be the defendant.  I don't

13    believe I have --

14         THE COURT:  As long as they're aware of that.

15         MR. BURNHAM:  I don't know if I explicitly informed

16    them of that, we didn't submit a witness list but that was

17    the implication I think from that.

18         THE COURT:  All right.  With that, are we ready to

19    resume with Special Agent Moore?

20         MS. AYERS-PEREZ:  Yes, your Honor.

21         THE COURT:  All right.  Special Agent Moore,

22    please.  All right.  I remind you you're still under oath.

23         THE WITNESS:  Yes, sir.

24

25         J O H N   M O O R E , called as a witness

John Moore - Direct                                    224

1   and being previously duly sworn, testifies as

2   follows:

3              THE COURT:  Let's continue, Ms. Ayers-Perez.

4              MS. AYERS-PEREZ:  Thank you, your Honor.

5   CONTINUED DIRECT EXAMINATION BY MS. AYERS-PEREZ:

6   Q    Good morning, Agent Moore.

7   A    Good morning, ma'am.

8   Q    I show we left off on Exhibit 903 last time.  So we can

9   pull up Government's Exhibit 904.

10             THE COURT:  Is there an objection?

11             MR. BURNHAM:  Yes, your Honor, the same basic

12  objection.  It refers to the Insurrection Act, Supreme Court,

13  to patriots from Athens, doesn't refer to January 6th,

14  Electoral College, certification, anything like that.

15             THE COURT:  All right.  And it's a communication

16  from November -- I'm sorry, December 4th.  Anything you want

17  to say, Ms. Ayers-Perez?

18             MS. AYERS-PEREZ:  A couple things, your Honor.

19  First, this is the first mention of IO war and if you

20  remember from Government's Exhibit 509, the defendant uses

21  the term IO war multiple times while he's on the Senate floor

22  on January 6th.  This is again about the election, the

23  Supreme Court stopping the steal, he attends the Stop the

24  Steal Rally on January 6th, and the "steal" of course is in

25  reference to the election from November which is the basis of

John Moore - Direct                                    225

1    the January 6th Capitol riot that the defendant was at, and

2    in further messages, you'll see more communication about

3    insurrection, and this is the first time we see mention of

4    the Insurrection Act so I do think this is relevant.  I do

5    not think it's more prejudicial than probative in this

6    instance, your Honor.

7            THE COURT:  All right.  I think it is, in context

8    and the context being other Facebook messages, it is relevant

9    as being more -- making a fact in issue, the intent question,

10   addressing that and making it more probable than not that the

11   intent that the Government asserts was present with

12   Mr. Brock, and then when we get to a -- and therefore it's

13   admissible.  And then when we get to Rule 403 -- admissible

14   under 401 and 402.  When we get to Rule 403, again, in

15   context, I think the relevance is more than minimal, and the

16   prejudice, I understand the argument for prejudice.  It

17   doesn't seem to me that once the other Facebook

18   communications that I've admitted are in evidence that the

19   prejudice from this document is very significant and I find

20   that it, prejudice does not substantially outweigh the

21   relevance here, and that's especially true with a bench trial

22   and the ability of the judge to filter and limit any

23   potential prejudice.  So the objection is overruled and 904

24   is admitted.

25   Q    Agent Moore, can you tell us what we're looking at here

John Moore - Direct                                      226

1   with Government's 904?

2   A       Yes.  This is a Facebook -- excuse me, a reply on

3   Facebook to a post made by somebody named Jeff Ciaccio and

4   the reply was made on December 4th, 2020.

5   Q       And can you read to us what the reply was?

6   A       "No dude, you will not win the IO war, nor will I cede

7   that territory to you.  I have been trying to refrain but if

8   you are too stupid to see the fraud even with video evidence

9   you are not smart enough to truly understand the oath.  I

10  will reveal no more.  It is pointless.  Either SCOTUS stops

11  the steal or we must emulate the patriots from Athens in

12  1946.  Plans need to be made.  The Insurrection Act must be

13  used and those like you that swore to a higher oath will be

14  held accountable to a higher standard."

15  Q       And do you believe this post to be made by Mr. Brock?

16  A       I do.

17  Q       And why is that?

18  A       Because it comes from his Torch Flyer Facebook account.

19  Q       You mentioned yesterday, Agent Moore, that you have a

20  military background?

21  A       That's correct.

22  Q       Do you know what IO war means?

23  A       It means information operations.

24  Q       What is information operations?

25  A       Information operations is a broad term in concept,

John Moore - Direct                                    227

1    referring to the use of information to shape the battlefield

2    both using information to shape what enemy conventional

3    military units do as well as unconventional enemy forces as

4    well as the civilian populous where, in this case, the United

5    States would be fighting using a multitude of things from

6    information, shaping the news media, doing events that are

7    deemed to be friendly to the local populous, doing a

8    multitude of things to shape the information that your enemy

9    or the civilians take in with the intent of ultimately

10   influencing their actions.

11             MR. BURNHAM:  Your Honor, I have a partial

12   objection to that answer.  I don't think it was a bad

13   question, just ask what's the definition, but then -- because

14   he is a veteran, I acknowledge that, but then about the

15   remaining 75 percent of it I think got into speculation at

16   least as it applies to how it's used in this context, so I

17   move to strike everything after the basic definition of what

18   IO means.

19             THE COURT:  I'm going to limit what the testimony

20   was just by not considering part of it.  Also verged on being

21   expert testimony and of course Special Agent Moore has not

22   been qualified as an expert, but I will accept the general

23   contours of the explanation of what IO war is.

24   Q     Agent Moore, what is SCOTUS, if you know?

25   A     It's an acronym for Supreme Court of the United States.

John Moore - Direct                                          228

1    Q      Okay.  And are you familiar with what patriots from

2    Athens in 1946 means, just a general idea?

3    A      I am.

4    Q      And can you tell us what that is?

5    A      It was when a group of World War II veterans broke into

6    a National Guard armory in Athens, Tennessee, took weapons

7    and used them to fire on election authorities to seize ballot

8    boxes in what was perceived as an illegitimate election.

9    Q      If we can pull up Government's Exhibit 905.

10           THE COURT:  This is the same one, isn't it?

11           MS. AYERS-PEREZ:  Yes, this is.  There we go.

12           MR. BURNHAM:  Your Honor, same basic objection,

13   again, as I've been objecting to messages that don't refer to

14   anything surrounding the certification of the votes and, you

15   know, the prejudice here would be particularly if the

16   Government argues that it should be taken literally, you

17   know, the prejudice of them arguing this shows he was trying

18   to start a civil war.  To the extent that they are going to

19   take that position would be significant prejudice.

20           THE COURT:  All right.  I understand that, but of

21   course I can accept or reject the Government's argument if it

22   does choose to argue that.  Same ruling in essence,

23   particularly in context, particularly because the standard,

24   once we reach 403, the standard is whether in this instance,

25   the unfair prejudice, which is the term in Rule 403,

John Moore - Direct                    229

1    substantially outweighs the probative value, and I find that

2    it does not.

3              MS. AYERS-PEREZ:  Yes, your Honor.

4              THE COURT:  Therefore, 905 is admitted.

5              MS. AYERS-PEREZ:  Thank you.

6    Q    Agent Moore, what are we looking at here in

7    Government's 905?

8    A    Post made by Mr. Brock on Facebook from December 4th,

9    2020.

10   Q    Okay.  And are there a number of posts in this exhibit?

11   A    There are.

12   Q    Are they all from December 4, 2020?

13   A    Sorry, the first two are from December 4th and the last

14   three are from December 5th.

15   Q    Will you read these posts to us?

16   A    The first one says, "Trump won the election.  If

17   necessary I aim to misbehave."

18   Q    The second one?

19   A    "Prove me wrong.  The FBI is the equivalent of the KGB

20   for the Democratic party."

21   Q    Those are both from December 4th?

22   A    "Game is high drama.  I mean I am not sure if we can

23   break 100."

24   Q    And those first two posts, those were from

25   December 4th?

John Moore - Direct                                          230

1   A     That's correct.

2   Q     And what are the dates, what's the date of the last

3   three posts?

4   A     December 5th, 2020.

5   Q     Okay.  And if you could start with the fourth one.

6   A     The fourth one is, "#resist Government overreach must

7   be stopped in even red state Texas.  Tell them to eat a bag."

8   Q     And the last one?

9   A     "If SCOTUS doesn't act we have two choices.  We can

10  either live in a Communist country or we can rebel, keep the

11  rightful President in power and demand free and fair

12  elections #civilwar2021."

13  Q     I'm pulling up Government's 906.

14        THE COURT:  Same objection?

15        MR. BURNHAM:  Same objection.  I would just add

16  that this one is even a much more, much higher level of

17  generality than even some of the ones your Honor has admitted

18  in the series.

19        THE COURT:  I make the same ruling, make the same

20  observation that certainly in my consideration of this

21  evidence, I will consider its level of generality and how

22  specifically it is tied to January 6th, but in the context of

23  the Facebook messages and the question of intent, I find that

24  it's both relevant and not inadmissible under Rule 403.

25  Q     Agent Moore, what are we looking at here in

John Moore - Direct                          231

1   Government's 906?

2   A     This is a post made by Mr. Brock on Facebook on

3   December 6, 2020.

4   Q     Okay.  And can you tell us what it says?

5   A     "Going to get a lot scarier if SCOTUS doesn't act.  No

6   way in hell we should accept this rigged election.  We need

7   to restore the Constitution and the best and shortest way is

8   to go offensive on the Communists that stole it, aka the

9   Democratic party."

10  Q     All right.  I'm pulling up what is labeled as

11  Government's Exhibit 907.  And just as way of context for

12  your Honor, this one is a conversation between Mr. Brock and

13  another individual, and it takes the entire length of the

14  page.  If it's easier we can highlight the top half and then

15  go to the bottom half.

16        THE COURT:  We're having trouble finding it.  You

17  can scroll.  Scroll again, please.  Is there more on the next

18  page?

19        MS. AYERS-PEREZ:  This is the only page.

20        THE COURT:  And any objection?

21        MR. BURNHAM:  Same basic objection.

22        THE COURT:  Same ruling.  Understanding, of course,

23  that it's what comes from Torch Flyer that I'm looking at in

24  terms of the relevance to this case, and while initially some

25  of the communications from Torch Flyer were pretty mundane

John Moore - Direct                                    232

1   and probably irrelevant, ultimately, the context of the whole

2   series of communications with some specific references later

3   in them, I find that the relevance under 401 and 402 is

4   satisfied and the outcome of the 403 assessment is the same,

5   that any unfair prejudice is not -- does not substantially

6   outweigh the probative value.  And therefore, 907 is

7   admitted.

8   Q    Agent Moore, what are we looking at here in

9   Government's 907?

10  A    It's a direct message conversation between Mr. Brock

11  and someone whose Facebook screen name is Beaf Supreame.

12  Q    Do you happen to know who Beaf Supreame is outside of

13  social media?

14  A    I do.

15  Q    Okay.  Without going into anything he's ever said to

16  you, do you know what his occupation was?

17  A    He had worked at the same company as Mr. Brock,

18  Hillwood Airways.

19  Q    Did he have any military background?

20  A    He did.

21  Q    And what was that?

22  A    I believe he was a Special Forces NCO in the Army and

23  then became a aviator, Army aviator as a warrant officer and

24  retired.

25  Q    Okay.  So what are we looking at here in 907?

John Moore - Direct                          233

1    A    The conversation between the two of them on Facebook.

2    Q    And what date did it occur?

3    A    December 7th, 2020.

4    Q    And if you could read that conversation for us.

5    A    The first message, Beaf Supreame says, "Need to

6    establish a network prior to anything.  Need event driven IO

7    wins to garner support.  Need hierarchy of command for

8    operational cells and auxiliary support.  Need psyops,

9    leaflets, et cetera.  Then organize civil disturbance without

10   our involvement.  Lots of planning and organizing."

11   Q    Agent Moore, what is psyops, if you know?

12   A    Psychological operations.

13   Q    Okay.  If you could continue.

14   A    To that Mr. Brock responds, "If not you then who?"

15   Q    Keep going.

16   A    And to that Beaf Supreame responds, "Well I'm currently

17   getting my shit mixed at work.  I have very little support

18   from others in the office and just got more thrown on me."

19   Q    You can continue, Mr. Moore -- Agent Moore.

20   A    To that Mr. Brock replies, "Roger."  Then goes on to

21   say, "You know people that should be doing this."

22             To that, Beaf Supreame replies, "But I am

23   playing this by ear and have a lot of people that are like

24   minded."

25             To that Mr. Brock replies, "Same."

John Moore - Direct                    234

1          To that, Beaf Supreame says, "Never want to be

2    the guy that runs over the protester or blasts a bunch of

3    people in self-defense after putting out a dumpster fire.  It

4    will take an event like someone getting schwacked on a gun

5    grab raid ... then all hell breaks loose."

6          To that Mr. Brock responded, "Probably but I

7    think we could also peacefully occupy legislatures in these

8    fake states and demand action."  He goes on to post, "I think

9    SCOTUS needs to see if they don't act that there will be

10   blood."

11   Q    And Agent, I apologize, Agent Moore, you say "he goes

12   on to post," is that Mr. Brock?

13   A    Yes, two consecutive posts.

14   Q    Thank you.  Please continue with the last one.

15   A    Finally, Beaf Supreame responds, "I'm pretty sure that

16   I cannot get time off to go to another state.  Gonna keep

17   working until it is at the point when it is time to defend."

18   Q    Thank you.  I'm pulling up what's been marked as

19   Government Exhibit 908.

20          THE COURT:  All right.

21          MS. AYERS-PEREZ:  And there's some more at the

22   bottom of the page, if you can scroll down, please.

23          MR. BURNHAM:  Your Honor.

24          THE COURT:  Mr. Burnham.

25          MR. BURNHAM:  Same objection.  We're confident your

John Moore - Direct                    235

1   Honor can sort this out, but as a purely legal matter,

2   there's not much relevance here.  It appears to be a lengthy

3   quote and there's references to AR-15s and a master target

4   list and, you know, scary-sounding things that have no

5   connection to the rest of the evidence, so I think it should

6   be excluded on 403 grounds.

7          MS. AYERS-PEREZ:  Your Honor, I believe when we

8   look at the first message --

9          THE COURT:  Just scroll back to the first message.

10          MS. AYERS-PEREZ:  Yes.  This is just a continuation

11   of what we've seen in the Government exhibits in the 900

12   series that have come before this, that the defendant is very

13   concerned about the Supreme Court when it comes to the

14   election, that's the basis of the January 6th riots that he

15   took part in.  He's talking about restoring the republic

16   through force of arms and once again talking about the same

17   election that's the basis of the counting of these Electoral

18   College votes.  Then if we scroll to the bottom, at this

19   point it appears Mr. Brock is aware the Supreme Court is not

20   going to do what he's hoping they're going to do when it

21   comes to the election results and now he's talking about

22   rules of engagement, clear chain of command which is going to

23   be emulated in other exhibits that we see after this,

24   including one that your Honor's already seen as part of the

25   opening statement.  But this is all in the context and the

John Moore - Direct                                      236

1   lead up to January 6th and the defendant's continued concern

2   about the election, belief that the election was stolen and

3   the basis of why he's there on January 6th and the intent to

4   stop counting of the Electoral College votes on January 6th,

5   which is the basis of the intent for Count One of the

6   indictment.

7            THE COURT:  All right.  Same ruling.  Certainly the

8   long quote from speeches by others is not directly of great

9   relevance but the context of the entire chain of

10  communications is consistent with the other Facebook

11  communications that have been admitted into evidence and does

12  bear certainly a relationship to the question of intent and

13  therefore I find it is relevant.  And again, in a bench trial

14  in particular, I find that the Rule 403 analysis leads to the

15  exhibit being admitted and I will admit it.  So that's 908

16  that is admitted.

17  Q    All right, Agent Moore, what are we looking at here?

18  A    Post made by Mr. Brock on December 11th, 2020.

19  Q    Is it multiple posts or just one?

20  A    Yes, sorry, multiple posts.

21  Q    Okay.  And if you could read for us.

22  A    The first says, "If SCOTUS doesn't act, Trump must

23  emulate Lincoln and we must restore the republic through

24  force of arms."  Second post says --

25            THE COURT:  Do we need to read the whole of the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

John Moore - Direct                           237

1   second post?

2            MS. AYERS-PEREZ:  We don't.  Your Honor, if you're

3   okay with that, if we could just read the last sentence of

4   the first --

5            THE COURT:  Maybe the first sentence and the last

6   sentence.

7   A     The first sentence is, "True in 1776 and true today if

8   SCOTUS doesn't act."  And the last sentence says, "But when a

9   long train of abuses and usurpations, pursuing invariably the

10  same object evinces a design to reduce them under absolute

11  despotism, it is their right, it is their duty, to throw off

12  such government, and to provide new guards for their future

13  security."

14  Q     Okay, Agent Moore.  If you go on to the last two posts.

15  A     Okay.  The next post says, "It appears as if SCOTUS is

16  going to duck.  If so then it will be game on soon.  We need

17  ROE, a clear chain of command ending with President Trump and

18  a master target list."

19  Q     Agent Moore, do you know what ROE stands for?

20  A     Rules of engagement.

21  Q     Continue with the last post, please.

22  A     "It is a good weekend to make sure your AR-15s are

23  sighted.  Your clips are loaded.  Your body armor checked."

24  Q     Agent Moore, what is an AR-15 if you know?

25  A     It is a semiautomatic rifle.

John Moore - Direct                238

1    Q      Going to pull up what's been marked as

2    Government's 909.

3                    (The Court reviewing the exhibit.)

4                    THE COURT:  Scroll, please.  All right.  That's it?

5                    MS. AYERS-PEREZ:  It's four pages long, your Honor.

6                    THE COURT:  Oh.  All right.  Keep scrolling.

7                    Scroll again, please.

8                    And again.  Woops, I'm sorry.  Well, yeah, stop.

9    Okay.

10                   Scroll, please.

11                   And again.

12                   And again.

13                   And that's it?

14                   MS. AYERS-PEREZ:  That is it.

15                   THE COURT:  Thank you.

16                   MR. BURNHAM:  Your Honor, we're getting close to

17   the part I believe is relevant but I'm going to continue

18   objecting for a couple more.  Now it's in evidence that this

19   is a military buddy, this post in particular is sort of out

20   there theorizing, so same objection.

21                   THE COURT:  All right.  You know, some of this has

22   marginal relevance, but I don't think in the context of the

23   entire set of Facebook communications the prejudice,

24   particularly with me, is all that great, and indeed I don't

25   think it outweighs the probative value of this set of

John Moore - Direct                                    239

1    communications in the context of the other communications,

2    and it's really just setting out a full context.  This one's

3    probably a little closer, but I will go ahead and admit it,

4    and under both the 401, 402 analysis, and a 403 prejudice

5    analysis.

6    Q    All right, Agent Moore, what are we looking at here in

7    Government's Exhibit 909?

8    A    This is another Facebook direct message conversation

9    between Mr. Brock and the friend Beaf Supreame that we

10   referenced earlier.

11   Q    And when does this conversation take place?

12   A    December 18th, 2020.

13   Q    Okay.  If you could read what Mr. Brock says, please.

14   A    First post says, "If Biden steals it, I do not

15   recognize the USG as being legitimate."

16   Q    Do you know what the USG stands for?

17   A    United States Government.

18   Q    If you could continue, please.

19   A    "I want to actively rebel."

20   Q    What does Beaf Supreame say?

21   A    "I think there is so much swilling right now with

22   commie china ties and hunter business deals ... all the MSM

23   networks are suppressing the story.  There will be some

24   blowback coming, timed with a coming sham inauguration that

25   may be the IO victory that we can leverage."

John Moore - Direct                    240

1    Q     Do you know what MSM stands for?

2    A     Mainstream media.

3    Q     You can continue, please.

4    A     Beaf Supreame goes on to say, "Do you have body armor

5    or plate carrier?"  To this Mr. Brock replies, "Yep."

6    Q     What does Mr. Brock do at that point?

7    A     He sends a photo to Beaf Supreame.

8    Q     And what is this photo of?

9    A     A plate carrier.

10   Q     Does that look familiar to you in any of the evidence

11   you've seen so far?

12   A     It does, looks like the plate carrier Mr. Brock was

13   wearing on January 6th, 2021.

14   Q     And by plate carrier, does it look like a vest

15   basically?

16   A     Yes, body armor or vest.

17   Q     We can continue.  All right, Agent Moore, what happens

18   from here?

19   A     Mr. Brock posts, "Gets here 28 December."

20   Q     From there?

21   A     Beaf Supreame responds, "Nice.  I am trying to get some

22   new plates from a buddy."  Beaf Supreame goes on to post,

23   "Mine are moldy and delaminating."  To this, Mr. Brock

24   replies, "Can you imagine if several hundred thousand

25   patriots descended on D.C. refusing to let Biden be

John Moore - Direct                    241

1    inaugurated."  And he goes on to say, "I do not believe the

2    U.S. military will fire on us."

3                    To that, Beaf Supreame posts, "Yeah.

4    Inauguration would be canceled or moved to a secure

5    location."  Beaf Supreame goes on to post, "But would be more

6    of a spectacle to delay."  And again posts, Beaf Supreame

7    again posts, "And a possible IO loss if a cop got hurt."

8                    To that Mr. Brock responded, "Look dude I am

9    pretty sure I am ready to go at it.  I just need numbers with

10   me."

11   Q    And from there?

12   A    Beaf Supreame responds, "It would be branded as a right

13   wing militia extremist organization that hates LEO."

14   Q    From there?

15   A    Mr. Brock responds, "Yep but we will be branded that

16   way regardless."

17   Q    Keep going.

18   A    Beaf Supreame responds, "Disagree, the left are doing a

19   great job of branding themselves."  Beaf Supreame goes on to

20   post --

21   Q    Agent Moore, sorry to cut you off there, but I think

22   that message has one final word there at the top of the next

23   page.

24   A    Yes, I left out a word.  So Beaf Supreame's last post

25   said, "Disagree, the left are doing a great job of branding

John Moore - Direct                              242

1    themselves extremists."

2    Q    Okay.  Go on from there, please.

3    A    Beaf Supreame goes on to post, "We need to be rational,

4    organized, strength to back the defense of the Constitution.

5    Can't blow the load early or we are just a bunch of Proud

6    Boys, et cetera."

7    Q    And Agent Moore, are you familiar with the term Proud

8    Boys?

9    A    I am.

10   Q    And what is that?

11   A    They are a -- consider themselves to be western

12   chauvinists, I don't want to tie that to any sort of ideology

13   but they're western chauvinists, organization that is often

14   protesting and threatening to use violence against people

15   that they oppose.

16   Q    If you can continue from there.

17   A    To that, Beaf Supreame goes on to post, "I'm don't

18   agree with armed protesting, nothing good comes from it.

19   Just bad press.  I haven't seen a line in the sand where I

20   quit my job and go to war."

21             To that Mr. Brock responds, "Dude, if theft of

22   the Presidency isn't enough, why do you think gun

23   confiscation will be?"

24             To that Beaf Supreame says, "Okay, so load up

25   our trucks and go to D.C. and hope we don't get arrested?"

John Moore - Direct                                    243

1              Mr. Brock responds, "Nope.  We need a plan.  I
2    am hoping Trump provides it."
3              To that, Beaf Supreame says, "the Presidency
4    was stolen.  It's time for damage control starting in
5    Georgia.  The ATF signaled their softball answer to Biden's
6    call.  I am waiting for the situation to develop.  A lot of
7    people are waiting for that as well."
8    Q     Agent Moore, this is just to make sure the record is
9    clear, in that last post you just read, is it Georgia or did
10   it say GA?
11   A     GA.
12   Q     Do you know that to stand for Georgia?
13   A     I do.
14   Q     Okay.  If you could continue, please.
15   A     So to that post, Mr. Brock responds, "You know how to
16   boil a frog?"
17             And to that, Beaf Supreame posts, "Well a frog
18   is just a dumb amphibian without the ability to adapt to its
19   situation.  It acts only with animal instincts and can be
20   controlled because those instincts are predictable and basic.
21   The mistake can be made by someone that reaches for the frog
22   and is met by a predator that may look like a frog to the
23   boiler."
24             To that Mr. Brock responds, "LOL."  And
25   Mr. Brock goes on to post, "Drew, I don't believe Americans

John Moore - Direct                        244

1    will act."

2    Q      Do you know who Drew is?

3    A      Yes, Drew is the first name of the person with the Beaf

4    Supreame Facebook name.

5    Q      Okay.  And then the last message?

6    A      Beaf Supreame responds, "I disagree.  I've seen

7    firsthand what 12 guys can do to recruit, train, equip and

8    advise lesser motivated people."

9    Q      All right.  I'm going to pull up what's been marked as

10   Government's Exhibit 910.

11                   Your Honor, this begins with what you're

12   familiar with from opening statement; however it is actually

13   three pages long.

14               THE COURT:  Did I admit the document when we

15   discussed it or just indicated an inclination to admit it?

16               MS. AYERS-PEREZ:  You did not actually admit it,

17   you just said that you wanted to see where the evidence takes

18   us because you don't know if it's relevant until you heard

19   the rest of the evidence.

20               THE COURT:  All right.  Well, let me read it over.

21                   (The Court reviewing the exhibit.)

22               THE COURT:  Scroll again, please.

23               And again.

24               And again.  Is that it?

25               MS. AYERS-PEREZ:  That is it, your Honor.

John Moore - Direct                                245

1          THE COURT:  Thank you.

2          MR. BURNHAM:  Same objection, your Honor.  Now with

3    the benefit of all the evidence, our position would be that

4    the yawning gap between the content here and the actual rest

5    of the case evidence is starting to get absurd.  We're

6    talking about setting up provisional governments and, you

7    know, all sorts of stuff, so same objection on those grounds.

8          THE COURT:  All right.  Go to the top of the

9    document, please.  Scroll back.  So in context, I think this,

10   continue to think that this exhibit is admissible.  With

11   respect to relevance, it specifically outlines a, to quote

12   it, "plan of action if Congress fails to act on 6 January,"

13   and then among the list of main tasks are seizure or, is

14   seizure of certain members of Congress.  So it seems to me

15   that this does have some real connection to what is being

16   charged with respect to Mr. Brock and therefore I find that

17   the test of relevance has been met, it is relevant and

18   therefore admissible.

19          With respect to prejudice, standing alone, maybe

20   I'd think that there was some prejudice but put in the

21   context of all the other documents that have been admitted,

22   it seems to me that the prejudice here is not significant and

23   not unfair, and does not substantially outweigh the probative

24   value or relevance of the document and therefore 910 is

25   admitted.

John Moore - Direct                                    246

1   Q     Agent Moore, what are we looking at here with

2   Government's Exhibit 910?

3   A     This is a continuation of the conversation between

4   Mr. Brock and Beaf Supreame.

5   Q     What is the date of this conversation?

6   A     December 24th, 2020.

7   Q     Okay.  And who starts the conversation?

8   A     Mr. Brock.

9   Q     Can you tell us what Mr. Brock says?

10  A     "Initial thoughts if we could do it.  Assumptions:

11  U.S. military isn't involved.  Objective:  Restore the rule

12  of law in the rebellious states, hold a free and fair

13  election in one year.  Plan of action if Congress fails to

14  act on 6 January."

15  Q     And just for the record, that was -- it says Jan,

16  right?

17  A     That's correct, it says 6 Jan.

18  Q     And do you know that to be a short form of the word

19  January?

20  A     Yes, ma'am.

21  Q     If you could continue, please.

22  A     "Main tasks.  1.  Seize all Democratic politicians and

23  Biden key staff and select Republicans (Thune and McConnell).

24  Begin interrogations using measures we used on Al Qaeda to

25  gain evidence on the coup.

John Moore - Direct                247

1           "Number 2.  Have General Flynn get in touch

2    with President Trump and have him declare a state of

3    Insurrection exists to provide color of law to our actions.

4           "3.  Seize national media assets and key

5    personnel.  Zuck, Jack, CNN lead and talking heads, seize

6    WAPO, seize NYT editors.  Eliminate them.  Media silence

7    except for White House communications."

8    Q     Agent Moore, do you know who Zuck is?

9    A     I believe it's a reference to former Twitter CEO -- or

10   correction, Zuck is a reference to Mark Zuckerberg, the

11   current founder and CEO of Facebook.

12   Q     And Jack?

13   A     Jack I believe is a reference to former Twitter CEO

14   Jack Dorsey.

15   Q     And WAPO, do you know what that stands for?

16   A     The *Washington Post*.

17   Q     Do you know what NYT stands for?

18   A     *New York Times*.

19   Q     If you can continue, Agent Moore, please.

20          THE COURT:  Interesting observation that now in

21   your view, CNN doesn't require explanation but the print

22   media, *Washington Post* and *New York Times* do.

23          MS. AYERS-PEREZ:  That's true.

24          THE COURT:  Maybe a comment on our society.

25   Q     Agent Moore, do you know what CNN stands for?

John Moore - Direct                    248

1    A     The Cable News Network.

2    Q     There we go, thank you.  If we can continue.

3    A     "Number 4.  Present slate for clean elections to

4    existing Congress and make sure they sign.

5                "Number 5.  Let the Democratic cities burn.

6    Cut off power and food to all who oppose us.

7                "Number 6.  Establish provisional government

8    in rebellious states and representatives we can count on.

9                "Number 7.  Seize all foreign aid except for

10   key allies as determined by Trump.

11               "Number 8.  General pardon for all crimes up

12   to and including murder of those restoring the Constitution

13   and putting down the Democratic Insurrection.

14               "ROE."

15   Q     What does that stand for again, Agent Moore?

16   A     Rules of engagement.

17   Q     If you can continue, please.

18   A     "1, do not kill LEO unless necessary.  Gas would assist

19   in this if we can get it."

20   Q     Agent Moore, do you know what LEO stands for?

21   A     Law enforcement officer.

22   Q     If you can continue, please.

23   A     "2.  Attempt to capture Democrats with knowledge of

24   coup.

25               "3.  Shoot and destroy enemy communication

John Moore - Direct                    249

1    nodes and key personnel.

2                    "4.  So many subtasks I can't even imagine

3    them."

4    Q    And what's the response to this, Agent Moore?

5    A    To this Beaf Supreame responds, "So what's the

6    paragraph III meat and potatoes?  Concept of the operations,

7    tasks to subordinate units, coordinating instructions and

8    actions on the objective."

9    Q    And that's just a shortened version of the word

10   objective?

11   A    That's correct.

12   Q    Okay.  And what else does he say?

13   A    He goes on to say, "Who is providing secure comms, who

14   is in command, what is the order of battle with tasks and

15   purpose of maneuver units?  Locations of command elements and

16   next higher, and paragraph V stuff, who is providing funding,

17   medical care and facilities, weapons, ammo, demo, equipment,

18   meals, billeting, DETFACs, et cetera?"

19   Q    What does comms mean, Agent Moore?

20   A    Communications.

21   Q    And what is DETFACs?

22   A    I believe it's a -- not an acronym but shorter version

23   of detention facilities.

24   Q    Okay.  And what happens from there?

25   A    Beaf Supreame goes on to say, "And going back to

John Moore - Direct                                              250

1   mission prep and IPB, what is the enemy situation, COO/MCOO,

2   comp, disp capabilities, air, fires, known and assessed

3   locations for targeting, MLCOA/MDCOA."

4   Q     All right, there's a lot in this one, Agent Moore.

5   What does IPB stand for?

6   A     Information preparation of the battlefield.

7   Q     Do you know what COO/MCOO stands for?

8   A     MCOO is modified combined obstacle overlay and I

9   believe which is basically a piece of acetate you put over a

10  map when you're planning a military operation to depict

11  certain obstacles.  I believe COO is a similar thing but I in

12  the Army have not seen COO.

13  Q     What about MLCOA?

14  A     Most likely course of action.

15  Q     MDCOA?

16  A     Most dangerous course of action.

17  Q     And going up a little, do you know what comp is short

18  for?

19  A     Composition.

20  Q     And Disp?

21  A     Disposition.

22  Q     Okay.  If you can continue from there.

23  A     To that, Mr. Brock responds, "Totally agree and it all

24  starts with a chain of command."

25  Q     And from there?

John Moore - Direct                                    251

1   A      Goes on to say, "It needs to stretch to Trump ideally."

2   Q      Was that Mr. Brock who says that?

3   A      Yes.

4   Q      Okay.  And what happens from there?

5   A      Beaf Supreme replies, "So unified command at strategic

6   level is not entirely necessary.  But field commanders and

7   order of battle for maneuver elements jas," I think he means

8   has, "to be defined."

9   Q      Okay.

10  A      To that Mr. Brock responds, "No question."  And then

11  goes on to respond again, "Surely someone has planned for

12  this with experience."  Goes on to post again.  "This isn't

13  what I was trained to plan."

14            And Beaf Supreme says, "This is like an

15  invasion versus UW, punching and running in support of larger

16  operations.  So in occupied, nonpermissive/semipermissive

17  battle space, the UW operation is supported by an area

18  command, with subordinate overt and covert elements.  We

19  called them the auxiliary, logistical support network and

20  guerrilla force.  I am trained to act as a Co-BN," which I

21  believe means company or battalion, "commander for indigenous

22  forces if necessary, lead small teams or train larger

23  elements, usually brigade staff to plan for and carry out

24  operation."

25  Q      What does UW stand for, if you know?

John Moore - Direct                     252

1    A      Unconventional warfare.

2    Q      What does nonpermissive/semi-permissive battle space

3    mean, if you know?

4    A      Refers to level of threat that exists in the battle

5    space.

6    Q      Okay.  And then you said Co/BN stood for battalion?

7    A      CO stands for company which is military formation and

8    then BN stands for battalion which is the larger parent

9    military formation.

10   Q      And what did you say BDE stands for?

11   A      Brigade which is the even larger parent military

12   formation to a battalion.

13   Q      Understood.  If you could continue, please, Agent

14   Moore.

15   A      Beaf Supreame goes on to say, "The root SF, UW/FID

16   mission still has the backing of the U.S. military, so not

17   necessarily a unilateral op."

18   Q      What does SF stand for?

19   A      Special forces.

20   Q      What does UW/FID stand for?

21   A      UW stands for unconventional warfare, FID stands for

22   foreign internal defense.

23   Q      Okay, if you could continue, please.

24   A      Mr. Brock responds, "Yes, but you know people trained

25   to do larger stuff.  My prediction is occupation of Capitol

John Moore - Direct                                    253

1    abs capture of some assets is easy.  If Trump didn't back the

2    peaceful protest of veterans to restore the republic, we

3    lose."  Mr. Brock goes on to say, "I think we would covertly.

4    They have to have cover and denial."

5    Q     And from there?

6    A     Mr. Brock says, "Okay, hopping in the shower.  Think

7    more."

8                     To that Beaf Supreme responds, "Okay.  First

9    thing to figure out is who is the source for op funds."

10                    To that Mr. Brock responds, "Makes you wonder

11   how our revolution got off the ground."  Mr. Brock goes on to

12   say, "We need someone with $$$$ to back it."

13   Q     And lastly?

14   A     To that Beaf Supreme responds, "Revolution had funding

15   from France and seized property.  But for every conventional

16   in ranks battle there were 10 guerilla style operations like

17   the most famous Christmas Day raid.  The Brits never had a

18   chance.  That is why we spend billions every year to sustain

19   combat operations in AFG against the sand people."

20   Q     What do you -- or do you know what AFG stands for?

21   A     I believe it's short for Afghanistan.

22   Q     If we can go up to the top of page 2, I'm going to

23   bring you back to one that we had talked about a little bit

24   earlier, where Beaf Supreme says, "So what's the paragraph

25   III meat and potatoes," do you know what paragraph III is in

John Moore - Direct                                    254

1    reference to?

2    A     I do.  It's the execution paragraph of a military

3    operations order.

4    Q     Okay.  And below that it says, "and paragraph V stuff,"

5    do you know what that is in reference to?

6    A     That's the command and signal paragraph of a military

7    operations order.

8    Q     Thank you.  I'm going to pull up what's been marked as

9    Government's Exhibit 911.

10          MR. BURNHAM:  Happy to say, we have no objection to

11   this one.

12          THE COURT:  Thank you, Mr. Burnham.  Without

13   objection, 911 may be admitted.

14   Q     All right, Agent Moore, what are we looking at here?

15   A     This is a Facebook conversation between Mr. Brock and

16   someone with the user name Bettina Steinhold.

17   Q     And when is this from?

18   A     December 26, 2020.

19   Q     Who is writing the first message?

20   A     The first one is from Bettina Steinhold.

21   Q     And can you read that for us?

22   A     "I'm not thinking that.  At all.  I just believe that a

23   Civil War is the last resource, and no one should wish for

24   it.  I'm sure there are more civilized ways to fight."

25   Q     And the response?

John Moore - Direct                          255

1    A    Mr. Brock responds, "Agree.  Congress can stop it on
2    the 6th of January."
3    Q    And from there?
4    A    Goes on to say, "The Supreme Court is staying out of
5    it."  And again posts, "Those are the last two peaceful
6    options."
7    Q    So those last three posts starting with the, "Agree.
8    Congress can stop it on the 6th of January," ending with,
9    "The last two peaceful options," those came from Mr. Brock?
10   A    That's correct.
11   Q    If you could continue from there?
12   A    Bettina Steinhold posts, "Okay."
13        THE COURT:  Are we on another date now?
14   Q    Yes, Agent Moore, are we on a new date now?
15   A    Yes, ma'am, this is December 27th, 2020.
16   Q    And what's the response to that?
17   A    Mr. Brock responds, "I don't want it to be this way but
18   communism isn't coming to Texas."
19   Q    I'm going to pull up what's been marked as Government's
20   Exhibit 912.
21        MR. BURNHAM:  No objection to this one either.
22        THE COURT:  Without objection, 912 is admitted.
23   Q    All right, Agent Moore, what are we looking at here?
24   A    This is a continuation of the Facebook conversation
25   between Mr. Brock and Beaf Supreame.

John Moore - Direct                    256

1   Q    Okay.  And if you could start with that second message

2   and tell us who it is from.

3   A    That's from Mr. Brock.

4   Q    And what is the date of these messages?

5   A    December 27th, 2020.

6   Q    Could you read that message, please?

7   A    "I don't think they will do it when the Dems come for

8   the guns."

9   Q    Is that, "I don't even think they will do it"?

10  A    "I don't even think they will do it when the Dems come

11  for the guns."

12  Q    That's from Mr. Brock?

13  A    That's correct.

14  Q    If you could continue from there, please, Agent Moore?

15  A    Beaf Supreame responds, "Hope not.  Riots are for

16  chimps."

17  Q    Keep going, Agent Moore, please.

18  A    Mr. Brock responds, "I prefer outright Insurrection at

19  this point."  Mr. Brock goes on to say, "Booked the hotel.

20  Now need to book flights."

21            Beaf Supreame responds, "Where?"  And

22  Mr. Brock responds, "D.C. on the 5th through the 7th."  Then

23  Mr. Brock goes on to say, "I have a feeling history will turn

24  there."  And Mr. Brock posts again, "Not sure how."

25  Mr. Brock goes on to post, "Hopefully Congress doing what is

John Moore - Direct                                    257

1  right."  Mr. Brock goes on to post, "Or could be a clown show

2  and an IO loss or an outright rebellion."  Mr. Brock goes on

3  to post, "Not knowing how it will go."

4  Q     Is that not knowing or no knowing how it will go?

5  A     Sorry, "No knowing how it will go."

6  Q     What happens from there?

7  A     Beaf Supreame posts, "Probably not the best way to go

8  into something.  And I seriously doubt it would pay off if

9  you get wrapped up in a riot."  Beaf Supreame goes on to

10 post, "There won't be a revolution in D.C.  There may be some

11 people getting rolled up.  Let the situation develop."

12 Q     Okay.  I'm going to pull up what's been marked as

13 Government's Exhibit 913.

14           THE COURT:  Mr. Burnham?

15           MR. BURNHAM:  No objection.

16           THE COURT:  Without objection, 913 is admitted.

17 Q     All right, Agent Moore, what are we looking at here?

18 A     This is a series of Facebook posts by Mr. Brock.

19 Q     And what is the date of these?

20 A     December 28th, 2020.

21 Q     Well, for the first two, what about the last two?

22 A     The last -- sorry, the third post is from

23 December 29th, 2020 and the last one is from December 31st,

24 2020.

25 Q     Okay.  And can you read these for us?

John Moore - Direct                                    258

1          THE COURT:  Could you tell me how you know these

2     are from Mr. Brock?

3          THE WITNESS:  I would need you to scroll up.  I

4     reviewed the Facebook search warrant return with the

5     redactions here, I can't speak intelligently to what is above

6     these postings.

7          MS. AYERS-PEREZ:  I'm not the witness, your Honor,

8     but I can answer as to what the record looks like.  There are

9     portions of it where it speaks or you have Torch Flyer and

10    then you have a series of posts or messages.  They don't

11    always have his name there but they are under there and you

12    have the date and the time and what the message is.  And this

13    would be some of those that are within that.

14         THE COURT:  All right.  I will allow the Government

15    to provide me something that establishes that it's from

16    Mr. Brock, unless Mr. Burnham has no objection to -- or

17    stipulate basically to the fact that these are messages from

18    Mr. Brock's Facebook account.

19         MR. BURNHAM:  Your Honor, it's tempting to take

20    this opportunity but they probably could come up with

21    something, so we'll agree they can come in.

22         THE COURT:  All right.  So you may proceed.

23    Q    Thank you.  Agent Moore, what are we looking at here?

24    A    Posts made by Mr. Brock on Facebook in late

25    December 2020.

John Moore - Direct                              259

1   Q    Okay.  And if you could read us the first one and let
2   us know the date, please.
3   A    First one is December 28th, 2020, "Want to see some
4   panic.  Start playing the Purge siren outside the Capitol on
5   6 January 2021.  Watch Nancy flee."
6   Q    And it's, Jan was the abbreviated form of January?
7   A    That's right.
8   Q    And who is Nancy, if you know?
9   A    I would speculate.
10        THE COURT:  It's speculation.  We can all do the
11   same speculation.
12   Q    The next message, please, Agent Moore, and the date?
13   A    Next message, December 28th, 2020.  "I need all people
14   that voted Democrat to wear a piece of cloth identifying you
15   as a nonfunctioning member of society.  You need to do this
16   to flatten the curve.  It is for our collective health.  If
17   you refuse I will need to close your business and destroy
18   your livelihoods.  Trust the science, if you vote Democratic
19   you are a moron and usually a leech on the body politic, so
20   please wear your cloth.  I prefer the cloth to be a series of
21   concentric red circles over the heart.  This will show you
22   care."
23   Q    And the next post along with the date of that post?
24   A    The next post is December 29th, 2020.  "Expect Fakebook
25   to fact check it as they have deep admiration for Goebbels."

John Moore - Direct                                          260

1    Q    And the last post and the date, please.

2    A    The last post is December 31st, 2020, "'We are now

3    under occupation by a hostile governing force.  That may seem

4    ludicrous to some, but I see no distinction between a group

5    of Americans seizing power and governing with complete

6    disregard for the Constitution and an invading force of

7    Chinese Communists accomplishing the same objective.'

8    Against all enemies foreign and domestic #oathkeeper #2A

9    #III percent."

10   Q    Agent Moore, with the exception of the last sentence,

11   "against all enemies foreign and domestic," along with

12   hashtags, are the rest -- is the rest of that in quotes?

13   A    It is.

14   Q    Okay.  Moving on to what's been marked as Government's

15   Exhibit 914.

16           MR. BURNHAM:  No objection.

17           THE COURT:  Thank you, Mr. Burnham, and without

18   objection, 914 will be admitted.

19   Q    All right, Agent Moore, what are we looking at here?

20   A    This is a comment that Mr. Brock made from his Torch

21   Flyer Facebook account on January 1st, 2021.

22   Q    And what did it say?

23   A    "Help is on the way.  6 Jan 2021 #MAGA

24   #Stormthecastle."

25   Q    Do you know what MAGA stands for?

John Moore - Direct                                    261

1   A     Make America Great Again.

2   Q     Okay.  Moving on to Government's Exhibit 915.

3           MR. BURNHAM:  No objection.

4           THE COURT:  Without objection, Government's 915

5   will be admitted.

6   Q     All right.  What are we looking at here, Agent Moore?

7   A     It's a post made by Mr. Brock's Torch Flyer Facebook

8   account on January 5th, 2021.  And he says, "Our second

9   American Revolution begins in less than two days."

10  Q     Okay.  And scrolling down --

11          THE COURT:  Again, is that in quotation marks, or

12  appears to be?

13          THE WITNESS:  Yes, your Honor.

14  Q     And what is -- is there another message here, Agent

15  Moore?

16  A     There is.  It's another message from Mr. Brock's Torch

17  Flyer Facebook account, on January 3rd, 2021, also in quotes,

18  it says, "Irrelevant.  Biden won't be inaugurated.  We will

19  ensure that on the 6th."

20  Q     Okay.  And pulling up Government's Exhibit 916.

21          MR. BURNHAM:  No objection.

22          THE COURT:  Without objection, 916 is admitted.

23  Q     All right, Agent Moore, what are we looking at here?

24  A     A series of posts from Mr. Brock's Torch Flyer Facebook

25  account, starting on January 5th, 2021.

John Moore - Direct                                    262

1    Q     Okay.  And what does it say?

2    A     "Plane is packed with people going to Stop the Steal."

3    Q     And from there?

4    A     Goes on to post, "AA bought four people off the plane

5    at a thousand dollars each."

6    Q     And scrolling down.  What's the date and the post on

7    this one?

8    A     This date is January 6, 2021.

9    Q     What does he say?

10   A     "Here we go again."

11   Q     And the next?

12         THE COURT:  Perhaps you should for the record give

13   not only the date of something on January 6th but also the

14   time.

15   Q     Okay.  And what is the time here?

16   A     The time here is 3:23 UTC which is five hours ahead of

17   Eastern Standard Time so this post was likely 10:23 p.m. on

18   January 5th.

19   Q     Okay.  And the next post, with the date and time as

20   well, please.

21   A     Okay.  Again, this is UTC time so this would have been

22   10:23 p.m. on January 5th, 2021, "Men with guns need to shoot

23   their way in."

24   Q     Okay.  And from there, what did Mr. Brock do?

25   A     He posted ... on January 5th, 2021 at 10:57 p.m., he

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

John Moore - Direct                263

1    sent a message with an attachment and says, "Police in D.C.
2    are currently pepper spraying Trump supporters who are
3    outside rallying for Trump.  Guess they forgot who was
4    backing the blue when BLM supporters aka Democrat voters were
5    killing."
6    Q    Okay.  And from there scrolling down.  Okay.  Is
7    Mr. Brock involved in a conversation with someone else?
8    A    Yes, with someone named Shelley.
9    Q    Okay.  And what's the date on these and the time?
10   A    This appears to be 11:33 p.m. on January 5th, 2021,
11   someone named HRM Shelley says, "Freaking Georgia."
12   Q    And from there?
13   A    Goes on to post, "I won't fly through ATL until they
14   get their crap together."
15   Q    And from there?
16   A    Mr. Brock responds, "What did you expect?  There will
17   never be a free and fair election again."
18   Q    And what was said from there?
19   A    "As long as they can keep the fraud machine cranked."
20   Q    And from there, Agent Moore?
21   A    Mr. Brock goes on to write, "One man one vote.  No
22   absentee unless military.  Period."  And he goes on to post,
23   "Seriously, did you expect them not to run the same play
24   again and again until we stop it?"
25   Q    Okay.  Agent Moore, I want to take you back to one

John Moore - Direct                                      264

1    thing we had discussed yesterday when you executed the search

2    warrant at Mr. Brock's residence.

3    A     Yes, ma'am.

4    Q     Did you find a gun safe there?

5    A     We did.

6    Q     Was there anything unusual about it?

7    A     The code to the gun safe was left on the gun safe but

8    there were no guns in the safe.

9    Q     Okay.

10          MS. AYERS-PEREZ:  I pass the witness, your Honor.

11          THE COURT:  Mr. Burnham?

12          MR. BURNHAM:  Would this be a good time, even if

13   it's perhaps a little early, to take just a five-minute break

14   before we start cross?

15          THE COURT:  The request is for our morning break

16   now, and I'm happy to honor that request, we'll take a

17   10-minute break.

18          MR. BURNHAM:  Thank you, your Honor.

19          THE COURT:  All right.  So see you back -- well, it

20   will be 12 minutes to make it easy, I'll see you back at

21   11:00 by the clock on the back of the court.

22          MR. BURNHAM:  Thank you.

23             (Court in recess, 10:48 a.m. to 11:05 a.m.)

24          THE COURT:  All right, sorry for the delay, I hope

25   you made good use of the time, Mr. Burnham.

John Moore - Cross                                265

1          MR. BURNHAM:  Thank you, your Honor.

2          THE COURT:  We need the witness.  Special Agent

3   Moore.  I remind you you're still under oath.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  And Mr. Burnham.

6          MR. BURNHAM:  Thank you, your Honor.

7   CROSS-EXAMINATION BY MR. BURNHAM:

8   Q     Good morning, Agent Moore.

9   A     Morning, sir.

10  Q     So it came out a couple times in your testimony that

11  you were in the Army for six years; that's correct, right?

12  A     That's correct.

13  Q     And am I correct in understanding you were in the

14  artillery was your part of it, is that right?

15  A     That's correct.

16  Q     All right.  And that's shooting large guns in layman's

17  terms?

18  A     That's correct.

19  Q     And in your experience, did you learn that soldiers

20  that are in that branch for extended period of time might

21  suffer hearing loss?

22  A     Yes.

23  Q     All right.  Because guns are extremely loud?

24  A     That's right.

25  Q     And aircraft engines are also very loud, would you

John Moore - Cross                                          266

1    agree with that?

2    A      Yes.

3    Q      Especially jet engines?

4    A      I don't have direct experience but I'm sure they're

5    loud.

6    Q      Thank you.  Do you agree that the Punisher comic book

7    character is sort of an object of fascination in the military

8    these days?

9    A      Yes.

10   Q      You see it on Humvees and you see people with tattoos

11   and that kind of thing?

12   A      Yes.

13   Q      The famous soldier Chris Kyle, who you may know, the

14   Punisher was sort of his symbol, do you recall that, if

15   you're aware?

16   A      I do.

17   Q      Thank you.  Would you agree that Larry Brock was

18   approximately 54 years old on January 6th, 2021?

19   A      I actually don't recall his birthday, but if -- is that

20   how old he was?

21   Q      Does that sound roughly correct?

22   A      Yes.

23   Q      Mid 50s I guess let's say?

24   A      Yes, sir.

25   Q      And you testified about some knowledge you gained about

John Moore - Cross                                    267

1    Mr. Brock's military career on direct, you recall that,

2    right?

3    A      Yes.

4    Q      And did you learn that he flew several hundred combat

5    missions?

6    A      Yes.

7    Q      And that's largely flying the A10?

8    A      Correct.

9    Q      You were assigned this case on the morning of

10   January 9th, is that right?

11   A      That's correct.

12   Q      And that was January 9th, that was a pretty hectic time

13   for law enforcement, would that be correct?

14   A      Yes, sir.

15   Q      And it sounds like you acted pretty fast to get the

16   information you needed to find out what the story with

17   Mr. Brock was, is that right?

18   A      That's correct.

19   Q      And I assume toward the top of that list of things you

20   had to do would be to get the CCTV feed footage and review

21   that?

22   A      At that time, I didn't even know what CCTV was.

23   Q      I understand, but I assume once you got assigned this

24   case involving the Capitol, one of first things you would

25   have done is call the Capitol and say do you guys have

1  cameras, is that right?

2  A     I mean, it wasn't one of the first things since there

3  was already overwhelming video evidence available, but that

4  was, you know, kind of further down the list of things we

5  did.

6  Q     Okay.  So it wasn't a priority for you to get the

7  cameras from inside the Capitol itself as soon as you could?

8  A     My top priority was locating Mr. Brock and safely

9  arresting him --

10  Q     I don't mean to cut you off, my question is

11  specifically not what was your top priority, my question was,

12  was it not a top priority to get the Capitol video footage in

13  the early part of the case?

14  A     Yes, in the early part of the case as in, within the

15  first week, yes, that was a priority.

16  Q     Approximately when did you receive the CCTV footage?

17  A     I don't recall.

18  Q     Can you give me a month?

19  A     I believe it was in -- first, I don't recall.

20  Q     You can't even give me a month?

21  A     I can tell you it was in the winter or spring of 2021.

22  Q     And spring meaning until May, could have been as late

23  as May or as early as January, is that the best we can do?

24  A     Yes.

25  Q     There were several videos introduced through your

John Moore - Cross

1    testimony from Mr. Brock's phone.  You recall that, right?

2    A     Yes, sir.

3    Q     And two or three of them were short snippets of the

4    speech by former President Trump at the Ellipse, you recall

5    that?

6    A     Yes, sir.

7    Q     And whether or not it was captured on those videos, did

8    you learn that part of the remarks that the President made

9    was, we want to go to the Capitol, addressing the protesters?

10   A     Yes.

11   Q     And I think he said, I'll be there with you, is that

12   part of his remarks, to your knowledge?

13   A     I don't recall the speech in that kind of detail.

14   Q     Do you recall a video of the President that's in

15   evidence that says, I think this is pretty close to exact

16   quote, all Vice President Pence has to do is send it back to

17   the states and recertify.  Do you recall that statement in

18   evidence?

19   A     I do.

20   Q     And do you understand the President, by using the word

21   it to be referring to the election results basically?

22   A     Yes.

23   Q     And what he was saying there was that he, according to

24   him anyway, the Vice President could refer the matter back to

25   the states and they could consider whatever issues had been

John Moore - Cross                                    270

1    raised involving fraud, illegality, whatever?

2    A     Yes.

3    Q     Were you -- you become aware as part of your

4    investigation that not everybody in the crowd but there were

5    a considerable number of people who made derogatory comments

6    about the Vice President that day?

7    A     Yes.

8    Q     Thank you.  If the Government would be good enough to

9    help us, can we actually take a look at Number 325.  And

10   while they're pulling that up, that video, I'll represent to

11   you is the one with the defendant wearing a vest and I think

12   your testimony on direct was that you thought it was -- it

13   could be the same vest as was shown in the January 6th

14   photograph but in different lighting; is that your testimony

15   about that?

16   A     Yeah, I -- it appears to be a different color so it

17   could be -- it appears to be similar in design but I don't

18   know if it's lighting or whatnot but that looks like a

19   different color and it could be a different vest.

20   Q     It appears to be tan, would that be --

21   A     Yes.

22   Q     What color military gear is typically worn in middle

23   eastern countries?

24   A     I mean there's different shades, this is what I would

25   call coyote tan and I believe the vest he had on on

John Moore - Cross                                    271

1    January 6th was green.  Like I said yesterday, I don't know

2    if that's a function of the lighting in this picture or if

3    they're different vests.

4    Q    Well, you're aware that Mr. Brock, if you are aware,

5    has been to the Middle East as a military officer and as a

6    civilian many, many times, is that correct?

7    A    That's correct.

8    Q    And the standard, let's say the standard BDU in fatigue

9    uniform in the Middle East is largely tan in color, not

10   green, correct?

11   A    I -- having been there myself, there are -- I've seen

12   many people wearing green body armor in Iraq and Afghanistan,

13   so it's ... I've seen both.

14   Q    Okay.  You can take it down, thank you.  There was

15   another piece of social media evidence that had -- 901, we

16   don't have to pull it up, that said #oathkeeper, you recall

17   that, right?

18   A    Yes.

19   Q    To be absolutely clear, there's no evidence that

20   Mr. Brock was a member of the Oath Keepers?

21   A    No, there's not.

22   Q    There's no evidence that he has ties to anyone in the

23   Oath Keepers?

24   A    No, there's not.

25   Q    Oath Keepers are not then and are not now an illegal

John Moore - Cross                    272

1    organization, however disreputable certain people may think

2    they are, correct?

3    A     Could you repeat -- do you say legal?

4    Q     Illegal.  The Oath Keepers were not then, nor are they

5    today, an illegal organization?

6    A     That's correct.

7    Q     And a hashtag on -- do you use social media, Facebook,

8    Twitter, whatever it is?

9    A     A little bit, I'm not great with hashtags.

10   Q     Hashtags, one of the uses of a hashtag is to facilitate

11   searching, is that right?

12   A     I believe so.

13   Q     If I wanted to, you know, find out the latest news on

14   the FBI, I might enter in #FBI and that would help me find

15   FBI news, is that your understanding?

16   A     Yes.

17            MR. BURNHAM:  Court's indulgence.

18            I'd like to turn on the document camera here.

19            THE COURT:  I'm sorry, do you want to use the ELMO?

20            MR. BURNHAM:  Yes, please.

21            THE COURT:  Mr. Bradley can help you.

22            THE CLERK:  It's not powering.

23            THE COURT:  Well, I thought Mr. Bradley could help

24   you.

25            MR. BURNHAM:  I just have two documents to show the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    witness, I can do it by -- and I'm just going to identify

2    them and I'll move it in with my case, I'll just do it with

3    the documents so we can --

4              THE COURT:  If you're comfortable doing that.

5              MR. BURNHAM:  I've shown it to the Government, I

6    can just do it that way.  Can I approach the witness?

7              THE COURT:  You may.

8    Q    I'm going to show you a picture and you just tell me

9    whether or not you recognize the individual on the right.

10   It's marked for identification, your Honor has the same

11   binder, Defense 3.  Tell me if it looks like Mr. Brock on the

12   right-hand side.

13             THE COURT:  This is Defense 3?

14             MR. BURNHAM:  Yes, your Honor, for identification.

15   A    Yes, it does appear to be Mr. Brock on the right-hand

16   side.

17   Q    And does that appear to be the -- I'll speak loud.

18   Does that appear to be the same jacket you later recovered

19   from his house?

20   A    It does appear to be the same or at least a very

21   similarly patterned jacket.

22   Q    I'll take it back.  Thank you.  I'm sorry, one more

23   question.  That appears to be a ski lift of some sort in that

24   picture?

25   A    Yes.

1          THE CLERK:  He said hold down on it.

2          MR. BURNHAM:  It's all right, that's all I needed

3    to do for now, thank you.  I'll move on, for now.

4          Again, going back to social media here, would you

5    agree that as a general matter, social media these days has

6    become famous for making people mad and making people get

7    into spats with one another; that's one of the criticisms of

8    it, is that right?

9    A     I've heard that criticism, yes.

10   Q     Can we take out -- can we pull up 904, please, one of

11   the Facebook messages.  Can we scroll all the way to the top

12   of 904, very top of the page, even if it's blacked out.

13   Okay.  Scroll down slowly if you would, and you can stop

14   there.  You recall this exhibit, correct?

15   A     I do.

16   Q     So there looks to be a page worth of content blacked

17   out, and I'm not alleging that's improper, I'm just observing

18   it's blacked out, right?

19   A     Mm-hmm.

20   Q     And then below that --

21   A     Yes, sir.

22   Q     Sorry, didn't let you answer.  Below that, it begins

23   with, "Torch Flyer replied to your comment," and then it goes

24   on, did I read that correctly?

25   A     That's correct.

John Moore - Cross

1  Q    So Torch Flyer is replying to a comment from Jeff

2  Ciaccio, is that right?

3  A    That's correct.

4  Q    And then the comment starts with, "No dude," and he

5  goes on to question whether Jeff Ciaccio was smart enough to

6  understand certain things.  Is that some of the content of

7  this message here?

8  A    Yes, it is.

9  Q    So it would appear that Jeff and Torch Flyer,

10  Mr. Brock, are engaged in a sort of back and forth that's

11  getting a little personal; would that be a description you

12  could agree with?

13  A    Yes.

14  Q    All right, thank you.  Have you ever been in an

15  internet argument where you said something you wished later

16  you could take back?

17  A    No.

18  Q    This same exhibit, we don't have to scroll to it, it's

19  already up there, refers to patriots in Athens in 1946; did I

20  read that correctly?

21  A    Yes.

22  Q    And you testified on direct that that refers to a

23  historical episode where World War II veterans stormed

24  National Guard armory to retrieve guns that were later used

25  to confront officials that they believed had committed

1    election fraud.  Is that a summary of that historical

2    episode?

3    A     That's correct.

4    Q     Washington, D.C. has a National Guard armory in

5    addition to other military installations, is that right?

6    A     I would imagine they do.

7    Q     And that National Guard armory presumably has guns?

8    A     Yes.

9    Q     And Larry Brock did not attempt to storm that National

10   Guard armory to your knowledge?

11   A     Not to my knowledge.

12   Q     The next -- we can take that down, thanks.  Government

13   905, we don't have to bring it up unless you have trouble

14   recalling, has the statement from Torch Flyer where he says,

15   "If necessary I aim to misbehave."  Do you remember that?

16   A     Yes.

17   Q     Does that sound a little funny to you, little perhaps

18   out of context for him?

19   A     No.

20   Q     All right.  Have you seen the 2005 film *Serenity*

21   starring Nathan Fillion?

22   A     I have not.

23   Q     Are you aware that people that are good friends,

24   perhaps especially men with the risk of sounding gender

25   essentialist, sometimes speak to each other in movie quotes;

John Moore - Cross                                    277

1    is that something you're familiar with?

2    A     I am familiar with that.

3    Q     Thank you.  That same exhibit has #resist, if you

4    recall that in there somewhere?

5    A     It sounds familiar but I'd have to see the exhibit to

6    definitively say what was said by whom and when.

7    Q     There it is.  Do you see that there?

8    A     I do.

9    Q     Are you aware that #resist was actually a popular

10   hashtag throughout the Trump Presidency in what's called

11   liberal circles?

12   A     No, I'm not familiar with that.

13   Q     All right, that's fine.  Are you aware of where the

14   term Beaf Supreame might have come from?

15   A     I don't know where it came from.

16   Q     All right, one more silly question.  I'm not going to

17   belabor this but have you ever seen the film *Idiocracy*?

18   A     No.

19   Q     So I guess you wouldn't know whether or not *Idiocracy*

20   has a prominent character that goes by Beaf Supreame?

21   A     I don't know.

22   Q     All right.  Does the film *Idiocracy* sound like a

23   serious film about geopolitics to you, just going by the

24   title?

25   A     No.

John Moore - Cross                                      278

1    Q      Are you aware of -- well, strike that.  Can we pull up

2    907, actually.  Can we scroll down just a little bit, please.

3    All right, we can stop there.  Do you recall this exhibit?

4    A      I do.

5    Q      All right.  And here is an example of Beaf Supreame and

6    Mr. Brock talking about various things they might do such as

7    peacefully occupying legislatures to combat election issues,

8    is that a good summary?

9    A      That's correct.

10   Q      All right.  And here at the end, Beaf Supreame says,

11   "I'm pretty sure that I cannot get time off to go to another

12   state."  Did I read that correctly?

13   A      That's correct, that's the first sentence.

14   Q      Would you agree it's nothing but good sense that if

15   you're going to occupy a state legislature, you should

16   probably square it with your boss ahead of time?

17   A      As far as square the time off or the active occupying

18   the legislature?

19   Q      I'm sorry, I didn't hear you.

20   A      Are you saying would you square getting time off or

21   occupying the legislature with your boss?

22   Q      Getting time off.

23   A      You probably should, yes, square getting time off.

24   Q      We can move on, thank you.  Could we look at 909,

25   please.  Court's indulgence.

1          THE COURT:  Is this where you want to be or are you

2    trying to get to another --

3    Q    Just trying to center myself here, there was a passage

4    from this but I thought I could find it quicker than that, so

5    I don't have to trouble the Government to scroll for me.

6    Sir, can we look at the message, there's a message at

7    12/18/20, 16:32:19, that's the one I'm trying to look at.

8    There we go.  All right.  You see the message there,

9    16:32:19, do you see where I'm looking here?

10   A    I do.

11   Q    That message says, "Can you imagine if several hundred

12   thousand patriots descended on D.C. refusing to let Biden be

13   inaugurated," did I read that correctly?

14   A    You did.

15   Q    So the inauguration was not on January 6, is that

16   right?

17   A    That's correct.

18   Q    That was scheduled to take place on January the 20th, I

19   think, is that right?

20   A    That's right.

21   Q    Can we look at Number 910, please, the next one.

22   Before we get to this message, you're aware and I think we

23   even had some testimony about it, is that the Congress

24   reconvened on January 6th later that evening.  I can't

25   remember the time but it was late in the evening, do you

John Moore - Cross                                        280

1   recall that?  Or do you know that?

2   A    I do know that, yes, they did.

3   Q    And once they reconvened, excuse me, they sort of

4   picked up where they had left off around 2:00, is that right?

5   A    They finished, they finished what they were doing in

6   the early hours of January 7th.

7   Q    So early -- on January 6th in the morning they had made

8   it through a certain number of states and then there was the

9   interruption and then they picked up with the rest of the

10  states that evening; is that all correct based on your

11  knowledge?

12  A    Yes.

13  Q    And so the ultimate decision of whether or not the

14  results of the election were going to be certified didn't

15  take place until after the Capitol had been cleared and the

16  legislature had reconvened, correct?

17  A    Only because the Capitol had to be cleared, yes.

18  Q    So in other words, the answer is yes, the certification

19  didn't happen until later on, right?

20  A    That -- yes, that's correct.

21  Q    Because the Vice President and the legislature were not

22  going to be deterred from following the Electoral Count Act

23  as it was set forth, right?

24  A    That's correct.

25  Q    They didn't throw it out the window because of the

John Moore - Cross                                            281

1    interruption, right?

2    A      That's correct.

3    Q      All right.  So we've got 910 up here.  You recall this,

4    this is -- this is the, I guess we'll call it a

5    point-by-point plan that seems to be presented here, you

6    recall this, correct?

7    A      I do.

8    Q      All right.  And so in response to the messages from

9    Mr. Brock, Beaf Supreame raises a number of seemingly

10   sensible responses to what you would need to do if you wanted

11   to take over the government; would that be generally what

12   he's doing here?

13   A      Yes.

14   Q      He points out, for example, that you would need, it

15   would probably be a good idea to have a chain of command and

16   secure communications if you were going to pull off something

17   like that; is that part of what he says here?

18   A      That's correct.

19   Q      And you agree that Mr. Brock seems to agree that you

20   probably ought to have a chain of command and some

21   communication if you're going to have a revolution, is that

22   basically his response?

23   A      Yes.

24   Q      And at a certain point, feel free to refresh your

25   recollection, Mr. Brock says that this really isn't his area

John Moore - Cross

1  of expertise being a pilot or something to that effect,

2  correct?

3  A    I believe he said this wasn't what he was trained for

4  but if you can scroll down on the exhibit, I just can't see

5  that part right now.  Yes.

6         THE COURT:  I think you're going past it now.

7  Q    It's right there if you want to read it.  I can ask it

8  more directly.  At 23:43:06 UTC time he says, "This isn't

9  what I was trained to plan," that's what Mr. Brock says, did

10 I read that correctly?

11 A    You did.

12 Q    Towards the end of this discussion, Beaf Supreame again

13 raises the sensible point that, an enterprise like this is

14 probably going to be pretty expensive, is that one of the

15 points he makes?  Feel free to ask, we can scroll down.

16 A    Yeah, could you scroll down, please.

17 Q    You can stop there, I'll ask the question directly.  At

18 12 -- 23:52:43 Beaf Supreame says, "Okay, first thing to

19 figure out is who is the source for op funds," did I read

20 that correctly?

21 A    You did.

22 Q    This exchange came after the plans had to be put on

23 hold for Mr. Brock to go take a shower, is that also correct?

24 A    That's correct.

25 Q    And eventually down there, Mr. Brock seems to agree

1     that you ought to have some money to pull off a plan of this

2     nature; is that a good paraphrasing of what he says?

3     A     Yes.

4     Q     At any point in this conversation does either Beaf

5     Supreame or Mr. Brock come up with any ideas of where to get

6     billions of dollars or where it would come from?

7     A     I mean not with a concrete plan, just that they need to

8     find someone with the money.

9     Q     And what time -- I guess what time in Texas time would

10    be 00:29:52, the last message there?

11    A     It would be six hours ahead of that message so

12    6:29 p.m. on Christmas Eve.

13    Q     Well, this conversation begins on Christmas Eve, looks

14    like it ends on Christmas Day or at least Christmas Day in

15    certain time zones, would that be generally right?

16    A     Yes.

17          THE COURT:  Wait a minute, the time of 00:29:52 on

18    Christmas Day UTC is what time you're indicating?

19          THE WITNESS:  Your Honor, that would be 6:29 p.m.

20    on Christmas Eve.

21    Q     In Texas?

22    A     In Texas central time.

23    Q     Can we look at 916, please.  And can we scroll down a

24    little bit here until it gets to the messages from user

25    Shelley.  Okay, can we stop there.  Actually scroll up just a

John Moore - Cross                                    284

1   little bit to the "Shoot their way in" messages if you would,

2   thank you.  Little bit more.  Right there, thank you.  You

3   introduce this message here, part of which says from

4   Mr. Brock, "Men with guns need to shoot their way in."  Did I

5   read that correctly?

6   A     You did.

7   Q     And then Mr. Brock sends an attachment that refers to

8   police in D.C. in the next entry, do you see that?

9   A     I do.

10  Q     And then HRM Shelley responds, "Freaking Georgia."  Did

11  I read that correctly?

12  A     You did.

13  Q     Does a reference to Georgia seem a little out of

14  context in view of Mr. Brock's two previous messages?

15  A     No, I believe they're talking about the Georgia

16  election results which were being decided at that time.

17  Q     That's right, and men with guns need to shoot their way

18  in is referring actually to the counting of the ballots and

19  interference with Republican watchers alleged in Georgia,

20  right?

21  A     It could be, I'm not certain.

22  Q     Well, let me refresh your recollection on that.  If I

23  can just pull up the ... court's indulgence, I thought I had

24  it right here.

25              THE COURT:  Certainly.

John Moore - Cross                                    285

1          MR. BURNHAM:  I think I can find it pretty quickly.

2                (Pause in Proceedings.)

3     Q    All right, I think I've got it here, sorry for the

4     delay.  I'm just going to do this with my laptop, I'm

5     afraid -- I'm just refreshing recollection, what I'm -- for

6     everybody's -- I'm going to show the witness the unredacted

7     version of this and see if it refreshes his recollection, if

8     I can approach.

9                THE COURT:  You're going to show him on your

10    laptop?

11               MR. BURNHAM:  I don't have -- I have to, it's a

12    little sloppy.

13               THE COURT:  Is this the transcript?

14               MR. BURNHAM:  No, this is this very same exhibit,

15    just unredacted, that's all it is.

16               THE COURT:  Okay.

17               MR. BURNHAM:  I'm just going to show him on my

18    laptop --

19               THE COURT:  Check with the Government, make sure

20    the Government is comfortable.  If they have an objection,

21    they'll make it.

22               MR. BURNHAM:  Can I approach, your Honor.

23               THE COURT:  You may.

24    Q    Agent Moore, I'm going to hand you my laptop here and

25    feel free to take as much time as you want but if you start

John Moore - Cross

1    with the highlighted portion that refers to pointing to here

2    and then just read down as much as you need.

3    A     Okay.

4    Q     Let me know when you've finished.

5    A     I'm finished.

6    Q     Thank you.  So now would you agree with me that the

7    statement meant -- well, first of all, did that refresh your

8    recollection?

9    A     It did.

10   Q     All right.  So now you would agree with me, wouldn't

11   you, that the, "Men with guns need to shoot their way in,"

12   post pretty clearly refers to a situation in Fulton County

13   involving Republican poll monitors allegedly being blocked?

14          MS. AYERS-PEREZ:  Your Honor, I'm going to object

15   to that, I mean he can certainly testify as to what messages

16   were around there but what it actually references, I think

17   that's something that would be speculation for him.

18          THE COURT:  Well, we'll let the witness respond to

19   the question as asked.  Go ahead and respond.  So the

20   objection, to the extent that was an objection, is overruled.

21   You may respond to the question.

22   A     The Facebook post that preceded that post about

23   shooting your way in was a post about election results in

24   Georgia.

25   Q     And specifically it was about, whether or not it

John Moore - Cross                                    287

1    happened is another question, but it was about Republican

2    poll monitors being blocked from overseeing the count,

3    correct?

4    A     I guess I -- I would need to see that again.

5    Q     You want --

6    A     Something about Fulton county, Georgia.

7    Q     I'll just let you take a quick look, if I can approach.

8    A     Sorry about that.  Yes, that's correct, it's about

9    Republican poll watchers.

10   Q     Thank you.  Would you agree that given the charges in

11   this case, that was some pretty important context for the

12   "men with guns" statement?

13   A     I don't believe it was left out to deny context, I

14   think it was left out out of -- redacted for anonymity for

15   other Facebook users.

16   Q     Do you recall testifying at a prior proceeding in this

17   case in Texas?

18   A     I do.

19   Q     All right.  And during -- that was a detention hearing

20   for Mr. Brock, correct?

21   A     Yes, I recall, yes.

22   Q     And feel free if you need to look at your testimony

23   I'll ask you just a couple questions about that.  You

24   didn't -- you make several references to the flex cuffs

25   pursuant to a government attempt to detain Mr. Brock pending

John Moore - Cross                                    288

1    trial, correct?

2    A      That's correct.

3    Q      All right.  And at no point did anybody, yourself or

4    the U.S. Attorney, inform the judge in Texas that there was

5    evidence that Mr. Brock had found those flex cuffs in the

6    Capitol, correct?

7    A      I would need to take a look at that transcript.

8    Q      Sure.  And I'll ask ... well, I'll ask one other

9    question and you can refresh your recollection as to both if

10   you'd like.

11   A      Okay.

12   Q      There was a statement not from you but from the U.S.

13   Attorney that perhaps he had those flex cuffs there to take

14   hostages, took them with him to take hostages, do you recall

15   that being part of the case for detention?

16          MS. AYERS-PEREZ:  Objection, your Honor, this has

17   no bearing on our actual case, what happened at a detention

18   hearing in Texas almost two years ago.  We haven't made that

19   allegation here, and we see video evidence and we've

20   stipulated actually to video evidence we stipulated that he

21   did pick up the flex cuffs later inside the Capitol.  We have

22   that footage now so I'm not sure what relevance this hearing

23   two years ago almost has on this.

24          THE COURT:  Well, I'm going to overrule the

25   objection, the Government's case did at several points have

John Moore - Cross                                    289

1    witnesses point out that he had, that Mr. Brock had flex

2    cuffs.  Now there was later clarification as to when he may

3    have acquired or how he may have acquired them, but it did

4    seem important to the Government witnesses to point out that

5    Mr. Brock had the flex cuffs so I'm not going to prohibit

6    questioning with respect to the reason the Government might

7    have at some point, and I understand that we're talking about

8    back at that time of the detention hearing, have thought

9    something in particular with respect to the flex cuffs.  So

10   you can go ahead, and first I'll say, Mr. Burnham, you can

11   ask the question, and then, Agent Moore, you can answer it.

12   Q     All right.  The first question is, just to recenter us

13   is, I'm asking you isn't it true that you participated in a

14   Government attempt to detain Mr. Brock during which the

15   allegation was made that he was carrying flex cuffs to

16   restrain hostages, and this was by the U.S. Attorney, not

17   yourself, and so I will let you look at the transcript and

18   I've got it on a page I think is the relevant page but if

19   you'd like to look around, you certainly can.

20          THE COURT:  So, so we're trying to put before me a

21   statement made by the U.S. Attorney in the detention hearing

22   that Mr. Moore was present at?

23          MR. BURNHAM:  And then there's going to be, that's

24   going to be the first question, then the second question is

25   going to be during his testimony did he ever let the judge

John Moore - Cross

1    know Mr. Brock found those cuffs there.  And I'll let the

2    witness answer, but I have an answer that I'm expecting and I

3    think it goes to the overall credibility of the investigation

4    and it ties in with other aspects of the Government's case

5    that we think --

6              THE COURT:  I'll let you do it, go ahead.

7              MR. BURNHAM:  Thank you.

8    A    Thank you.  (Witness reviewing transcript.)  So I've

9    read through the conversation by the AUSA about flex cuffs.

10   Q    All right.  Did that refresh your recollection?

11             THE COURT:  Well, why don't you take back the

12   document.

13   Q    Yeah, I'll take that.  Did that refresh your

14   recollection about that hearing?

15   A    Yes.

16   Q    All right.  So isn't it true that the AUSA made the

17   allegation that perhaps the flex cuffs were something

18   Mr. Brock brought with him perhaps to take hostages, as part

19   of the case, correct?

20   A    He also said, whether or not they were a fortuitous

21   find, it doesn't matter and he still walked around with them

22   for a significant amount of time, so I don't think that was

23   disingenuous.

24   Q    And in fact it's absolutely the case that they were

25   found there, that wasn't a whether or not, that's what

John Moore - Cross                                    291

1    happened; you'd agree with that, correct?

2    A    I agree that they were found, I can't agree to his

3    intent --

4    Q    And at no point -- I'm sorry, finish your answer.

5    A    He didn't immediately throw them in the trash, he

6    walked around in the Senate Chamber with a pair of flex cuffs

7    in his hand, so just like AUSA Jay Weimer said, whether

8    they're a fortuitous find or not, it's a concerning thing.

9    Q    And at no point in your testimony did you inform the

10   judge that in fact there was video evidence that he found the

11   flex cuffs there at the Capitol?

12   A    No, I did not.

13   Q    And being detained pending trial can absolutely destroy

14   a person's life, correct?

15             That's all right, you don't have to answer,

16   can I have -- I withdraw the question.  Can I have a moment,

17   your Honor?

18             THE COURT:  Certainly.

19             (Pause in Proceedings.)

20             MR. BURNHAM:  Thank you, your Honor, just a couple

21   more.

22   Q    Just a couple of housekeeping things I guess you would

23   say.  I think this is in evidence but you would agree that

24   the electoral session of Congress adjourned around 2:13 p.m.

25   in response to the first entrance into the Capitol?

John Moore - Cross                                    292

1    A    I'm not sure of the exact time but somewhere in that

2    neighborhood.

3    Q    Let me show you another document here that I've

4    previously shared with the Government, I'll remind them now.

5    I'm going to show you a document, and again, I'm just going

6    to have the witness identify it and then I'll move it in

7    later.

8              THE COURT:  Is it marked?

9              MR. BURNHAM:  Yes, it's marked for identification

10   in your Honor's binder as Number 5.

11             THE COURT:  Number 5, okay.

12   Q    I'm going to show you a document, ask you to read --

13   you can read as much as you want but I ask that you read the

14   second paragraph, please.  Let me know when you're done.

15   A    I've read the second paragraph.

16   Q    So first of all, does that appear to be an article

17   about politics from the internet?

18   A    It -- it does.

19   Q    Are you familiar with *American Thinker*?

20   A    I am not.

21   Q    Do you recognize that second paragraph as being quoted

22   in one of the exhibits from Facebook that we've put, that the

23   Government's put into evidence?

24   A    I mean, it sounds familiar to a lot of the rhetoric but

25   I would need to see the exhibit to make a direct link.

1          MR. BURNHAM:  Court's indulgence.  You know, I

2     don't want to waste the Court's time, I don't have that

3     exhibit number right at my fingertips, I don't know how --

4     I'll make the connection in my case if I need to.  Our

5     contention is it's a direct quote, I'll let your Honor look

6     at the two as soon as I can, I wasn't going to move it now

7     anyway so I'll withdraw the question for now.

8          THE COURT:  All right.  Sounds fine to me,

9     Mr. Burnham.

10          MR. BURNHAM:  I can -- can I approach the witness?

11          THE COURT:  Yes.

12          MR. BURNHAM:  All right, thank you, no further

13     questions.

14          THE COURT:  Redirect?  Ms. Ayers-Perez?

15          MS. AYERS-PEREZ:  Briefly, your Honor.

16     REDIRECT EXAMINATION BY MS. AYERS-PEREZ:

17     Q    Agent Moore, I just have a couple of questions for you.

18     Do you remember the month that that detention hearing took

19     place in Texas?

20     A    January of 2021.

21     Q    Was it pretty soon after you had arrested Mr. Brock?

22     A    It was.

23     Q    Did you collect evidence on a continuing basis after

24     that?

25     A    Yes.

John Moore - Redirect                                    294

1   Q     Did that include things like videos and things of that

2   nature?

3   A     Yes, it did.

4   Q     Would it be fair to say you learned a lot about the

5   case since then?

6   A     Since -- yes.

7   Q     Okay.

8         MS. AYERS-PEREZ:  Okay.  That's all I have, your

9   Honor.

10         THE COURT:  All right.  Agent Moore, you may step

11   down.  I won't excuse you since you're permitted to stay in

12   the courtroom.

13              (The witness was excused.)

14         THE COURT:  Ms. Ayers-Perez, further evidence from

15   the Government?

16         MS. AYERS-PEREZ:  Your Honor, Agent Moore's our

17   final witness.  We have a couple of housekeeping matters with

18   some exhibits prior to resting.

19         THE COURT:  First question I have is, are all the

20   stipulations in?  I don't think I've actually at least marked

21   a couple of them so I'm not sure that they've been

22   introduced, and should they be introduced?

23         MS. AYERS-PEREZ:  Yes, your Honor.  And so that

24   was -- I haven't marked, three of them have not been

25   introduced.

1          THE COURT:  703, 704, and 705?

2          MS. AYERS-PEREZ:  That's correct, your Honor,

3     that's what I have been marked as not being introduced so I

4     would move to admit 703, 704, and 705 marked for the

5     Government at this time.

6          THE COURT:  And they are stipulations so there's no

7     objection to them so I will go ahead and admit 703, 704, 705.

8     Any problem with that, Mr. Burnham?

9          MR. BURNHAM:  Fine, your Honor.

10          THE COURT:  Thank you.  703, 704, and 705 are

11     admitted.

12          MS. AYERS-PEREZ:  And also there are some exhibits

13     in the 600 series we would move to admit.  These are just the

14     legal background as to the Electoral College and they go hand

15     in hand with the stipulations 702 that's already been

16     admitted at Government's Exhibit 702 and this is just to

17     complete the record, your Honor, and that would be 600, 601,

18     I'll just do 600 through 610.  And I also show that 613A, B,

19     C, D, and E as well as 614 did not get admitted and I would

20     move to admit those exhibits at this time.

21          THE COURT:  So 600 through 610 are actually to some

22     extent legal documents but you say that they're referenced in

23     the stipulation which is 702 did you say?

24          MS. AYERS-PEREZ:  Yes, 601 through 610 are the

25     legal documents and that goes hand in hand with Government's

1    Exhibit 702 which is the stipulation regarding the Electoral

2    College proceedings and 600 is a video regarding what

3    happened in Congress that day which goes hand in hand with

4    Government stipulation, Government's Exhibit 703 which is the

5    stipulation to the authenticity of the House and Senate

6    recordings, and so I would move to admit 600 through 610

7    right now.

8              THE COURT:  Any problem, Mr. Burnham, with 600

9    through 610 being admitted?

10             MR. BURNHAM:  No, your Honor.

11             THE COURT:  All right.  I will therefore admit 600,

12   601, 602, 603, 604, 605, 606, 607, 608, 609, and 610.

13             MS. AYERS-PEREZ:  And then also 613A, 613B, 613C,

14   613D, 613E, and 614, those are the CSPAN videos, 614 is CSPAN

15   video, 613A through E are just still shots from 613, 613 I

16   show was admitted yesterday at 2:00.  I would move to admit

17   those now as well to complete the record.

18             THE COURT:  All right.  So the description is 613A

19   through E are still shots from the 613 video that is in

20   evidence already; any problem with those, Mr. Burnham?

21             MR. BURNHAM:  No, your Honor.

22             THE COURT:  And then 614 is another video?

23             MS. AYERS-PEREZ:  Yes, your Honor, that's just a

24   continuation of 611, 612, and 613.

25             THE COURT:  Any objection to 614, Mr. Burnham?

1          MR. BURNHAM:  No, your Honor.

2          THE COURT:  All right.  So 613A through E and 614

3    are admitted.

4          MS. AYERS-PEREZ:  Okay.  All right.  That, your

5    Honor, at this time the Government would rest.

6          THE COURT:  The only things not admitted would be

7    the beginning of the 300 series, 300 through 305.

8          MS. AYERS-PEREZ:  Yes, your Honor.

9          THE COURT:  And that one document earlier, I think

10   204 was never admitted.

11         MS. AYERS-PEREZ:  That's correct, your Honor, those

12   are correct.

13         THE COURT:  All right.  With that, the Government

14   has rested.  Mr. Burnham, I will turn to you.

15         MR. BURNHAM:  Thank you, your Honor.  Make a motion

16   to dismiss under Rule 29.  I'll make the motion as to every

17   element of every charge technically but I'll focus on the

18   ones that I think are most important and I'll take the counts

19   in order.

20         I think there's really two issues that present

21   themselves with respect to Count One which is the 1512

22   obstruction count.  One is, it's an undisputed fact of this

23   case, even taking the evidence in the light most favorable to

24   the Government, that Congress had already adjourned by the

25   time Mr. Brock entered the building, and I think it can be

1   pretty clearly inferred that it adjourned before he got even,

2   even at all close to the building.

3           THE COURT:  He entered at 2:24.

4           MR. BURNHAM:  2:24, and Congress adjourned at 2:13.

5   So even with taking all the inferences most favorable to the

6   Government, I think the court should conclude that at 2:13,

7   Mr. Brock was probably at least several hundred yards from

8   the building.  And so by the time he got there, there was no

9   proceeding left to attempt to corruptly influence, impede and

10  so on and so forth.  Unless the Government can make a case

11  that he could somehow attempt to impede the proceeding in the

12  future, there's no crime here.  Perhaps we'll hear when the

13  Government has a chance to respond, the argument may be,

14  well, the fact that there was so many people there meant they

15  couldn't reconvene as quick as they wanted to because they

16  had to get all those people out.  But then the question

17  before the Court becomes, does one more person being in the

18  Capitol constitute anything other than a de minimus

19  obstruction.  We suggest even at the Rule 29 stage it

20  doesn't.  That's one problem.

21          The second problem is, is that there's the question

22  of intent that was previewed to the Court in opening

23  statements.  And you know, here, we get into the Facebook

24  messages that are in evidence.  Well, I guess there was one

25  that was conditionally admitted, perhaps I should ask for the

1      Court's ruling.

2              THE COURT:  I need to go back to that and I will go

3      back to that perhaps just to clarify it.  Based on -- I

4      conditionally admitted 902 and that was to see what the rest

5      of the Facebook-related exhibits would be and having reviewed

6      and decided on them, I will remove the conditional aspect of

7      that admission of 902 and it is admitted unconditionally.

8              MR. BURNHAM:  So that's I guess the most direct

9      evidence of intent that we have.  The court can of course

10     infer and all those inferences go in favor of the Government

11     at this stage but let's take the direct evidence that we

12     have, and I think that the thought process at Rule 29 is,

13     let's take all of those messages as literally true, not

14     hyperbole, not blowing smoke, like really true, which is the

15     view most favorable to the Government.  Even then, what's set

16     forth is that we really, really hope Congress acts, and if it

17     doesn't act, maybe we'll take over the government.  But the

18     hope expressed in those messages was that the Congress would

19     have the opportunity to correct the fraud that Mr. Brock

20     seems to have believed occurred, and then revolution, if they

21     didn't do that.  So all of the talk about revolution and so

22     on and so forth is sort of plan B if Congress doesn't act

23     which means it's not relevant to the question of is there

24     intent here to obstruct the electoral count, and so I would

25     argue even at the Rule 29 stage that Facebook posts are

1    highly exculpatory even when taken in the light most
2    favorable to the Government.  So really two problems with
3    Count One.  No obstruction and no corrupt intent.
4           Count Two and Three, I'll start with -- Count Two
5    and Three to a certain extent can be taken together because
6    they both are 1752 charges that have some common elements.
7    So with respect to both of those, our contention is that at
8    least by the point that Mr. Brock arrived on the scene, the
9    Capitol grounds were not legally restricted.  Certainly they
10   were restricted in a platonic sense and that that was the
11   intent of law enforcement that day, we saw a diagram.
12          THE COURT:  You're talking about the grounds.
13          MR. BURNHAM:  The grounds, the grounds.  There was
14   the perimeter, I don't dispute that it was the intent of the
15   Capitol Police and others to restrict the grounds both
16   practically and legally.  But the way the cases treat that
17   element, and this is the individual being prosecuted has to
18   be on notice of the restriction.  And there's not a ton of
19   cases on this but the one that I think is helpful is *McCabe*
20   *v. Macaulay*, 51 F.Supp.2d 944, and that -- there's a case
21   before that, *Bursey*, which was a Fourth Circuit case that's
22   persuasive but I think it makes sense that basically says
23   even if there's not a fence, if officers tell you you have to
24   leave, that's a restriction even though might not seem like
25   one, and then *McCabe v. Macaulay* is sort of the logical

1    consequence of that is, if there's not a fence or something

2    and the defendants aren't on notice, then it's not legally

3    restricted and sort of a weird procedural posture in that

4    case but the ultimate holding was there was no probable cause

5    to arrest for 1752 because the defendants didn't know it was

6    restricted and then when the officer said it was restricted,

7    they left so that's the takeaway there.  So the question even

8    at Rule 29 is, where's the evidence that Mr. Brock was on

9    notice that he was entering a legally restricted area?  And

10   so there's --

11            THE COURT:  And you're still talking about the

12   grounds at the moment.

13            MR. BURNHAM:  The grounds and the building.

14            THE COURT:  Or talking about the building as well?

15            MR. BURNHAM:  I guess in theory the restriction

16   could be anywhere as long as police communicated to Mr. Brock

17   that he wasn't supposed to be there, either on the grounds or

18   as he was coming up or at the door.  Taken in the light most

19   favorable to the Government, they don't need to do it at a

20   specific time, there just has to be something, and we don't

21   have any evidence that Mr. Brock would have seen the

22   barriers, let alone participated in removing them.  There's

23   no evidence that any officer, whether, whether when he was

24   entering the grounds or whether when he was entering the

25   building said, you're not supposed to be here, it's

1   restricted, you have to leave.  Just didn't happen.  In fact

2   the evidence is he happened to walk through the door at the

3   little five-minute interval where there weren't any officers

4   there to tell him that.

5           And so then for 90 percent of the video that has

6   him walking around the Capitol, there's no officers there,

7   and then towards the end, he encounters some and there's no

8   sound so we don't know what they said but the conduct of

9   Mr. Brock and the officers, I think even in the light most

10  favorable to the Government, shows that he did leave

11  voluntarily well before the building was ultimately cleared

12  and without offering resistance to the officers, you can see

13  that especially in the final video where he walks out under

14  the supervision of officers.  So the question is where is the

15  restriction.  I just don't see it anywhere here.

16          THE COURT:  So would there be a restriction for the

17  fifth person in line who was standing behind the first four

18  people who broke windows and pushed open the door to enter

19  the Capitol?  So what about that fifth person, would that

20  fifth person have a restriction relevant to them?

21          MR. BURNHAM:  If the fifth person had seen the

22  windows being broken, I think there would still be --

23          THE COURT:  How about seeing glass on the floor?

24          MR. BURNHAM:  Well, if there's evidence to permit

25  the Court to find that there was glass on the floor, that

1    might support a restriction but I think even at the Rule 29

2    phase, it doesn't get you all the way there, if that's all

3    you have.  I mean the case -- what we're looking for is a

4    sign, a fence, an officer saying get out of here.  Glass on

5    the floor is not a -- I would argue that even that doesn't

6    get you anywhere close to a legal restriction.  There's

7    certainly no case that would support a restriction based on

8    glass on the floor, especially since --

9              THE COURT:  What about someone who's in the mob,

10   shall we say, who saw from behind them, not the front rank,

11   the barricades being breached, police lines being parted,

12   pushed aside, and then going up to the Capitol and going into

13   what had been a closed building?  Are you excusing everyone

14   who's in the large gathering because when they actually got

15   to the Capitol doors, others had already breached them?

16             MR. BURNHAM:  If someone witnessed other protesters

17   fighting with police or physically against police will

18   removing the barricades, that would be legally restriction,

19   there's no question about it, I would agree with that, but I

20   don't think that's the case here.  There's no evidence for

21   the Court, from which the Court can infer that Mr. Brock

22   witnessed that; in fact the evidence is opposite.  He was

23   probably pretty far back.  I mean you could sort of infer

24   that from when he entered, the time, and secondly, the one

25   little snippet -- we only have one little snippet of his

1    approach, that's it, that's the video where you can see the

2    back of his helmet for like very briefly is the only evidence

3    we have of how he got from -- we have him walking down

4    Constitution, and then the record goes dark and then you see

5    his helmet very briefly so we got to look at that video of

6    the back of his helmet and see what, if anything, does that

7    tell us and I think it's exculpatory because he's very far

8    back at that point from the entrance.  You can watch the

9    video, there's no view of the barricade, in fact one of the

10   officers even admitted you can't see that portion, it was

11   Officer Patton who admitted you can't see that portion from

12   downstairs which is where that video was shot and you can see

13   how thick the crowd is and how loud they were.  There's every

14   reason to infer from that video that Mr. Brock would not have

15   had any opportunity to witness the destruction of those

16   barriers.  So that's, I think that's the correct finding even

17   at Rule 29 there.

18           Now, the fallback that your Honor has already

19   telegraphed, maybe we'll hear this from the Government, was,

20   well, he had to have seen the broken glass or he had to have

21   seen a broken window, there's no way he didn't, and I think

22   even in Rule 29 that argument doesn't wash because you can

23   see when he walks in, he's not looking from side to side, it

24   doesn't happen.  And even if he had looked from side to side,

25   the glass panes are completely removed at that point, there's

1    no shards, there's no like partial windows, certainly there's

2    no one there still trying to take him out, so it's not

3    something the court can conclude he would have legally been

4    on notice of.  The broken windows and the glass is hard to

5    see, I even had to watch the video several times to notice

6    it, it's off to the side.  Obviously glass is opaque, it's on

7    the floor --

8         THE COURT:  We see more than he saw because we see

9    it actually at one point large plates of glass being cleared

10   by an officer pushing it aside with his foot.

11        MR. BURNHAM:  Before and after the fact, that's

12   right.  So I think if there was even a glance to the side,

13   you know, by Mr. Brock towards the direction of the glass, I

14   might have a much harder time but we don't have that, so

15   there's nothing even at this stage to conclude that he would

16   have seen the glass.  I think that's the situation here.

17        So that would be, if the court agrees with that

18   argument, doesn't need to go any farther on Counts Two and

19   Count Three but just for the record, specifically as to, I

20   think this really applies more to Count Three, I'm not seeing

21   the disorderly conduct here.  There's no yelling, you know,

22   there's no -- he's not participating in chants.  Obviously

23   we've emphasized when he tries to maintain order, that

24   happened four times, there's no pushing and shoving, he's not

25   carrying a sign, he's not acting crazy the way some of the

1    people were.  It's not simply enough to enter a restricted

2    area to be guilty of Count Three, you have to then do

3    something that's likely to cause a disruption and I don't see

4    that with Mr. Brock at all, in fact quite the contrary.

5              THE COURT:  Well, the term is disorderly or

6    disruptive conduct.

7              MR. BURNHAM:  That's right.

8              THE COURT:  Disruptive conduct as defined in the

9    relevant provisions is disturbance that interrupts an event

10   or activity or the normal course of a process.  So you're

11   saying that that wasn't the case.

12             MR. BURNHAM:  Simply entering can't be enough

13   because it can't be coextensive with entering the restricted

14   area.

15             THE COURT:  Well, he didn't enter alone, he entered

16   with a vast number of other people.

17             MR. BURNHAM:  Yes, your Honor.  It's not a

18   conspiracy case, and if the allegation is aiding and

19   abetting --

20             THE COURT:  But it's not irrelevant that he was one

21   of many.

22             MR. BURNHAM:  Well, if inherently entering is one

23   of many, I think even under the definitions your Honor cited

24   which are correct is he would have to be aiding them in some

25   way or approving of their conduct or assisting to have him be

1    culpable for himself engaging in disorderly conduct.  If the

2    allegation is merely entering itself with a large number of

3    people is disorderly conduct, there's not a case on this but

4    just based on the plain language of the cases we do have --

5              THE COURT:  Not disorderly, disruptive.

6              MR. BURNHAM:  Disruptive conduct, we're looking for

7    something -- it doesn't have to be a lot, I'm not saying he

8    had to be smashing things but something to disrupt the

9    function of government business other than just walking

10   around which is the same thing the journalists were doing.

11   We know journalists were there that day, some people were

12   manifestly journalists in the video, they were walking

13   around, they contributed to the number.  There were invited

14   guests, that contributed to the number of people but they

15   obviously wouldn't be included, and so unless the Government

16   can point to something saying this is an action Mr. Brock

17   took that was disruptive and went beyond merely entering,

18   even under Rule 29 is a problem with that count too, I would

19   maintain.

20             THE COURT:  What else?

21             MR. BURNHAM:  Count Four, willfully entering the

22   floor of Congress, that has to be done willfully and we don't

23   have any communication to him that that was unauthorized for

24   him to be there.  He did not participate in the, you know,

25   there was, the testimony from Officer Timberlake --

1          THE COURT:  Your problem is that he didn't know

2     that it was without authorization?

3          MR. BURNHAM:  That's right, that's right.  There's

4     testimony from, I guess the closest thing to that would be

5     the testimony from Officer Timberlake and he testified that,

6     you know, he's there, he's trying to secure the doors and

7     then he gets into the confrontation so obviously those people

8     would have been on notice that they weren't supposed to go in

9     there because the officer -- I mean, he was in plain clothes

10    and it could be an issue if it needed to be but I don't think

11    it needs to be, is the officer was physically trying to stop

12    those people from going in.  And then there's the scuffle and

13    you can see Mr. Brock coming in from a different section, he

14    walks into the side of the video from some other part of the

15    Capitol, not adjacent to where the scuffle had taken place,

16    and by the time he comes in the video, it wouldn't have been

17    apparent what the subject of the dispute was because both the

18    officers and their antagonists had moved down the hall

19    significantly away from the door there.  And there's no -- I

20    mean Officer Timberlake didn't testify he told Mr. Brock, you

21    guys can't go in there or those guys, I was trying to keep

22    them out and they tried to force their way in or anything

23    like that, he didn't have those statements so that's the

24    problem with number four.

25          Count Five is a different version of disorderly

1    conduct, very similar under 5104, and then finally, Count

2    Six, parading, demonstrating, or picketing.  This is another

3    one where there's not a ton of case law that I was able to

4    find to help with that but just the plain meaning of those

5    words, I would submit we're looking for waving banners, we're

6    looking for participating in chants, we're looking, guy with

7    the horns on the bull horn, he would clearly qualify, but I

8    didn't see any footage where --

9            THE COURT:  So if there are ten people, it's the

10   two with the banner that could be convicted under that

11   provision but not the eight who aren't holding the banner?

12           MR. BURNHAM:  Not if they don't appear to be acting

13   in concert.  If there's one guy with a banner and eight

14   people following along behind, certainly that's parading, but

15   if there's a guy with a banner over here and Mr. Brock is

16   just doing his own thing looking at his phone, taking

17   pictures, doing whatever, he's not answerable for the guy

18   with the banner unless there's some sort of concertive action

19   there would be our position.

20           Thank you, your Honor, ask for brief response if

21   appropriate.  Thank you.

22           THE COURT:  Thank you, Mr. Burnham.  Let me hear

23   briefly from the Government.

24           MS. AYERS-PEREZ:  Yes, your Honor.  As to Count

25   One, the obstruction of the official proceeding, Brock was

1    part of a mob that, and it was, we've heard from Agent

2    Glavey, we've heard from Captain Patton, it was that mob

3    breaching the Capitol that caused the official proceedings to

4    both recess, and I would point out that although the Senate

5    recessed at 2:12 --

6              THE COURT:  Well, it wasn't the mob outside that

7    caused the recess, it was --

8              MS. AYERS-PEREZ:  It was the breach.

9              THE COURT:  -- when there was a breach.

10             MS. AYERS-PEREZ:  Right.  And Larry Brock is part

11   of a breach in the sense that he did breach the Capitol at

12   2:24 p.m.  The House did not recess until 2:29 p.m. when

13   Brock had been inside the Capitol for five minutes at that

14   point.  And there's also an aiding --

15             THE COURT:  Is that what this turns on, my finding

16   the time that there was a recess by either the House or the

17   Senate --

18             MS. AYERS-PEREZ:  I don't believe -- I'm sorry.

19             THE COURT:  Let me finish.

20             -- and if Mr. Brock entered the Capitol before that

21   time, then the obstruction charge may survive, but if he

22   entered after that time, it cannot?

23             MS. AYERS-PEREZ:  No, I don't believe so --

24             THE COURT:  That's their argument basically.

25             MS. AYERS-PEREZ:  I understand that.  I think in

1   this case that's just another thing that I'm pointing out to

2   your Honor, that the House didn't even recess until he'd been

3   inside the Capitol for five minutes.  Even if that wasn't the

4   case, and it's the case here, but even if it wasn't, he's

5   part of this violent mob that's breached the Capitol

6   building.  And under the aiding and abetting provision of

7   Count One, he's responsible for what's happening in this mob.

8   I understand that he entered 12 minutes after the initial

9   breach of the Senate Wing Doors, but he's still part of that

10  mob pushing through, and as we saw from that time lapse

11  video, this is a significant group of people with a

12  significant police line in front of them, between them and

13  the Capitol, and there's obviously just a huge ton of people

14  there, including Brock, and so it does take people time to

15  get through, and so yes, he's 12 minutes later, but he's

16  still responsible for what the mob did because he's part of a

17  mob.  That's how a mob works.  It exists because of the

18  numbers.  And you know, we've heard from officers about how

19  outnumbered they were, well, that's because it's a mob.  Not

20  everybody has the same role in that mob, not everybody's

21  smashing the glass with a flagpole, not everybody's holding a

22  sign, but those people can do that because the mob exists and

23  they provide them cover in the number of people and Brock is

24  a part of that.  And he's responsible.

25          THE COURT:  I'm surprised that this issue hasn't

1   been addressed by some judge on this court over the past

2   couple of months, is this an unaddressed issue?  Has this not

3   been argued in some other case that someone who just came in

4   isn't individually responsible for obstructing?  Or to employ

5   Mr. Burnham's argument, if you came in after a recess of the

6   proceedings, then you can't be charged with obstructing the

7   proceedings.

8           MS. AYERS-PEREZ:  And your Honor, this is a quote

9   from Judge Kollar-Kotelly and it's actually a metaphor about

10  the mob that, "Just as heavy rains cause flood in a field,

11  each individual raindrop itself contributes to that flood.

12  Only when all of the floodwaters subside is order restored to

13  the field.  The same idea applies in these circumstances.

14  Many rioters collectively disrupted Congressional proceedings

15  and each individual rioter contributed to that disruption."

16  And in this case, the defendant's name is Rivera.  "Because

17  Rivera's presence and conduct in part caused the continued

18  interruption of Congressional proceedings, this court

19  concludes that Rivera in fact impeded and disrupted the

20  orderly conduct of government business or official

21  functions."  And I think that --

22          THE COURT:  And how about the term "continued

23  disruption" meaning that it doesn't matter, I take it, from

24  Judge Kollar-Kotelly that the exact timing of one's conduct,

25  if it continued to interfere with Congress from completing

1    its proceedings?

2         MS. AYERS-PEREZ:  Right, your Honor.  I mean this

3    is -- this is a continuous course of action that began from

4    the first or even before the first breach when the restricted

5    area was breached into the first breach of the Capitol until

6    they were finally able to clear them out as we've heard from

7    our witnesses, and begin the Congressional proceedings again

8    and that was late into the evening to the point where of

9    course they finished the next morning.

10        THE COURT:  Okay.

11        MS. AYERS-PEREZ:  And so that's in response to

12   defendant's argument as to Count One.  Because of the aiding

13   and abetting provision and because of what we just discussed,

14   I do think we've reached the standard to get past this Rule

15   29 when it comes to Counts two and Three in the restricted

16   area.  We've heard from Captain Patton, there were signs,

17   there was snow fencing, there were bike racks, and the

18   evidence we've seen of the defendant, there are people

19   climbing a scaffolding next to him when he enters through the

20   Senate Wing Doors, the windows are broken out.  Even if, even

21   if, and I'm not conceding this but even if you believe that

22   he didn't see the glass, there are people climbing through

23   the windows next to him.  When he enters in, there's not a

24   ton of people right there, but you can see people climbing in

25   the windows right next to him, and he knows that people are

1      not supposed to be climbing in the windows next to him.  When

2      he's next to the east Rotunda door before he picks up the

3      flex cuffs and heads up to the third floor where the Senate

4      Gallery is, there are officers standing in front of the door

5      trying to stop more people from coming in.  There is a broken

6      window on that east Rotunda door that he's standing two feet

7      away from.  He then turns around, grabs flex cuffs and walks

8      up the stairs to the Senate Gallery.  He knows --

9               THE COURT:  But we've merged two things here, we've

10     merged the building and the grounds.

11               MS. AYERS-PEREZ:  Right.

12               THE COURT:  Stay with grounds for just a second.

13               MS. AYERS-PEREZ:  We've heard from Capitol Patton

14     all of the signs that were along those grounds.  We've seen

15     the actual signs there, and the bike rack, and the snow

16     fencing behind it, and he's part of the group that pushed

17     through all of these blockades around this perimeter that we

18     know were in place because Captain Patton walked the

19     perimeter that morning for the entirety of that perimeter.

20     And so he would have to walk past this stuff, even if a bike

21     rack is on the ground when he walks past it, it's still

22     there, you still see it, even if a sign is on the ground,

23     it's still there, it's still says area closed.  These signs

24     weren't there every once in a while, they were there every

25     other bike rack, and he walked past those, he walked past

1    every single one of those perimeters there on the west side.

2    He had to of to get to where he ended up.

3            THE COURT:  All right, back to the building.

4            MS. AYERS-PEREZ:  And back to the building, your

5    Honor, once inside, you're seeing people climb through a

6    window next to you on the left side and on the right side,

7    you're next to the east Rotunda doors which are broken out on

8    the window that's closest to the defendant, is broken, there

9    are multiple officers standing by the doors trying to stop

10   the mob from getting in, and he still continues on.  At this

11   point he hasn't gone on the Senate floor yet, he ends up in

12   the Senate Gallery.  Sergeant Timberlake tells us he's

13   involved in an altercation with other rioters.  Larry Brock

14   saw this because he breaks it up, and he doesn't break it up

15   and leave, he breaks it up and then goes out onto the Senate

16   Gallery.  He leaves there, he grabs a set of keys to try to

17   open the Senate floor doors, the doors say U.S. Senate on

18   them so he knows where he is.  He's also been up above that,

19   so he's looking down and knows where he's at.  He goes

20   directly down there to the Senate floor.  We're getting into

21   Count Four -- or Count Four at that point.  But there are

22   sign after sign after sign.

23           THE COURT:  By the way, you've offered something

24   that I don't think is in evidence, at least I don't recall

25   it, which is what the items that he was using to try to open

1      that door were.  You just said he grabbed the Senate keys.

2               MS. AYERS-PEREZ:  Or I said he grabbed some keys.

3               THE COURT:  Is there evidence that says what it

4      was, where he got it?

5               MS. AYERS-PEREZ:  We had a witness who said that

6      he -- it looked like a set of keys, we don't have the keys,

7      as Agent Moore testified they didn't find them there in the

8      execution of the search warrant, but we did have when the

9      witness --

10              THE COURT:  Which witness, just so I can find it

11     again because I didn't recall that, which witness says that

12     it looked like the Senate keys?

13              MS. AYERS-PEREZ:  It was Captain Patton.

14              THE COURT:  All right, I'll check that.

15              MS. AYERS-PEREZ:  That's as we were going through

16     the video footage with him.  But yes, and at that point he's

17     trying to get into a locked door, it says U.S. Senate on it.

18     I mean there's sign after sign after sign that you're not

19     supposed to be inside this building, besides the obvious that

20     you're part of a mob that's overtaken a building.  You

21     understand what a public building is, that you have to go

22     through security.  He had no issue going through security

23     today, you understand that that's a process you go through.

24     He went through a broken door, with people climbing windows

25     next to him.  He sees officers in multiple locations, either

1    in altercations with rioters or trying to keep rioters out

2    and he continues his path through the Capitol on to the

3    Senate floor after seeing all of this.  It's clear that this

4    is a restricted building and he's not supposed to be inside

5    of it.  That's after going through all the signage on the

6    restricted grounds that he's not supposed to be on, and he

7    continues on throughout it.

8            THE COURT:  All right.  Go ahead.

9            MS. AYERS-PEREZ:  And then when it comes to Count

10   Four and the Senate floor, first he's trying to get into a

11   locked door that says United States Senate on it, and then he

12   turns around and goes through another door and ends up there

13   in the Senate Chamber.  He had previously, just about five

14   minutes prior, been in the Senate Gallery looking down

15   directly onto the Senate floor and goes directly down there,

16   as soon as he realizes what's below him and where he's at and

17   he has oriented himself with the Capitol, and he stays on the

18   Senate floor going through desks, walking through the Senate

19   floor for about eight minutes, I believe.  It wasn't walking

20   in realizing, oh, no, and walking back out, no.  He spent, he

21   spent a good chunk of time in there.  And then once he was on

22   the Senate floor, he left the building, because that was his

23   intention in being there.  So he knows that's the Senate

24   floor, he knows that he had tried to get into a locked door,

25   was unable to and goes around to another door that's

1    unlocked, and then stays there for a period of time while

2    proclaiming this is an IO war and things of that nature.  He

3    knows to the point that the President of the Senate is Vice

4    President Pence and where his chair is so he can tell other

5    rioters what it is they're sitting in or looking at.  So this

6    isn't -- he didn't just stumble there and not understand

7    where he's at.  Larry Brock knows exactly where he was.

8           And when it comes to the disorderly or disruptive

9    conduct, he and the rest of the mob disrupted the proceedings

10   that were happening there by being there, by marching

11   through.  He was on the Senate floor where the proceeding was

12   supposed to be taking place, and wasn't, because they were in

13   the building, not just on the Senate floor, and then he's

14   standing there where it's supposed to be happening.

15          THE COURT:  Well, so here's my question on that.

16   There are two different charges, one is entering and

17   remaining on the floor of Congress, or entering or remaining

18   in a restricted building and grounds, and the other is

19   disorderly or disruptive conduct in restricted building or

20   grounds or in a Capitol building, those are four of the

21   counts, two for each.  What's the difference between the

22   disorderly conduct counts and the entering counts?  Is anyone

23   who entered the Capitol building also guilty of disorderly or

24   disruptive conduct on that date in the Capitol building?

25          MS. AYERS-PEREZ:  When you enter as part of a

1    violent mob, then yes.

2            THE COURT:  So your answer is yes, everyone who

3    entered the Capitol on that date is guilty not just of

4    entering but also of disorderly or disruptive conduct in the

5    building.

6            MS. AYERS-PEREZ:  The mere, and we've heard this

7    from our witnesses, the mere fact that the Capitol was

8    breached and people were inside is what disrupted the

9    proceeding, and part of the disruptive definition is that it

10   disrupts the orderly course of business or official business.

11   And in this case, it disrupted the counting of the Electoral

12   College votes.  Certainly the way Larry Brock entered with

13   the violent mob of people and the way he went through the

14   Capitol building certainly disrupted the proceedings and to

15   add to that, of course he's standing where the proceedings

16   were supposed to be taking place.  So certainly with Larry

17   Brock, he would have violated both the entering and the

18   disruptive conduct as he's inside which is as part of this

19   mob that's stopped the official proceeding.

20           THE COURT:  So just -- so someone who entered let's

21   say not when Mr. Brock entered but 15 minutes later, at 2:39,

22   and came in and was there for about 90 seconds, looked

23   around, then said to him or herself, Jeez, maybe I shouldn't

24   be here and turned around and walked out, in your view, they

25   would be guilty not just on the entering concept, but also on

320

1    the disorderly or disruptive conduct because of what was

2    happening around them by the rest of the mob?

3              MS. AYERS-PEREZ:  In -- every case is different,

4    there are facts and circumstances for every case, I don't

5    want to tie the Government to --

6              THE COURT:  But judges like to ask hypotheticals of

7    counsel and I'm asking you that hypothetical.

8              MS. AYERS-PEREZ:  Yes, your Honor.  And I would

9    believe in that case, yes, that he would be responsible for

10   disruptive conduct within the building.

11             THE COURT:  Which I think is returning to the point

12   that no one who entered the Capitol on that date is not

13   guilty of the disorderly and disruptive charges as well as

14   the entering and remaining charges.

15             MS. AYERS-PEREZ:  For people who entered the

16   Capitol on that date, just the mere entrance of the mob

17   caused the disruption, so if you're part of the mob, you're

18   part of that disruptive conduct.  And not just entering, but

19   also then disrupting the proceeding that took place because

20   it wasn't just one person, it was everybody, and you're a

21   part of everybody.

22             THE COURT:  And do you think the evidence shows

23   that Mr. Brock was unreasonably loud or disruptive or

24   interfered with another person by jostling against or

25   unnecessarily crowding that person?

1          MS. AYERS-PEREZ:  He was part of a crowd and group

2     that's going through the Capitol, went through about every

3     area you could get through, he's screaming on the Senate

4     floor, he's screaming in the Senate Gallery.

5          THE COURT:  He's screaming?

6          MS. AYERS-PEREZ:  He's yelling at other rioters and

7     in the Senate Gallery he's yelling at them about not to --

8     not to damage anything and on the Senate floor he starts by

9     saying this is our house, he then says that this is an IO

10    war, to get out of the Vice President's chair but he's --

11         THE COURT:  So two out of the three things you just

12    said were basically telling other rioters not to do bad

13    things.

14         MS. AYERS-PEREZ:  It's true, but he's still causing

15    a disruption as he does it.  And we've already seen from his

16    Facebook post why he's telling them that.

17         THE COURT:  Yeah, my guess is that the language,

18    the definitional language for disorderly conduct, the

19    unreasonably loud and disruptive was written having in mind

20    someone who was doing something during a Congressional

21    proceeding and interfering with that Congressional

22    proceeding, but I understand your argument.

23         MS. AYERS-PEREZ:  Yes, your Honor, and I think, I

24    think I've responded to all of the defendant's points on

25    Counts One through Six, or the entirety of the indictment.

1              THE COURT:  All right.  Mr. Burnham, anything you

2       want to say in response?

3              MR. BURNHAM:  Yes, just a few specific things.  As

4       to Count One, certainly other judges, you know, have denied

5       motions similar to mine to Count One but there's absolutely

6       no controlling authority on that question and I think it's

7       only natural with the unorthodox use of heretofore kind of a

8       sleepy statute, that the members of this court might come

9       down differently.  And I have great difficulties with the

10      reasoning of, well, there was a mob, and whoever joined the

11      mob is answerable for all of the consequences that ensued

12      when evidence in this case even shows this "mob" was composed

13      of discrete groups of people doing very discrete types of

14      things.  There was everything from out-and-out miscreants

15      behaving abominably to people who seemed to be befuddled and

16      a little confused by their situation.  So I think the

17      reasoning of, well, there was a mob, and he was in the mob so

18      he's answerable is overly simplistic and not the intent of

19      the statute.

20             THE COURT:  But that may be right although the

21      response, it would seem to me, is that the mob had at least

22      seemed to have a common purpose, and that was to prevent the

23      certification of the election, to interfere with that

24      process, and they took a common action to try to accomplish

25      that, which was entering the Capitol grounds and then

1    entering the Capitol building.

2         MR. BURNHAM:  I don't agree at all, your Honor, I

3    think you could see even in the evidence in this case, try to

4    put out of our minds everything else, we know there was a

5    disparity of purposes.  There were people who were just

6    trashing things that I suppose were just interfering --

7         THE COURT:  That doesn't speak to their purpose,

8    because their purpose wasn't to trash things, their purpose

9    was to stop a proceeding and they were trashing in order --

10   along the way to accomplish that.

11        MR. BURNHAM:  But there was another group of people

12   of whom Mr. Brock was a member that wanted the proceeding to

13   function effectively and to achieve the right result.

14   Mr. Brock wanted the Electoral College proceeding to proceed,

15   he was in support of that.  The Government's witnesses all

16   testified there's a process for making objections, they're

17   debated, and slates of electors can be rejected.  Some people

18   thought it could be sent back to the states and Mr. Brock and

19   many others manifestly were supporting that process.  They

20   were there to support the Senators, the Congressmen making

21   those objections and they wanted an ultimate legal result of,

22   in many cases, rejecting the purported Biden victory in favor

23   of at least investigating the fraud.  So they were there

24   supporting the Electoral College.  So I distinguish those

25   people from the riffraff, breaking things, acting crazy, you

1    know, fighting with law enforcement, who knows what was in

2    their minds but those people were criminals.  There was

3    another group of people that was not that at all, at all.

4    And that's why I think that, well, was he in the mob is not

5    the right analytical framework at all for Count One.

6            Technical point, but I would argue that once the

7    Senate, Mr. Brock is charged with obstructing the Electoral

8    College and I guess the House proceeded a little farther but

9    once the Senate adjourned, it's not the Electoral College

10   anymore, it's just the House by itself which is a different

11   proceeding, not charged in this case.  It's undisputed that

12   the Electoral College ceased to function prior to Mr. Brock's

13   entry, I think that's an important point.

14           And that's sort of the same arguments I'm making if

15   the Government -- the Government hasn't exactly elected a

16   theory as to Count One, whether it's aiding or abetting or

17   whether it's not but to the extent it is relying on aiding

18   and abetting and Ms. Ayers-Perez did use that term, they have

19   to show that Mr. Brock's intent was to assist, I forget the

20   exact terminology but to assist, encourage, you know, all the

21   terms the statute uses, Section 2, the individuals who were

22   responsible for obstructing the proceeding, again, as

23   distinct from encouraging the proceedings to arrive at what

24   they viewed as the correct results.  And the witnesses even

25   added support to this, the Government's witnesses testify, we

1    heard people breaking the windows so we adjourned.  People

2    were smashing the doors so we adjourned.  In order to convict

3    on an aiding-and-abetting theory, there needs to be evidence

4    to find that Mr. Brock supported that, which is what

5    triggered the adjournment and we don't have evidence of that.

6            As to the -- as to the restricted area, I basically

7    gave the Government in the opening, point to some evidence

8    that shows him being put on notice of the restriction and

9    they pointed to I guess three things the way I understood the

10   argument.  One is the people climbing the scaffold, which is

11   the restriction has to come from the persons lawfully in

12   charge of the property, and people climbing a scaffold don't

13   indicate any intention one way or the other on the part of

14   the people lawfully in charge of the premises, there's just

15   some knuckleheads climbing a scaffold, you'd find that at a

16   football game, a rock concert, any large gathering of people

17   there's going to be some knuckleheads so that doesn't

18   communicate anything one way or the other.

19           The window, there's been arguments from the

20   Government that Mr. Brock was put on notice from people

21   jumping through the window and I'd urge the court to go back

22   and take another look at the video.  There are a couple of

23   people that come in through the window which would have been

24   on Mr. Brock's left, I think there was two, maybe three, but

25   if the court reviews the video or perhaps recalls better than

1    I do, there's a piece of the wall there, it's like a piece

2    that sticks out that would have obscured the view from where

3    Mr. Brock was entering to that window, and so that combined

4    with the fact that Mr. Brock doesn't look to his left,

5    doesn't allow the court to find that the --

6              THE COURT:  Don't you think it would require me to

7    blink reality to conclude that Mr. Brock in the few moments

8    before he actually entered the building and as he was

9    entering the building didn't see anyone going through the

10   windows?  That sounds pretty amazing for you to suggest that

11   that would be the case.

12             MR. BURNHAM:  I don't think it's amazing at all

13   because we saw that by that point the door was open, there

14   was no need to go --

15             THE COURT:  We also see people still coming through

16   the windows.

17             MR. BURNHAM:  I think it was approximately two out

18   of maybe 30 that entered during that --

19             THE COURT:  You say two while he was immediately

20   walking through?

21             MR. BURNHAM:  That's right.

22             THE COURT:  That doesn't mean while he was

23   approaching that there weren't others, indeed I think there

24   were others because we've seen some video before he actually

25   came through the door.

1            MR. BURNHAM:  When the windows are actually being

2       broken, certainly we did but by the time Mr. Brock arrived on

3       the scene, the door was open so the reasonable finding would

4       be that most of the people are just going to walk through the

5       door because there's no reason to go through the window at

6       that point.

7            THE COURT:  But there were people coming through

8       the windows.

9            MR. BURNHAM:  I think there were two, for whatever

10      reason, they went through the window, I don't know, but the

11      vast majority of people at that point were going through the

12      door and only stands to reason that that's what most people

13      would do with the exception of, again, the few just

14      miscreants that were just misbehaving for its own sake but

15      that would have been very few of number, and there's no

16      evidence Mr. Brock would have been on notice of because it

17      would have been, as he's walking through unless he looked

18      over and watched it, would have been indistinguishable

19      someone coming through the window and then someone that was

20      just walking from that part of the hallway, he wouldn't have

21      known the difference.

22           THE COURT:  I'm talking about the moments before he

23      reached the door and came through.  He must have seen people

24      going through the windows then.

25           MR. BURNHAM:  Well, there's no evidence of that and

1    I would argue that there's not even an inference of Rule 29

2    that he would have had to have seen that.  I think if there's

3    any inference it would have been that few people would have

4    gone that way, and he seemed pretty intent on looking ahead

5    at the time, at least when he comes on the video and wouldn't

6    have been in a position --

7            THE COURT:  I'll have to look at the video again to

8    see whether it only captures Mr. Brock coming through the

9    door or whether it also captures moments before he came

10   through the door and whether there were people coming through

11   the windows at that time.

12           MR. BURNHAM:  Thank you, your Honor.  And final

13   point the Government raised is the situation at the Rotunda

14   doors and the first observation there is this is a triple

15   fallback position, I guess the argument is that if the

16   grounds weren't legally restricted and the outside of the

17   building was, perhaps he was then on notice well after

18   entering, but even there, you don't have those officers

19   communicating to him that he wasn't allowed to be there.

20   There was some seemingly crazy people outside the door

21   banging which only makes sense that the police weren't going

22   to let those guys in because they were acting crazy, didn't

23   communicate anything to Mr. Brock and with respect to the

24   remainder, I'd rest on my initial arguments.

25           THE COURT:  All right, thank you, Mr. Burnham.  And

1    those are the arguments that are good food for thought but

2    I'm going to keep them as thought.  I'm going to reserve a

3    decision on the motion consistent with Rule 29(b) and let the

4    remainder of the evidence in the case come in.  And I'll rule

5    after that, before I, or in conjunction with, if necessary,

6    any ruling on the defendant's guilt as to the various

7    charges.  But at this point, I'll reserve a decision on the

8    Rule 29 motion as Rule 29(b) permits.

9            So we're going to break for lunch now, and I'll

10   give you time to think further, Mr. Burnham, and Mr. Brock,

11   but we'll resume at -- oh, let's make it 1:50, and we'll

12   proceed with a decision from the defendant with respect to

13   its case, and what lies thereafter.  Okay.  Anything else we

14   need to talk about before you have your lunch break?

15           MS. AYERS-PEREZ:  Nothing from the Government.

16           MR. BURNHAM:  No, your Honor.

17           THE COURT:  All right.  Thank you, all.

18               (Luncheon recess, 12:45 p.m. to 1:53 p.m.)

19           THE COURT:  All right.  Welcome back, everyone, and

20   turn to you, Mr. Burnham, for the defense case.

21           MR. BURNHAM:  Thank you, your Honor.  I'll approach

22   the podium.

23           THE COURT:  Use whichever mic you want.

24           MR. BURNHAM:  I'd like to move in the exhibits

25   previously identified, that's Exhibit 3, Defense Exhibit 3

1     was a photo that --

2           THE COURT:  I haven't seen -- well, it may be in

3     the book, is it in your book?

4           MR. BURNHAM:  Yes, it is, under those tabs, tab 3

5     is the photo, that's identified by Agent Moore, I'll go ahead

6     and ask the court to receive it now.

7           THE COURT:  All right.  Any objection to moving

8     Defense Exhibit 3 into evidence?

9           MS. AYERS-PEREZ:  No objection, your Honor.

10          THE COURT:  All right.  And I will include with

11    your representation, Mr. Burnham, that the date of the photo

12    is February 7th, 2020.

13          MS. AYERS-PEREZ:  Yes, your Honor.

14          THE COURT:  So Defense Exhibit 3 is admitted.

15          MR. BURNHAM:  And then the other exhibit is Defense

16    Exhibit 5, under tab 5, which was the article that, you know,

17    I had the agent review but the basis for why that's

18    admissible is the second paragraph is the agent testified is

19    a quote and now that I've recovered the number, it matches up

20    pretty much word for word, I think word for word with

21    Government's 913, and so, you know, the odds of that being a

22    coincidence are vanishingly small so we would offer that as

23    proper authentication with that exhibit combined with the

24    agent's testimony.

25          THE COURT:  All right, that's the representation

1    made with respect to admissibility of the article and it

2    would be admitted only for that purpose, to show that a

3    quoted portion of Government Exhibit 913 is the same as a

4    paragraph of Exhibit 5.  Defense Exhibit 5.  Any objection?

5           MS. AYERS-PEREZ:  I have no objection to that

6    limited purpose, your Honor.

7           THE COURT:  All right.  And it will be admitted for

8    that purpose.  That is Defense Exhibit 5.

9           MR. BURNHAM:  And with that, we rest.  If your

10   Honor needs to do a colloquy with Mr. Brock, he's prepared

11   but if not --

12          THE COURT:  Yes, I would like, would you like to

13   ask him anything, or want me to do the colloquy?

14          MR. BURNHAM:  However the court's norm -- I can

15   represent our discussions.

16          THE COURT:  I usually do the colloquy so I will do

17   that so I'll just ask Mr. Brock to come up to the microphone,

18   you can stay there with him, Mr. Burnham.  Good afternoon,

19   Mr. Brock.

20          THE DEFENDANT:  Yes.

21          THE COURT:  The -- your counsel has indicated that

22   the defense is resting, which would mean that you have

23   decided not to testify, and I just wanted to confirm that

24   that is your free and voluntary choice and so I will ask you,

25   have you consulted with Mr. Burnham about whether you should

1    or should not testify in this matter?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  And have you taken into account his

4    advice to you?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  And is it your decision that you will

7    not testify in this case, which is Criminal Case 21-140 in

8    this court?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  All right.  And that is a decision made

11   by you upon advice of counsel, but freely, voluntarily, and

12   intelligently?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  All right.  Thank you.

15             MR. BURNHAM:  Thank you, your Honor.

16             THE COURT:  With that, the record is complete.  And

17   now the only thing I have yet to receive from you all is

18   argument.  And we're about 2:00 in the afternoon, I'm

19   prepared to give you a little time if you want a little time

20   to compose your thoughts and so I can give you half an hour,

21   45 minutes, and then we can come back for argument.  Would

22   that be your request and in your interest?

23             MS. AYERS-PEREZ:  Yes, your Honor.

24             THE COURT:  One yes.  Mr. Burnham?

25             MR. BURNHAM:  Yes, your Honor.

 1          THE COURT:  All right.  And now --

 2          MR. BURNHAM:  Yes, your Honor.

 3          THE COURT:  And now timing, how long would the

 4    Government expect to need?

 5          MS. AYERS-PEREZ:  I think 45 minutes is fine, your

 6    Honor.

 7          THE COURT:  That's 45 minutes total?

 8          MS. AYERS-PEREZ:  Yes, your Honor, I think that

 9    would take us to about 2:40 -- oh, I'm sorry, I'm sorry, I

10    was not on the same page, I'm so sorry.  No, I would need at

11    max 30 minutes total, so probably 20 and 10.

12          THE COURT:  And Mr. Burnham?

13          MR. BURNHAM:  I'll ask for 30 minutes, it might be

14    a little under that.

15          THE COURT:  So 30 minutes or so.  So we'll resume

16    at -- I'll give you the full 45 minutes, resume at 2:45 and

17    hear argument at that time.  And once I hear argument, I will

18    either rule then or it's possible that I will decide to bring

19    you back first thing in the morning to rule.  We'll see how

20    things go with respect to your arguments, how convincing they

21    are on each side.  All right?  See you in 45 minutes.  Thank

22    you.

23          (Court in recess, 1:59 p.m. to 2:49 p.m.)

24          THE COURT:  All right.  Anything before we start

25    with the arguments?

1          MS. AYERS-PEREZ:  Not for the Government, your

2     Honor.

3          MR. BURNHAM:  No, your Honor.

4          THE COURT:  Fine.  Ms. Ayers-Perez, we'll start

5     with the Government.

6          MS. AYERS-PEREZ:  Thank you, your Honor.  Your

7     Honor, in the days and weeks leading up to January 6th, 2021,

8     the defendant ... I apologize.

9          THE COURT:  That's quite all right.  Your gesturing

10    was quite amusing.

11         MS. AYERS-PEREZ:  In the days and weeks leading up

12    to January 6th, 2021, Larry Brock was obsessed with the

13    election.  He was saying things such as, "Biden won't be

14    inaugurated and we will ensure that on the 6th."  Things such

15    as, "the Supreme Court is staying out of it.  Those are the

16    last two peaceful options."  Talking about, "Congress can

17    stop it on the 6th of January."  Saying things such as, "Help

18    is on the way, 6 January #MAGA #Stormthecastle."  On

19    July 5th, "our second American Revolution begins in less than

20    two days."

21         THE COURT:  It's January 5th, not July, right?

22         MS. AYERS-PEREZ:  January 5th, your Honor, thank

23    you.  And then in December, "I prefer outright Insurrection

24    at this point."  He prepared for January 6th, he bought

25    tactical gear, he bought a helmet, and he showed up there and

1   the first thing he did is he went to the Stop the Steal Rally

2   with so many others.

3           And then he began his march to the Capitol.  He

4   marched down Constitution Avenue, we can see him here,

5   wearing his combat vest, wearing his jacket, and he enters

6   into the restricted area.  We heard from Captain Patton what

7   that restricted area looked like.  He personally walked it

8   that morning.  Signs every other bike rack, area closed by

9   Capitol Police.  Bike rack all around, snow fencing, all

10  around, and Larry Brock walked through all of this, with

11  everybody else, and he walks up --

12          THE COURT:  Is there any evidence as to whether all

13  of that was in place or not in place when Mr. Brock entered

14  that area?

15          MS. AYERS-PEREZ:  Well, Captain Patton saw it that

16  morning and I haven't heard any evidence that Mr. Brock

17  didn't see it that day.  Here we are next to the scaffolding

18  on the west side of the Capitol.  We've heard from Captain

19  Patton, we're already in the restricted area at that point.

20  People are climbing scaffolding outside the United States

21  Capitol building, and there's Larry Brock.  Helmet on, part

22  of the group, part of the mob, making his way towards the

23  Capitol building.  And at 2:24 p.m., he enters into the

24  Capitol building.  You see the broken windows next to him,

25  people have entered through those windows, he's walking into

1    the Capitol building a mere 12 minutes after the initial

2    breach on the west side of the Capitol.

3              THE COURT:  That's a still photo from a video.

4              MS. AYERS-PEREZ:  It is, your Honor, yes.

5              THE COURT:  I haven't gone back and looked at the

6    video, I will.  Does the Government represent whether the

7    video shows the time before Mr. Brock entering?

8              MS. AYERS-PEREZ:  I'm not sure, I don't believe it

9    shows too much time before he enters.  I can tell you this

10   window here on the right side of the screen, there is

11   somebody who does climb through that window in close

12   proximity to when Larry Brock enters into the Capitol

13   building.

14             THE COURT:  Well, I guess I'll look at the video.

15             MS. AYERS-PEREZ:  Larry Brock then ends up outside

16   the Rotunda at 2:35 p.m., and these are those east Rotunda

17   doors, right outside the Rotunda after Larry Brock has

18   already gone into the area marked Speaker of the House, Nancy

19   Pelosi, and here is Larry Brock.  Mere feet from that east

20   Rotunda door.  And what you'll notice about that door is the

21   window has already been smashed out.  And there are law

22   enforcement, Capitol Police right there and right there

23   (indicating).  Despite all of this, despite Larry Brock being

24   within feet of all of this, he continues on his mission

25   throughout the Capitol Building.  He grabs flex cuffs off the

1    ground and proceeds to head upstairs to the third floor.

2          Here he is going down the corridor one minute later

3    towards the Senate Gallery.  And here he is two minutes later

4    outside the Senate Gallery, and this is where Sergeant

5    Timberlake talked about.  As he's trying desperately to close

6    these gallery doors, he's been assaulted by Capitol rioters,

7    not by Larry Brock.  Larry Brock stops the assault per

8    Sergeant Timberlake, calms things down.  To calm it down

9    means that Larry Brock saw it.  He saw Sergeant Timberlake

10   assaulted by fellow rioters and he continues on again.

11         And we see this post.  The conversation Larry Brock

12   is having with Beaf Supreame.  "A possible IO loss if a cop

13   got hurt."  And Brock, "look dude, I am pretty sure I am

14   ready to go at it.  I just need numbers with me."  This is

15   the mindset that Larry Brock had that day, and I --

16         THE COURT:  Wait a minute, wait a minute, Beaf

17   Supreame is saying, it would be bad if a cop got hurt.

18         MS. AYERS-PEREZ:  Yes, yes.

19         THE COURT:  And Mr. Brock is responding that he's

20   ready to go at it.  He just needs numbers.

21         MS. AYERS-PEREZ:  Right.  He's ready to go at it

22   that day, and then what you see is that Larry Brock stops a

23   cop from being hurt that day, Sergeant Timberlake.  And what

24   we will see in a few minutes is when Larry Brock is on the

25   Senate floor, he's still talking about that IO war.  He's

1    stopping, the reason that Sergeant Timberlake is being

2    stopped from being assaulted by Larry Brock and why Larry

3    Brock is trying to defuse a situation, calm it down, is

4    because he's worried about this IO loss.  This IO war is at

5    the front of Larry Brock's thought process that day, which we

6    hear when he gets on the Senate floor.

7            Just one minute later, here he is on the Senate

8    balcony, and you'll notice that here he is shouting at fellow

9    rioters and they're turning and looking at him.  He has a

10   commanding presence.  He's making his voice heard.  He's

11   telling them, do not destroy anything and they're listening.

12   People around him.

13           THE COURT:  We would all prefer that he's saying

14   that rather than the opposite, don't we?

15           MS. AYERS-PEREZ:  I prefer he wasn't at the Capitol

16   that day.

17           THE COURT:  Different issue, different issue.

18           MS. AYERS-PEREZ:  But yes, it is great that he said

19   that.  But the fact that his actions then take him down onto

20   the Senate floor is different than if he had said that and

21   left.

22           And then four minutes later, he goes directly

23   downstairs to the second floor.  He knows where he is now.

24   He has oriented himself because he was there in the gallery

25   and understands that the Senate floor is below him.  And here

1    he is at the door, we heard from Captain Patton it looked

2    like he had a set of keys in his hand, and that door says

3    United States Senate on it.  And we know that door 21 minutes

4    earlier had Vice President Michael Pence leaving from that

5    door, just 21 minutes prior to Larry Brock standing outside

6    trying to get inside.  And we heard from Captain Patton, what

7    that door leads to.  It leads to the Senate floor and it

8    leads to Vice President Pence's ceremonial office.

9              THE COURT:  It's not really that important what's

10   behind that door because there's no evidence that Mr. Brock

11   knew what was behind that door.

12             MS. AYERS-PEREZ:  Well, the door says United States

13   Senate on it.

14             THE COURT:  That's right.  It is obviously a closed

15   locked door giving access to some part of United States

16   Senate.

17             MS. AYERS-PEREZ:  It is.

18             THE COURT:  The fact that the Vice President came

19   through it 20 minutes earlier is dramatic, but it doesn't

20   seem to me to be that significant because Mr. Brock didn't

21   know that.  There's no evidence that he knew that.

22             MS. AYERS-PEREZ:  Right.  But Mr. Brock has found

23   himself in an area that's extremely sensitive, so much so

24   that the Vice President had just come out of there 21 minutes

25   prior and he's trying to get into a locked door inside a

1    building he was never supposed to be in in the first place.

2           And just two minutes later, here he is on the

3    Senate floor, and you'll see in his left hand, he now has his

4    flex cuffs out.  The interesting thing about those flex cuffs

5    is that Sergeant Timberlake never saw them, and he was right

6    next to Larry Brock and he never saw the flex cuffs.  When

7    Larry Brock is right next to Sergeant Timberlake he doesn't

8    have them displayed, he doesn't hand them to an officer to

9    get rid of them, he has them wherever he has them, we don't

10   know, but now he's brought them out again, now that he's on

11   the Senate floor.  And once again, we find Larry Brock in the

12   Senate Chamber shouting at fellow rioters saying things such

13   as get out of the Vice President's chair.  This is our house.

14   This is an IO war.  We can't lose the IO war.

15          And he's back to his mindset that led up to all of

16   this, which is the IO war, which is what we see message after

17   message after message on Facebook that Larry Brock has in the

18   days and weeks leading up to January 6th.  We saw the

19   progression of furor from Larry Brock, first in November,

20   that Donald Trump had lost the election, in December, so he

21   has convinced himself the Supreme Court will handle the loss,

22   that Donald Trump will still be President, and now his final

23   piece is January 6th and Congress and now he's on the floor

24   of the Senate where just less than an hour before, they had

25   been debating Arizona and the objection to Arizona, the Vice

1    President had been in his chair, and now Larry Brock is in

2    combat gear standing on the floor of the Senate.  He's

3    walking around not just in the middle of the Senate, you can

4    see him here in the back walking around the desks there in

5    the Senate.

6         THE COURT:  Now those keys that you referenced a

7    moment ago at that door, we don't know where those keys came

8    from.

9         MS. AYERS-PEREZ:  We don't, as Agent Moore

10   testified, they didn't find them when they executed that

11   search warrant, we have no idea where those keys came from,

12   where he got them from, what they were to.

13        THE COURT:  Does that matter?

14        MS. AYERS-PEREZ:  It matters in the sense that we

15   would like to know what those keys are to if they're

16   actually --

17        THE COURT:  We would like to know but it doesn't

18   matter in terms of his culpability on any of the charges?

19        MS. AYERS-PEREZ:  It matters in the sense that he

20   was deep inside the Capitol in a very sensitive area and he

21   at some point, whether inside the Capitol or before he got to

22   the Capitol, had found a set of keys that it appeared he

23   believed could open the door to the Senate Chamber, and you

24   know it's the Senate because it says so on the door.  And

25   so --

1          THE COURT:  I'm not sure you're understanding my

2     question.  My question is this:  If A, he brought the keys

3     with him; or B, he found the keys on the table outside the

4     door and they were unlabeled; or C, he found the keys there,

5     and they were labeled Senate keys, is there a different

6     result from those three possibilities or is the result at the

7     end of the day the same?

8          MS. AYERS-PEREZ:  Well, the result is the same

9     because he didn't get in through the keys, but him even

10    trying with the keys, whether or not they were A, B, or C,

11    whichever way he obtained the keys, goes to his corrupt

12    intent and his unlawful intent that day to get onto the floor

13    of the Senate where the official proceeding was taking place.

14         THE COURT:  I think you're saying it doesn't matter

15    because whether it's A, B, or C, it's still corrupt intent.

16         MS. AYERS-PEREZ:  It is.  And we --

17         THE COURT:  That's your answer to my question, I

18    think.

19         MS. AYERS-PEREZ:  Yes, your Honor.  It is still

20    corrupt intent, whether it's A, B, or C, the fact that he's

21    using the keys, obtained however he obtained them, is showing

22    his corrupt intent that day and his unlawful intent to get to

23    the heart of the Capitol to get onto the Senate floor, where

24    the official proceeding that's the basis for Count One of the

25    indictment was in the process of taking place.  The objection

1    to Arizona was being debated in the Senate at that moment in

2    time.  So it does go to his corrupt intent that day.

3         And we see his corrupt intent throughout the course

4    of this.  We see it beginning in his Facebook posts, leading

5    up to January 6th, as he gets more and more angry and his

6    rhetoric gets more and more intense.  When he says things

7    such as storm the castle, when he says things such as that

8    the American Revolution begins in less than two days, on

9    January 5th, that's showing his intent on what he's going to

10   do when he gets to Washington, D.C. on January 6th.

11        What is so unique about Larry Brock is that he

12   doesn't talk very much about going to the Stop the Steal

13   Rally, that wasn't his purpose behind being in Washington,

14   D.C. on January 6th.  His conversations leading up to

15   January 6th are about Congress.  They're about the vote,

16   they're about January 6th itself.  And he is acutely aware of

17   what is happening inside that Capitol building on

18   January 6th.  It's not just the end result of a Stop the

19   Steal Rally that he attends, it is the Capitol and Congress

20   that is the reason why he's there in the first place.  He

21   very, very infrequently talks about the Stop the Steal Rally.

22   It's Congress, it's the counting of the Electoral College

23   votes, it's the peaceful transfer of power on January 6th

24   that brought Larry Brock to Washington, D.C., in combat gear

25   at that.

1          THE COURT:  One could read the evidence, I'm not

2     saying that I do, but one could read the evidence in a way

3     that supports the conclusion that Mr. Brock wanted to stop

4     the inauguration, because that's referenced a couple of

5     times, as opposed to specifically stopping the certification

6     of the election.  Why shouldn't the evidence be read that

7     way?  And would that matter?

8          MS. AYERS-PEREZ:  He wasn't there on January 20th,

9     he was there on January 6th, and one way to stop the

10     inauguration of a new President is to be there on January 6th

11     and stop the peaceful transfer of power.  It's that day that

12     he bought plane tickets for to go to Washington, D.C.  He

13     didn't buy plane tickets to go to Washington, D.C. on

14     January 19th to stop the eventual inauguration on

15     January 20th.

16          THE COURT:  Is there anything in the evidence --

17     there are a lot of references to January 6th, and some of

18     those references, not many of them but some of them might

19     have been tagged to the Stop the Steal Rally on January 6th,

20     is there any evidence in any of his communications

21     beforehand, the Facebook communications mainly, that he

22     intended to go to the Capitol on January 6th?

23          MS. AYERS-PEREZ:  He talks multiple times about

24     Congress on January 6th, and Congress is there inside the

25     Capitol building, and he ends up there at the Capitol

1   building.

2           THE COURT:  I know where he wound up, but is there

3   anything that actually says, that indicates there are things

4   that indicate I'm going to the Stop the Steal Rally, is there

5   anything that indicates I'm going to the Capitol?

6           MS. AYERS-PEREZ:  It's not, there's nothing in

7   there that says I'm going to the Capitol.  There are a number

8   of messages that says Congress on January 6th and what

9   Congress is doing on January 6th.  Larry Brock is a smart

10  guy, he's a graduate of the United States Air Force Academy,

11  former lieutenant colonel in the Air Force, he understands

12  where Congress is and he understands what's happening on

13  January 6th, in Congress, and I think he's made his knowledge

14  of what's happening on January 6th and Congress' role in

15  that, he discusses that plenty of times throughout his

16  messages leading up to January 6th, and he very infrequently

17  discusses the actual rally that Donald Trump is having that

18  day, and prior to going to the Capitol.

19          THE COURT:  Okay.

20          MS. AYERS-PEREZ:  And all of this leads to this

21  chilling post on December 24th that reads as a military

22  operation that Larry Brock sends in a private message to a

23  fellow military man where he lists what he wants to happen if

24  Congress fails to act on January 6th, and it is egregious and

25  severe, but it also shows just how strongly Larry Brock feels

1    about January 6th and that January 6th is the end point for

2    him.  Not the inauguration, it's January 6th, and what's

3    happening in Congress at the Capitol that is the end point

4    for Larry Brock.  Thank you, your Honor.

5              THE COURT:  Well, wait a minute.  I have a question

6    or two.  So if I decide that there has to be something more

7    than just being in the Capitol in order to find disorderly or

8    disruptive conduct, what evidence would you point me to that

9    is more than just being in the Capitol?

10             MS. AYERS-PEREZ:  Well, the disruptive conduct was

11   disrupting the proceeding, or any course of business that

12   day, and more than just being in the Capitol, he is

13   throughout the Capitol.  He starts on the first floor, second

14   floor, third floor, Rotunda, east Rotunda stairs, Senate Wing

15   Doors, Senate Gallery, Senate floor, Parliamentarian doors,

16   he makes quite a bit of headway and goes through the Capitol

17   a lot.  He didn't walk in -- and I know your Honor had the

18   hypothetical earlier of somebody walking in and walking out

19   almost immediately.  He spent about 38 minutes inside the

20   Capitol, but during that time, he went on to the Senate

21   floor, where less than an hour before, they're debating

22   Arizona on the Senate floor, where he is now at and they

23   can't continue their order of business, the normal

24   proceedings because not just people are inside the Capitol of

25   course, but he's not leaving immediately like you said, he is

1    going through the Capitol for a lengthy period of time and

2    he's going to one of the most sensitive areas within a

3    sensitive building within the United States.

4           THE COURT:  So you would point to the duration and

5    scope of his time in the Capitol?

6           MS. AYERS-PEREZ:  Duration and scope and, yes, and

7    the location, yes, as part of his subset of scope.

8           THE COURT:  What about in the last charge, the

9    parading, picketing, demonstrating, which of those do you

10   assert Mr. Brock engaged in?

11          MS. AYERS-PEREZ:  The demonstrating, as part of a

12   group that's demonstrating throughout as somebody who's

13   shouting commands and as part of a group in the Senate

14   Gallery.

15          THE COURT:  So not picketing.

16          MS. AYERS-PEREZ:  Picketed, too, he really did.  I

17   mean Larry Brock's conduct on January 6th covers a wide range

18   of conduct.  I think demonstrating is the one that most

19   closely fits, but it doesn't mean the others don't fit.

20          THE COURT:  So the only one of those three terms

21   that's defined, specially defined for purposes of the

22   provisions is demonstrate, which is defined as conduct that

23   would disrupt the orderly business of Congress by, for

24   example, impeding or obstructing passageways, hearings or

25   meetings but does not include activities such as quiet

1    praying, and so with that definition of demonstrate, what is

2    it you feel that he did that constitutes demonstrating?

3              MS. AYERS-PEREZ:  Merely being inside the Capitol

4    and going throughout the Capitol, especially with the scope

5    of what he did, it disrupted the order of Congress and what

6    Congress is doing, but in addition to that, going inside the

7    Senate Chamber twice, once at the gallery, once on the Senate

8    floor, absolutely disrupted normal course of Congress because

9    he's inside the chamber where Congress is supposed to be

10   convened at that moment in time.

11             THE COURT:  Well, is it odd that someone going into

12   the chamber who wasn't a Senator or a staff person for the

13   Senator or into the gallery, unless they do something more,

14   probably would not be disrupting the orderly business of

15   Congress, but someone going in when Congress isn't even there

16   would be disrupting the orderly business of Congress?  It

17   seems a little odd.

18             MS. AYERS-PEREZ:  Well, I take it from the first

19   example that that's somebody who's already lawfully inside

20   the building.  Larry Brock and the --

21             THE COURT:  That's my hypothetical, yes.

22             MS. AYERS-PEREZ:  -- and the fellow rioters are not

23   lawfully inside the building.  We've heard from multiple law

24   enforcement officers that they didn't go through the

25   security, they didn't put their bags in the x-ray machine,

1    they didn't go through the metal detector, they don't know

2    what's on them, and that's what makes the conduct of the mob

3    and how they broke into the Capitol so dangerous, is because

4    you don't know what anybody has, and Larry Brock was part of

5    that.  He's not the person who came into the building

6    lawfully and went through security and is lawfully inside the

7    building and then makes a disruption up in the gallery.  He's

8    not lawfully there, he hasn't gone through security and he's

9    on the Senate floor which nobody would be allowed to do short

10   of staffers or members, and they're supposed to be there

11   right then but they're not because of what the rioters have

12   done.

13         THE COURT:  So, my last question is, is related to

14   entry into restricted grounds as opposed to building.  Does

15   that provision 1752 require that an individual, Mr. Brock in

16   this instance, know that the grounds are restricted?

17         MS. AYERS-PEREZ:  He has to knowingly violate it,

18   but --

19         THE COURT:  Has to knowingly but not knowingly and

20   willingly which is the language in other provisions but not

21   in this provision.

22         MS. AYERS-PEREZ:  Right, he does have to knowingly

23   do it, and this case --

24         THE COURT:  Not just that he's entering in the area

25   but he has to know the area he's entering is restricted.

1          MS. AYERS-PEREZ:  Right, which is why Capitol

2     Police did all they could or did all they did with the

3     restricted perimeter, with the area closed by Capitol Police

4     signs every other bike rack, with the bike racks with the

5     snow fencing, the fact that there were more than one set of

6     those and Captain Patton told us they were all up there that

7     morning, and we haven't heard any evidence that Larry Brock

8     didn't see that stuff that day.  I mean it was -- we have

9     evidence that it was there, and that, it wasn't just a sign

10    stapled to a tree that you hope somebody sees that says no

11    trespassing.  I mean we're talking about a actual barrier

12    around the Capitol building with multiple sources of barrier

13    with bike racks and snow fencing and signs.  It wasn't just

14    one, it was around the entirety of the Capitol in a really, a

15    large restricted area that he had to have gone through to end

16    up where he ended up.

17               THE COURT:  All right.  Thank you.

18               MS. AYERS-PEREZ:  Thank you.

19               THE COURT:  I'll give you some time in rebuttal.

20               MS. AYERS-PEREZ:  Thank you.

21               THE COURT:  Mr. Burnham.

22               MR. BURNHAM:  Thank you, your Honor.

23               Your Honor, I'll welcome questions from the bench

24    but failing that, I'll try to go through more or less

25    chronologically what the evidence was which means that I'll

1    start with the social media record because that's the first

2    thing in time.  And as already previewed to the court in the

3    arguments surrounding the admissibility of those, it's a

4    little hard, I submit, to tell exactly how much weight to

5    give to some of that stuff.  There's hashtags, we presented

6    one article that shows some of it is quotes, sometimes he's

7    responding to other things that are blacked out, but I submit

8    that there are --

9              THE COURT:  Just because he's got a quote from some

10   other source doesn't mean he's not advocating what's in that

11   quote, he's copying it and putting it in his communication.

12             MR. BURNHAM:  Well, I think there's other

13   evidence --

14             THE COURT:  It may not be his original language,

15   but he seems to be in line with it, right?

16             MR. BURNHAM:  I think the remainder of the evidence

17   in the case would show quite clearly whether that was a

18   serious suggestion or not.  I introduced the article more to

19   show the tenor of those discussions, it was passing around

20   things on the internet, it was hashtags, it was little

21   sayings like storm the castle.  If there was evidence tending

22   to show that the quote from the *American Thinker* article was

23   indeed presented as a real plan to be put into practice, then

24   yes, it would be highly significant evidence, but I

25   absolutely think the court should compare it against what we

1  know about the conduct that followed.

2          But I think there are -- I do agree that there are

3  two significant things we can take away from the social media

4  record and the first is that Mr. Brock's concern about the

5  2020 election was genuine.  This was not just something he

6  drummed up because he didn't want to see Trump lose.  He was

7  genuinely concerned about what he had read on the internet

8  about alleged fraud, about illegality.  We all have our

9  different opinions about that but I think it's manifest from

10  the record where his head was, that's one thing.

11          The second thing is, is related, is he trusted the

12  United States Congress to fix that problem.  He says that

13  multiple times, Government's Exhibit 911, Congress can stop

14  on January 6th; Government's Exhibit 912, hopefully Congress

15  will do what is right, that's referring to the Electoral

16  College.  That's where Mr. Brock placed his faith and I'll

17  come back to that.

18          THE COURT:  Well, why does that matter that much?

19  Let's say he came to Washington with the hope that Congress

20  was going to fix the problem, but with the firm belief that

21  if Congress didn't, he was gonna be a participant in conduct

22  to fix it because Congress hadn't?

23          MR. BURNHAM:  That would be -- that would be highly

24  illegal and problematic but that's not what we have here,

25  neither in the social media evidence nor in his behavior he

1    doesn't say --

2         THE COURT:  He's got a specific plan that he sets

3    out if Congress didn't fix it on January 6th.

4         MR. BURNHAM:  I have two things to say about the

5    plan.  One about the face of the plan and one in comparing --

6    I submit to the court it's absurd on its face.  I started

7    referring to it in my head as the Christmas Eve plan because

8    when you read it, one wonders if Beaf Supreame and Mr. Brock

9    hadn't gotten into the eggnog a little early.  Maybe the

10   court shares that view; maybe it doesn't.

11        THE COURT:  I love it when counsel take those views

12   of their client.  That happens sometimes and I know it's not

13   a serious view of your client, but I understand it.

14        MR. BURNHAM:  They're military buddies, obviously

15   they know each other very well, they're talking about cutting

16   off the power to Democratic cities, arresting Mark

17   Zuckerberg, it's so over the top.

18        THE COURT:  But isn't it, isn't it at least a

19   reflection of, I'm willing to support serious efforts to stop

20   this election from being certified?

21        MR. BURNHAM:  It's absolutely --

22        THE COURT:  To stop the Congressional certification

23   of the election?

24        MR. BURNHAM:  It's absolutely not, and we can tell

25   that it's not by just looking at -- that's Exhibit 910, if we

1    just skip forward to Exhibit 912, it makes clear as day it's

2    not a serious plan.  912 is, if your Honor recalls, that's

3    where Mr. Brock tells Beaf Supreame/Drew, I'm going to D.C.,

4    I bought my tickets and Beaf Supreame doesn't say, oh, great,

5    we're going to go arrest Mitch McConnell like we planned just

6    a couple of days ago, he says, why are you going there?  And

7    Mr. Brock doesn't say, well, don't you remember we planned

8    out we're going to take over the government?  He says, I

9    don't know, I think it's going to be a significant day, I

10   want to be there, and he repeats again, hopefully Congress

11   will do what's right.  He says that in that very message.

12   And so without even getting into his conduct on January 6th,

13   just based on the social media record itself, there's enough

14   evidence to find that Exhibit 910 is not a serious statement

15   of intent.

16            THE COURT:  Go ahead.

17            MR. BURNHAM:  I have one more thing.

18            THE COURT:  Just reading those exhibits.

19            MR. BURNHAM:  I think it's a useful other way to

20   think about this is, if Exhibit 910 was serious, you know,

21   what would we have expected to see?  We would have expected

22   to see Mr. Brock making, you know, contact with other people

23   that could help him, we would have expected to see him

24   assembling some kind of assault force, making plans to go

25   arrest Mark Zuckerberg, making plans to cut off the power to

1   Dem cities.  I mean, if it was a serious thing you'd expect

2   some followup and there's none of that, there's absolutely

3   none, it's two military buddies getting out of hand getting a

4   little too angry about an election that didn't go their way

5   and it stopped there and that's as far as it went.

6           THE COURT:  So what do you think, what's your

7   explanation for a Facebook communication on the 1st of

8   January, "Help is on the way, 6 January 2021, storm the

9   castle."

10          MR. BURNHAM:  Well, storm the castle is a hashtag,

11  you can see that's in there, means it was something sort of

12  circulating on social media and so to ask what he meant by

13  it --

14          THE COURT:  So what's it mean for him to put that

15  in there?

16          MR. BURNHAM:  Well, we can tell what it means from

17  his conduct, from his conduct that day, I'll go through it

18  just the way the Government did, is if he went in there and

19  was one of the ones that was breaking the windows, that was,

20  you know, screaming we're going to hang Mike Pence, well,

21  then maybe you'd say storm the castle meant something

22  sinister, but given the way he did that, storm the castle was

23  just a reference to the January 6th rally, that's all it is.

24          THE COURT:  So, wasn't he committed to take action

25  on January 6th to keep President Biden ultimately from

1   becoming President?

2          MR. BURNHAM:  Action by supporting the Congressmen

3   and Senators in objecting to the count, that was the action

4   that he intended.

5          THE COURT:  By supporting Congress.

6          MR. BURNHAM:  Yes, the Stop the Steal Rally was a

7   rally in support, and the President, you know, his comments

8   dovetail with this exactly, it's a rally in support of the

9   Senators and Congressmen that intended to object to the

10  certification.  And Agent Glavey acknowledged that that was

11  well known leading up, Congressmen and Senators were saying

12  there are problems with the vote, we have meritorious

13  objections to these states and Secret Service planned out

14  exactly how they were going to accommodate the extensive

15  debate that they knew was going to have to take place.

16         THE COURT:  And supporting Congress was what he

17  meant by the second American Revolution?

18         MR. BURNHAM:  Well, I think that's something that

19  your Honor can conclude was overheated rhetoric.  I think

20  it's not being, trying to have it both ways to draw a

21  distinction between when he seems to be being serious, when

22  he's saying, I hope Congress can fix this, I've read about

23  fraud and when he's saying, oh, hey, it's going to be 1776,

24  we're all patriots, we're going to have a resolution, I don't

25  think he's trying have it both ways to make a distinction

1    between venting on Facebook about how much you think, you

2    know, how disappointed you are in the election versus serious

3    statements that have some plausible connection to his later

4    actions, that's the distinction that I would make.  If

5    there's a statement on social media that has some reasonable

6    relation to his later action, it was meant as a serious

7    statement; if there's a statement that's both a little crazy

8    on its face and has no reasonable relation to his later

9    actions, I think the court can conclude it's just venting on

10   Facebook.  That's the distinction that I've tried to make

11   throughout this.

12           And we sort of, we sort of, I got into this a

13   little bit in response to your Honor's questions but I did

14   want to draw the Court's attention to the evidence that's in

15   the record about how the Electoral College was supposed to

16   function because that becomes important.  And this came from

17   a couple sources but the Secret Service agent was one, is

18   that, as I already alluded to, there was a process there.

19   Congress and senators were supposed to object to states, that

20   wasn't a nefarious thing, that's, happens every four years,

21   it's the way it's supposed to work.  Having opinions that

22   there was fraud in 2020 is not per se corrupt, I mean we can

23   get into the basis for it but it's not a per se corrupt

24   opinion to have.  And every witness that I questioned about

25   this confirms that objections to the vote were anticipated,

1  they were perfectly normal, and even the Secret Service agent

2  said there had been suggestions that perhaps the matter could

3  be remanded to the states.  Obviously it was different

4  opinions about whether that's even legally possible but she

5  acknowledged that that was something that had been raised and

6  that's something that the President explicitly raised at the

7  rally.  President of the United States said that it could be

8  sent back.  So these were all things that were in the

9  atmosphere that were informing the words and actions of the

10  different demonstrators.

11        And that becomes important because I continue to

12  insist that the appropriate analysis does not proceed using

13  analytical category of the mob.  There was not one mob, there

14  was -- it's apparent from the video, there were many

15  different types of people there and many different

16  situations.  Some people looked like your grandfather in a

17  MAGA hat, some people were terrifying, and some people just

18  looked lost, some people were in certain situations at the

19  Capitol where there was violence and confrontations, others

20  were not.  We have to analyze the specific slice of geography

21  and time in which Larry Brock's actions unfolded to come to

22  the right legal result.  And the most significant thing is

23  there is a world of difference legally between an individual

24  who entered the Capitol at 2:12 and an individual like Larry

25  Brock that entered the Capitol at 2:24.  It sounds like a

1    small fact, it's not a lot of time, but in terms of legality

2    and the situation on the ground, it makes all the difference

3    in the world.

4            THE COURT:  There might be a difference but does it

5    ultimately make a difference in terms of criminal

6    culpability?

7            MR. BURNHAM:  I think it does, your Honor,

8    because -- well, let me talk about the -- if it's okay with

9    the Court I'll talk about the restricted area issue and then

10   move forward to the door, I think is what we're --

11           THE COURT:  It's your argument, as you wish.

12           MR. BURNHAM:  Just want to tee it up.

13           THE COURT:  I may divert you from time to time with

14   questions, but go ahead.

15           MR. BURNHAM:  I think your Honor asked the exact

16   right question about the restricted area.  Was there any

17   evidence that Mr. Brock -- the law absolutely does require

18   him to be on notice, there's no such thing as a secretly

19   restricted area that you could get prosecuted for violating.

20   They have to be on notice, that's clear in the cases that I

21   cited.  Not a lot of cases but the ones that exist make that

22   clear.  Secondly, in response to your Honor's question, was

23   he on notice of this, the Government couldn't point to any

24   evidence because there isn't any.  The statement from the

25   Government is there's no evidence that Mr. Brock didn't see

1    the barriers and that's sort of not how this is supposed to

2    work.  The restricted area is an element they have to prove,

3    it's not something we have to disprove, but we actually did

4    do our best to disprove it in our questioning with Captain

5    Patton if your Honor recalls.  I asked him, you know, was

6    it -- did the police attempt to rebuild the barriers after

7    the demonstrators moved them out of the way and he candidly

8    admitted, no, we didn't have the manpower for that, we had

9    bigger problems we didn't do it.  And we know that Mr. Brock

10   was -- we don't know exactly how far back but we know he was

11   not anywhere close to the front of the crowd.  So even if

12   we -- even if through some burden-shifting argument we had to

13   prove --

14          THE COURT:  We know that he wasn't at the front of

15   the crowd?

16          MR. BURNHAM:  Yes.

17          THE COURT:  We don't actually know that.  It

18   depends when you identify the crowd.  We see videos of the

19   crowd moving up to the Capitol, moving up to the lower

20   terrace, and delaying there for a while with the line of

21   police, we don't know where Mr. Brock is in that group, do

22   we?

23          MR. BURNHAM:  All the evidence supports an

24   inference that he was somewhere towards the middle.  We know

25   that for several reasons.  One, the time that he entered,

1   that's one; two, the video, the very brief video where you

2   can see his helmet, he's -- bunch of people in front of him,

3   and --

4           THE COURT:  You mean with the hand next to the

5   scaffold?

6           MR. BURNHAM:  I think that's somebody else's hand

7   but that's the video, and he's clearly towards the back and

8   so the evidence we do have supports an inference, I would

9   urge the Court, that he wasn't in a position to see the

10  initial confrontations between police or the movement of the

11  bike racks.  Certainly there's no direct evidence that he did

12  see any, all the evidence supports an inference the other

13  direction.

14          THE COURT:  Well, but where does that take one?

15  Let's say he was in the middle of a group that was pressing

16  against a police line that was trying to keep them from

17  moving forward to the Capitol, and that ultimately, that

18  group, a large group, called a mob by many, broke the police

19  line and breached it and went up to the Capitol.  Why is that

20  not clear evidence that he knew he wasn't authorized to go up

21  to and then into the Capitol?  He only got there by being

22  part of a large group that overwhelmed the police line

23  keeping them from moving forward.

24          MR. BURNHAM:  In your Honor's hypothetical --

25          THE COURT:  That's not a hypothetical.

1              MR. BURNHAM:  Okay, well --

2              THE COURT:  What's hypothetical about what I just

3     said?

4              MR. BURNHAM:  Well, the crucial question was, was

5     he in a position to see how the crowd moved forward,

6     that's -- everything depends on that.  If there was evidence

7     that he was in a position, even if he wasn't involved, he

8     could see the confrontation, then yes, I have a serious

9     problem, but there's no evidence --

10             THE COURT:  A lot of your argument depends on

11    Mr. Brock not seeing anything that's going on around him.

12             MR. BURNHAM:  I understand that but --

13             THE COURT:  That's part of your argument about him

14    entering the Capitol, and that's now part of your argument

15    about breaching the police line preventing people from

16    getting to the Capitol.

17             MR. BURNHAM:  I'm just going from the Government's

18    evidence but I think it's only natural that the people that

19    entered at a certain period of time would, naturally that

20    would be their experience, after the initial incurgence

21    (phonetic) took place but before the police kind of got their

22    act together, it's not surprising that there was a group of

23    people who were able to enter without having any particular

24    indication of exactly what the status of the restrictions or

25    the police intent was, that shouldn't be surprising.  If he

1    came in later after the police had secured the door or after

2    they started trying to get people out, that would be a

3    different situation.  If he was in the first wave, obviously

4    that's different.  He's in the middle, so it's not surprising

5    at all that that was his experience.  I'm not surprised the

6    evidence unfolded that way.

7              THE COURT:  Go ahead.

8              MR. BURNHAM:  And so I think we analyzed the video

9    of him entering pretty thoroughly in the Rule 29 arguments

10   and I incorporate that now but I just --

11             THE COURT:  I'll go back and look at it.  I have

12   not gone back and looked at it because I don't have access to

13   it back in my chambers but I will be, at the conclusion of

14   this argument, I will be asking that that exhibit be played

15   again.

16             MR. BURNHAM:  Absolutely, yes, absolutely reviewing

17   it is something we're happy to hear the Court's going to do

18   and the facts I think that are crucial are the large number

19   of people proceeding through the door compared to the

20   relative handful that go through the window and the relative

21   orderly manner in which the individuals entering through the

22   door go through.  Mr. Brock's body language and expression

23   don't indicate that, you know, he's not sitting there looking

24   around, what's that guy doing, what's that guy doing.  For

25   whatever reason, he's straight ahead, and then he turns and

1    he leaves.  We think that's highly significant.  As an aside,

2    I don't know that it particularly makes the area restricted.

3    We maintain there's no evidence he saw the people going

4    through the window but I don't know if it converts it to a

5    restriction if he did.  It just means certain people there

6    were breaking the law that aren't Larry Brock.  Maybe that's

7    relevant to Count One when I get to it but it's not a

8    restricted area if that happens, but again, I absolutely

9    think the evidence supports an inference that he had no

10   opportunity to see those people and he was at that point

11   proceeding in an orderly manner through the door with many

12   others.

13           THE COURT:  So let me go back to something that you

14   said earlier, that's sort of part of your theme that the

15   reason Mr. Brock went to the Capitol, I take it that this is

16   your theme that the reason why Mr. Brock went to the Capitol

17   was to support Congressional action to deny certification of

18   the election, right?

19           MR. BURNHAM:  Yes.

20           THE COURT:  So why did he go into the Capitol?  How

21   is that actually helping Congress to certify or not certify

22   the election?  How was his going into the Capitol and

23   wandering around in the Capitol helping Congress to do that?

24           MR. BURNHAM:  As a show of support to the objecting

25   Senators and Congressmen.  I mean, that was the point of Stop

1    the Steal in a way if, based on what we've seen in the

2    evidence is the Stop the Steal, the very name evokes the

3    intention to remedy fraud.  The President's remarks, to the

4    extent they've been in the record, very much are along with

5    that theme.  It was a show of political support for the

6    Congressmen and Senators who might be on the fence as to

7    whether to object or support objections.

8              THE COURT:  That's true of attending the Stop the

9    Steal Rally, of marching to the Capitol, even demonstrating

10   in vast numbers around and outside the Capitol.  But why is

11   that true of entering and wandering through the Capitol

12   including going to all these closed areas in the Capitol?

13             MR. BURNHAM:  Because --

14             THE COURT:  Why is that supporting Congress?

15             MR. BURNHAM:  I mean, I'll answer your question,

16   putting aside questions about was it smart, was it well

17   advised, what was he thinking.

18             THE COURT:  We don't prosecute, have people

19   prosecuted and convicted of crime because they're not smart,

20   although there's an element of criminal stupidity sometimes,

21   but I'm not saying that's true here.

22             MR. BURNHAM:  I mean a thousand times he should

23   have just turned around and left, however pure his

24   intentions, but I think it's only natural that if the object

25   of the protest centered on Congress, the demonstration, the

1    protest, the show of support, it's only natural if the doors

2    are open, that some of the protest activity would take place

3    inside the building.  The captain testified that that's, to

4    the extent possible, consistent with security, that Congress

5    is not the NSA, it's supposed to be somewhere where

6    individuals can to a certain extent petition their elected

7    representatives, designated First Amendment areas right

8    there, it's not outlandish that the demonstration and the

9    show of support might take place inside the building.

10            THE COURT:  So I take it that your argument is not

11   that there's evidence that supports the proposition that

12   Mr. Brock thought he had authority to enter the Capitol.

13   It's just that your argument is that it's the government's

14   burden to prove that he knew he didn't have authority.

15            MR. BURNHAM:  That's right.  I mean, the record is

16   silent on, you know, his, exactly what he was thinking, the

17   Government's burden to prove his intent, the Government's

18   burden to prove the restrictions.  I think the reasonable

19   inferences about his behavior was that he was there to

20   support the President and he seems to have been engaged in

21   political activity inside the Capitol in absolutely the most

22   respectful manner he possibly could for reasons I'll get

23   into.  I think that's what we can say about his behavior.  As

24   to whether, you know, exactly what he thought about why there

25   weren't metal detectors or exactly why the door was left

1    open, the record is silent on those, but the reasonable

2    inferences that can be drawn are that whatever he was

3    thinking, it wasn't wrongful, it wasn't corrupt, it wasn't,

4    I'm going against the police, it wasn't, I want to obstruct

5    and interfere with government business.  Those are really the

6    crucial questions, is there evidence that he had those bad

7    thoughts in his head that criminal offenses require.

8             THE COURT:  It also requires to a certain extent a

9    belief that he wore what he wore in order to protect himself

10   against counter-demonstrators.  Right?

11            MR. BURNHAM:  That's right.  And I hope that the

12   Government's witnesses who largely agreed with me on that --

13            THE COURT:  No, no, didn't agree with you on why he

14   wore what he wore, they agreed with you on the fact that

15   there had been some clashes in other circumstances between --

16            MR. BURNHAM:  That's right.

17            THE COURT:  -- pro- and anti-Trump demonstrators.

18            MR. BURNHAM:  I mean Sergeant Timberlake, for

19   example, agreed, okay, there's someone in a bike helmet,

20   there's someone in some other kind of helmet, several

21   witnesses agreed there had been such clashes where hard

22   objects were thrown.  It supports an inference that that

23   likely was why he was dressed in that manner.  Now if he was

24   jousting with police, well, maybe we could say, well, no, I

25   think he had that because he was ready to rumble, but the

1    evidence is the opposite way.  So I think the best evidence

2    is it had been a rough year for protests and he wore personal

3    protective equipment appropriate to those risks.

4              THE COURT:  I'll have to review the Facebook

5    communications to see whether they support the view that he

6    was going to be wearing this kind of gear only to protect

7    himself from counter-demonstrators.

8              MR. BURNHAM:  One last thing on the entry video is,

9    we think the video, upon careful review, supports our

10   position but to the extent there's any doubt in your Honor's

11   mind about, well, maybe he saw that glass there, I think

12   maybe he, if you -- anything like that, it has to be

13   considered not only in the four corners of the video but in

14   light of the whole picture including the conduct I'm about to

15   evaluate once he gets into the building, that's the way I

16   look at it.

17             And specifically what I'm referring to there is the

18   question is, I guess the Government's contention is he would

19   have had to have seen people going through the window and he

20   said, oh, I guess that means the building is restricted, but

21   you know what, I'm not only not going to pay any attention to

22   the guys going through the window, I'm just charging in

23   myself, no matter what.  And so the question that poses for

24   the court is, is that consistent or inconsistent with the

25   rest of his behavior in the building.  And really the first,

1    the first opportunity that he would have had to manifest a

2    wrongful or contrary intention, corrupt intention, intention

3    to be against law enforcement restrictions or anything like

4    that was the situation in the hall with Officer Timberlake.

5    And we take a different view from the Government on that.

6    The Government presented it as inculpatory situation, we

7    think it's exculpatory for obvious reasons and one less

8    obvious.  The less obvious one is if you watch the video

9    again or you'll recall it, Mr. Brock wouldn't have been in a

10   position to see the initial confrontation, the assault, the

11   officer said he was hit in the back of the head.  And that

12   took place, as you can see in the video, by the door, you

13   know, 10 or 20 yards from the metal detector.  At the time

14   when Mr. Brock enters the scene, that confrontation has

15   already kind of stopped and the combatant, so to speak, not

16   Officer Timberlake but his colleague had moved down toward

17   the metal detector and when Mr. Brock comes in, it's from

18   another part of the Capitol and what, the first thing he sees

19   is the other officer whose name I forget with fists raised

20   and then he sees the guy wearing the weird uniform, he's got

21   his fists raised, and that's the first thing he sees.  So he

22   doesn't know what led up to it and he doesn't even really

23   know that the individual, the officer there was in fact an

24   officer.  They, your Honor recalls, they were wearing blazers

25   and slacks and I think the officer said he had on a tie and I

1    didn't specifically ask him this but I didn't even see a

2    badge, at least not any kind of prominent badge.  So those

3    individuals, I guess you could say they probably weren't

4    demonstrators just based on their attire, maybe, who knows

5    but they could easily have been congressional staffers, some

6    kind of non-law enforcement security personnel, maybe even

7    politicians, based on what the video shows.  So at any rate

8    all we can show from the video is that some official-looking

9    person was squared off with a person that looked like he

10   probably was a protester, perhaps even one of the malefactors

11   in the crowd.  And Mr. Brock immediately, without even

12   thinking about it, comes in and defuses the situation, calms

13   them down, says that's not what we're here for, you know,

14   that's the way he reacted.  And if, and if -- that's

15   completely inconsistent with the Government's contention that

16   he saw people going through the windows and said, you know

17   what, I don't care, I'm charging in, you know, broken

18   windows, who cares?  It's totally inconsistent, and that's

19   just the first example.

20            THE COURT:  I'm not so sure it's totally

21   inconsistent.  I think avoiding confrontation, physical

22   confrontations with the police, with law enforcement is

23   consistent with what the Facebook communications indicate was

24   part of his thinking and plan all along.  That those kinds of

25   confrontations and injuries to law enforcement would

1    interfere with the IO war that he was trying to successfully

2    complete.  So trying to avoid, excuse me, physical

3    confrontation with law enforcement could be perfectly

4    consistent with his effort to enter the Capitol in order to

5    prevent Congress from certifying the election.  There's no

6    inconsistency there at all.

7          MR. BURNHAM:  Well, I guess it depends on exactly

8    what interpretation one gives the Facebook messages, if we're

9    taking Exhibit 910 literally and he's there to take hostages

10   of Mitch McConnell, then he absolutely would have been.

11         THE COURT:  I'm not saying that.  But just on the

12   IO, wouldn't you agree that part of his messaging in the

13   Facebook communications was, particularly in the

14   conversations with Beaf Supreame, was to avoid physical

15   confrontation and injury to law enforcement?

16         MR. BURNHAM:  I think --

17         THE COURT:  To have injuries to law enforcement

18   would interfere with and detract from their IO war.

19         MR. BURNHAM:  Well, I think it was genuine but I

20   think that was a secondary purpose.  Certainly when he

21   explicitly says that this is an IO war, he says that later on

22   the floor of the Senate, that's right, but that's all the

23   more reason he wouldn't have approved of people charging

24   through broken windows.  That's, if anything, worse than

25   having words with a police officer.

1          THE COURT:  Well, that's not, that's not -- having

2     words is not the same as injuring the police officers.  But

3     having words leads to possible confrontation, but anyway,

4     we're probably digging too deeply into that.

5          MR. BURNHAM:  Well, one final point because I think

6     it is a relevant question is if part of his mentality there

7     is I want to win the IO war, meaning I don't want Trump

8     supporters, patriots looking bad, he absolutely would not

9     have approved of people coming in through the window.  That

10    would be absolutely opposite of what winning the IO war would

11    be.  That's terrible and that's exactly how it's played out,

12    is those footages are now iconic of everything that was wrong

13    with January 6th.  And that's exactly what he explicitly

14    was -- any kind of property destruction, this is what he

15    specifically says on the balcony of the Senate, nobody breaks

16    anything, we're patriots, be respectful.  So all the evidence

17    is that, even taking IO war comments into account, that

18    breaking windows, going through windows was anything he would

19    have approved of.

20          THE COURT:  All right.

21          MR. BURNHAM:  Court's indulgence.

22          THE COURT:  Certainly.

23          MR. BURNHAM:  As to the -- as to the statement on

24    the floor of the Senate, the Government is presenting his

25    comments to the man in the chair as aggravating.  Maybe the

1    quotes that they pulled out were sort of out of context from
2    that video.  The video speaks for itself.  The Government is,
3    you know, they're making their case and so they're casting
4    Mr. Brock's actions a certain way.  Instead of walking to the
5    Capitol, they say he's marching to the Capitol; instead of
6    walking around the Capitol, they say he's maneuvering around
7    the Capitol, that's their theme of their case.  But the full
8    quote of the Senate floor is, if I can, I think I can quote
9    it from memory at this point, is, get out of that chair,
10   that's not our chair, that belongs to the Vice President of
11   the United States.  I love you guys, we're brothers, but we
12   can't be disrespectful.  That was the full quote.  Not the
13   parts the Government pulled out.
14          And I'll do a little digression here is that, Agent
15   Moore offered some testimony on this, is if there was anybody
16   that was gonna be in a bad odor that day with some segments
17   of the demonstrators, it was the Vice President Pence for
18   political reasons.  So if there was a time when any kind of
19   ill will towards politicians was gonna come out, it was going
20   to have to do with the Vice President, and you saw the
21   absolute opposite reaction from Mr. Brock.  We have to show
22   respect to the Vice President.  And I think your Honor asked
23   the exact right questions on the key issue.  I mean, if there
24   was a reason to believe that someone told him the Vice
25   President was in there, that would be a totally different

1    case but that's not what we have.  It might have been a

2    boneheaded move to try to go in a locked door, but it's not

3    indicative of any particular purpose.  I mean it said U.S.

4    Senate, it didn't say secret office, didn't say hiding place

5    or anything.  It was an ill-advised thing for him to do.

6           And so what is the role of law enforcement here?

7    If we can step back, it's a fact that can kind of get hidden

8    in all these videos that sort of have to be pieced together,

9    is based on my review of the evidence, from about 2:37 p.m.

10   which was the scene at the Rotunda door where there were

11   three officers there, till around 2:55, if you don't count

12   Sergeant Timberlake and his colleagues who were dressed in

13   plain clothes, even they -- I'll come back to that.  If you

14   don't count those gentlemen, Mr. Brock didn't encounter any

15   law enforcement at all for that entire time period.  And even

16   if, even if the supposition is maybe he would have known

17   Officer Timberlake and his colleagues were law enforcement,

18   the officer didn't testify to giving any particular

19   directives to Mr. Brock.  He didn't testify he said this is

20   an unlawful assembly, you guys need to get out or anything

21   like that.  So there was no law enforcement interaction for

22   almost 20 minutes, and the one possible exception to that

23   didn't involve any particular directives, and this is -- the

24   case is on 1752 and this is relevant to 1512 as well.  It's a

25   total game changer if an officer tells you you're not

1    supposed to be here, get out, that would be a totally

2    different situation, and we don't have that.

3         And the first significant law enforcement

4    interactions we have come towards the end, and there are two

5    of them, one of which has no sound, but actions, you know,

6    speak louder than words sometimes.  And what I'm referring to

7    is first there's the -- I think the Government presented in

8    the opposite way but I think this one comes first is there's

9    a video where Mr. Brock is walking down a long hallway and

10   there's probably about ten or a dozen members of the police

11   walking around.  He's got his flex cuffs and as came out in

12   questioning, he's not trying to hide them, he's not like

13   trying to, you know, put them in his jacket or anything, so

14   he walks by the police and at first police don't pay him any

15   mind at all, you can't even see a police officer even

16   noticing him.  He's not a police officer, that's obvious.  He

17   just walks right by and then ultimately an officer comes out

18   and you can't hear what he says but he seems to be giving

19   Mr. Brock directives.  You can see him moving and Mr. Brock

20   turns directions, goes back the other way.  So I think the

21   reasonable inference is that police officer said, no, you got

22   to go this way, probably to get out of the building.  And I

23   say that in part because of the final vignette when he does

24   exit just a few minutes later.

25        But before I get to that I'll make a brief comment

1    on the Officer Humphrey video which is around this time, I

2    think it's like one minute later, and that actually does have

3    sound because there's -- it's the body worn camera.  And so

4    there you see him walking down and, you know, he didn't

5    testify so this isn't presented great in the record, but

6    Agent Moore agreed certain aspects of the military can cause

7    hearing loss in older men, and aviation, I think our common

8    experience tells us that could be it.  So to the extent

9    that's in the record, that's something the court can think

10   about, but then even added to that is Mr. Brock's body

11   language there.  He's looking down, it looks like he's

12   looking at his phone, he never looks at the officers even

13   once and he continues walking down the hallway.  The officer

14   agreed he didn't run and I would suggest, I didn't even see a

15   change in pace after the officers called out to him.  You

16   know, it was a noisy situation in there, you can even hear

17   that a little bit in the body worn camera and the officer,

18   two of the officers start to go down the hall after him but

19   when they're still about 20, 30 feet away in my estimation,

20   they just stop and leave.

21         So I don't think there's any inference there that

22   he was disregarding law enforcement, especially not for the

23   video just a couple minutes later has him exiting, seemingly

24   under the supervision of multiple law enforcement officers in

25   an orderly way.  And as I've already commented upon, he sort

1   of calms down the guy that seems like he was, if at least not

2   physically interacting with law enforcement, not leaving and

3   he seemed like he was giving them some lip.  And Mr. Brock,

4   using his size, his command presence as has been commented

5   upon, pats that guy on the shoulder, turns him around and

6   they go out together peacefully.  This was before the

7   President told everybody to leave, this was before the

8   Electoral College result had been decided.  There's no

9   evidence that he had to be forced out, and so I think that

10   voluntary departure before the issue had been settled speaks

11   volumes, especially in connection with everything else about

12   his -- about his actual intent there that day combined with

13   everything else.

14         So I keep repeating that all the evidence has to be

15   viewed together because I sound like a broken record perhaps

16   but I truly, strenuously contend that if you look at the arc

17   of the whole story, starting with the Facebook messages

18   through his whole conduct, his true intent emerges,

19   especially when you add in the one thing I haven't mentioned,

20   which is his personal -- his history and personal

21   characteristics.  Now we're not in a sentencing hearing, this

22   is a criminal case but 1512, Count One, has an elevated mens

23   rea from most other criminal offenses and we can understand

24   why that would be.  It criminalizes attempting to influence

25   official proceedings.  If there wasn't some kind of elevated

1    mens rea, that would be an extremely problematic statute for

2    our civic life.  Mr. Brock had to know that his conduct was

3    corrupt, meaning wrongful.  So he doesn't have to know he was

4    violating 1512, but he had to have the specific intent to act

5    in a wrongful way and we submit that all the evidence shows

6    that, misguided though other people may think he was, he

7    absolutely believed that he was acting in an upright way in

8    accordance with the law and in accordance with patriotism,

9    out of respect for law enforcement.  And I absolutely think

10   it's appropriate for your Honor to take into account what's

11   come into evidence about his military record and ask, is it

12   the best view of the evidence, is there proof beyond a

13   reasonable doubt that this individual who, throughout the

14   late '80s, '90s, throughout the whole war on terror, through

15   multiple combat deployments, chose to serve this country in

16   defense of Democracy as he understood it in defense of our

17   institutions, he clearly took great pride in his service,

18   even to the point where he still had, even as a 50-year-old

19   man, the patch from his old unit there, I think that's highly

20   relevant and should be taken into account when asking the

21   question of, is this someone who was acting wrongfully, who

22   knowingly was doing the wrong thing.

23            THE COURT:  To take it into account and lead to the

24   conclusion you wish me to reach does require that I also give

25   the Facebook communications the interpretation that you urge

1    that I employ.

2              MR. BURNHAM:  Yes, your Honor.

3              THE COURT:  And not take many of them seriously.

4              MR. BURNHAM:  Yes, your Honor.  I can only repeat

5    what I think is the most sensible view is look at the

6    Facebook communications and in light of, both on their face,

7    is this something that's kind of absurd, and is it consistent

8    or inconsistent with later conduct.  That's the way to

9    separate what's significant in the Facebook record from

10   what's not.

11             THE COURT:  All right.  Anything else?

12             MR. BURNHAM:  Thank you, no, that's all I have.

13   Thank you, your Honor.

14             THE COURT:  Thank you, Mr. Burnham.

15   Ms. Ayers-Perez, I'll hear from you in rebuttal, briefly.

16             MS. AYERS-PEREZ:  Thank you, your Honor.  In

17   response to a few of the points Mr. Burnham makes, the first

18   being about the restricted area and the grounds, once again,

19   we heard from Captain Patton what that looked like, and even

20   though people have gone through and of course breached that

21   perimeter in some areas, certainly bike racks on the ground,

22   snow fencing on the ground, signs on the ground as people

23   have gone past them are still there, but it's not in all

24   areas.  But what is really noting -- or that I've taken note

25   of about what Larry Brock is wearing on January 6th is that

1    Mr. Burnham speaks about counter-protesters and Larry Brock
2    was at the Stop the Steal Rally and he was there and he had
3    bought his combat gear, his helmet, he bought the tactical
4    vest prior to coming up there, but he's not wearing the
5    helmet when he's at the Stop the Steal Rally, which is where
6    you would encounter counter-protesters such as, I believe
7    Mr. Burnham mentioned Antifa or Black Lives Matter mentioned
8    earlier.  He's not wearing his helmet and in fact when you
9    see the still shot in the video of him walking down
10   Constitution Avenue towards the Capitol, he's still not
11   wearing his helmet.  It's when he's next to the scaffolding
12   already on the Capitol, on the west side of the Capitol that
13   he's now put his helmet on.  And so that tactical gear, the
14   combat gear that he brought to Washington, D.C., he didn't
15   wear it to the protest, the helmet, he wears it to go inside
16   the Capitol building, which was his whole purpose for being
17   there that day.
18           And Mr. Burnham mentions the defendant was
19   supporting Congress.  Well, Congress is trying to do a job
20   that day.  If the defendant is supporting Congress, Congress
21   has to stop because the defendant and others are entering
22   into the Capitol building illegally without any sort of
23   making sure there's any sort of security concerns or that
24   he's gone through any sort of security measures to get in.
25   Congress can't do their job which -- because the defendant is

1    inside of there.  And if you're trying to help Congress,

2    you're not going to go into Congress in combat gear and think

3    that you're going to make a difference.  Larry Brock doesn't

4    actually think that.  He's on the Senate floor where the Vice

5    President should be conducting business and he knows that,

6    because, as we've seen in the video, he's telling people this

7    is the Vice President's chair right there.  He knows that the

8    Vice President is supposed to be there that day.

9            And so much of Larry Brock's Facebook rhetoric,

10   much of which we see actually come to fruition on January 6th

11   when he says, I want to actively rebel, I'm going to buy this

12   combat gear, storm the castle.  What else could that mean on

13   January 6th other than go into the Capitol building which is

14   what he did?  All of that comes to fruition, the Facebook

15   post at 9:10, the one from the Christmas Eve where he's

16   talking about the list of what he wants to have happen is

17   supposed to take place if nothing happens on January 6th.  If

18   Congress certifies the vote on January 6th.  He was arrested

19   four days later afterwards.  We don't know what else he would

20   have done, but that message was not for what was going to

21   happen on January 6th, it says at the top, this is what

22   happens if Congress fails to act on January 6th.

23           And you know, to Mr. Burnham's point, to not

24   understand that there's a restricted perimeter, he would have

25   had to miss all the signs, the snow fencing, the bike racks,

1   had to have missed people going into windows, had to have

2   missed the broken door, had to have missed the broken glass

3   on the ground, had to have missed the fact that the entire

4   mob is with him, had to have missed the fact that he wasn't

5   going through security, it doesn't make sense.

6            THE COURT:  And have to miss the police lines that

7   were holding the mob back.

8            MS. AYERS-PEREZ:  Yes, and in one of the photos

9   taken from the defendant's phone in the 300 series and I can

10  give you the exact number, your Honor, I believe it's 315 --

11  yes, okay, 315, the defendant takes a photo on January 6th on

12  the west side of the Capitol near the Senate Wing Doors while

13  still outside the Capitol and there are two police officers

14  standing outside one of the doors in his photo.  He has the

15  photo right there on his phone and it shows officers standing

16  outside another door while he's still outside the Capitol and

17  hasn't entered yet.  So he would have had to miss the photo

18  that he took himself as well.  This was a clearly restricted

19  area that he went into, the building, he shouldn't have been

20  in there, there's sign after sign inside the building in the

21  sense that there's officers at the door, there are doors

22  broken, windows broken, there's Sergeant Timberlake being

23  assaulted by fellow rioters, and still he continues on and

24  continues on to the Senate floor.  And he only left after he

25  achieved his mission of going on the Senate floor, being

1    there, walking around, looking at desks of what Senators have

2    on the Senate floor and paperwork that's there on the Senate

3    floor and it's only after all of that that he finally leaves

4    the Capitol building.

5          And lastly, your Honor, Mr. Burnham mentioned that

6    Larry Brock had the most respectful manner he could when he

7    went into the Capitol and there on the Senate floor and I

8    would surmise that that's absolutely not true.  He broke into

9    the Capitol building, he went into -- onto the Senate floor,

10   and although he did tell people on the Senate floor to be

11   respectful, the fact that he was there, the actions that he

12   took to get there are not respectful at all to Congress, to

13   the Vice President, to this country, and to what he did.

14   That's all I have, your Honor.

15         THE COURT:  All right.  Thank you.  Okay.  It's

16   4:00.  The one thing I would like to do before we adjourn for

17   the day -- we're going to come back tomorrow morning, I'm not

18   going to try to pack in resolution of the case here this

19   afternoon.  We'll reconvene tomorrow morning, but the one

20   thing I would like to do is I'd like to look at the evidence,

21   that video of the entire video that's in evidence of his

22   entry into the Capitol.  I don't want just the still shot or

23   a portion of it, I want to see the whole thing.

24         MS. AYERS-PEREZ:  We can play it right now if you

25   want.

384

1              THE COURT:  That's what I want.  Yeah.

2              MS. AYERS-PEREZ:  Okay.

3              THE COURT:  Thank you.  I wasn't asking to take it

4    back there.  And refresh me, what exhibit number is it?

5    You're going to have to figure that out to pull it up.

6              MS. AYERS-PEREZ:  It's 411.

7              THE COURT:  411, okay, thank you.

8                  (Government's Exhibit 411 playing.)

9              THE COURT:  All right, that's at 2:24:27.  Would

10   you also pull up the video of the actual breaking of the

11   windows.  There's another exhibit that covers those and I'd

12   like to see the time.

13             MS. AYERS-PEREZ:  Your Honor, this is 401, and I'm

14   sorry, starting at 6 minutes 28 seconds.

15                 (Government's Exhibit 401 playing.)

16             MS. AYERS-PEREZ:  Your Honor, this is the second.

17             THE COURT:  This is after Mr. Brock's already in?

18             MS. AYERS-PEREZ:  Correct, this is four minutes

19   later.

20                 (Government's Exhibit 401 playing.)

21             THE COURT:  All right.  Okay.  Thank you.  We can

22   start at 10:00 if you'd rather start at 10:00, give

23   yourselves a little extra shuteye.  So let's be back at 10:00

24   and I think you'll be hearing from me at 10:00 tomorrow

25   morning rather than me hearing from you.  Thank you very much

1    for the presentation.  You should make sure in checking with

2    Mr. Bradley with respect to all the exhibits that we have all

3    the exhibits straight and in the record so that we have a

4    complete record to consider.  And with that, I will see you

5    all in the morning.  Thank you.  Do you have the originals of

6    the stipulations?

7                 THE CLERK:  I think you have them.

8                 THE COURT:  I have them.  I'll hold them for now.

9                 THE CLERK:  Okay.

10                     (Court Adjourned, 4:09 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4          I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

5     Official Realtime Court Reporter, in and for the

6     United States District Court for the Northern

7     District of New York, DO HEREBY CERTIFY that

8     pursuant to Section 753, Title 28, United States

9     Code, that the foregoing is a true and correct

10    transcript of the stenographically reported

11    proceedings held in the above-entitled matter and

12    that the transcript page format is in conformance

13    with the regulations of the Judicial Conference of

14    the United States.

15

16                        Dated this 27th day of November, 2022.

17

18

19                        /S/ JODI L. HIBBARD

20                        JODI L. HIBBARD, RPR, CRR, CSR
                          Official U.S. Court Reporter
21

22

23

24

25