**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-140-JDB** |
| **LARRY BROCK,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Larry Brock to 60 months' incarceration, 36 months' supervised release, $2,000 restitution, and the mandatory special assessments ($100 for Count One, $25 each for Counts Two and Three, and $10 each for Counts Four through Six). The calculated guideline range is 57 to 71 months' incarceration, and the 60-month recommendation is at the low end of that range.

## I. INTRODUCTION

The defendant, Larry Brock, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in

losses.[1]

Larry Brock, a retired Lieutenant Colonel in the Air Force, stormed the United States Capitol building on January 6, dressed in tactical gear, and on a mission.   In the days and weeks leading up to January 6, Brock grew increasingly angry about the 2020 Presidential Election. Brock proclaimed on Facebook that the election was stolen, and that then President-Elect Joe Biden would not be inaugurated in January 2021.   Brock expressed an acute awareness of what was happening on January 6, stating at one point "Congress can stop it on the 6th of January". Brock bragged to his friends about the tactical gear he was buying in anticipation of January 6, even saying he "preferred outright insurrection at this point."   On January 6, Larry Brock, dressed in combat gear, made his way into one of the most sensitive areas in all of Government – onto the Senate Floor that the Vice President, Senators, and staff had fearfully evacuated minutes earlier – and showcased his leadership skills therein.   Brock loudly proclaimed, "THIS IS OUR HOUSE!", and during a dispute with a fellow rioter sitting in the Vice President's chair, Brock lectured his fellow rioters that this was an "IO war."[2]   Brock was part of the mob that halted certification and the peaceful transfer of power on January 6.

The government recommends that the Court sentence Brock to 60 months' incarceration

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] FBI Special Agent John Moore, a lieutenant colonel in the U.S. Army reserve component, explained that "Information operations is a broad term in concept referring to the use of information to shape the battlefield both using information to shape what enemy conventional military units do…"." Tr. 11/15/22, 226: 25, 227:1-10.

for his violations of 18 U.S.C. § 1512(c)(2) and 2, 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(A), (D), and (G), which is within the low end of the advisory Guidelines' range of 57 to 71 months, which the government submits is the correct Guidelines calculation. A 60-month sentence reflects the gravity of Brock's conduct, but also acknowledges that, despite his planned violence and threatening conduct, he did not directly engage in violent conduct within the Capitol building.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the Complaint and attached Affidavit filed in this case, ECF No. 1 at ¶¶4-10, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Larry Brock's Role in the January 6, 2021 Attack on the Capitol

Larry Brock, a retired Lieutenant Colonel in the United States Air Force, participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos including body worn cameras from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol, as well as numerous incendiary and violent statements on Facebook in the days and weeks leading up to January 6.

#### *Brock's Statements through Facebook Leading Up to January 6*

Brock grew increasingly angry about the results of the 2020 Presidential Election, and believed the election had been stolen from then-President Donald Trump.   Brock believed that the

Supreme Court would be overturning the election, and when that did not happen, Brock set his sights on the Electoral College certification on January 6 at the U.S. Capitol.

On November 7, 2020, the day most mainstream media outlets called the election for President Biden, Brock posted on Facebook: "A revolution every now and then is a good thing."

The following day, on November 8, 2020, Brock posted on Facebook: "Biden outperformed Obama?   Right!   I have said it before and I will say it again.   If the President calls, I will answer. #OathKeeper."   On November 9, Brock posted on Facebook: "When we get to the bottom of this conspiracy we need to execute the traitors that are trying to steal the election, and that includes the leaders of the media and social media aiding and abetting the coup plotters."

On November 13, 2020, Brock posted on Facebook: "I believe the courts will act, but if they don't, are we willing to see the will of the American people be thwarted? What exactly constitutes supporting and defending the Constitution … against all enemies, foreign and domestic. Does stealing an election through fraud make one a domestic enemy? If so, what are we prepared to do?"

On December 5, 2020, Brock posted on Facebook: "If SCOTUS[3] doesn't act we have two choices.   We can either live in a Communist Country or we can rebel, keep the rightful President in power and demand free and fair elections. #civilwar2021."

On December 6, 2020, Brock posted the following on Facebook: "Going to get a lot scarier if SCOTUS doesn't act. No way in hell we should accept this rigged election. We need to restore

_____

[3] FBI Agent Moore testified at trial that SCOTUS referred to the Supreme Court of the United States.

the Constitution and the best and shortest way is to go offensive on the Communists that stole it, aka the Democratic Party."

On December 7, 2020, Brock sent a message to another Facebook user with the screenname Beaf Supreame[4] stating that "I think SCOTUS needs to see if they don't act that there will be blood."

On December 11, 2020, Brock posted the following on Facebook: "It appears as if SCOTUS is going to duck. If so then it will be game on soon. We need ROE, a clear chain of Command ending with President Trump and a master target list." [5]

On December 18, 2020, Brock engaged in a conversation with Beaf Supreame about the 2020 election, referencing the upcoming Inauguration on January 20, 2021, with Brock saying that he was "ready to go at it".   Beaf Supreame brought up the possibility of an "IO[6] loss if a cop got hurt."   *See* Images 1 and 2.

---

[4] The FBI is aware of the identity of the friend.   He was identified at trial as "Drew" and by his Facebook screenname of "Beaf Supreame". FBI Agent John Moore testified that "Beaf Supreame" was former special forces in the military.

[5] Agent Moore testified at trial he believed ROE to be rules of engagement.

[6] FBI Agent Moore testified at trial as to what an IO war is.   He stated that IO means Information Operations, and that Information Operations is a broad concept that is used in the military to denote using information to shape what the enemy does.

**Author**  Torch Flyer (Facebook: 100015060977787)
**Sent**  2020-12-18 16:32:19 UTC
**Body**  Can you imagine if several hundreds thousand Patriots descended on dc refusing to let Biden be inaugurated

**Author**  Torch Flyer (Facebook: 100015060977787)
**Sent**  2020-12-18 16:33:14 UTC
**Body**  I do not believe the US military will fire on us

**Author**  Beaf Supreame (Facebook: 725043739)
**Sent**  2020-12-18 16:33:28 UTC
**Body**  Yeah. Inauguration would be canceled or moved to a secure location

**Author**  Beaf Supreame (Facebook: 725043739)
**Sent**  2020-12-18 16:33:57 UTC
**Body**  But would be more of a spectacle to delay.

*Image 1*

**Author**  Beaf Supreame (Facebook: 725043739)
**Sent**  2020-12-18 16:34:28 UTC
**Body**  And a possible IO loss if a cop got hurt.

**Author**  Torch Flyer (Facebook: 100015060977787)
**Sent**  2020-12-18 16:35:29 UTC
**Body**  Look dude I am pretty sure I am ready to go at it. I just need numbers with me

*Image 2*

On December 24, 2020, Brock sent the Facebook message, "I bought myself body armor and a helmet for the civil war that is coming."   That same day, on December 24, 2020, Brock sent the following Facebook message to user Beaf Supreame regarding the election:

6

Assumption: US Military isn't involved

Objection: Restore the rule of law in the rebellious states, hold a free and fair election in 1 year

Plan of Action if Congress fails to act on 6 January

Main Tasks:

1. Seize all democratic politicians and Biden key staff and select Republicans (Thune and McConnell). Begin interrogations using measures we used on Al Queda to gain evidence on the coup
2. Have General Flynn get in touch with President Trump and have him declare a State of Insurrection exists to provide color of law to our actions
3. Seize national media assets and key personnel.   Zuck[7], Jack[8], CNN[9] lead and talking heads, seize WAPO[10] and NYT[11] editors.   Eliminate them.   Media silence except for White House communications
4. Present slate for clean elections to existing congress and make sure they sign.
5. Let the Democratic cities burn.   Cut off power and food to all who oppose us.
6. Establish provisional government in rebellious states and representatives we can count on.
7. Cease all foreign aid except for key allies as determined by Trump
8. General pardon for all crimes up to and including murder of those restoring the Constitution and putting down the Democratic Insurrection.
   ROE:
   1. Do not kill LEO[12] unless necessary.   Gas would assist in this if we can get it.
   2. Attempt to capture Democrats with knowledge of coup
   3. Shoot and destroy enemy communication nodes and key personnel
   4. So many sub tasks I can't even imagine them


Later that same day, Brock sent the following message predicting "occupation of the capital (sic)."  *See* Image 3.

---

[7] Agent Moore testified at trial he believed Zuck to be Mark Zuckerberg, the CEO of Facebook

[8] Agent Moore testified at trial he believed Jack to be Jack Dorsey, then CEO of Twitter

[9] Agent Moore testified at trial he believed CNN to be the Cable News Network

[10] Agent Moore testified at trial he believed WAPO to be the Washington Post

[11] Agent Moore testified at trial he believed NYT to be the New York Times

[12] Agent Moore testified at trial he believed LEO to be law enforcement officers.

7

**Author** Torch Flyer (Facebook: 100015060977787)
**Sent** 2020-12-24 23:51:06 UTC
**Body** Yes but you know people trained to do larger stuff. My prediction is occupation of capital abs capture of some assets is easy. If trump didn't back the "peaceful protest" of veterans to restore the Republic we lose

*Image 3*

On December 26, 2020, Brock messaged another Facebook user with the initials B.S. and noted, "…Congress can stop it on the 6th of January[.] The Supreme Court is staying out of it[.] Those are the last two peaceful options."   *See* Image 4.

**Author**
B███ S██████ (Facebook: 618738863)
**Sent** 2020-12-26 16:07:45 UTC
**Body** I'm not thinking that. At all.
I just believe that a civil war is the last resource, and no one should wish for it.
I'm sure there are more civilized ways to fight.

**Author** Torch Flyer (Facebook: 100015060977787)
**Sent** 2020-12-26 16:11:01 UTC
**Body** Agree. Congress can stop it on the 6th of January

**Author** Torch Flyer (Facebook: 100015060977787)
**Sent** 2020-12-26 16:11:15 UTC
**Body** The Supreme Court is staying out of it

**Author** Torch Flyer (Facebook: 100015060977787)
**Sent** 2020-12-26 16:11:29 UTC
**Body** Those are the last two peaceful options

*Image 4*

8

On December 27, Brock again messaged "Beaf Supreame", this time discussing booking a flight to Washington, D.C. on January 5, and whether people would riot.   Brock stated to "Beaf Supreame": "I prefer outright insurrection at this point".

 On January 1, 2021, Brock wrote on Facebook, "Help is on the way. 6 Jan 2021. #MAGA #StormtheCastle.

On January 3, Brock wrote on Facebook, "Biden won't be inaugurated. We will ensure that on the 6th".

On January 5, Brock wrote on Facebook, "Our second American Revolution begins in less than 2 days".

### *Approach to the Capitol*

Brock traveled to Washington, D.C. from his home near Dallas, Texas on January 5, 2021. On January 6, he first went to the "Stop the Steal" rally in Washington, D.C. where he was amongst a crowd of people while wearing a tactical vest.   *See* Image 5 below.



*Image 5*

Brock then walked down Pennsylvania Avenue, still wearing his tactical vest, with a helmet attached to his vest.  *See* Image 6.  Despite Brock claiming to the Probation Officer during the interview for his Presentence Report ("PSR") that he brought the helmet and tactical vest due to threats from Antifa, Brock does not wear his helmet during the Stop the Steal rally or in the march to the Capitol.  *See* Images 5 and 6.



*Image 6*

Brock then approached the U.S. Capitol building and climbed the stairs next to the scaffolding on the west side of the building. *See* Image 7. The scaffolding was located at the western face of the Capitol building. Brock is circled in red. Brock has donned his helmet at this point, while climbing the overrun stairs outside the Capitol building, preparing to go inside. Surrounding Brock were other rioters, climbing scaffolding that was present as construction crews prepared a temporary stage for the Presidential Inauguration, which was scheduled to take place on January 20. *See* Image 7.



*Image 7*

After making his way up the steps on the west side of the Capitol, Brock eventually made his way through the Senate Wing Doors at approximately 2:24 p.m. on January 6, approximately 12 minutes after the Senate Wing Doors were initially breached.   *See* Image 8.



*Image 8*

Brock made his way outside the East Rotunda Doors, where he witnessed overrun U.S. Capitol Police Officers trying to keep the door closed from the impending mob outside.  The windows in the East Rotunda Doors were shattered, which was visible from where Brock was standing.   Despite this, Brock continued on throughout the Capitol building.  *See* Image 9.



*Image 9*

Brock then headed towards the East Rotunda stairs, where he would eventually make his way up to the third floor of the Capitol building.   On the ground near the stairs Brock discovered a pair of flex-cuffs that had been discarded.   Brock picked up the flex-cuffs, and headed upstairs while carrying the flex-cuffs.   *See* Image 10.



*Image 10*

Brock, while still holding the flex-cuffs, walked up the East Rotunda stairs, where he made his way outside the Senate Gallery.   While outside the Senate Gallery, Brock witnessed other rioters engaging in violence with U.S. Capitol Police Officers who were trying to shut the doors to the Gallery.   Although Brock intervened in the violence, he then went into the Senate Gallery along with numerous other rioters.   One of the officers present, Sergeant Nairobi Timberlake, stated that Brock had a "command presence" in the group and described how Brock was vocal with those around him. Tr. 11/14/2022, 166:1-6.   Sgt. Timberlake also stated that Brock did not have the flex-cuffs out where he could see them, nor did Brock give the flex-cuffs to him. Tr. 11/14/2022, 166:15-23 *See* Image 11.



*Image 11*

　　While in the Senate Gallery, Brock again displayed his command presence and leadership. Brock shouted at the other rioters, and gave orders not to destroy anything.   Brock had commanded the attention of many other rioters, who stopped what they were doing to listen to Brock.   Once Brock was not in the presence of law enforcement, he took the flex cuffs back out and held them in his right hand.   *See* Image 12.



*Image 12*

After leaving the Senate Gallery, Brock went downstairs and attempted to enter the Senate Floor.  This was the same door that Vice President Pence had exited from 21 minutes prior. Brock approached the door with what appeared to be a set of keys and attempted to unlock the door.  *See* Images 13 (Vice President Pence circled in blue) and 14.



*Image 13*



*Image 14*

After he failed to unlock the door, Brock went around to the other side of the Senate,

where he then entered onto the Senate Floor.   Brock was let on to the Senate Floor by another rioter opening the locked door from the inside.   Once on the Senate Floor, Brock shouted at his fellow rioters saying, "THIS IS OUR HOUSE" and "This is an IO War.   We can't lose the IO War."   *See* Image 15.



*Image 15*

Brock spent approximately 8 minutes on the Senate Floor, in which time he rifled through paperwork on Senator's desks.   At one point, Brock shouted to other rioters to get out of the Vice President's chair. This was consistent with Brock's stated overall mission on January 6, which was intelligence gathering to stop the certification and the transfer of power.   After leaving the Senate Floor, Brock was encountered by a Metropolitan Police Department (MPD) Officer.   The Officer, Maggie-May Humphrey, was equipped with a Wearable Video System (WVS) or bodycam, which captured Brock ignoring the officers attempting to direct him out of the building and their brief

pursuit of Brock before returning to their post.   Brock eventually exited the U.S. Capitol via the Parliamentarian Doors at 3:02 p.m. Before exiting, Brock briefly breaks up a confrontation between another rioter and a law enforcement officer.

## POST-JANUARY 6 STATEMENTS

On January 8, 2021 the New Yorker published an article about Brock's involvement on January 6. Ronan Farrow, An Air Force Combat Veteran Breached the Senate, The New Yorker (Jan.   8   2021)   https://www.newyorker.com/news/news-desk/an-air-force-combat-veteran-breached-the-senatePer the article, Brock claimed that he saw no violence on January 6, and assumed he was welcome to enter the building. Id.   Brock is quoted in the article in reference to the flex cuffs he picked up outside of the Rotunda: "I wish I had not picked those up… my thought process there was I would pick them up and give them to an officer when I see one…I didn't do that because I had put them in my coat, and I honestly forgot about them."[13]  Id.

## THE CHARGES AND TRIAL

On June 23, 2021, a federal grand jury returned a superseding indictment charging Larry Brock with six counts, including, Obstruction of an Official Proceeding in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One), Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Two), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Three), Entering and Remaining on the Floor of Congress in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four),

---

[13]  Brock is observed via U.S. Capitol Police CCTV recovering the discarded flex cuffs from the floor of the Rotunda Interior at approximately 2:39 pm, and can be seen holding them almost continuously after that point. (Tr. Ex. 418)

Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five), and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six). On, November 16, 2022, Larry Brock was convicted of those offenses following a three-day bench trial.

### III.        STATUTORY PENALTIES

Larry Brock now faces sentencing on Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One), Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Two), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Three), Entering and Remaining on the Floor of Congress in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five), and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six).

As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for Count One; up to one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25 for each of Counts Two and Three; and up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10 for each of Counts Four through Six.

### IV.        THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government agrees with the Sentencing Guidelines calculation set forth in the Pre-Sentence Report (PSR) and the calculated guidelines range of 57 – 71 months.   PSR ¶ 117. However, the PSR mistakenly fails to include a full Guidelines analysis for all three Counts to which the Guidelines apply—Counts One, Two, and Three.[14]   *See* PSR ¶¶ 46-60.   Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count."   Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.   The PSR does not follow these steps.   It concludes (*see* PSR ¶ 49) that Counts One, Two, and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).   That Guidelines analysis is as follows:

Count One: 18 U.S.C. § 1512(c)(2) and (2)[15]

---

[14] As the PSR properly notes, pursuant to U.S.S.G. § 1B1.9, the Guidelines do not apply to counts of conviction that are Class B misdemeanors, and so do not apply to Counts Four, Five, or Six here. PSR ¶ 48.

[15] For the aiding and abetting charge (18 U.S.C. § 2), the offense level would be the same as that for the underlying offense. *See* U.S.S.G. § 2X2.1(a).   Accordingly, that analysis mirrors the

22

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Causing or Threatening to Cause Physical Injury or Property Damage[16] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[17] | +3 |

---

analysis for 18 U.S.C. § 1512(c)(2) here.

[16] The enhancement in U.S.S.G. § 2J1.2(b)(1)(B) applies where "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B).

There are multiple theories for application of this offense characteristic based on U.S.S.G. § 1B1.3 which encompasses both Brock's own acts or omissions and those whom he aided, abetted, counseled, commanded, induced, procured, or willfully caused. U.S.S.G. § 1B1.3(a)(1)(A). It also includes "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant. U.S.S.G. § 1B1.3(a)(1)(B). As discussed above, Brock used extremely dangerous and violent rhetoric in the days and weeks leading up to January 6. In November 2020, Brock posted on Facebook "When we get to the bottom of this conspiracy we need to execute the traitors…." In December 2020, he posted to Facebook using the hashtag, "#civilwar 2021." Also in December 2020, Brock sent a Facebook message to a friend, which showed that he viewed January 6 to be a military-style operation, listing "Task[s]" that included "Seiz[ing] all Democratic politicians and Biden key staff and select Republicans (Thune and McConnell). Begin interrogations using measures we used on Al Queda….'. The message also listed "ROE," or rules of engagement, including "Do not kill LEO (law enforcement officers) *unless necessary*" (emphasis added), and "Attempt to capture Democrats with knowledge of the coup." Although Brock did not engage in violent acts while inside the Capitol building (to the government's knowledge, and in fact stopped some violence from occurring inside the Capitol, he still went to one of the most secure areas inside the Capitol building – the Senate Floor –minutes after Vice President Pence had been ushered out of the Senate. Multiple people followed Brock inside the Senate. Brock marched inside the Capitol building to various locations, while holding flex cuffs, dressed in a helmet and military style tactical vest. This was extremely threatening behavior meriting application of the § 2J1.2(b)(1)(B) enhancement, as also noted by Probation. PSR ¶ 52.

[17] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Brock was found guilty of corruptly obstructing and impeding an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

|  |  | **Total** | **25** |
|---|---|---|---|

Count Two: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3 (a) | Base Offense Level | 4 |
|---|---|---|
| U.S.S.G. § 2B2.3(b)(1)(A) | Trespass occurred at any restricted building or grounds[18] | +2 |

*Cross Reference*

| U.S.S.G. § 2B2.3(c)(1)/2X1.1 | Intent to Commit a Felony[19] | **17** |
|---|---|---|

|  | **Total** | **17** |
|---|---|---|

Count Three: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|

|  | **Total** | **10** |
|---|---|---|

| **Combined Offense Level** | **25** |
|---|---|
| Acceptance of responsibility (U.S.S.G. §3E1.1)[20] | 0 |

| **Total Offense Level:** | **25** |
|---|---|

---

[18] Section 2B2.3 gives "restricted building or grounds" the meaning that the phrase is given in 18 U.S.C. § 1752. U.S.S.G. § 2B2.3 cmt. n.1.

[19] Since the Section 1752(a)(1) offense was committed with an intent to commit another felony (18 US.C. § 1512), the base offense level of that felony applies to the 1752(a)(1) charge, pursuant to U.S.S.G. § 2B2.3(c)(1) and § 2X1.

[20] Brock contested essential factual elements of guilt at trial, such as denying that he went to the Capitol to stop the certification; denying that he dressed in tactical gear to support his mission to storm the Capitol and stop the certification; and denying that he picked up and held on to the flex-cuffs in case he needed them for a member of Congress, or to otherwise support his goal of stopping the certification. Accordingly, the adjustments for acceptance of responsibility in U.S.S.G. §§ 3E1.1(a) and (b) should not apply. U.S.S.G. §§ 3E1.1 Application Note 2; U.S.S.G. § 3E1.1(b).

Counts One through Three group because all involve the same victim: Congress. U.S.S.G. § 3D1.2(a) and (b).   The offense level for that Group is the level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a).   Since Counts One and Two have the highest offense levels for any count in the group (both are 25), the combined offense level for the group is 25.   And because acceptance of responsibility points are not available in the instant case, the total offense level remains 25.   This is the same as the Probation Officer's estimated total offense level of 25.   PSR ¶ 60.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.   PSR ¶ 63.   Accordingly, based on the government's calculation of the defendant's total adjusted offense level of 25, Brock's Guidelines imprisonment range is 57 to 71 months' imprisonment.

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Larry Brock's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   The nature and circumstances of Larry Brock's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 60 months' incarceration, 36 months' supervised release, and $2,000 restitution,.

**B.  The History and Characteristics of the Defendant**

Brock is a former Lieutenant Colonel in the United States Air Force.   PSR ¶ 25.   Engaged in a significant amount of violent rhetoric leading up to January 6.   On May 18, 2018, Brock was terminated from his employment as a sales leader at CAE in Fort Worth, Texas. PSR ¶ 100.   In a termination letter from May 18, 2018, it was stated that Brock was terminated because he had stated to other employees that he "had not killed anyone for a while" and because of comments by Brock regarding shooting members of a particular religion and/or race.   CAE noted that Brock had already received three verbal warnings and two written warnings prior to termination about this kind of rhetoric.

On January 13, 2015, Brock received six months of deferred adjudication probation for a misdemeanor disorderly conduct charge out of Montana.   PSR ¶ 62.

The defendant's history and characteristics, including his history of violent rhetoric and disorderly conduct, weigh in favor of a lengthy term of incarceration.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Larry Brock's criminal conduct, on January 6 was extreme and dangerous.   Brock had disturbing and violent rhetoric leading up to January 6, and he acted on that rhetoric by buying tactical gear, flying to Washington, D.C., storming the U.S. Capitol building, making his way into the Senate Chamber twice, rifling through paperwork belonging to Senators, and ignoring law enforcement commands to leave.   His behavior helped to delay the certification and interfere with the peaceful transition of power, as was his intent.   This was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[21] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Brock has a criminal history category of I, his prior offense of disorderly conduct, as well as violent and dangerous rhetoric, shows a clear pattern of dangerous behavior. *See* Section VI(B) *supra*.   Second, Brock has yet to express remorse for his actions.   Brock stated in his PSR interview that he lost his job over a "peaceful protest". PSR ¶ 37.   Brock stated this after having walked through broken doors, around broken windows, seeing the Senate Chamber broken into, witnessing rioters chanting "Nancy, Nancy" over and over again, and hearing from law enforcement officers about the horrors of that day.   Third, Brock's behavior was disturbingly premediated.   Weeks after sending messages about "[s]eiz[ing]" and "interrogat[ing]" politicians, including Senators Thune and McConnell, Brock showed up on the Senate floor in tactical gear with flex-cuffs (which he made sure to pick up off the floor on his way upstairs to the Senate

---

[21] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Gallery), rifling through Senator's papers.  Had the Senate Gallery not been emptied minutes before, Brock could have come face-to-face with the politicians he had fantasized about seizing and interrogating.  Even the seemingly more altruistic parts of Brock's behavior fit into his professed plans.  As noted above, he asserted "Do not kill LEO *unless necessary*" (emphasis added), and during an exchange with a friend, during which Brock asked "Can you imagine if several hundred thousand Patriots descended on dc refusing to let Biden be inaugurated[?]", his friend warned that it could be "a possible IO loss if a cop got hurt."  Accordingly, even those moments where Brock avoided or discouraged direct physical confrontation with police (whom he did not have to engage with because they were so vastly outnumbered) served the goals of Brock's planned IO war, which was focused on preventing the certification and peaceful transfer of presidential power.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

29

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[22]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[22] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Joshua Pruitt (21-CR-23-TJK) was a January 6 case where, like Brock, Pruitt had a lot of violent rhetoric in the lead up to January 6.   Pruitt was a member of the Proud Boys and was communicating with other Proud Boys members, whereas Brock did not have an official affiliation to any specific group[23].   Like Brock[24], Pruitt wore a Punisher logo on his clothing.   Pruitt entered the Capitol earlier than Brock did; additionally, Pruitt had a close encounter with then House Majority Leader Chuck Schumer, as well as law enforcement officers.   Pruitt did not go into the Senate Chamber, which Brock did twice.   Pruitt also accepted responsibility for his criminal conduct on January 6 and pleaded guilty to obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2).   Pruitt was eventually sentenced to 55 months' incarceration.

Jerod Hughes (21-CR-106-TJK) is another January 6 case with some analogies to the Brock case.   Like Brock, Hughes also went onto the Senate Floor and rifled through paperwork on Senator's desks.   Hughes yelled violent rhetoric on January 6, though not of the intensity of the violent rhetoric that Brock displayed online in the days and weeks leading up to January 6. Hughes was involved in property destruction and chasing U.S. Capitol Police Officer Goodman,

---

[23] In a December 31, 2020 post on Facebook, Brock discussed his view of the 2020 electronic and used hashtags referencing the Oath Keepers and the Three Percenters (as well as the Second Amendment):

'we are now under occupation by a hostile governing force.   That may seem ludicrous to some, but I see no distinction between a group of Americans seizing power and governing with complete disregard for the Constitution and an invading force of Chinese communists accomplishing the same objective.' Against all enemies foreign and domestic #OathKeeper #2A #III%

[24] Brock wore a Punisher patch on his tactical vest.

whereas Brock is not alleged to have done either of those things.   Hughes accepted responsibility for his actions on January 6 and pleaded guilty to obstruction of an official proceeded in violation of 18 U.S.C. § 1512(c)(2).   The Government asked for 46 months incarceration for Hughes, and Hughes was eventually sentenced to 38 months incarceration.

Matthew Bledsoe (21-CR-204-BAH) is another January 6 case with similarities to the Brock case.   Bledsoe, like Brock, entered through the Senate Wing Doors within 15 minutes of the initial breach of those doors.   Bledsoe also had social media rhetoric before January 6. Bledsoe paraded through the Capitol with a flag, while Brock had a pair of flex cuffs.   Bledsoe went near the House Chamber, while Brock went onto the Senate Gallery, and onto the Senate Floor.   Bledsoe spent a total of 22 minutes inside the Capitol, while Brock spent 38 minutes inside the Capitol.   Like Brock, Bledsoe also was convicted after a trial.   The Government asked for 70 months in Bledsoe, and Bledsoe was eventually sentenced to 48 months incarceration.

G.      Brock's Objections to the PSR

Brock objected to paragraph 31 of the PSR, which states that Sgt. Timberlake referred to Brock as "the leader".   The Government agrees that Sgt. Timberlake did not refer to Brock as "the leader" during trial, instead he spoke about Brock having a "commanding presence". Tr. 11/14/2022 166:1

Brock objected to paragraph 33 of the PSR, which stated that Brock's participation "in the riot contributed to the mob's ability to delay the certification proceedings for hours."   The Government concurs with probation that Brock, as a part of the mob on January 6, is responsible for the delay to the certification proceedings.   It was the mob of people, of which Brock was a

part, that caused the certification to be delayed on January 6.   As Cpt. Patton testified to, any time one person bypasses security the Capitol Police have to go into lockdown to secure the threat. Tr. 11/14/2022, 78:15-22.   Brock was part of the mob of people who entered the Capitol on January 6, while not going through any security screenings.   Brock made his way into the Senate Chamber, where earlier in the afternoon Senators had been debating the certification of the State of Arizona. The certification of the vote was delayed, and could not continue for hours, because of the mob of people inside the Capitol of which Brock was a part of.

Brock objected to paragraph 37 of the PSR, which denies a reduction of levels for acceptance of responsibility.   The Government has addressed that objection on page 24, footnote 20 of this memo.

Brock objected to paragraph 52 of the PSR, which assesses an additional eight levels for causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice.   The Government has addressed that objection on page 23, footnote 16 of this memo.

Lastly, Brock objected to paragraph 53 of the PSR, which assesses an addition three levels for an offense which resulted in the substantial interference in the administration of justice.   The Government has addressed that objection on page 23, footnote 17 of this memo.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," _United States v. Fair_, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, _United States v. Papagno_, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." _Papagno_, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. _Papagno_, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." _Hughey v. United States_, 495 U.S. 411, 418 (1990) (interpreting the VWPA); _see United States v. Clark_, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under Hughey).[25]  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. [26]  _See_ 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C.

---

[25] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  _See_ 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); _see also United States v. Zerba,_ 983 F.3d 983, 986 (8th Cir. 2020); _United States v. Giudice,_ 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[26] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  _See United States v. Emor_, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

§ 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" _United States v. Ekanem_, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. _See_ _Papagno_, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. _United States v. Bikundi_, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. _See_ _Emor_, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[27] _United States v. Gushlak_, 728 F.3d 184, 196 (2d Cir. 2013); _see_ _United States v. Sheffield_, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); _United States v. James_, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that

---

[27] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." _Fair_, 699 F.3d at 513. Here, the Court should find that Brock's conduct in entering the Capitol building as part of a mob caused damage to that building.

"absolute precision is not required") (citation omitted); _United States v. Burdi_, 414 F.3d 216, 221 (1st Cir. 2005) (same); _see also_ _Paroline v. United States_, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." _United States v. Williams_, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" _Fair_, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[28]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued

---

[28] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Brock to pay $2,000 in restitution for his convictions on Counts One through Six. This amount fairly reflects Brock's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 60 months' incarceration, 36 months' supervised release, $2,000 restitution, and the mandatory special assessments ($100 for Count One, $25 each for Counts Two and Three, and

$10 each for Counts Four through Six).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:      */s/ April Ayers-Perez*_____
April Ayers-Perez
Douglas Meisel
Barry Disney
Trial Attorneys (detailees)
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20001
202-894-4237
April.AyersPerez@usdoj.gov