IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES | : |
| | : |
| v. | : Case No. 1:21cr140 |
| | : |
| LARRY BROCK | : |
| | : |
| Defendant. | : |

**SENTENCING MEMORANDUM**

**I.   Introduction**

Mr. Brock is before the Court following his conviction at a bench trial for Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c) and related misdemeanors. As set forth below, Mr. Brock is a man of outstanding character with a remarkable military record and no criminal history. Several of Mr. Brock's fellow veterans have written to the Court to praise Mr. Brock's heroism and integrity, including a retired Major General.

It is undisputed that Mr. Brock did no violent acts on January 6th and in fact acted to restrain disorderly protesters on multiple occasions. In one particularly dramatic episode, Mr. Brock physically intervened to protect two plain clothes Capitol policemen from a group of aggressive protesters.

In many other § 1512 cases, this Court has seen fit to depart downward from the harsh guidelines for this offense, including non-incarceration sentences in some cases. The defense respectfully submits the Mr. Brock's outstanding personal history and actions on January 6th place him firmly among those § 1512 defendants most deserving of lenient treatment for their charges stemming from this unique historical episode.

1

## II. Law of Sentencing

The law requires this Court to impose a sentence sufficient but no greater than necessary to achieve the goals of sentencing in 18 U.S.C. § 3553. The sentencing guidelines must be considered but are not binding on the Court. *United States v. Booker*, 542 U.S. 220 (2005).

## III. Sentencing Factors

### a. Sentencing Guidelines

The PSR has given Mr. Brock guidelines of 25/I which is a range of 57-71 months. Mr. Brock disagrees with several aspects of this calculation and maintains that the proper guideline should be 12/I which is 10-16 months. The particular objections are addressed as follows:

#### i. Acceptance of Responsibility

Mr. Brock has objected to probation's decision to award him no points for acceptance of responsibility. Although this is common for trial cases, this case is an exception. As the Court observed at sentencing, few facts were in dispute and the main issue for decision was how the law applied to the facts. This is therefore a case where acceptance of responsibility (or a roughly equivalent variance) is appropriate.

USSG § 3E1.1. n. 2, the acceptance guideline, provides that:

> "[c]onviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g. to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that such a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."

This exception applies here. Mr. Brock filed several pretrial motions including a Motion to Dismiss Count I (ECF 46), a Motion to Change Venue (ECF 47) and a Motion to Compel

2

Discovery on Selective Prosecution (ECF49).  The Court denied these motions.  Had the Motion to Compel Discovery on Selective Prosecution been granted, it may have led to a Motion to Dismiss based on Selective Prosecution.  Mr. Brock proceeded to trial to preserve his right to appeal these issues.

Mr. Brock's pretrial statements show that he did not deny the basic facts of the case, even if he did not necessarily agree with the federal government's legal theories.  Shortly after January 6, Mr. Brock made public admissions to Ronan Farrow of the New Yorker[1].  Mr. Brock's pretrial filings implicitly conceded that he was present in the Capitol and indeed even conceded his presence on the Senate floor itself.  For example, Mr. Brock argued in ECF 22 that his statements while on the Senate floor that another individual should show respect and not sit in the Vice President's chair was a fact supporting less stringent conditions of release.

Mr. Brock's posture at trial also showed acceptance of responsibility for the essential facts of his case (again, as distinct from the government's legal theories).  As the Court will recall, Mr. Brock stipulated to the vast majority of the government's case.  Mr. Brock's pretrial motions, pretrial statements, and posture at trial support assessing him 2 points for acceptance of responsibility.

If the Court should conclude that, as a technical matter, Mr. Brock does not qualify for the two points, this Court should impose a comparable variance to reflect that Mr. Brock did not deny the essential facts of his case.

---

[1] https://www.newyorker.com/news/news-desk/an-air-force-combat-veteran-breached-the-senate

### ii. The PSR's Enhancements for Property Damage and Substantial Interference Should Not be Assessed

The PSR gives Mr. Brock an 8-level enhancement for causing or threatening to cause physical injury to a person or property damage under § 2J1.2(b)(1) and an additional three levels for "substantial interference" under (b)(2). PSR ¶ 52-53. However, neither enhancement is implicated unless the conduct interferes with "the administration of justice." The phrase "administration of justice" refers to judicial proceedings. *See, e.g., United States v. Richardson*, 676 F.3d 491, 502-502 (5th Cir. 2012)("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."). The electoral count before Congress does not constitute a "judicial hearing or trial" so these enhancements do not apply. This Court adopted this interpretation of the enhancements in *United States v. Hale-Cusanelli*, 21-cr-37-TNM.

Moreover, the PSR incorrectly bases the 8-level enhancement on social media posts. PSR 52. By the enhancement's very terms the "offense" must "involve[]" threatening to cause physical injury to a person, or property damage." The posts in question were made before the offense and were not directed at any specific person. The PSR acknowledges the messages in question were from Mr. Brock to "a friend." On January 6th itself, Mr. Brock did not make threats. As the PSR states, "Mr. Brock did not engage in violent acts while inside the Capitol, and in fact stopped violence from occurring inside the Capitol." *Id*. Thus, even if this offense had involved the "administration of justice", the 8-level enhancement would not apply.

### b. History and Personal Characteristics

### i. Early Life and Education

Mr. Brock is a native of Texas and comes from a family with a strong military tradition. ECF 68. After graduating from high school as salutatorian (2nd highest GPA out of 612

graduates) Mr. Brock attended the Air Force Academy and graduated in 1989. Even as a cadet, Mr. Brock already possessed the strong sense of integrity that would allow him to be successful in the Air Force. We proffer that a classmate of Mr. Brock's has written the following:

> Larry lived the Cadet Honor Code at the Air Force Academy…I recall a time when he was just a couple minutes late for sign-in at the dormitory. No one else was around. He easily could have written down that he had been on time, but he didn't. He put his actual arrival time knowing it would result in the loss of some free time privileged on the next weekend. That, to me is integrity – doing the right thing even when no one is watching.

Mr. Brock would go on to spend the bulk of the next thirty years serving his country in military and civilian capacities.

### ii. Mr. Brock's Military Service

After graduating the Academy, Larry Brock served in the Air Force in some capacity for the next 25 years. He served on active duty from 1989 until 1998. PSR ¶ 89. He served in the reserves until 2014. PSR ¶ 91. He was honorably discharged at the rank of Lt. Colonel. *Id*. He flew the A-10 Warthog and served as recruiter for the Academy. *Id.*

Mr. Brock made many deployments including as a reservist. Between 1998 and 2007 he was deployed at least once per year. *Id*. He flew 350 combat hours and 1500 hours piloting a King Air military aircraft and reconnaissance missions. PSR ¶ 93. Mr. Brock received the following decorations for his service:

- Air Medal with four devices;
- Air Force Achievement Medal;
- Aerial Achievement Medal with three devices;
- Air Force Longevity Service Award with two devices;
- Air Force Training ribbon;
- Southwest Asia Service Medal with two devices;

5

- Air Force Overseas Long Tour Ribbon;

- National Defense Service Medal;

- Humanitarian Medal;

- Small Arms Expert Marksmanship Ribbon with device;

- Kuwait Liberation Medal;

- Air Force Outstanding Unit Award with two devices.

Mr. Brock's five Air Medals merit some additional comment. The Air Force sets forth the criteria for this award as follows:

> The Air Medal is awarded to U.S. and civilian personnel for single acts of heroism or meritorious achievements while participating in aerial flight and foreign military personnel in actual combat in support of operations.
>
> Required achievement is less than that required for the Distinguished Flying Cross, but must be accomplished with distinction above and beyond that expected of professional airmen. It is not awarded for peace time sustained operational activities and flights.[2]

Several of Mr. Brock's fellow veterans have written to the Court to praise his character and describe some of the missions which led to these awards. We proffer that a fellow officer recalls Mr. Brock's service as follows: "[Mr. Brock]'s flying capabilities far exceeded the performance of other pilots in his peer group." For example:

> On likely the most complex mission I flew in my 28 year Air Force career, [Mr. Brock] calmly and methodically led a large aircraft package night combat search and rescue training mission with over 40 aircraft in support for a "downed airman"…Larry pushed me to fly better and pushed others to be better people, pilots and officers.

We proffer that a retried flag officer recalls Mr. Brock's service in Afghanistan as follows:

---

[2] https://www.afpc.af.mil/Fact-Sheets/Display/Article/421927/air-medal/

6

As the unit prepared for a combat deployment in 2004, Larry's expertise was evident, and he quickly rose to the top of my pilot list. On that deployment, Larry risked his life to protect US forces under attack from Taliban elements. At night, in challenging mountainous terrain, he flew below mountain peaks into a valley saturated with enemy forces and successfully employed ordinance. The result thwarted enemy advances on US personnel, saved US lives and defused an ever-escalating situation for the forces at that remote base in Afghanistan. For his actions, Larry was eventually awarded an Air Medal in part for that mission and promoted to the rank of Lieutenant Colonel.

Mr. Brock's decorations and the praise of those he served with and under make clear that his military record should be judged exceptional. It is an important mitigating factor in this case.

### iii.  Mr. Brock's Character and Other Good Works

While Mr. Brock's wartime heroics are certainly significant, the way he treats other people in everyday situations when no one is looking is equally so. Several individuals have written to the Court to describe works of charity and kindness by Mr. Brock. For example, we proffer that one acquaintance recalls the following:

> This Fall I witnessed Larry being approached in a Wal-Mart by an expectant mother with children that shared she was homeless and in need of food. Without hesitation, he bought the mother and children a mean, groceries for later, as well as some money. When I asked, "What if she was lying to you? What if she was just trying to take advantage of you?" He responded, "I have to do the right thing."

A former service member recalls that:

> On another deployment, I recall a junior enlisted member…pleading for his help with a military pay issue. Military pay had incorrectly misplaced a decimal on his pay statement by two decimal positions. The enlisted member was paid less than $10.00 on his mid-month pay statement. I remember Larry getting involved in this pay issue that actually affected several other members as well, even offering to help one of them financially without hesitation because the military pay office was slow to help. Larry's persistence was a key element in effectively resolving this young airman's pay issue.

An acquaintance also recalls an episode where Mr. Brock went above and beyond in his new profession of home inspector:

> This personal moral compass stemming from his sacred beliefs guides Larry not only as he gives back through charity but also throughout his business dealings…I have been present for a few customer exchanges where he has gone above for the best customer services. Larry has allowed his business to absorb losses to remove even the shadow of a doubt that a customer may have had. On one occasion, a customer believed Larry had overlooked a certain quality check in his work. He took as many phone calls as needed to walk the customer, as well as the customer's relatives, through the quality control process, explaining each requirement.

These seemingly minor anecdotes about how Mr. Brock treats others are in fact not minor at all. They show the Court that Mr. Brock is a man of high character and a love for his fellow man. Mr. Brock would never have appeared in a criminal Court were it not for the extraordinarily unique confluence of events that led to January 6th.

### iv. Mr. Brock's Family Responsibilities

In the post-*Booker* era, district courts have developed an established practice of varying downward from the guidelines where the effect of the defendant's incarceration on innocent third parties would be extreme and the defendant would not pose an ongoing threat to society. *See*, *e.g. United States v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005)(on remand of bank fraud case, district court may consider defendant's role as caretaker for brain-damaged son even though alternative means of care existed); *United States v. Lehman*, 513 F.3d 805 (8th Cir. 2008)(sentence of probation affirmed where justified by atypical nature and circumstances of the felon in possession case and by the defendant's need to care for her nine-year-old developmentally disabled son); *United States v. Crawford*, 2007 WL 2436746 (E.D. Ws. 2007)(variance granted in part due to impact incarceration would have on defendant's five children); *United States v. Bortnick*, 2006 WL 680544 (E.D. Pa. 2006)(seven day sentence despite 51-63 guidelines in part based on defendant's responsibility for severely handicapped son).

These precedents apply in this case because Mr. Brock has above average family responsibilities. As set forth in the PSR, Mr. Brock's parents divorced when he was very young and remarried. PSR ¶ 68. Both parents' second marriages proved lasting and Mr. Brock is close with both "sets" of parents. Mr. Brock's parents and stepparents are now of advanced age and Mr. Brock is heavily involved in caring for them. We proffer that an acquaintance would state as follows:

> Larry cares for not one but two sets of elderly parents in frail health as well. He is the only child that lives locally for both his mother and stepfather as well as his father and stepmother. He takes this responsibility very seriously with several calls and visits to each parent each week. Just this last week, Larry assisted with taking down Christmas decorations and hauling them up to the attic for his father and stepmother as they are unable to lift boxes. Larry's father is confined to a wheelchair so also requires additional support from Larry as well as his stepmother. The week prior, he spent an afternoon shopping for quality ingredients from a nice grocery store and a day cooking chili to bring to his mother and stepfather for a Christmas Day meal.

If Mr. Brock is incarcerated, 4 innocent senior citizens will be deprived of their most important source of companionship and care. It is completely appropriate for the Court to take this fact into account when deciding Mr. Brock's sentence.

### c. Facts and Circumstances of the Offense

#### i. Issues Surrounding the 2020 Election

The January 6th rally occurred in response to allegations of fraud and illegality in the 2020 Presidential election. As is well known, the President of the United States, the former Mayor of New York during 9/11, a retired four-star Army general and other luminaries publicly shared their belief that the purported result of the 2020 election was called into question by evidence of potentially material fraud and/or illegality. Sitting congressmen and senators publicly announced in the weeks leading up to January 6 that they shared these concerns. It should not be a matter of surprise that many Americans of good faith took these concerns

9

seriously. As of September 2022 nearly a third of Americans stated in a poll outcome determinative fraud took place in the 2020 election.[3]

It is of course not necessary for this Court to decide the extent to which fraud and illegality existed in the 2020 election in order to impose a sentence. However, it is necessary for the Court to make some assessment as to whether Mr. Brock's actions were motived by a genuine concern over this issue or whether he participated in the rally for some other reason. If Mr. Brock was sincerely motivated by high ideals, it significantly reduces his culpability even if the Court should privately disagree with his view. It distinguishes him from rabble rousers, violent actors, and other truly criminal elements in the January 6th disturbances.

Based on all the information in the record of this case, it should not be difficult for this Court to conclude that Mr. Brock traveled to DC on January 6 out of a genuine concern that something terrible happened in the 2020 election that called for vigorous exercise of the First Amendment right to protest. One after another, his character references describe Mr. Brock's honesty and patriotism. It is inconceivable that he was motivated by anything other than genuine concern for democracy.

### ii. Mr. Brock's Role on January 6th

This Court will well recall the evidence in Mr. Brock's case from his bench trial. It was undisputed that Mr. Brock was not a member of any suspect group (or any group) that participated in the January 6 rally. He traveled from his home to Washington, DC alone.

The government's evidence showed Mr. Brock attending President Trump's speech at the ellipse and then walking peacefully to the Capitol in the midst of a crowd of thousands. Mr.

---

[3] https://www.nbcnews.com/meet-the-press/meetthepressblog/poll-61-republicans-still-believe-biden-didnt-win-fair-square-2020-rcna49630

Brock walked by several law enforcement officers on his way to the Capitol building who did not attempt to forestall him or the other persons in the crowd.  He entered the Capitol without force through one of the doors on the West side.

While in the building, evidence showed Mr. Brock proceeding peacefully through the hallways, stopping briefly to admire the Rotunda.  He can be seen retrieving the police "flex cuffs" he would later be photographed carrying from the floor by a doorway on the side of the rotunda.  Mr. Brock then proceeded up some stairs.

As the Court will recall, Officer Nairobi Timberlake of the Capitol Police testified that while working the Capitol in plain clothes, he encountered Mr. Brock near one of the doorways to the Senate chamber.  The officer testified that when some particularly aggressive protesters attempted to fight him and one of his fellow officers, Larry Brock intervened to protect the police.  Had it not been for Mr. Brock's decisive action and willingness to put himself at risk, the officers may have been harmed.

Mr. Brock continued to use his imposing physical stature and military command presence to maintain order in the Capitol whenever anyone got out of hand.  On multiple occasions Mr. Brock can be seen on video imploring fellow demonstrators to be respectful of the Capitol.  While Mr. Brock walked through the vacant Senate Gallery, another individual ascended the rostrum and seated himself in the President of the Senate's chair.  Mr. Brock addressed the man as follows: "get out of that chair…it belongs to the Vice President of the United States, it's not our chair.  Look, I love you guys, we're brothers, but we can't be disrespectful."  When another individual protested that "they stole an election" Mr. Brock insisted that they must maintain respect.  Although they were not all caught on video, Mr. Brock admonished others to respect the Senate Gallery on several occasions.

After exiting the Senate Gallery peacefully, Mr. Brock eventually found his way to a law enforcement officer and asked to be escorted out of the building. The officer obliged and accompanied Mr. Brock to an exit where he willingly left the Capitol. On his way out, Mr. Brock encountered a shirtless man behaving aggressively towards a line of police. On CCTV footage, Mr. Brock can be seen placing his arm around the man and gently escorting him away from his confrontation with the police and out the Capitol door.

To be sure, Mr. Brock made many ill-advised statements on social media about the 2020 election. As multiple character references attest, Mr. Brock is a man of passionate convictions. As a combat aviator, he is not immune from the machismo culture that decades in the military can inculcate. And, he is far from the only individual who unburdened themselves on social during that stressful period in our nation's history. However, Mr. Brock respectfully submits that his actions on January 6th should carry more weight than any social media activity.

### d. Avoid Unwarranted Sentencing Disparities

While those who assaulted law enforcement or committed other violent acts on January 6th have rightly received serious sentences, this Court has seen fit to treat other types of defendants more leniently. The following comparator cases should place Mr. Brock's case in the proper context:

### i. *United Stats v. Matthew Wood*, 21-CR-223-APM- Home Confinement for Defendant Convicted of Felony

Mr. Wood entered a straight plea (no agreement) to Obstruction of an Official Proceeding under 18 U.S.C. § 1512 (c) in addition to all of the routinely charged January 6th misdemeanors. ECF 55 at 66. Like Mr. Brock, Mr. Wood left a digital trail of incendiary comments leading up to January 6th. *Id*. at 2. Unlike Mr. Brock, he was one of the first persons to enter the capitol and one of the last to leave (80 minutes inside). *Id*. at 2, 5. Mr. Wood and others chased Capitol

police through the building.  *Id*. at 3.  He "directly pushed against MPD officers attempting to clear the Rotunda."  *Id*. at 4.

Mr. Wood argued for a sentence of home confinement based on, among other things, his lack of violence in the Capitol, humble origins, and strong work history.  ECF 56.  The Court gave Mr. Wood concurrent terms of 36 months' probation with the first 12 months to be served on home confinement.

### ii. *United States v. Nicholas Rodean*, 1:21cr57 – TNM – Home Confinement for Defendant Convicted of Felony

Mr. Rodean entered the Capitol by smashing a window with a flagpole and a metal object.  ECF 67.  He was one of the first to enter the Capitol. He was convicted of felony destruction of property and a collection of misdemeanors following a bench trial.  The Court sentenced him to 6 months of home confinement.  ECF 75.  To be sure, Mr. Rodean had personal mitigating factors which Mr. Brock does not have.[4]  However, Mr. Brock destroyed no property and has his own unique mitigating factors most notably his extraordinary military record.  Taking all these factors into account, the § 3553 calculus for the two men comes out roughly the same.

### iii. January 6th Misdemeanor Cases Where the Government Could Have Charged Obstruction But Did Not

The government's charging decisions in the January 6th cases themselves create unwarranted disparities between defendants with similar conduct and criminal histories.  For the most part, the government did not bring felony charges against persons who entered the Capitol building but did not assault police or destroy property.  Many of these defendants did not receive

---

[4] https://www.politico.com/news/2022/10/26/jan-6-rioter-gets-probation-not-prison-after-judge-finds-autism-played-a-role-00063588

13

any jail or prison.  However, under the obstruction theory the government advanced in this Court and is currently defending before the Circuit Court, such persons could certainly have been charged with Obstruction of an Official Proceeding, triggering sentencing guidelines of years in prison.  After all, they were part of the group of persons whose entry of the Capitol interrupted the "official proceeding" of the vote certification.

It is undisputed that Mr. Brock did not destroy property or assault police, yet he has received a felony obstruction charge.  The government's reasoning for this decision was that Mr. Brock entered the Senate gallery, which the government views as a significant aggravating factor.  The government does not dispute that Mr. Brock entered the gallery after the proceedings had already adjourned or that he did not damage property in the gallery.  In the government's view, his mere presence in that section of the Capitol justifies charging him differently than those who occupied other parts of the Capitol.

Mr. Brock submits that giving persons who entered other parts of the Capitol misdemeanors with no jail while those who nonviolently entered the Senate Chamber get felonies and (if the government has its way) years in jail is an unwarranted disparity.  Assessing a downward variance in favor of Mr. Brock would bring his case into more of a rational relation with misdemeanor defendants whose culpability is not all that much less than his and whose personal mitigating factors may be much less weighty.

### iv.  Other Protest Activity in 2020/21

As the Court will recall, substantial protest activity occurred in the United States throughout 2020 involving participants from across the political spectrum.  Many observers have noted that the January 6th defendants seem to have been prosecuted more harshly than protestors motivated by "liberal" causes more closely associated with the current Presidential administration such as

14

police reform.  The most comparable cases are the prosecutions (or lack thereof) stemming from riots at the Hatfield Federal Courthouse in Portland Oregon in 2020.  Portland's federal courthouse was the focus of intense protest activity for more than 90 consecutive nights[5] following the death of George Floyd during a police encounter in Minnesota.  In one court filing, the government described the protests as follows:

> [The protests] [w]ere followed by nightly criminal activity in the form of vandalism, destruction of property, looting, arson, and assault. One violent event impacting federal property occurred on May 28, 2020, when the Portland Field Office for the Immigration and Customs Enforcement (ICE) was targeted by a Molotov cocktail. The Mark O Hatfield Courthouse has experienced significant damage to the façade, glass, and building fixtures during the weeks following this incident. Additionally, mounted building security cameras and access control devices have been vandalized or stolen. The most recent repair estimate for the damage at the Mark O. Hatfield Courthouse is in excess of $50,000. Other federal properties in the area routinely being vandalized include the historic Pioneer Federal Courthouse, the Gus Solomon Courthouse, and the Edith Green Wendall Wyatt Federal Office Building. FPS law enforcement officers, U.S. Marshal Service Deputies and other federal law enforcement officers working in the protection of the Mark O. Hatfield Courthouse have been subjected to assault, threats, aerial fireworks including mortars, high intensity lasers targeting officer's eyes, thrown rocks, bottles and balloons filled with paint, and vulgar language from demonstrators while performing their duties.

*United States v. Bouchard*, 3:20-mj-165 (D.Ore. July 24, 2020), ECF 1-1 at 4-5.  The protests involved thousands gathering on a nightly basis.  *United States v. Judd*, 579 F.Supp.3d 1, 8, *10 (D.D.C. December 28, 2021).  Despite these enormous numbers, federal prosecutors limited themselves to charges against a few dozen persons, mostly involving property destruction or assaulting law enforcement.[6]  Many of these cases were later dismissed or resolved with extremely favorable plea bargains.[7]  A handful of Portland protesters were charged with lesser

---

[5] https://www.justice.gov/usao-or/pr/74-people-facing-federal-charges-crimes-committed-during-portland-demonstrations
[6] *Id*.
[7] https://www.kgw.com/article/news/investigations/portland-protest-cases-dismissed-feds/283-002f01d2-3217-4b12-8725-3fda2cad119f;

offenses. *See, e.g. United States v. Ian Wolf*, 3:20-cr-286, ECF 1 (D. Ore.)(Information charging Creating a Hazard on Federal Property under 41 C.F.R. § 102.74.380(d) and Failing to Obey a Lawful Order under 41 C.F.R. § 102.74.385). The overwhelming majority of the persons involved in the Portland protests were not charged with any offenses. This Court described the federal response to the Portland protests in *Judd* as follows:

> Therein lies a troubling theme that emerges from a wholesale analysis of the Government's decisions in Portland. The Government dismissed 27 cases brought against Portland defendants, including five felony cases. *See generally* Appendix to Def's Mot. Dismissal of one felony case is unusual. Dismissal of five is downright rare and potentially suspicious. Rarely has the Government shown so little interest in vigorously prosecuting those who attack federal officers.

*Judd*, 579 F.Supp.3d at 7. The "appendix" referred to in this passage is attached as Exhibit 2. It is a charge of the various Portland cases and their dispositions.

The extraordinarily lenient treatment afforded to the Portland rioters supports a downward variance for Mr. Brock to avoid an unwarranted disparity. This is particularly necessary because the disparity could reasonably be interpreted to have been created by political bias in the Department of Justice, which is especially odious.

e. **Collateral Consequences of this Case**

This case is not only Mr. Brock's first felony conviction but his first criminal conviction of any kind.[8] As a convicted felon, Mr. Brock will suffer immense social stigma and be prevented from voting or owning firearms. Mr. Brock has long history of civic engagement and responsible use of firearms, so these are significant consequences.

But there are collateral consequences in this case that exceed the normal felony case. As of January 6, 2021, Mr. Brock was working as a commercial airline pilot. PSR ¶ 98. The FAA

---

[8] A disorderly conduct misdemeanor in 2014 was deferred and then dismissed.

16

revoked all his licenses in March 2021 as a result of this case, stating that Mr. Brock "pose[d], or are suspected of posing, a risk of air piracy or terrorism, or a threat to airline or passenger safety." *Id*. Mr. Brock was therefore forced to abandon a career that he loved and was uniquely qualified for.

At age 53 Mr. Brock went back to school to start a new career as a home inspector. Despite the unfortunate circumstances, Mr. Brock threw himself into his new trade with characteristic aplomb. As his stepfather has written to the Court:

> Despite the trauma of the past two years Larry has done a remarkable job of building a new business. He started a real estate inspection company and has worked very hard in establishing himself in that market with the intent of being able to support himself and his son.

Ex. 1.

Although Mr. Brock has made a success of his new calling, his income and standard of living have taken an unavoidable hit. His income has dropped from $14,000 per month as a commercial airline pilot (PRS ¶ 100) to just over $5,000 per month as a home inspector (PSR ¶ 97). Most unfortunately, Mr. Brock's vast experience as an aviator is going to waste.

In addition to losing his career as a pilot, the Air Force Academy's Association of Graduates "AOG" has revoked Mr. Brock's membership. He will be unable to attend any future AOG functions commemorating the service academy which held such a special place in his life and career.

Finally, Mr. Brock has already been forced to endure conditions of pretrial supervision far beyond what was warranted. At the start of the case, the government sought to have Mr. Brock detained. An out-of-district judge refused detention but put Mr. Brock on house arrest. Mr. Brock remained on house arrest status for seven months before this Court agreed to relax his conditions (Mr. Brock has subsequently shown that this Court's trust in him was not misplaced).

Thus, before even getting to sentencing, Mr. Brock has served a term of home confinement comparable to some post-sentencing felony defendants such as the *Wood* and *Rodean* cases discussed above.

In sum, the collateral consequences to Mr. Brock have been far above the typical felony case and support a downward variant sentence.

### f. General Deterrence

As has been widely reported, over 800 people have been prosecuted for their roles on January 6th. Their sentences have ranged from probation to years in prison. Their cases have been widely reported in the media, as have judges' comments about the seriousness of the cases. Such a large lumber of related cases gives this Court more flexibility to show measured leniency in cases with significant mitigation without sacrificing much in the way of general deterrence.

### g. Specific Deterrence

As mentioned above, January 6th was a unique historical event stemming from a confluence of unique factors unlikely to be repeated. Most of the January 6th defendants likely had little or no criminal history and Mr. Brock in particular is notable for his long history of respect for the law. We submit that specific deterrence need not be a driving factor in this sentencing.

## IV. Conclusion

For the foregoing reasons, Mr. Brock requests a sentence home incarceration for an appropriate period of time.

Respectfully submitted,
By: */s/ Charles Burnham*
Charles Burnham
D. Md. Bar 12511
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 265-2173 (fax)
charles@burnhamgorokhov.com

'

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this filing has been served on opposing counsel by email.

> By: */s/ Charles Burnham*
> Charles Burnham
> D. Md. Bar 12511
> *Attorney for Defendant*
> BURNHAM & GOROKHOV, PLLC
> 1424 K Street NW, Suite 500
> Washington, DC 20005
> (202) 386-6920 (phone)
> (202) 265-2173 (fax)
> Charles@burnhamgorokhov.com